UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., ET AL.<br>        Plaintiffs, )<br> )<br>    and )<br> )<br> )<br>JUANCHENG KANGTAI CHEMICAL CO., LTD. )<br>AND HEZE HUAYI CHEMICAL CO., LTD., )<br>        Consolidated Plaintiffs, )<br> )<br> )<br>    v. )<br> )<br>UNITED STATES, )<br>        Defendant, )<br> )<br>    and )<br> )<br>BIO-LAB, INC., ET AL;  JUANCHENG KANGTAI )<br>CHEMICAL CO., LTD. ET AL. )<br>        Defendant-Intervenors and )<br>        Consolidated Defendant-Intervenors.. )<br> ) | Consol.  Ct No. 24-00024 |

**PLAINTIFFS' RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION
FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinhui Wang
**deKieffer & Horgan, PLLC**
Suite 1101
1156 Fifteenth Street, N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs*

Dated: July 16, 2024

# TABLE OF CONTENTS

I.       RULE 56.2 STATEMENT ................................................................... 1

      A.    Administrative Determination Subject to Appeal ........................... 1

      B.    Issues Presented ........................................................................... 1

II.     Standards of Review ................................................................................ 2

III.    ARGUMENT ............................................................................................. 4

      A.    The Department's Decision that it Could Consider Romania as a Primary Surrogate Country is Arbitrary and Capricious ............................................. 4

      B.    The Department's Decision that Romania Sources the Best Available Information Is Not Supported by Substantial Evidence ............................. 12

             1.    Malaysia Sources the Best Available Information for Financial Ratios ........................................................................................... 12

             2.    Malaysia Sources the Best Available Information for Chlorine..... 14

             3.    Malaysia Sources the Best Available Information for Labor ......... 21

IV.    Conclusion and Prayer for Relief .......................................................... 23

i

# TABLE OF AUTHORITIES

## Cases

*Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295 (2006)...............................4

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)................................. 3, 18-19

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (Ct. Int'l Trade 2003). ............................ 3-4, 17

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)....................................2, 11

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)........................................3

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (Ct. Int'l Trade 1983).................3

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262 (CIT 2006)........................................4

*Evonik Rexim (Nanning) Pharm. Co. v. United States*, 253 F. Supp. 3d 1364, 1375 (Ct. Int'l Trade 2017)...............................................................................................................................14

*Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006) ......4

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323 (2006)..........................................4

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1361-1362 (April 19, 2018)...........19

*Juancheng Kangtai Chem. Co., Ltd. v. United States, SLIP OP. 2015-93, Slip Op. 15-93, 2015 WL 4999476, at \*25 (CIT Aug. 21, 2015)* .............................................................................. 19-20

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) ...............................21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29  (1983).......................2

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ........................17

*Peer Bearing Company-Changshan v. United States*, 752 F. Supp. 2d 1353 (January 28, 2011) 18

*Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, F. Supp. 2d 1354 (1999), aff'd, 268 F.3d 1376 (Fed. Cir. 2001)....................................................................18

*Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004)....................................................................................................................17

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001).......................................... 2, 9-10

*SNR Roulements v. United States*, 402 F.3d 1358 (Fed Cir. 2005)................................................2

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................3

*Vinh Hoan Corp. v. United States*, 2015 Ct. Intl. Trade LEXIS 156, *81 (2015)........................23

**Statutes & Regulations**

19 U.S.C. § 1516a(b) ...........................................................................................................2

19 U.S.C. § 1677b(c)(1).................................................................................................3, 17

19 CFR § 351.301(c)(3)....................................................................................................10

**Administrative Decisions**

*Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 21,195 (May 5, 2017).......20

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assemble, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*, 83 Fed. Reg. 248 (December 28, 2018) ....................................20

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019*, 86 Fed. Reg. 58,871 (October 25, 2021) .....20

*Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Comm. Nov. 9, 2012)...13

*Fresh Garlic Final Results and Final Rescission of the 20th Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 39,897 (June 20, 2016)............................................................9

*Pure Magnesium Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 94 (January 2, 2024).........................................................................................................9

*Steel Racks and Parts Thereof From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 7,326 (March 4, 2019) ...............8

*Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78 Fed. Reg. 28,803 (May 16, 2013) .....13

*Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; and Partial Rescission; 2020-2022*, 88 FR 62539 (September 12, 2023) ...........................................22

## I.    RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), Plaintiffs Heze Hauyi Chemical Co., Ltd. ("Heze Huayi") and Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") (collectively, "Plaintiffs") hereby state the administrative decision subject to appeal and the issues of law presented:

### A.  Administrative Determinations Subject to Appeal

The U.S. Department of Commerce (the "Department") published its contested final results in the Federal Register on January 4, 2024.  *See Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2021-2022,* 89 Fed. Reg. 455 (January 4, 2024), *incorporating* Issues & Decision Memorandum ("IDM").  Kangtai and Heze Huayi were assigned an assessment and deposit rate of 73.84% and 50.27%, respectively as a result of those final results.

### B.  Issues Presented

1.    <u>Issue One</u>: Whether the Department's consideration of Romania as a potential primary surrogate country is arbitrary and capricious?

2.    <u>Issue Two</u>: Whether the Department's selection of Romania as the primary surrogate country unsupported by substantial evidence?

3.    <u>Issue Three</u>:  Whether the Department's choice of surrogate value for chlorine was unsupported by substantial evidence and contrary to practice?

## II.    Standards of Review

This Court "shall hold unlawful any determination . . . found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with law.[1]  Different standards of review are applicable to the issues in this case.

### A.  Arbitrary & Capricious Standard

This Court will hold as unlawful any administrative decision that is arbitrary, capricious, or an abuse of discretion.  *See* 19 U.S.C. § 1516a(b)(l)(A).  Normally, an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Moreover, Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration, quotation marks and citation omitted).  An agency "must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463 U.S. at 48 (citations omitted).  Thus, when the administering agency's actions are internally inconsistent and self-contradictory, and the agency treats similarly situated parties differently or

---

[1] 19 U.S.C. § 1516a(b)(1)(B)(i); *accord SNR Roulements v. United States*, 402 F.3d 1358, 1361 (Fed Cir. 2005).

fails to consider an important aspect of a problem, the agency's decisions are arbitrary and capricious and subject to reversal.

### B.    Substantial Evidence Standard for Non-Market Economy Cases

"[S]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."[3]  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'"[4]

In cases involving non-market-economy ("NME") countries, although "the standard of review precludes the court from determining whether Department's choice of surrogate value was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices."[5]  While the statute "'grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis.' . . . [t]his discretion . . . is constrained by the underlying objective of [19 U.S.C. § 1677b(c)]; to obtain the most accurate dumping margins possible.[6]  "'This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents.'"[7]

---

[2] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (*quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)).
[3] *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).
[4] *Diversified Products Corp. v. United States*, 6 CIT 155, 161, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).
[5] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct. Int'l Trade 2003).
[6] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 365 (Ct. Int'l Trade 2003) n.12 (citations omitted).
[7] *Id.* (citations omitted).

The courts have elaborated on the meaning of "best available" in the NME normal value statute.  The *Dorbest* court wrote a seminal opinion summarizing the law:

> The term "best available" is one of comparison, i.e., the statute requires Commerce to select, from the information before it the best data for calculating an accurate dumping margin.  The term "best" means "excelling all others."  II Oxford English Dictionary 139 (2d 1989); Webster's II new Riverside University Dictionary 168 (1988) ("{e}xceeding all others in excellence, achievement, or quality").  This "best" choice is ascertained by examining and comparing the advantages and disadvantages of using certain data as opposed to other data.

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262, 1268 (CIT 2006) ("*Dorbest*"), *citing Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006).  The *Dorbest* Court thus concluded that "{o}n factual issues, the court's role 'is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'"  *Dorbest* at 1269, *citing Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (2006) (add'l citations omitted).

According to *Dorbest*, "Commerce needs to justify its selection of data with a reasoned explanation."  *Dorbest* at 1269 (citation omitted).  The *Dorbest* Court further cautioned that {i}n doing so, Commerce must 'conduct a fair comparison of the data sets on the record' with regard to its announced method or criteria."  *Id*., citing *Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295, 1313-14 (2006).  Finally, *Dorbest* warned:  "Commerce's findings or conclusions rendered in equations or numeric form are not beyond scrutiny."  *Id*.

## III.    ARGUMENT

### A.    The Department's Decision that it Could Consider Romania as a Primary Surrogate Country is Arbitrary and Capricious.

The Department relied upon Romania as the primary surrogate country in the this review.  However, Romania was not timely suggested as a potential surrogate country by any party.

Petitioner only suggested Romania as a potential primary surrogate country in its final surrogate value submission and Preliminary Comments—some 6 months after the surrogate country comment deadline.  Accordingly, Romania cannot be relied upon as a primary surrogate country and the Department's final results are arbitrary and capricious because they ignored these deadlines and the Department's normal policy with respect to surrogate country deadlines.

In cases involving a non-market economy ("NME") country Order, the Department does not use respondents' actual cost records to value its inputs, home market sales, and financial statements for the purposes of calculating the normal value (a special form of constructed value particular to nonmarket economy investigations).  Rather, the Department selects surrogate values from a surrogate country.  The Department will normally rely on a single primary surrogate country and rely on costs for inputs, energy, financial ratios, etc. sourced from this surrogate country to calculate the normal value.  There are four main deadlines involving surrogate values:  The GNI list of Economically Comparable Country comment deadline, surrogate country deadline, the initial surrogate value deadline, and final surrogate value deadline.  Each of these deadlines also has rebuttal deadlines.

On November 14, 2022, the Department set deadlines to comment on the level of economic development, comment on the potential surrogate country, and initial surrogate value deadlines. *See* Dep't SC/SV Memo, PR34.  The Department specifically stated that "[t]herefore, comments on surrogate country selection must be submitted to Commerce no later than EST, 5:00 pm, December 2, 2022, so that Commerce may have an opportunity to consider these comments for the preliminary results" and specified that such comments should include information on significant production of comparable merchandise, quality and availability of data for major inputs, and quality and available of data for financials. *Id.*  This is commonly

understood to be the deadline to suggest the surrogate country or countries that a party may advocate for, in part due to the reference to significant production that must also come from an economically comparable country. On December 2, 2022, Respondents timely filed comments suggesting Malaysia should be selected as the primary surrogate country, and submitted information on significant production in Malaysia and comments on data availability. PR40. Then on the subsequent preliminary surrogate value deadline, Respondents submitted surrogate values for Malaysia for all inputs.

On December 2, 2022, the surrogate country deadline, Petitioners submitted only that *Mexico* should be selected as the primary surrogate country. *See* Pet. SC Cmts, PR41. In their November 22, 2022 comments on the surrogate country list, Petitioners also only suggested Mexico as a potential surrogate country. *See* Pet. GNI Cmts, PR36. In neither of these comments did Petitioners make any suggestion that Romania or any other country should be selected. By the surrogate country comment deadline, Petitioners provided no information that Romania is a significant producer of comparable merchandise and provided no information on the quality or availability of data in Romania. In fact, by this deadline, Petitioners only submitted information that Romania does *not* produce any identical merchandise. Petitioners failed to suggest Romania as a potential surrogate country by the December 2, 2022 deadline. These deadlines are important as a policy and practical matter because substantial research must be done to evaluate other litigant's proposed potential surrogate countries within the months remaining before the final surrogate value deadline.

Only in its preliminary surrogate value submission did Petitioners make any mention that Romania may be relied upon in any respect, but not only was this suggestion untimely, but it was also incomplete. *See* Pet. Prelim. SVs (December 19, 2022), PR45. In this submission,

Petitioners again suggested that the Department should rely on Mexico and submitted a Mexico surrogate value record.  At the very end of the cover letter, Petitioners merely said "[i]n the event, however, that Commerce departs from the use of Mexico with respect to any of the surrogate values, there is actual production of chlorine, caustic soda, and downstream derivatives in Romania. The Romanian surrogate value data attached to this letter consist of the following:." *Id*. at page 4.  Petitioners then merely attached the financial statement from a Romanian company, Chimcomplex.

Petitioners provided no other Romanian surrogate value information in this submission. Petitioners did not even actually suggest that Romania should be selected as a primary surrogate country, but only stated that some surrogate values could be selected from Romania and then only submitted financial data.  Apart from being untimely and highly prejudicial, this cannot reasonably be considered a surrogate country suggestion, given it did not actually suggest Romania as a primary surrogate country and provided no information on Romania's production of comparable merchandise or  quality and availability of data for primary inputs.  Even if this is considered a surrogate country suggestion, it was untimely as surrogate country comments were due on December 2, 2022.  It was only on the absolute latest deadline to submit any surrogate value data, May 31, 2024, that petitioner made any mention that Romania should be relied upon and only then did petitioner submit a Romanian surrogate value record.

In response to Respondent's arguments that Romania was not timely submitted as a potential surrogate country, the Department merely said that the Romanian surrogate value data was timely submitted by the final 30-day surrogate value deadline.  Final IDM at Comment 3. Respondents do not contest that parties could submit Romanian data, or indeed any surrogate value data, to the record up to the 30-day surrogate value deadline.  But this is completely

separate from whether Romania could be considered as a primary surrogate country. Petitioner utterly missed that deadline, thus while Romanian data could be submitted as secondary surrogate data or corroborating data, Romania could not be relied upon as a primary surrogate country.

The Department did not actually address this argument in its Final Results. The Department cites to the *Steel Racks from China Investigation* and noted that the Department relied on Romanian data submitted at the 30-day final surrogate value deadline. Final IDM at Comment 3. However, in that investigation, Respondent Dongsheng had timely submitted at the surrogate country deadline that Romania should be selected as a primary surrogate country. *Steel Racks and Parts Thereof From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 7,326 (March 4, 2019) and accompanying Prelim. IDM at 10. Dongsheng also then submitted Romanian surrogate values at both the preliminary and final surrogate value deadlines. The facts of that case are in stark opposite posture to this review and in fact only support Respondent's argument that potential surrogate countries must be submitted by the surrogate country deadline set by the Department. Petitioner and the Department have provided no example of when a party failed to suggest a surrogate country by the surrogate country deadline and was then allowed to untimely submit a surrogate country on the final surrogate value deadline.

In contrast, Respondents have provided examples of the Department following the deadline it set and rejected other untimely suggested surrogate countries. In a review of *Fresh Garlic from China*, the Department rejected consideration of Mexico, stating:

> Our decision to reject Xinboda's untimely filing with SC information is consistent with our factual information regulations and was in accordance with the law. As we stated in the Preliminary Results, we established deadlines for SC information so that we may consider the SV information from economically comparable

countries in a timely fashion. Xinboda's argument that the Department "has never treated the surrogate country comment deadline as an actual deadline to information related to the surrogate country selection," is not accurate and does not show requisite understanding of what is required to analyze the SV information at the appropriate stage in an administrative proceeding. The Department intentionally set deadlines for comments on the OP List and relating to SC selection to be early in the proceeding.

*Fresh Garlic Final Results and Final Rescission of the 20th Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 39,897 (June 20, 2016) and accompanying IDM at Comment 2. In that case, Xinboda attempted to submit an alternative surrogate country due to intervening information on economic comparability that became available only *after* the surrogate country and OP list comment deadline, but it was still rejected as untimely. In this review, Petitioner had no reason not to suggest Romania at the initial deadline. Petitioner knew Mexico was not on the GNI list and had every opportunity to timely submit an alternative surrogate country that *was* on the country list by the December 2, 2022 deadline, including Romania, but failed to do so.

In another case, the Department did not reject information from another surrogate country, but agreed that consideration of the country as a primary surrogate country was barred as untimely:

> Because the record remained open to the submission of alternate surrogate value information subsequent to the *Preliminary Results*, the submission of Ukrainian FOP data itself was not untimely or inappropriate. However, we agree with Petitioner that the consideration of Ukraine as a potential surrogate country for the first time at the briefing stage of the instant review, is exactly the type of scenario considered in and found to "create undue administrative difficulties" and be "potentially unfair to the parties."

*Pure Magnesium Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 94 (January 2, 2024) and accompanying IDM at Comment 1 (discussing that Ukraine was not suggested at the surrogate country deadline). Accordingly, given the established deadline and the Department's practice, it is arbitrary for the Department to consider Romania as a primary surrogate country. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (It is

well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").

Further, the Department's concern that it would be potentially unfair to the parties to consider an untimely submitted surrogate country is absolutely the case in this review. As described above, while Petitioners for the first time mentioned Romania in their preliminary surrogate value submission (which was already untimely to suggest a surrogate country), Petitioners did not actually even suggest Romania in that submission. Petitioners only suggested that certain surrogate values may be sourced from Romania and then supplied only a financial statement. Respondents were absolutely not on notice that Petitioners would be suggesting Romania as a primary surrogate country and submitting a full slate of surrogate values to value other raw materials, energy, etc. Only in Petitioners' *final* surrogate value submission did Petitioners for the first time actually suggest Romania as an alternative surrogate value and submit factors of production for Romania. Pet. Prelim Cmts & Final SVs (May 31, 2023), PR78. This was the final deadline to submit any surrogate value to the record. After this deadline, under the regulation, no party can submit alternative values. 19 CFR § 351.301(c)(3)(ii) & (iv).

In other words, when Petitioners finally actually suggested Romania and placed Romanian surrogate value information on the record, Respondents were barred under the regulation to submit any alternative Romania surrogate values or value information relevant to the Romanian surrogate values (such as chlorine values in the other surrogate countries as described below to make an aberrancy argument). Respondents could only submit rebuttal information, but were expressly barred from submitting surrogate values in rebuttal, which is highly limiting and prejudicial in this case. 19 CFR § 351.301(c)(3)(iv) (In rebuttal, "[a]n

interested party may not submit additional, previously absent-from-the-record alternative surrogate value information under this subsection.”).

Accordingly, not only was Romania untimely submitted as a surrogate country, but Respondents were unfairly prejudiced by the consideration of Romania at this late date. Respondents submitted Malaysia in the original surrogate country deadline and surrogate value deadline, providing Petitioner the opportunity to know the surrogate country they were submitting, see the surrogate values submitted, and submit alternative surrogate values and information at multiple stages over a period of many months.  Respondents were provided no such reasonable opportunity to rebut the Romanian data or country.  The Court should find, consistent with its set deadlines, past practice, and principles of fairness, that Romania was not properly submitted as potential surrogate country on this record.  The Department's reliance on Romania ignores its own deadlines and practice and is thus arbitrary. *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce acts arbitrarily and capriciously when it “consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice.").  Malaysia was the only timely submitted surrogate country that is economically comparable to China.  The Court should thus find that the Department must select Malaysia as the primary surrogate country because it is the only country that fulfills all of the Department's requirements for a primary surrogate country.  Otherwise, NME cases will descend into chaos as parties conclude that they can hide and withhold surrogate country and data until the last minute when meaningful rebuttal is highly limited.  This is the opposite of the policy goals advanced in the 2013 Amendments meant to bring order and impose a reasonable set of deadlines for the submission of surrogate data related pleadings; and for Commerce to administer same.

11

**B.**    **The Department's Decision that Romania Sources the Best Available Information Is Not Supported by Substantial Evidence.**

The Court should find that the Department's reliance on Romania is unlawful because it was not timely submitted.  While this reason alone is fully adequate to reject Romania, Romania also does not source the best available information.  Substantial evidence on the record supports that Malaysia sources the best available information.  Malaysia sources superior surrogate data for financial ratios, chlorine, and labor.  In the Final Results, the Department acknowledges that its practice is to prefer relying on a surrogate country with multiple financial statements but says this only applies when the "overall quality of the remaining SVs of the two competing countries are considered equal." Final IDM at Comment 2.  The Department then claims that the labor rate was unreliable in Malaysia and had a less preferable water rate.  *Id*.  However, Malaysia does source not only a reliable labor rate, but a more specific and contemporaneous labor rate than Romania.  Further, Malaysia sources the best available information for a primary raw material, chlorine.  Accordingly, Malaysia is not only superior for financial ratios, but is also superior to Romania with respect to the other inputs.  Critically, the Department has a long-standing practice of considering financial ratios to be one of the most important considerations in selecting a primary surrogate country.  In other words, according to the Department's practice, the superiority of the Malaysia financial ratios actually outweighs other surrogate data. It is no wonder why:  the factory overhead ratio and SG&A ratio are multipliers applied to the cost of production build up based on all the other surrogate factors for raw materials and energy.  The profit ratio is applied in a final step to all of the above.

**1.**    **Malaysia Sources the Best Available Information for Financial Ratios.**

In this review, the Department found that that Malaysia sourced financial statements from two Malaysia companies, CCM and Malay-Sino, that are producers of comparable merchandise

Final IDM at 20; *see also* Prelim. IDM at 32, PR93.  The Department also found that the sole Romanian company, Chimcomplex, also produced comparable merchandise.  However, the Department failed to properly consider the importance not only of Malaysia sourcing more financial statements than Romania, but also the relative quality of the statements in each country.

The Department has often made surrogate country determinations based on the comparability and quantity of financial statements.  *See Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Comm. Nov. 9, 2012), and accompanying *IDM* at Cmt. 1F (after preliminarily finding Thailand to be the most suitable surrogate country, the Department changed its position in the final results, selecting the Philippines because multiple Philippines financial statements provided a broader market average than the sole Thai statement, satisfying the Department's "preference for using multiple financial statements."); This preference is based on the Department's understanding that there may be certain cost distortions in one company's financial situation, so using multiple financial statements reduces the potential for such distortions in the comparable industry and more assuredly leads to the critical "accuracy" of the margin calculations that is a foundational goal of the applicable statute. *See, e.g., See Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78 Fed. Reg. 28,803 (May 16, 2013) and accompanying *Issues & Decision Memo* at Cmt. 1D (expounding on its policy and the reasons multiple financial statement are preferable and more representative of capital costs). Malaysia sources multiple financial statements from comparable producers while the record only has one Romanian financial statement.  Accordingly, under Department practice, the Department should find that Malaysia sources superior financial data.

13

The Malaysian financials are also more comparable than the sole Romanian financial. CCM, a Malaysian chlor-alkali manufacturer, produces calcium hypochlorite.  Resp. Final SVs at Exhibit 12, PR69-72.  This company is <u>only</u> engaged in the same industry, i.e., chlor-alkali manufacturing, and is therefore far more comparable than the financial statements from other countries.  Malay-Sino produces sodium hypochlorite.  *Id*. at 13.  This company is also <u>only</u> engaged in the production of chlor-alkali products and is therefore highly comparable.  In contrast, Chimcomplex produces several chemicals that are not in the chlor-alkali industry, including macromolecular products, organic synthesis products (such as polyethers used to make foam mattress), demineralized water, and other oxo-alcohols.  Pet. Prelim Cmts & Final SVs at Exhibit 12, PR78.  The Department should have concluded that the Malaysian companies are more comparable.  *Evonik Rexim (Nanning) Pharm. Co. v. United States*, 253 F. Supp. 3d 1364, 1375 (Ct. Int'l Trade 2017) ("The Department normally engages in a three-part analysis to determine whether the company in question produces 'comparable merchandise,' focusing on physical characteristics, end uses, and production processes.  Commerce also has a practice of selecting financial information from producers who have production experience similar to the respondent.").  Thus, Malaysia offers superior financials both in quality and quantity.

## 2.    Malaysia Sources the Best Available Information for Chlorine.

The Department relied upon Romania as the primary surrogate country and the Romanian import value for chlorine in particular, a very significant input for the subject merchandise, as recognized throughout past reviews.  However, an analysis of the Romanian import value for chlorine shows abnormalities and renders it an unreliable surrogate value for chlorine. Specifically, a number of imports for Romania have no quantity reported, the monthly AUVs for this commodity base industrial chemical vary dramatically for no logical reason, the Romanian

import quantity is low, and the Romanian price is many times higher than the other record values for chlorine.

First, the Romanian imports are not reliable because there are a number of imports with "0" reported for the quantity.  *See* Prelim. SVs at tab "Romania GTA Imports" PR97-98.  The Department dismisses this as an issue, suggesting that the presence of "0" quantities must mean that the quantity was just very low.  Final IDM at 26.  However, this presumption is not supported by the record because the associated value for these imports is not small.  7% of the total import value for Romania was from these "0" quantity lines, this is a significant amount and undermines the Department's presumption that the "0" is from rounding.  Further, the value of a number of these monthly totals is higher than other monthly totals that had a reported associated quantity, so this concern cannot reasonably be dismissed as rounding.  The data is missing quantity for a number of imports, and this alone should render the data unusable.  Moreover, if the quantity is missing for some months, it is uncertain whether some other quantity is distorted or missing elsewhere in this dataset for chlorine.  This dataset is on a monthly total basis by country.  For the months with substantially higher AUVs, it is very likely that there are partial transactions with zero reported quantity contributing to this higher AUV.  Indeed, the other issues with the Romanian chlorine import value and quantity corroborate that there is an issue with imports.

The AUVs for the Romanian imports vary widely with no logic for the variance.  The Romanian import values range from 138 Euro/T to 58,920 Euro/T.  Resp. Case Brief at Attachment, PR113-114.  It is not uncommon that a small quantity of imports is more expensive than a large quantity of imports for a variety of business reasons, such as buying and shipping in bulk is less expensive or smaller quantity chemicals may be more rare and used for lab testing

rather than commercial purposes.  However, the Romanian import data's widely ranging AUVs do not follow this general understanding of input surrogate value analysis.  The widely ranging AUVs are throughout the dataset, from the higher quantity to the lower quantity imports.  In contrast, the Mexican import AUVs are very consistent[8] and the Malaysian import AUVs are logically connected to quantity[9].  The Romanian dataset AUVs are illogical, suggesting something profoundly unreliable in the dataset, such as imports of something other than commercial chlorine.  This is further underscored by the low quantity of imports into Romania and the dramatically higher pricing into Romania.

Romania imported 413 tons of chlorine during the POR.  In contrast, Malaysia imported 12,020 tons and Mexico imported 16,300 tons.  Resp. Prelim. SVs at Exhibit 2, PR86-87; Pet. Prelim. SVs at Exhibit 2, PR45; *see also* Resp. Final SVs at Exhibit 5 (Mexican monthly import statistics), PR69-72.  While Respondents *alone* consumed more chlorine than all countries imported, the import quantities into Malaysia and Mexico are in range with their purchases and representative of commercial quantities.  Heze Huayi Section D at Exhibit D-9, PR32 CR9; *see also* Kangtai Section D at Exhibit D-9, PR33 CR21. Therefore, these small imports by Romania are not possible for use in the commercial production of the subject merchandise; and hence are not representative.

Although the Department is given discretion in selecting factors of production, that discretion is constrained by the underlying objective to calculate the most accurate dumping margins possible and "[t]his objective is achieved only when Commerce's choice of what

---

[8] Mexico import AUVs ranged from 7.27 MXN/KG to 11.22 MXN/KG.  Resp. Final SVs at Exhibit 5, PR69-72.

[9] While the Malaysian AUVs had a larger range of AUVs, they directly correspond to quantity.  The larger quantity AUVs are all low and very close to the overall POR AUV, while there were only some high AUVs with a very low corresponding quantity.  Resp. Prelim. SVs at Exhibit 2, PR86-87.

constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents." *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct. Int'l Trade 2003).  Accordingly, relying on imports into Romania that could not be used in commercial production does not fulfil this objective. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (discussing that while Commerce does not have to perfectly duplicate the production experience of the Chinese manufacturer, Commerce should rely on the surrogate value that "most accurately represents the fair market value of [the respective input] in a hypothetical market-economy.").

Even more telling is the individual monthly totals from various countries into Romania. A normal container load is 20 tons in commercial trade, slightly below the maximum weight allowed for shipping containers.  Even presuming that the monthly totals per country were each in one container, there were very few totals that were large enough for a container load.  In other words, the vast majority of the shipments were less than a container, with a significant amount of imports under 1 ton or even under 0.1 tons (under 100 KG).  *See* Respondents' Case Brief at Attachment 1 (analysis of Romanian imports), PR113-114.  These simply are not commercial shipment sizes for industrial production.  *Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) (Where Commerce erred in failing to establish that the import value relied on was based on a statistically or commercially significant quantity).  The imports by Romania are such a small quantity that they are not for the commercial use in the subject industry, but for other purposes such as high purity samples used in laboratory testing, which render the data unsuitable and not the best available information for a surrogate value for a large scale (or any) chlorinated isocyanurate manufacturer.  *See* 19 U.S.C. § 1677b(c) (Commerce is mandated to use the best available information for the valuation of

factors of production in NME antidumping cases).  In contrast, the Malaysian and Mexican import data had numerous monthly totals in excess of many container loads.  Further, if the non-commercial monthly totals (lines with quantities less than 20 tons) were excluded, then the AUV dramatically changes from 1546 Euro/MT to 799 Euro/MT.  This underscores that the imports into Romania are not a reliable surrogate value for the chlorine used in commercial quantities.

Lastly, the unit value into Romania is many times higher with a quantity many times lower the other record import values:

| Romania | 413.35 tons | $1.88 | USD/KG |
| Malaysia | 12,020.92 tons | $0.31 | USD/KG |
| Mexico | 16,356.90 tons | $0.51 | USD/KG |

The Malaysian and Mexican import values are similar, with similar large commercial quantities imported during the POR.  The Romanian value is 450% higher with a quantity 3400% lower.  *Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States*, 59 F. Supp. 2d 1354, 1360 (1999) (Commerce's "administrative practice with respect to aberrational data is 'to disregard small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other countries.'"); *Peer Bearing Company-Changshan v. United States*, 752 F. Supp. 2d 1353 (January 28, 2011) (finding that substantial evidence did not support relying upon a value 60% higher than other record sources, including countries that were less economically comparable).

The Department largely overlooks this argumentation, stating it would not consider the Mexican comparison because Mexico is not economically comparable and comparing the Romanian data only to Malaysia is not enough to make a conclusion.  Final IDM at Comment 3.  While the Department prefers to make aberrancy analysis on the basis of import data from all surrogate countries, it must still consider all information on the record.  *Atlantic Sugar, Ltd. v.*

*United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) ("[S]ubstantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.").  Respondents also submit that the procedural unfairness of the surrogate value record development must also be considered in this respect.  As explained above, Petitioner failed to timely suggest Romania as a potential surrogate country.  On the preliminary surrogate value deadline, petitioner only submitted one Romanian financial statement.  Petitioner submitted no other Romanian surrogate values at this deadline, including no values for chlorine or any other raw materials.  It was only at the final surrogate value deadline that petitioner submitted any Romanian import values, including this chlorine value.  After this final surrogate value deadline, parties are not permitted to submit any alterative surrogate values.

Accordingly, it was not possible for Respondents to submit all of the comparable surrogate country AUVs in rebuttal to this filing to show aberrancy.  Respondents had no reason to submit such information earlier, as petitioner had made no attempt to submit a Romanian surrogate value record and had not submitted this unreliable or aberrant chlorine value.  Respondents were put at a procedural disadvantage by petitioner's bold strategic delay until the final deadline to submit a Romanian surrogate value record.  Respondents submit such gamesmanship must be considered in evaluating the aberrancy of this chlorine value.

All of these reasons together support a finding that the Romanian import value is unreliable or at a minimum is not the best available information for chlorine on the record.  *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1361-1362 (April 19, 2018) ("'[A] surrogate value must be as representative of the situation in the NME country as is feasible.' Representativeness is important if Commerce is to fulfill its statutory mandate of calculating dumping margins as accurately as possible.") quoting *Juancheng Kangtai Chem. Co., Ltd. v.*

*United States, SLIP OP. 2015-93, Slip Op. 15-93, 2015 WL 4999476*, at *25 (CIT Aug. 21, 2015) (citation omitted). In contrast to the Romanian chlorine value, the Malaysian import value for chlorine is reliable, has quantity for all imports, represents a commercial quantity, and is corroborated by the Mexican import value. Malaysia sources the best available information for this critical input and should be relied upon as the primary surrogate country.

We also submit that even if the Court upholds the reliance on Romania as the primary surrogate country, the Court should find that Malaysia sources the best available information for the key chlorine input. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assemble, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments*, 83 Fed. Reg. 248 (December 28, 2018) and accompanying Prelim. SV Memo at 4 (unchanged in final) (finding the Thai import value for nitrogen was aberrant, and relied on the Bulgarian import value while still relying on Thailand as the primary surrogate country); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019*, 86 Fed. Reg. 58,871 (October 25, 2021) and accompanying IDM at Comment 7 (Relying on Malaysia as the primary surrogate country, but relying on a Turkish value for silver paste "because record information casts doubt on the accuracy of the Malaysian import data for purposes of valuing silver paste."); *Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 21,195 (May 5, 2017) (relying on an import value from another country to value coal tar because record evidence suggested the import value into Thailand was not specific to coal tar).

3.    **Malaysia Sources the Best Available Information for Labor.**

Malaysia also sources the best available information for labor.  In the Final Results, the Department claimed that Malaysia's labor rate was unreliable.  But this not only fails to address the significant issues raised about the Romania labor rate, but misrepresents the Department's approach to Malaysia labor and the misrepresents the findings in the *New American Keg Final Redetermination*.  Due to information on forced labor in the Malaysian electrical and electronics sector (E&E), the Department in the Kegs Remand rejected an overall manufacturing (i.e. a manufacturing rate that includes E&E) Malaysian labor rate as unreliable.  From that case, the Department has continued this practice in other cases.  However, the Malaysia labor rate on this record is not related to the E&E sector, but is specific only to a separate subsector, i.e., chemical manufacturing.  The Department considered this in the Final Results, but stated "we still find that the forced labor in the E&E sector is a large enough share of the overall manufacturing sector to influence the wages in other subsectors of the manufacturing industry, even if we have labor SV information specific to a different sector where widespread unfair labor practices are not present."  Final IDM at 19.  But this conclusion is entirely unsupported by any evidence.  The Department has absolutely no information that the E&E forced labor impacts other subsectors.  As such, this finding is not supported by substantial evidence but is pure speculation.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute substantial evidence.")

The *New American Keg Final Redetermination* can only support a finding that a labor rate that includes the Malaysia E&E sector is unreliable.  The record in that remand only contained an overall manufacturing rate for Malaysia such that it could not be segregated from the electrical and electronics sector industry.  But this record contains a Malaysian labor rate that

is specific to the "Manufacture of chemicals and chemical products." Resp. Final SVs at Exhibit 11, PR69-72. As such, there is no reliability concern with this Malaysian labor rate. Indeed, the Department has relied on this source when specific to other industries (i.e. when not including the electrical and electronics sector) in Malaysia even since the Department started its new understanding earlier this year of the Malaysia labor due to the *Steel Kegs from China* decision. *See*, *e.g.*, *Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; and Partial Rescission; 2020-2022*, 88 FR 62539 (September 12, 2023).

Further, the Malaysian labor rate is superior to the Romanian labor rate because it is definitively specific to not only the manufacturing industry, but also to the manufacture of chemicals. Moreover, the labor rate is reported on a monthly basis and is more precisely contemporaneous to the POR. *Id.* In contrast, the Romanian labor rate is not as contemporaneous and is to not even a manufacturing labor rate at all. Petitioner provided a 2021 annual labor rate for "Industry, construction and services (except public administration, defense, compulsory social security)" Pet. Prelim Cmts & Final SVs at Exhibit 10, PR78. As indicated by the description, this rate is for industry, construction, and services--- this is not a manufacturing-specific labor rate. There is no mention of manufacturing. This labor rate would include construction work and services, and whatever is broadly included in "industry" labor costs. This is not remotely specific to the manufacturing industry at all, much less to the chemical manufacturing industry. The source makes absolutely no mention of "manufacturing" or "chemical" at all. A proper review of the record must lead to a conclusion that the Romania labor value is not a suitable surrogate labor value for manufacturing chemicals, while the Malaysia labor value is reliable, specific, and contemporaneous.

In sum, Romania has less quality financial data and lacks a reliable chlorine value and labor rate.  In contrast, Malaysia sources the best available information for financials, chlorine, and labor .  Malaysia is the country where a reasonable mind would have to conclude that the data is the "best available" to value Kangtai's and Heze's factors of production.  *Vinh Hoan Corp. v. United States*, 2015 Ct. Intl. Trade LEXIS 156, *81 (2015) ("The best primary surrogate country in this case is that provides the best available information for most inputs is Indonesia.").

## IV.    Conclusion and Prayer for Relief

In light of the foregoing, the Department's *Final Results* were not supported by substantial evidence or in accordance with the law.  Plaintiffs respectfully request that the Court remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Judith L. Holdsworth
Vivien Jinghui Wang[**]
**deKieffer & Horgan, PLLC**
Dated:  July 16, 2024                        *Counsel for Plaintiffs*

---

[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **<u>6,950</u>** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth Street., N.W.  20005
Suite 1101
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com

1