**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| BIO-LAB, INC., ET AL. *Plaintiffs*, <br><br> v. <br><br> UNITED STATES, *Defendant,* AND <br><br> JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD., *Defendant-Intervenors.* | Consol. Ct. No.  24-00024 <br><br> **NONCONFIDENTIAL VERSION** <br> Business Proprietary Information Removed from Brackets on Pages 27, 30-31. |

**MEMORANDUM OF LAW AND FACT**
**IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION**
**FOR JUDGEMENT ON THE AGENCY RECORD**

James R. Cannon Jr.
Chase J. Dunn
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W., Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Plaintiffs Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

Date:   July 16, 2024

**Table of Contents**

Page

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 1

   I.  Administrative Determination Under Review ....................................................... 1

   II.  Issues Presented and Summary of Argument .................................................... 1

   III.  Request for Relief ................................................................................................ 3

STATEMENT OF FACTS ........................................................................................... 3

STANDARD OF REVIEW .......................................................................................... 8

ARGUMENT ............................................................................................................... 10

   I.  Commerce Failed to Implement the Twin Requirements of 19 U.S.C. §
      1677b(c)(4) ......................................................................................................... 10

      A. Commerce Ignored Mexico's Production of Identical Merchandise and
         Forced the Surrogate Selection Process to be Based on Per Capita GNI ................ 10

      B. Mexico Provided the Best Available Surrogate Value Information
         Given It Is Economically Comparable to China and Its Produces
         Identical Merchandise .......................................................................................... 13

           1.   Mexico Was at a Level of Economic Development Comparable to China and
              the SC List Countries Based on World Bank Benchmarks..................................... 14

           2.   As the Only Potential Surrogate that Produced Identical Merchandise,
              Mexico Provided the Best Available Surrogate Values........................................... 16

           3.   Commerce's Exclusion of Mexico as a Potential Surrogate Was Inconsistent
              with the Statute .................................................................................................... 18

   II.  The Finding that Calcium and Sodium Hypo Are "Comparable" to Chlor isos is
      Not Supported by Substantial Evidence .......................................................... 20

      A. Legal Framework for Determining Merchandise Comparability ........................... 20

      B. Physical Characteristics ....................................................................................... 20

           1.   CYA is the primary input of Chlor isos and provides a key difference in
              chemical composition ........................................................................................... 20

           2.   Chlor isos are solid whereas sodium hypo is a liquid solution..................... 23

      C. The significant differences in physical characteristics between Chlor
         isos and calcium or sodium hypo create differences in end use .............................. 23

i

D. The Production Process for Chlor isos is Far More Complex Than
Production of Sodium Hypo or Cal Hypo.................................................. 26

1.     Production of Chlor isos is significantly more expense and requires
substantially more workers that production of hypophosphates............................. 27

2.     Production of Chlor isos requires more equipment and processing stages than
production of calcium and sodium hypo................................................................. 28

3.     Production of Chlor isos requires a significantly more complex production
process than that required for calcium or sodium hypo .......................................... 30

E. Conclusion ......................................................................................................... 31

CONCLUSION................................................................................................................... 32

## Table of Authorities

**Page(s)**

**Statutes**

5 U.S.C. § 706 .................................................................................................................9

19 U.S.C. § 1516a(b)(1)(B) ...........................................................................................8-9

19 U.S.C. § 1677b(c) ................................................................................................ *passim*

19 U.S.C. § 1677b(c)(4) ............................................................................................ *passim*

28 U.S.C. § 2640(b) .......................................................................................................8-9

**Court Decisions**

*Ad Hoc Shrimp Trade Action Committee v. United States*, 36 C.I.T. 1557
(2012) ..............................................................................................................................11

*Baoding Mantong Fine Chemistry Co., Ltd. v. United States*, 222 F.
Supp. 3d 1231 (Ct. Int'l Trade 2017) .............................................................................20

*Catfish Farmers of America v. United States*, 2023 WL 4560815, Slip
Op. 23-97 (July 7, 2023) ........................................................................................ 12, 18-19

*Catfish Farmers of America v. United States*, 2024 WL 2843039, Slip
Op. 24-67 (June 5, 2024) ....................................................................................... 12, 18-19

*Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467
U.S. 837 (1984) ................................................................................................................9

*Consol. Edison Corp. v. NLRB*, 305 U.S. 197 (1938) ....................................................9

*Dupont Teijin Films v. United States*, 997 F. Supp. 2d 1338 (Ct. Int'l
Trade 2014) ......................................................................................................................20

*Fujian Lianfu Forestry Co., Ltd. v. United States*, 33 C.I.T. 1056 (2009) ............. 12-13

*Green Farms Seafood Joint Stock Company v. United States*, 2024 WL
1653791, Slip Op. 24-46 (Apr. 17, 2024) ......................................................................19

*Jiaxing Bro. Fastener Co., Ltd. v. United States*, 961 F. Supp. 2d 1323
(Ct. Int'l Trade 2014) .................................................................................................. 11-12

*Loper Bright Ent. v. Raimondo*, 2024 WL 3208360, — S. Ct. — (2024) ............. 1, 9-10

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927 (Fed.

Cir. 1984) .......................................................................................................10

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*, 463 U.S. 29 (1983) ...............................................................................10

*Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F.
Supp. 2d 1339 (Ct. Int'l Trade 2004) ...........................................................20

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir.
2020) .................................................................................................................9

*Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322 (Ct.
Int'l Trade 2010) ...........................................................................................10

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) .........................................9

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...............................9

## **Administrative Determinations**

*Glycine from the People's Republic of China: Final Results of
Antidumping Duty Administrative Review,* 73 Fed. Reg. 55814 (Sept. 26,
2008) ...........................................................................................................21-22

*Chlorinated Isocyanurates from the People's Republic of China:
Preliminary Results of Antidumping Duty Administrative Review; 2020-
2021*, 87 Fed. Reg. 40487 (July 7, 2022) ...............................................15, 17

## **Other Administrative Materials**

S. Rep. No. 100-71 (June 12, 1987) ........................................................ 10-11

H.R. Rep. No. 100-576 (Apr. 20, 1988) ................................................... 10-11

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation (hereinafter "Bio-Lab, IWC, and OxyChem" or "Plaintiffs"), respectfully submit the following memorandum of law and fact in support of their motion for judgment on the agency record.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

Bio-Lab, IWC, and OxyChem are domestic producers of Chlorinated isocyanurates ("Chlor isos") and challenge certain aspects of the final results of Commerce's antidumping duty administrative review of Chlor isos from the People's Republic of China. *See Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 455 (Jan. 4, 2024) ("*Final Results*") (P.R. 127) and accompanying Issues and Decision Memorandum ("IDM") (P.R. 126); *Chlorinated Isocyanurates From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 43271 (July 7, 2023) ("*Preliminary Results*") (P.R. 104) and accompanying Decision Memorandum ("PDM") (P.R. 93).[1]

### II.    Issues Presented and Summary of Argument

1. In non-market economy ("NME") cases, 19 U.S.C. § 1677b(c)(4) calls for Commerce to select a surrogate country that is both economically "comparable" to the country where the subject merchandise is produced and that is also "a significant producer of comparable merchandise."  In this case, Commerce examined the economic comparability of various potential surrogates without addressing whether the potential surrogates also produce identical or comparable merchandise, and presumptively excluded Mexico as a potential surrogate solely because it was not at the "same level" of economic development as China. Is this construction the of statute the "best meaning" of the provision within the teaching of *Loper Bright, infra*?

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__".

1

Because the merchandise subject to this administrative review was imported from China, an NME, Commerce calculated normal value using its factors of production ("FOP") methodology pursuant to 19 U.S.C. § 1677b(c). In this case, Commerce's normal value calculation was significantly distorted by the agency's selection of a surrogate country, Romania, that does not produce identical or comparable merchandise. The record contained ample data with respect to another potential surrogate, Mexico, that is a producer of identical merchandise (*i.e.*, Chlor isos). Instead of evaluating the relative importance of both statutory factors (*i.e.*, economic and merchandise comparability), Commerce instead used economic comparability as a threshold criterion and thus did not consider Mexico's status as a producer of identical merchandise, which is inconsistent with the structure of the statute. In addition, Commerce refused to select Mexico as the primary surrogate because Mexico, although "comparable" to China in terms of economic development, was not at "the same" level of development as other countries and was not on the surrogate country list, again contrary to the express language and structure of the statute. Consequently, Commerce's implementation of § 1677b(c)(4) was contrary to law.

2. To determine that Romania was a "significant producer of comparable merchandise" for purposes of § 1677b(c)(4)(B), Commerce found that calcium hypochlorite ("calcium hypo") and sodium hypochlorite ("sodium hypo") were "comparable" to Chlor isos. However, calcium and sodium hypo have different physical characteristics and end uses and a far less complex production process than Chlor isos. In these circumstances, was Commerce's finding supported by substantial evidence?

Apart from its flawed interpretation of § 1677b(c), Commerce's finding that calcium and sodium hypo are "comparable" to Chlor isos is not supported by substantial evidence. Commerce's analysis particularly failed to account for the importance of CYA as a major input

of Chlor isos, which imparts the essential characteristics of the finished product. Without CYA, Chlor isos do not act as a stabilizer, are not long-lasting in water, and residential swimming pool applications would not account for over 80 percent of sales. Commerce ignored this major difference between Chlor isos and calcium or sodium hypo. It also failed to address the different forms of the products, the different levels of chlorine contained in the products, and the different production processes utilized in the production of Chlor isos and calcium or sodium hypo. As such, Commerce's finding that calcium hypo and sodium hypo are "comparable" to Chlor isos is not supported by substantial evidence using Commerce's standard analytical framework.

## III.    Request for Relief

Plaintiffs request that this Court hold Commerce's *Final Results* unlawful and otherwise unsupported by substantial evidence and remand Commerce's determination with instructions to

(1) consider that Mexico is comparable to China in terms of economic development and analyze whether Mexico is a more appropriate surrogate for purposes of 19 U.S.C. § 1677b(c)(4) because it is a significant producer of Chlor isos identical to the subject merchandise imported from China; and

(2) reconsider the finding that calcium or sodium hypochlorite produced in Romania or any other potential surrogate is "comparable merchandise" for purposes of 19 U.S.C. § 1677b(c)(4) based on the substantial record evidence compiled in the challenged administrative review.

## STATEMENT OF FACTS

Because China is considered an NME in the context of antidumping duty proceedings, it was necessary for Commerce to select an appropriate surrogate market economy to value the Chinese respondents' FOPs pursuant to 19 U.S.C. § 1677b(c). For this purpose, Commerce

3

placed on the record a "*non-exhaustive* list of countries that Commerce has determined, based on per capita Gross National Income ('GNI'), is {sic} at the <u>*same level*</u> of economic development as China." Commerce Memorandum, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information" (Nov. 15, 2022) ("*SC Memo*") (P.R. 34) (emphasis supplied). Interested parties were invited comment on the non-exhaustive list "as a <u>*starting point*</u> for surrogate country selection," and Commerce specifically requested that interested parties "propose for consideration other countries that are at a level of economic development comparable to China." *Id.* at 1 (emphasis added).

Attached to this invitation to comment was a list of six countries that Commerce considered to be at the "same level" of economic development as China. The list was based on the per capita GNI of each country as published by the World Bank. *See id.* at Attachment 1 (Commerce Memorandum, "List of Surrogate Countries for Antidumping Investigations and Reviews from the People's Republic of China" (Aug. 19, 2022) ("*SC List*"). Commerce explained that

> Countries on the case record that are at the <u>*same level*</u> of economic development as China should be given equal consideration for the purposes of selecting a surrogate country. Countries that are not at the same level of economic development as China's, but still at a level of economic development comparable to China, should be selected <u>*only to the extent that data considerations outweigh the difference in levels of economic development*</u>.

*Id.* at 2 (emphasis supplied). In other words, Commerce considered the six *SC List* countries to be equally comparable to China, even though each was different in per-capita GNI than China or the other five countries.

In response to Commerce's request to nominate additional surrogate countries, Plaintiffs submitted evidence showing that Mexico was also economically comparable to China using

various different metrics identified by the World Bank, including per capita GNI. Specifically, Mexico's per capita GNI was (1) only slightly below Turkey's per capita GNI using the Atlas Method (Commerce's preferred methodology), (2) was closer to China's per capita GNI using the purchasing power parity ("PPP") method (the World Banks' alternative metric), and (3) placed Mexico and China in the "Upper Middle Income" income classification:

| Table 1: Economic Comparability Between Mexico, China, and SC List Countries | | | |
|---|---|---|---|
| **Country Name** | **Per Capita GNI 2021 ($USD) (Atlas Method)** | **Per Capita GNI 2021 ($USD) (PPP)** | **World Bank Income Group Classification** |
| Romania | 14,170 | 34,820 | High income |
| Panama | 14,010 | 29,900 | High income |
| Costa Rica | 12,310 | 21,800 | Upper middle income |
| **China** | **11,890** | **19,170** | **Upper middle income** |
| Malaysia | 10,930 | 28,730 | Upper middle income |
| Bulgaria | 10,720 | 26,000 | Upper middle income |
| Turkiye | 9,830 | 30,020 | Upper middle income |
| **Mexico** | **9,380** | **19,540** | **Upper middle income** |

*See* Petitioners, "Comments Concerning the Preliminary Determination" (May 31, 2023) ("*Preliminary Cmts*") (P.R. 78; C.R. 64) at 22 and Exhibit 6 (World Bank statistics); *see also* Petitioners, "Rebuttal Comments on Final Surrogate Value Submission" (June 12, 2023) ("*Preliminary Rebuttal Cmts*") (P.R. 84; C.R. 85-87).

Regarding the production of comparable merchandise, there was no debate that Mexico was the only producer of Chlor isos among the potential surrogates. *See* IDM at Comment 1. In addition, Plaintiffs submitted extensive documentation showing that Chlor isos are not "comparable" to calcium and sodium hypochlorite under Commerce's traditional framework. This evidence included the unique physical characteristics of Chlor isos, the fact that Chlor isos require cyanuric acid ("CYA") to function in their primary end use, and the complex nature of

the production process. *See, e.g.,* Petitioners, "Comments on Surrogate Country List" (Nov. 22, 2022) ("*SC List Cmts*") (P.R.36) at 4-5.

For example, the production of Chlor isos requires CYA, which is an essential input that imparts a key and unique physical characteristic to the finish product. *See* Petitioners, "Comments on Primary Surrogate Country Selection" (Dec. 2, 2022) ("*SC Selection Cmts*") (P.R. 41-43; C.R. 32-34) at 4-5; *see also* Petitioners, "Rebuttal Comments on Primary Surrogate Country Selection" (Dec. 12, 2022) ("*SC Selection Rebuttal Cmts*") (P.R. 44; C.R. 35). CYA is a stabilizer, which contributes to the ability of Chlor isos, particularly Trichloro isocyanurates, to be a long-lasting sources of chlorine in residential swimming pools. *See, e.g.*, *SC Selection Rebuttal Cmts* at Exhibit 3; Petitioners, "Surrogate Value Rebuttal Comments, (Dec. 29, 2022) (P.R. 48; C.R. 36) ("*SV Rebuttal Cmts*") at Exhibit 2. Commerce and the U.S. International Trade Commission ("USITC") define Chlor isos as "derivatives of cyanuric acid," reflecting the importance of CYA to the finished product. PDM at 2; *see also SC Selection Cmts* at Exhibit 1 (USITC Pub 4452) at 7. Indeed, the Chinese producers refer to CYA as "the major material of the subject goods." Letter from Heze Huayi Chemical Co., Ltd., " Section C&D Response" (Nov. 14, 2022) ("*Heze DQR*") (P.R. 32; C.R. 9-20) at 3, 5. Given the importance of CYA as a major raw-material input, it was critical that Commerce select a surrogate with an adequate and representative market for that input.

In contrast, the products which Commerce considered to be "comparable" to Chlor isos (*i.e.*, calcium and sodium hypo) do not include a stabilizer and are not used in the same applications. Indeed, the USITC found that "{a}pproximately 85 to 90 percent of chlorinated isos in the U.S. market are used as residential pool sanitizers." *Preliminary Cmts* at Exhibit 5 (excerpts of *Chlorinated Isocyanurates from China and Japan,* Inv. Nos. 701-TA-501 and 731-

TA-1226 (Final) (November 2014), USITC Pub. 4494 at 21 and II-10). Yet, the record contains no evidence that sodium hypo was used in residential swimming pools and no evidence that a significant volume of calcium hypo is sold in this application or that the product is even well-suited to use in residential swimming pools. In fact, the USITC found that "{a}lthough calhypo, chlorinated isos, and sodium hypochlorite have some degree of overlap in end uses, significant differences exist in their chemical compositions, particularly in the level of available chlorine, as well as the differing non-chlorine inputs involved." *Id.* at 7.

Given the unique nature of Chlor isos, and taking up Commerce's invitation to propose other "comparable" economies, Plaintiffs proposed that Mexico would be the best surrogate country for purposes of this review. Mexico was selected as the primary surrogate in many previous administrative reviews of the antidumping duty order on Chlor isos and had demonstrated production of identical merchandise. *See SC Selection Cmts* at 6-9 (and cases cited therein). Moreover, Mexico was home to an integrated producer of chlorine, caustic soda, and Chlor isos during the POR and therefore provided the most specific and accurate surrogate values for all FOPs. *Id.* at 8-9; *see also* Petitioners, "Initial Surrogate Value Data" (Dec. 19, 2022) ("*SV Cmts*") (P.R. 45-47) at Exhibit 10.

Commerce preliminarily rejected these arguments and selected Romania as the primary surrogate country. *See* PDM at 7-30. Commerce doubled down on its policy of selecting only countries that are on the *SC List*, unless such countries did not provide a reliable source of publicly available surrogate value data. In so doing, Commerce ignored not only that Mexico was in fact economically comparable to China by any metric of economic comparability but also that Mexico was the only potential surrogate that produced Chlor isos. *See* PDM at 22.

Next, having decided on the basis of per capita GNI (Atlas method) that Mexico was not

sufficiently "comparable" for purposes of 19 U.S.C. § 1677b(c)(4)(A), Commerce found that two countries, Romania and Malaysia, produced "comparable merchandise." PDM at 23-25. This finding was based solely on export statistics showing that these countries exported calcium and sodium hypochlorite. *Id.* at 21-25. However, despite the record evidence that calcium and sodium hypochlorite were not "comparable" to Chlor isos in terms of physical characteristics, end use, and production processes, Commerce relied on conclusory statements in its past precedents and found both products to be comparable merchandise. *Id.* at 25-29.

Ultimately, Commerce issued *Final Results* that reiterated its *Preliminary Results*. Notably, however, Commerce did not dispute that Mexico was economically "comparable" to China but nevertheless refused to consider Mexico because it was not at the same level of economic development as the six *GNI-List* countries. *See* IDM at Comment 2. On the same basis, Commerce failed to consider Mexico's comparable economic development together with its production of identical merchandise; instead, Commerce rigidly separated these factors for purposes of applying 19 U.S.C. § 1677b(c). As explained below, this conclusion is inconsistent with the statute and the precedent of this Court. In addition, Commerce found that calcium and sodium hypochlorite were "comparable" to Chlor isos despite evidence that both products did not include CYA and had different physical characteristics, production processes, and end uses. *See* IDM at Comment 1. On this basis, Commerce found that Romania, a producer of sodium hypo, was an appropriate surrogate for China. As also explained below, this conclusion was not supported by substantial record evidence.

## STANDARD OF REVIEW

In appeals of antidumping duty determinations, this Court will hold Commerce's determination unlawful if it is "unsupported by substantial evidence on the record, or otherwise

not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B); *see also* 28 U.S.C. § 2640(b); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) (citing the Administrative Procedures Act at 5 U.S.C. § 706). To determine whether Commerce's interpretation of a statue is in accordance with law, this Court applies the standard of review set forth in the APA. *See, e.g., SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351 n.2 (Fed. Cir. 2020). Under the APA, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Although the courts' legal decision-making formerly followed the two-step framework outlined in *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Supreme Court has recently overruled *Chevron. See Loper Bright Ent. v. Raimondo*, 2024 WL 3208360 at *22, — S. Ct. — (2024). In doing so, the Court explained the interpretive framework as follows:

> The APA…codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment. It specifies that courts, not agencies, will decide "<u>all</u> relevant questions of law" arising on review of agency action, § 706 (emphasis added)—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions.

*Loper Bright*, 2024 WL 3208360 at *12. Stated simply, regardless of any ambiguity in a statute, the Court's duty in applying 5 U.S.C. § 706 is to discern the statute's "best meaning" by "deploying its full interpretive toolkit." *See id.* at *20.

   To determine whether the agency's decision is supported by substantial evidence, the Court examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial

9

evidence is "more than a scintilla" and "must into account whatever in the record fairly detracts from its weight." *Id*. at 477, 488. The substantial evidence standard also requires Commerce to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Tianjin Magnesium Int'l Co. v. United States,* 722 F. Supp. 2d 1322, 1328 (Ct. Int'l Trade 2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, (1983)). In sum, substantial evidence review requires the Court to determine whether the evidence and reasonable, evidence-based inferences support Commerce's findings. *See Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

## ARGUMENT

I.  **Commerce Failed to Implement the Twin Requirements of 19 U.S.C. § 1677b(c)(4)**

A. **Commerce Ignored Mexico's Production of Identical Merchandise and Forced the Surrogate Selection Process to be Based on Per Capita GNI**

Pursuant to 19 U.S.C. § 1677b(c)(4), for purposes of valuing the factors of production in calculating the normal value of merchandise produced in an NME Commerce

> … shall utilize, to the extent possible, the prices of costs of factors of production in one or more market economy countries that are –
>
> (A) at a level of economic development comparable to that of the nonmarket economy country, and
>
> (B) significant producer of comparable merchandise.

The statute plainly does not prioritize economic comparability over merchandise comparability, which is consistent with the legislative history of this provision. Initially, the Senate version of the bill provided for the calculation of normal value using a surrogate value from "the eligible market economy country accounting for the largest volume of U.S. imports of such merchandise." S. Rep. No. 100-71 at 106 (June 12, 1987). "Comparable" merchandise was

to be used only if Commerce encountered "difficulties" obtaining the data and adjustments were to be made based on quality differences. *Id.* at 106. In Conference, this approach was altered and the final version became the two prong test in the current law, adding the requirement that the surrogate country also be "at a level of economic development" comparable to the NME. *See* H.R. Rep. No. 100-576 at 590-91 (Apr. 20, 1988). Consistent with the purpose of the provision to result in representative, surrogate normal value, the House report explains that "Commerce should seek to use, if possible, data based on production of the same general class or kind of merchandise using similar levels of technology and at similar levels of volume as the production subject to investigation." *Id.* at 590. In other words, the focus remained on the accuracy of the values "based on the factors of production utilized in producing the merchandise." *Id.* It follows that Congress intended Commerce to assign as much weight to the comparable merchandise criterion as to the comparable economy criterion.

Commerce has implemented a practice of selecting a surrogate country in Policy Bulletin 04.1. As this Court has recognized, "Commerce's own policy suggests that none of the three surrogate country eligibility criteria—economic comparability, significant production of comparable merchandise, and quality data—is preeminent." *Ad Hoc Shrimp Trade Action Committee v. United States*, 36 C.I.T. 1557, 1566-67 (2012). Indeed, Policy Bulletin 04.1 indicates that that "the relative importance" of each factor "will necessarily vary depending on the specific facts in each case." Policy Bulletin 04.1.

However, in practical fact, Commerce employs a hierarchy with economic comparability at the top. In this and every administrative review, Commerce follows a "four-step process of 'sequential consideration of the statutory elements' to select an appropriate primary surrogate country." *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 961 F. Supp. 2d 1323, 1328 (Ct. Int'l

Trade 2014). Specifically, "Commerce (1) compiles a list of countries at a comparable level of economic development to the subject nonmarket economy based on per capita GNI, (2) ascertains which of the listed countries produce comparable merchandise to the subject merchandise, (3) determines which of the listed countries are significant producers of such merchandise, and (4) evaluates the quality (*i.e.,* reliability and availability) of the data from these countries." *Id.* (citing Policy Bulletin 04.1).

At the crucial first step, Commerce has indicated that it "places primary emphasis on GNI," but it "does not set a fixed range into which a potential surrogate's per capita GNI must fall" because "GNI is a broad indicator spanning over 180 countries and territories, and {} 'an excessive focus on the exact ranking of each country on the list would only provide the illusion of precision and distort the appropriate purpose of using per capita GNI as the primary indicator, which is to give a general sense of the level of economic development of the country in question.'" *Fujian Lianfu Forestry Co., Ltd. v. United States*, 33 C.I.T. 1056, 1077 (2009). In some cases involving "unusual" merchandise, Commerce alters its sequential approach and identifies countries that produce comparable merchandise before considering whether those countries are at a comparable level of economic development to the subject NME. *See* Policy Bulletin 04.1; *Catfish Farmers of America v. United States*, Slip Op. 23-97 at *6 (July 7, 2023).

Despite the seeming flexibility in the surrogate country selection process, Commerce here did place "primary emphasis on GNI," *Fujian Lianfu Forestry*, 33 C.I.T. at 1077, insofar as Commerce treated economic comparability as a threshold criterion rather than balancing the relative importance of economic comparability, merchandise comparability, and data quality. *See* IDM at Comments 1 and 2. Rather than treating GNI as a "broad indicator" it displayed "an excessive focus" on Mexico's per capita GNI, creating exactly the "illusion of precision"

12

foresworn in *Fujian Lianfu Forestry* and ultimately undermining the statutory purpose to select a surrogate that meets both requirements of 19 U.S.C. § 1677b(c)(4) of the Act. *Id.*

### B. Mexico Provided the Best Available Surrogate Value Information Given It Is Economically Comparable to China and Its Produces Identical Merchandise

Commerce's selection of a surrogate country in the *Final Results* is inconsistent with the language and structure of the statute insofar as the agency presumptively excluded countries that were economically comparable to China from consideration simply because they were not included on the SC List. Uncontested record evidence demonstrated that Mexico was economically comparable to China in terms of per capita GNI during the POR, Commerce's preferred benchmark, as well as two other metrics of economic comparability used by the World Bank. Nevertheless, Commerce held that because Mexico was not on the SC List, and therefore not at the "same level" of economic development as China, it would not be considered as a potential surrogate. *See* IDM at Comment 2 (noting Mexico was "not on the SC List because its GNI falls outside the range of countries on the list, and therefore, is not 'at *the same level* of economic development, *even if it is, as the petitioner argues, at a comparable level of economic development* … because *Mexico's GNI is not within the range of GNIs on the SC List, we will not consider Mexico as a possible SC*") (emphasis supplied). By presumptively excluding Mexico from consideration, and by failing to weight the relative importance of both statutory criteria, Commerce misapplied the statutory standard for selecting a surrogate country. Consequently, Commerce's selection of a surrogate country in the *Final Results* is not in accordance with law.

       1. ***Mexico Was at a Level of Economic Development Comparable to China and the SC List Countries Based on World Bank Benchmarks***

During the POR, Mexico was at a level of economic development comparable to China measured under three different metrics used by the World Bank: (1) per capita GNI (Atlas Method), Commerce's preferred benchmark; (2) per capita GNI (PPP Method), the World Bank's alternative metric; and (3) the World Bank's country classification by income. *See Preliminary Cmts* (C.R. 64) at Exhibit 6 (World Bank statistics). As shown below, each factor demonstrated that Mexico and China were at comparable levels of economic development during the POR.

*First*, as shown in Table 2, *infra*, under Commerce's preferred metric of per capita GNI (Atlas Method) Mexico's per capita GNI at $9,590 is only slightly lower than Turkey's per capita GNI of $9,900. Similarly, Mexico's proximity to China (*i.e.*, $2,290) is essentially the same as Romania's proximity to China (*i.e.*, $2,280).

| Table 2: Comparison of Per Capita GNI (Atlas Method) (2021) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Country | **Romania** | Panama | Costa Rica | **China** | Malaysia | Bulgaria | **Turkey** | **Mexico** |
| *Per Capita GNI (Atlas Method)* | 14,160 | 13,920 | 12,310 | **11,880** | 10,710 | 11,200 | **9,900** | **9,590** |
| *$ difference from China* | **2,280** | 2,040 | 430 | - | 1,170 | 680 | 1,980 | **2,290** |

*Source*: *Preliminary Cmts* (C.R. 64) at Exhibit 6 (World Bank statistics).

Notwithstanding these data, Commerce ultimately selected Romania as the primary surrogate based on finding that Romania's level of economic development was "the same" as that of China and the other SC List countries. IDM at Comment 2. In terms of per capita GNI, however, Mexico was nearly the same distance from China: a difference of only $10 per capita. Insofar as Mexico and Turkey have similar per capita GNIs, and given that Mexico's and Romania's proximity to China are essentially the same, record evidence demonstrated that Mexico was, at

the very least, at a level of economic development comparable to China during the POR under

Commerce's preferred metric of economic comparability.

*Second*, Mexico was also at a level of economic development comparable to China

during the POR using the World Bank's alternative metric, per capita GNI (PPP Method). As

shown in Table 3, *infra*, under this metric Mexico's per capita GNI is closer to China's per capita

GNI than any of the SC List countries.

| Table 3: Comparison of Per Capita GNI (PPP Method) (2021) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Country | Romania | Panama | Costa Rica | **China** | Malaysia | Bulgaria | Turkey | **Mexico** |
| Per Capita GNI (PPP Method) | 35,260 | 29,720 | 21,810 | **19,160** | 28,150 | 27,200 | 30,290 | **19,740** |
| $ difference form China | 16,100 | 10,560 | 2,650 | - | 8,990 | 8,040 | 11,130 | **580** |

*Source*: *Preliminary Cmts* (C.R. 64) at Exhibit 6 (World Bank statistics).

*Third*, the World Bank's country classification by income also demonstrates that Mexico

and China were economically comparable. Both were deemed "upper middle income" by the

World Bank. *Preliminary Cmts* (C.R. 64) at Exhibit 6 (World Bank statistics). By comparison,

Romania and Panama are "high income" countries. *See id.* This metric also indicates that Mexico

is more comparable to China than either Romania or Panama, which Commerce found to be at

the "same level" of economic development. *See* SC List.

*Fourth*, Commerce consistently found that Mexico was comparable to China in economic

development in six consecutive administrative reviews. *See, e.g.*, *Chlorinated Isocyanurates

from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative

Review; 2020-2021*, 87 Fed. Reg. 40487 (July 7, 2022), PDM at Section IV.2 (noting that

Commerce selected Mexico "as the primary surrogate country in the five prior administrative

reviews"). To be sure, China's economy grew at a faster rate than Mexico's economy. Table 4,

*infra*, shows a slight decline in Mexico's per capita GNI over the same period that China's per capita GNI rose by 60 percent. Nevertheless, Mexico's per capita GNI was closer to China's per capita GNI during the 2021-22 POR in this review than it was in the first administrative review where Commerce deemed Mexico to be at the "same" level of economic development.

| Table 4: Per Capita GNI Comparison China and Mexico | | | | |
|---|---|---|---|---|
| Segment | World Bank GNI Data (Year) | China's GNI (A) | Mexico's GNI (B) | Mexico's GNI Compared to China's GNI (B/A) |
| 2014 – 2015 (Admin. Rev.)* | 2014 | $7,380 | $9,980 | 1.4 |
| 2021 – 2022 (Admin. Rev.)** | 2021 | $11,890 | $9,380 | 0.8 |

\* Mexico included in Commerce's Surrogate Country List.
\*\* Mexico not included in Commerce's Surrogate Country List.
*Source*: *Pre-Preliminary Cmts* at 23.

In sum, the record contained several different metrics of economic comparability, and all indicated that Mexico and China were at comparable levels of economic development during the POR. Under the per capita GNI (Atlas Method) metric, Mexico's per capita GNI was not meaningfully different from the per capita GNI of either Turkey or Romania, countries at the "same level" of economic development as China. Using the World Bank's two other metrics, per capita GNI (PPP Method) and the Income Group Classification, Mexico was *more comparable* to China during the POR than one or more of the other six countries on Commerce's SC List. Finally, Mexico was *more* comparable to China during the POR than it was in the 2014-2015 review. Thus, record evidence demonstrated that Mexico and China were at comparable levels of economic development during the POR.

## 2. *As the Only Potential Surrogate that Produced Identical Merchandise, Mexico Provided the Best Available Surrogate Values*

Despite these measures of economic comparability – and its own consistent treatment of Mexico and China as comparable in economic development – Commerce rejected Mexico as a

potential surrogate solely because of a thin margin of difference between the per capita GNI of Mexico and the other SC List countries. *See generally* IDM at Comment 2; *Preliminary Cmts* (C.R. 64) at Exhibit 6 (World Bank statistics). Commerce did not, however, consider whether Mexico produced comparable merchandise – it did – in the course of its surrogate country analysis. IDM at Comment 2.

The record showed that Mexico was the only potential surrogate country with demonstrated production of identical merchandise. In prior administrative reviews of Chlor isos, Commerce repeatedly selected Mexico as the primary surrogate country because it was "the only significant producer of identical merchandise (*i.e.,* Chlor isos)." *Chlorinated Isocyanurates from the People's Republic of China*, 87 Fed. Reg. 40487. Consistent with its "preference to select a surrogate country that produces identical merchandise over one that only produces comparable merchandise," Commerce repeatedly selected Mexico because its production of identical merchandise "also supports finding that Mexican import data are more suitable because it is more likely these data are specific to the inputs that we are valuing given that there is a manufacturer in this country that could be importing inputs actually used in the production of Chlor isos." *Id.* at PDM at Section IV.2.

Record evidence here demonstrated that Mexico was the only significant producer of identical merchandise among the countries on the SC List. *See, e.g., SC Selection Cmts* (C.R. 32-34) at 5, Exhibits 2, 3, and 5. This fact was uncontested. *See generally* IDM at Comment 1. Thus, not only did Mexico satisfy the economic comparability prong of the statute but it provided the best available surrogate value data insofar as it was the only potential surrogate that was a producer of identical merchandise.

### 3. *Commerce's Exclusion of Mexico as a Potential Surrogate Was Inconsistent with the Statute*

As shown above, Mexico and China were at comparable levels of economic development during the POR using three different benchmarks, including Commerce's preferred benchmark of per capita GNI (Atlas Method). In addition, Mexico was the only producer of identical merchandise and key material inputs among potential surrogates, demonstrating that it provided the best (*i.e.,* specific and accurate) surrogate values of any potential surrogate. As such, Mexico satisfied both elements of 19 U.S.C. § 1677b(c)(4).

Commerce, however, failed to address any of this evidence in the *Final Results*. Instead, Commerce rejected Mexico as a surrogate solely because it was not at the "same level" of economic development China (*i.e.*, not on the SC List). *See* IDM at Comment 2 ("because Mexico's GNI is not within the range of the GNIs on the SC List, we will not consider Mexico as a possible SC"). Commerce's refusal to consider Mexico as a potential surrogate is inconsistent with the language and structure of the statute.

Recently, in *Catfish Farmers of America v. United States*, Slip Op. 23-97 at *6 (July 7, 2023), this court considered Commerce's obligation to consider potential surrogates that are not on the SC List. In *Catfish Farmers,* plaintiffs argued that Commerce should select Indonesia as the primary surrogate for Vietnam even though Indonesia was not on the SC List. Commerce refused to consider Indonesia as a potential surrogate because Indonesia was not on the SC List and, therefore, was not at the "same" level of economic development as Vietnam. The Court held that this policy "shows a *conscious choice to disregard the statutory standard*" and that Commerce "*misapplied the statutory standard by presumptively excluding countries that fall within the 'comparable' category.*" *Id.* Put differently, this Court recognized that "not being 'at the same level' is not disqualifying under the statute if the country is at a 'comparable' level." *Id.*

(emphasis supplied); *see also Green Farms Seafood Joint Stock Company v. United States*, 2024 WL 1653791 at *7 (Apr. 17, 2024) (noting that the "Department's discretion does not permit it to disregard the statutory 'comparable level of economic development' standard" by excluding countries that are economically comparable to the NME in question).

On remand, the agency continued to assert that the "statute permits exclusion of a potential surrogate that is not at the 'same' level of economic development" but nevertheless "went ahead and compared the quality of the dueling Indian and Indonesia data sets on the merits rather than preemptively disqualifying the latter as before." *Catfish Farmers of America v. United States*, Slip Op. 24-67 at *3 (June 5, 2024). Consequently, although the court continued to "disagree with the agency's flawed interpretation of the legal standard" but held that a "remand on that issue would serve no purpose given that the rest of Commerce's analysis mitigates that error." *Id.* Slip Op. 24-67 at 3. In other words, the Court continued to find that Commerce's policy of presumptively excluding potential surrogates solely on the basis that they were not on the SC List and at the "same" level of economic development as the NME was a "flawed interpretation of the legal standard" but found that it was "harmless error" given Commerce's analysis of the relevant surrogate value data. *Id.*

In the present case, Commerce was explicit that it rejected Mexico as a potential surrogate solely because "Mexico's GNI is not within the range of GNIs on the GNI List." IDM at Comment 2. Moreover, unlike *Catfish Farmers*, Commerce conducted no comparative analysis of the quality of Mexican surrogate value data vis-à-vis the SC List countries, which would have shown that Mexico was superior to the other surrogate countries insofar as it was the only producer of identical merchandise. *See id.* Therefore, there is no analysis or record evidence that "mitigates" Commerce's "flawed interpretation of the legal standard." *Catfish Farmers*, Slip

Op. 24-67 at *3 Consequently, Commerce's refusal to consider Mexico as a potential surrogate solely because it was not on the SC List is not in accordance with law, as was its failure to address the "comparable merchandise" prong of the statute with respect to Mexico. The Court should therefore remand this issue with instructions to analyze Mexico's suitability as a surrogate applying both prongs of 19 U.S.C. § 1677b(c)(4).

## II.    The Finding that Calcium and Sodium Hypo Are "Comparable" to Chlor isos is Not Supported by Substantial Evidence

### A.  Legal Framework for Determining Merchandise Comparability

To "determine if a product produced by a company in the surrogate country is comparable, Commerce's established practice is to apply a three-part test that examines 'physical characteristics, end uses, and production processes." *Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2004). Commerce also "examines how similar a proposed surrogate producer's production experience is to the NME producer's production experience." *Baoding Mantong Fine Chemistry Co., Ltd. v. United States*, 222 F. Supp. 3d 1231, 1241 (Ct. Int'l Trade 2017). And in "cases where the subject merchandise contains a major input that is specialized or used intensively in the production of the subject merchandise, comparable merchandise should be identified on the basis of a comparison of such major input." *Dupont Teijin Films v. United States*, 997 F. Supp. 2d 1338, 1342 (Ct. Int'l Trade 2014) (emphasis supplied).

### B.  Physical Characteristics

#### 1.  *CYA is the primary input of Chlor isos and provides a key difference in chemical composition*

Chlor isos are made up of three different inputs: CYA, chlorine, and caustic soda. *SC Selection Cmts* (C.R. 32-34) at 5. Chlorine, which is common to Chlor isos and hypochlorites

20

(calcium or sodium), is a sanitizer that functions as a disinfectant and purifies the water in a swimming pool. *SV Rebuttal Cmts* (C.R.36) at Exhibit 1. CYA, which is unique to Chlor isos and is the "major material" used in the production process, is a stabilizer and binds free chlorine in the pool water and releases it slowly, extending the time needed to deplete each dose of the sanitizer. *Id.* at Exhibit 2; *see also* Heze DQR (C.R. 9-20) at 3, 5.

In water, chlorinating chemicals generate hypochlorous acid (HOC1), which is the primary disinfectant in aqueous environments. HOC1, however, rapidly degrades from UV rays present in sunlight. CYA shields HOCI from this degradation by bonding and releasing chlorine atoms. Without a stabilizer, most HOC1 generated would degrade within two hours, but with a stabilizer this degradation slows by a factor of 2-6, preserving disinfection levels and reducing the need to add more non-stabilized chlorinating agents. *Preliminary Rebuttal Cmts* (C.R. 85-87) at 4 and Exhibit 2. CYA is critical to maintaining the correct chlorine level in a pool and therefore critical to "reduc{ing} the likelihood of pathogens harmful to human health." *Id.*; *see also id.* (noting that a "pool stabilizer provides 4 times more water purity than support without using a stabilizer").

Commerce's determination that Chlor isos and calcium hypo/sodium hypo "share similar physical characteristics" focused on "chlorine and caustic soda." PDM at 25; IDM at Comment 1. Commerce ignored the critical importance of cyanuric acid (CYA), which is only found in Chlor isos, and imparts unique and essential physical characteristics to the finished product. Instead, Commerce opined that Chlor isos, calcium hypo and sodium hypo "are all part of the same chlorine family that includes unstabilized and stabilized chlorines." PDM at 25; IDM at Comment 1. Suffice it to note that many chemical products include chlorine, but do not primarily function as swimming pool chemicals. *See, e.g.*, *Glycine from the People's Republic of China:*

*Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 55814 (Sept. 26, 2008), IDM at 1 (noting that glycine "is used as a sweetener/taste enhancer, a buffering agent, reabsorbable amino acid, chemical intermediate, and a metal complexing agent) and Comment 5 (discussing surrogate value for Chlorine).

Additionally, record evidence indicated that one should "not mix types of chlorine compounds" because "most types of chlorine compounds are incompatible with each other." *Preliminary Rebuttal Cmts* (C.R. 85-87) at Exhibit 3. The USITC also noted that "putting Chlor isos and calhypo in close proximity can result in a rapid explosion and fire." *SC Selection Cmts* (C.R. 32-34) at Exhibit 1 (USITC Pub. 4452) at 7. In contrast, stabilized chlorine found in Chlor isos, is also less corrosive, is less reactive with other dissolved compounds and with materials of construction, and is less volatile than other non-stabilized sanitizers like calcium hypo and sodium hypo.

Fundamentally, the differences in physical characteristics described above are explained by the fact that calcium hypo and sodium hypo are not cyanurates or chlorinated CYA. Chlor isos are "*derivatives of cyanuric acid*, described as chlorinated s-triazine triones,"… for which "{t}here are three primary chemical compositions:  (1) trichloro isocyanuric acid ($Cl_3(NCO)_3$), (2) sodium dichloroisocyanurate (dihydrate) ($NaCl_2(NCO)_3(2H_20)$), and (3) sodium dichloroisocyanurate (anhydrous) ($NaCl_2(NCO)_3$). *SC Selection Cmts* (C.R. 32-34) at 5. Calcium hypo and Sodium hypo notably lack the crucial NCO isocyanate grouping and the two- to three-atom composition of the chlorine element. *Id.*

In sum, CYA imparts unique properties that are essential characteristics of Chlor isos (namely, stability) that are not found in calcium hypo or sodium hypo. It is for this reason that the respondents admit that CYA is "the major material of the subject goods." Heze DQR (C.R. 9-

20) at 3, 5. Unlike Chlor isos, calcium hypo and sodium hypo are not cyanurates or chlorinated

cyanuric acid, and do not share the same chemical makeup.

### 2. *Chlor isos are solid whereas sodium hypo is a liquid solution*

Another critical difference in physical characteristics between Chlor isos and sodium

hypo that Commerce overlooked is the physical form they take. *See* IDM at Comment 1. CYA

stabilizes chlorine to such an extent that the Chlor isos are stable, dry solids that can be

manufactured and shaped into granules or tables and, if kept dry, can have a shelf stability of

several years. *See Preliminary Rebuttal Cmts* (C.R. 85-87) at 4 and Exhibit 3; *Preliminary Cmts*

(C.R. 64) at 11 and Exhibit 2. Additionally, the powdered or tableted forms of Chlor isos are

concentrated chlorine sources and may be stored with minimal space, as well as limiting issues

with spillage. *Id.* In contrast, sodium hypo is known as "liquid bleach," *SC Selection Cmts* (C.R.

32-34) at Exhibit 1 (USITC Pub. 4452) at 7, and has a very short shelf life after it is opened. *See*

*Preliminary Rebuttal Cmts* (C.R. 85-87) at 4 and Exhibit 3. Moreover, the only solid forms of

sodium hypo are "not used commercially." *Preliminary Cmts* (C.R. 64) at Exhibit 2.

### C. **The significant differences in physical characteristics between Chlor isos and calcium or sodium hypo create differences in end use**

The significant differences in physical characteristics between Chlor isos and calcium or

sodium hypo have been repeatedly recognized by the USITC. *See, e.g., SC Selection Cmts* (C.R.

32-34) at Exhibit 1. In the *Final Results*, Commerce rejected the notion that the USITC's

analysis was probative, finding that "the criteria the ITC applies in determining what constitutes

a domestic like product are not the same criteria that Commerce applies in determining whether

products are comparable." IDM at Comment 1. Although the USITC's "like product" analysis

and Commerce's "comparable merchandise" analysis are not identical, both examine physical

characteristics, end uses, and production processes and call for the exercise of judgment applied to record facts to determine whether two or more products are comparable. As such, the USITC's analysis, while not dispositive, is instructive and persuasive.

In its 2014-2015 investigations of *Calcium Hypo from China*, the USITC found that calcium hypo, sodium hypo, and Chlor isos were separate like products "particularly given the differences in chemical composition, chlorine content, and manufacturing facilities and employees." *SC Selection Cmts* at Exhibit 1. In conducting its like product analysis, the USITC evaluated, *inter alia*, many of the same criteria that Commerce evaluates as part of its comparable product analysis (*i.e.*, physical characteristics, end uses, manufacturing facilities and production processes). *Id.* The USITC, among other things, particularly distinguished the "non-chlorine inputs" used in Chlor isos (*i.e.*, cyanuric acid) determining that "{a}lthough calhypo, Chlor isos, and sodium hypochlorite have some degree of overlap in end uses, significant differences exist in their chemical compositions, particularly in the level of available chlorine, as well as the differing non-chlorine inputs involved." *Id.* Regarding available chlorine, the USITC found that Chlor isos provide 56% (dichlor) to 90% (trichlor) available chlorine. *Id.* By comparison, the chlorine content in sodium hypo "is much lower at 15 percent." *Id.; see also Preliminary Cmts* (C.R. 64) at Exhibit 4 (Dixon Declaration at ¶ 6). Taken together, the physical differences in the chemical composition, chlorine content, function, and the form of the two products are substantial and indicate that Chlor isos and calcium or sodium hypo are not "comparable" based on their physical characteristics.

In the *Final Results*, Commerce rejected this analysis and instead found that Chlor isos and calcium or sodium hypo shared similar end uses because all three products are "used as swimming pool sanitizers." IDM at Comment 1. The only record evidence cited by Commerce,

however, indicates that calcium hypo and sodium hypo can be used as a "disinfectant for swimming pools *in theme parks*." *Id.* In contrast, as explained by the USITC, "{a}pproximately 85 to 90 percent of Chlor isos in the U.S. market are used as residential pool sanitizers." *Preliminary Cmts* at Exhibit 5 (USITC Pub 4494). There was no record evidence indicating that either calcium hypo or sodium hypo are used in residential, as opposed to commercial, swimming pools. *See* IDM at Comment 1.

The distinction between sanitizers that are used in large, commercial swimming pools and those used in smaller, residential swimming pools is important. Each type of swimming pool sanitizer "has unique features and chemical components that work to sanitize the water." *SV Rebuttal Cmts* (C.R. 36) at Exhibit 3. With respect to chlorine-based sanitizers, "{r}egulating the level of chlorine is essential for prolonging disinfecting your pool water (killing bacteria and algae)." *Id.* at Exhibit 2. Chlorine-based sanitizers like Chlor isos incorporate a stabilizer, whereas calcium or sodium hypo are unstabilized. Record evidence demonstrates that a "pool stabilizer provides 4 times more water purity than support without using a stabilizer." *Id.* Stabilized chlorine, like Chlor isos, is also less corrosive, is less reactive with other dissolved compounds and with materials of construction, and is less volatile than other non-stabilized sanitizers like calcium or sodium hypo.

Moreover, record evidence demonstrates that calcium or sodium hypo are not primarily used as a disinfectant in pools. For example, Speight reports that

> Sodium hypochlorite is employed as a disinfectant and deodorant in dairies, creameries, water supplies, sewage disposal, and households. It is also used as bleach in laundries. As a bleaching agent, it is very useful for cotton, linen, jute, rayon, paper pulp, and oranges.

*Preliminary Cmts* at Exhibit 3 at 2.475. Likewise, Chimcomplex, the Romanian producer of sodium hydroxide, similarly reports "Sodium hypochlorite is used as a bleaching agent for

textiles, cellulose and paper, in the manufacture of cleaning products, detergents, in the oxidation processes of organic products, in the refining of oil, in the disinfection of water and sterilization of sanitary installations." *SV Cmts* (P.R. 45-47) at Exhibit 11 at 4.

In short, the overlap between Chlor isos and calcium or sodium hypo in end-use applications is minor. The lack of CYA in calcium or sodium hypo make these product far more useful in applications other than residential swimming pools, whereas the predominant use of Chlor isos is use in residential swimming pools.

Finally, the significant differences in physical characteristics is also evidenced by the fact that Chlor isos and calcium or sodium hypo are classified in different chapters of the Harmonized Tariff Schedule of the United States ("HTSUS"). Because calcium or sodium hypo lack CYA, they are classified in Chapter 28 of the HTSUS under "inorganic chemicals." *Preliminary Cmts* at 11. In contrast, Chlor isos are a derivative of CYA and are therefore classified in Chapter 29 of the HTSUS under "organic chemicals." *Id.*

### D.  The Production Process for Chlor isos is Far More Complex Than Production of Sodium Hypo or Cal Hypo

In the *Final Results*, Commerce provided an overly simplistic comparison of the production processes for Chlor isos and calcium or sodium hypo. *See* IDM at Comment 1. Specifically, Commerce described the production process for Chlor isos as simply "first making intermediate inputs (CYA, caustic soda, and chlorine gas), then combining these intermediate inputs to make a finished product where shaping is the third step." *Id.* Commerce then analogized the production process of sodium hypo, explaining that "the production process for sodium hypochlorite {is} similar because it too involves a multi-stage production process requiring the production of two of the three same intermediate inputs, caustic soda and chlorine."

*Id.* As discussed below, Commerce's simplistic analysis overlooks significant differences in the production process of Chlor isos and calcium or sodium hypo.

### 1. *Production of Chlor isos is significantly more expense and requires substantially more workers that production of hypophosphates*

The production of Chlor isos involves a workforce, a plant, and an investment that is an order of magnitude greater than the number of workers and amount of investment involved in the production of calcium or sodium hypo. Specifically, record evidence demonstrated that the cost of building a new Chlor isos production facility is [          ] million dollars, whereas the cost to set up a new sodium hypo facility is approximately [          ]. *See Preliminary Cmts* at Exhibit 4 (Dixon Declaration). Similarly, the operation of a Chlor isos plant required [      ] skilled technicians to monitor thermal and chemical reactions. *See id.; see also* Heze DQR (C.R. 9-20) at Exhibit D-1 (explaining that [      ] workers are involved in the production of Chlor isos). In contrast, record evidence indicated that the operation of a sodium hypo manufacturing facility required only [          ]. *See Preliminary Cmts* at Exhibit 4 (Dixon Declaration)*.* These significant differences in plant costs and number of employees reflects the fact that the production of Chlor isos is a multi-step process that involves the production of several intermediate chemicals, which are then further processed to yield Chlor isos, whereas the production of calcium or sodium hypo involves a simpler production process with no intermediate chemicals. *Id.*

The record evidence discussed above is consistent with the USITC's conclusion that Chlor isos, calcium hypo, and sodium hypo are not "manufactured in common facilities with common employees." *SC Selection Cmts* (C.R. 32-34) at Exhibit 1 (USITC Pub. 4515). In fact, during the USITC's investigation of calcium hypo no "U.S. calhypo producer stated that it could switch production from calhypo to other products." *Id.* Likewise, during the USITC's

investigation of Chlor isos, "no responding U.S. producers of Chlor isos stated that they could switch production to any other products." *Id.* The USITC's findings reinforce the record evidence discussed above, which demonstrates that the production processes for calcium or sodium hypo and Chlor isos are significantly different.

### 2. *Production of Chlor isos requires more equipment and processing stages than production of calcium and sodium hypo*

The production of Chlor isos also requires more equipment and more production stages than calcium or sodium hypo, further demonstrating the lack of comparability between these products. In the *Final Results*, Commerce's held that the production processes were similar because the production process of sodium hypo involves more than just "the circulation of chlorine through a dilute caustic soda (sodium hydroxide) solution" but also includes "electrolysis, evaporation, and chlorine absorption." IDM at Comment 1. This overly simplistic analysis does not account for the extensive record evidence demonstrating production of Chlor isos requires a significantly more complex production process than calcium or sodium hypo, including use of significantly more pieces of equipment.

The production of Chlor isos begins with the production of CYA form urea. *SC Selection Cmts* (C.R. 32-34) at 5. Specifically, respondent Heze Huayi explained that the production of CYA involves the following separate processes, each manned by numerous employees and involving hours' worth of energy consumption and use of extensive equipment:

1. Condensation Reaction
2. Hydrolysis Reaction
3. Suction Filter Tanks
4. Ammonium Sulfate Reactor
5. Centrifugal Machine

CYA production also results in several additional by-product recovery and processing operations. *See, e.g.,* Heze DQR (C.R. 9-20) at 5, 8, 16. Thereafter, the production of Chlor isos involves numerous additional processes at a different site:

1. Make-up Tank
2. Chlorination Reactor
3. Suction Filtering Tank
4. Tower Drier
5. Granulating Machine
6. Tableting Machine
7. Sewage Treatment Equipment

*See id.* at Exhibit D-1; *see also Preliminary Cmts* (C.R. 64) at Exhibit 4 (Dixon Declaration); *Preliminary Rebuttal Cmts* (C.R. 85-87) at Exhibit 4 (Warner Declaration) and Exhibit 5 (Farley Declaration).

In contrast, sodium hypochlorite is produced from chlorine and sodium hydroxide (caustic soda) which are the two chemicals simultaneously produced by any chlor-alkali producer. This one-step reaction is as follows:

$$Cl_2 \text{ (g)} + 2 \text{ NaOH (aq)} \rightarrow \text{NaCl (aq)} + \text{NaClO (aq)} + H_2O \text{ (aq)}$$

*See Preliminary Cmts* at Exhibit 3 (Speight). As shown above, the Chlorine gas is reacted with liquid caustic soda (sodium hydroxide) to yield salt water (NaCl), sodium hypo liquid (NaClO), and water ($H_2O$). Put differently, the entire production process to make sodium hypo utilizes liquid caustic soda from a holding tank, chlorine recovered from the trichlor chlorinator, and a single vessel ("NaOCl GEN") where the sodium hypo (NaOCl) is produced. As illustrated in Appendix B of Plaintiffs' administrative case brief, the production of sodium hypo amounts to a partial process involved in one stage of a 12-stage process to manufacture Chlor isos. *See* Petitioners, "Case Brief" (Sept. 29, 2023) ("*Case Brief*") (P.R. 115) (C.R. 100) at Appendix B.

### 3. *Production of Chlor isos requires a significantly more complex production process than that required for calcium or sodium hypo*

As discussed above, the production of Chlor isos requires significantly more investment, employees, equipment, and production stages than the production of calcium or sodium hypo, as shown in Table 5 below:

| Table 5: Comparison of the Production Processes, Employees, Equipment and Investment to Manufacture Sodium Hypo versus Chlor isos | | |
|---|---|---|
| | **Sodium Hypo** | **Chlor isos** |
| Production stages | Circulation of chlorine through a dilute caustic coda (sodium hydroxide) solution. | 1) Production of CYA from urea, including<br>    a) [ ]<br>    b) [ ]<br>    c) [ ]<br>2) Reaction of CYA and Chlorine<br>    a) [ ]<br>    b) [ ]<br>    c) [ ]<br>    d) [ ]<br>3) Finishing<br>    a) [ ]<br>    b) [ ]<br>    c) [ ] |
| Production Employees | [ ] | Over [ ] |
| Equipment | [ ]<br>[ ]<br>[ ] | [ ]<br>[ ]<br>[ ]<br>[ ]<br>[ ]<br>[ ]<br>[ ]<br>[ ] |
| Plant Investment | [ ] | [ ] |

30

These significant differences in the production process further underscore the substantial differences between Chlor isos and calcium or sodium hypo.

### E.  Conclusion

The record established that there are sharp differences between the physical characteristics, production processes, and end uses of Chlor isos and calcium or sodium hypo. These products are not sufficiently comparable for purposes of selecting an appropriate surrogate country which will serve as the basis for calculating normal value. As shown in Table 6 below, Chlor isos have a different chemical formula, incorporate a unique and critical input like CYA, have higher chlorine content, take different forms, and require significantly more complex production processes as compared with calcium or sodium hypo:

| Table 6: Comparison of the Chemical Components, Raw Material Inputs, Physical Characteristics and End-Uses of Sodium Hypo and Chlor isos | | | |
|---|---|---|---|
| | **Chlor isos** | **Sodium Hypo** | **Calcium Hypo** |
| **Chemical Formula** | Trichlor ($Cl_3(NCO)_3$) Dichlor ($NaCl_2(NCO)_3$) | NaOCl | CaOCl |
| **Raw Material Inputs** | Chlorine Caustic Soda **Cyanuric Acid** | Chlorine Caustic soda | Chlorine Caustic soda |
| **Available Chlorine** | 56% - 90% | > 15% | 45-75% |
| **Form** | Granular or Tablet | Liquid | Powder, Crystalline, Tablet, or Liquid |
| **HTS Classification** | Ch. 29 (organic chemicals) | Ch. 28 (inorganic chemicals) | Ch. 28 (inorganic chemicals) |
| **Production Process** | [    ] employees Facility cost of [    ] million More than 12 stages More Equipment | [    ] employees Facility cost of [    ] 1-2 stages Minimal equipment | N/A |
| **End-Use: residential swimming pools** | 85% - 90% | Limited | Limited |

*Source: Preliminary Cmts* (C.R. 64) at Exhibit 4 (Dixon Declaration) and Exhibit 5 (USITC Pub. 4494); *Preliminary Rebuttal Cmts* (C.R. 85-87) at Exhibit 4 (Warner Declaration) and Exhibit 5 (Farley Declaration).

Accordingly, Commerce's determination in the *Final Results* that Chlor isos and calcium or sodium hypo were "comparable" for purposes of 19 U.S.C. § 1677b(c)(4) is not supported by substantial evidence.

## CONCLUSION

For the reasons discussed above, this Court should find Commerce's *Final Results* are not supported by substantial evidence and is otherwise not in accordance with law and should remand this matter to Commerce consistent with the arguments above.

Respectfully submitted,

/s/ James R. Cannon, Jr.
James R. Cannon, Jr.
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W.
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

Date:   July 16, 2024

Court. No. 24-00024

**<u>Certificate of Compliance</u>**

     The undersigned hereby certifies that the forgoing submission of "Memorandum of Law and Fact in Support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record" filed by Plaintiffs on July 16, 2024, contains 9,357 words, including footnotes, and excluding the table of contents, table of authorities, and signature block, and therefore, complies with the maximum 14,000 word limitation set forth in the Standard Chambers Procedures.

BY: <u>/s/  James R. Cannon Jr.</u>