## THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., *ET AL.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. | ) |
| AND HEZE HUAYI CHEMICAL CO., LTD., | ) |
| | ) |
| Consolidated Plaintiffs, | ) |
| | ) |
| v. | )    Consol. Ct. No. 24-00024 |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| BIO-LAB, INC., *ET AL.*; JUANCHENG KANGTAI | ) |
| CHEMICAL CO., LTD.; AND HEZE HUAYI | ) |
| CHEMICAL CO., LTD., | ) |
| | ) |
| Defendant-Intervenors and Consolidated | ) |
| Defendant-Intervenors. | ) |

## <u>ORDER</u>

Upon consideration of plaintiffs' and defendant-intervenors' motions for judgment upon the administrative record, response thereto, replies, and all other papers, it is hereby

ORDERED that the motion is denied, and it is further

ORDERED that judgment shall enter in favor of the United States.

_____
JUDGE

Dated:

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., *ET AL.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. | ) |
| AND HEZE HUAYI CHEMICAL CO., LTD., | ) |
| | ) |
| Consolidated Plaintiffs, | ) |
| | ) |
| v. | )    Consol. Ct. No. 24-00024 |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| BIO-LAB, INC., *ET AL.*; JUANCHENG KANGTAI | ) |
| CHEMICAL CO., LTD.; AND HEZE HUAYI | ) |
| CHEMICAL CO., LTD., | ) |
| | ) |
| Defendant-Intervenors and Consolidated | ) |
| Defendant-Intervenors. | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

OF COUNSEL
Jesus Saenz
Attorney
Office of Chief Counsel
For Trade Enforcement & Compliance
Department of Commerce

REGINALD T. BLADES, JR.
Assistant Director

TATE NATHAN WALKER
Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 307-0163
Fax: (202) 305-7643

November 6, 2024

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ..................................................................2

    I.     The Administrative Determination Under Review....................................................2

    II.    Issues Presented For Review ....................................................................................2

STATEMENT OF FACTS ........................................................................................3

SUMMARY OF ARGUMENT ..................................................................................9

ARGUMENT .........................................................................................................10

    I.     Standard Of Review ...............................................................................................10

        A.  Substantial Evidence .....................................................................................10

        B.  *Loper Bright* Framework ..............................................................................12

        C.  Legal Framework for Surrogate Value Selections ............................................14

    II.    Commerce's Selection Of Romania As The Primary Surrogate Country Is Supported By Substantial Evidence And Otherwise In Accordance With Law......16

        A.  Commerce's Consideration Of Romania As A Primary Surrogate Country And Its Factors Of Production Data Was Timely And In Accordance With The Law And Regulation ..............................................................................16

        B.  Commerce's Selection of Romania As The Primary Surrogate Country Is Supported By Substantial Evidence And In Accordance With Law ................20

            1.  Commerce's Formation Of The Surrogacy Country List Was Reasonable And In Accordance With The Law ............................................................21

            2.  Commerce Reasonably Determined Not To Consider Mexico As A Surrogate Country Because It Was Not Economically Comparable..........24

    III.   Commerce's Comparability Analysis Is Supported by Substantial Evidence And In Accordance With Law ......................................................................................30

        A.  Legal Framework for Merchandise Comparability............................................31

        B.  Sodium and Calcium Hypochlorites Are Comparable Products to Chlorinated Isos: Major Inputs ...............................................................................32

i

C.  Sodium and Calcium Hypochlorites Are Comparable Products to Chlorinated Isos:  Physical Characteristics ...........................................................34

D.  Sodium and Calcium Hypochlorites Are Comparable Products to Chlorinated Isos:  End Uses ...............................................................................35

E.  Sodium and Calcium Hypochlorites Are Comparable Products to Chlorinated Isos: Production Process ....................................................................36

F.  Precedent Supports Commerce's Decision As To Comparability ...................38

IV.  Commerce Properly Selected The Best Available Information On The Record For Determining Surrogate Values For All Factors Of Production ..............................39

A.  Romanian Surrogate Values Are The Best Available Information On The Record .......................................................................................40

CONCLUSION ................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                     **Page(s)**

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984).................................................................... 11

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*,
  464 U.S. 89 (1983)....................................................................................... 13

*Catfish Farmers v. United States*,
  No. 21-00380, 2023 WL 4560815 (Ct. Int'l Trade 2023) ......................... 24

*CBOCS West, Inc. v. Humphries*,
  553 U.S. 442 (2008).................................................................................... 13

*Ceramica Regiomontana, S.A. v. United States*,
  810 F.2d 1137 (Fed. Cir. 1987).................................................................. 11

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)............................................................................. 12, 13

*Clearon Corp. v. United States*,
  2014 WL 3643332, 38 C.I.T. 1122 (Ct. Intl. Trade 2014)................. *passim*

*Clearon Corp. v. United States*,
  2015 WL 4978995 (Ct. Int'l Trade 2015) ................................................. 46

*Clearon Corp. v. United States*,
  2016 WL 6892556 (Ct. Int'l Trade 2016) ................................................. 26

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)................................................................................... 10

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966)................................................................................... 11

*Dickerson v. United States*,
  530 U.S. 428 (2000)................................................................................... 13

*Dorbest Ltd. v. U.S.*,
  462 F. Supp. 2d 1262 (Ct. Intl. Trade 2006)...................................... 31, 32

*E.I. DuPont de Nemours & Co. v. United States*,
  No. 96-11-02509, 1998 WL 42598 (Ct. Int'l Trade Jan. 29, 1998)......... 27

*FedEx Trade Networks Transp. & Brokerage, Inc. v. Airboss Def. Group, LLC*,
No. 22-01313, 2024 WL 1485441 (D. Md. Apr. 4, 2024)....................................................... 43

*Final Remand Results in Jacobi Carbons AB et al. v, United States*,
Consol. Court No. 15-00286 (CIT April 7, 2017) ............................................................. *passim*

*Final Results of Redetermination Pursuant to Court Remand, New American Keg v. United States*,
Court No. 20-00008, 2022 WL 4363320 (Ct. Int'l Trade 2022) ............................................. 41

*Fresh Garlic Producers Assn. v. United States*,
121 F. Supp. 3d 1313 (Ct. Intl. Trade 2015).......................................................................... 24

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .......................................................................... 11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)................................................................................................................. 13

*Heze Huayi Chemical v. United States*,
No. 17-0032, 2018 WL 2328183 (Ct. Int'l Trade May 22, 2018) .............................. 31, 39, 44

*Home Meridian Int'l, Inc. v. United States*,
772 F.3d 1289 (Fed. Cir. 2014)............................................................................................... 15

*INS v. Elias-Zacarias*,
502 U.S. 478 (1992)................................................................................................................. 11

*Jacobi Carbons AB v. United States*,
313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) .......................................................................... 29

*Jeld-Wen, Inc. v. United States*,
567 F. Supp. 3d 1344 (Ct. Int'l Trade 2022) .......................................................................... 37

*Jiaxing Bro. Fastener Co. v. United States*,
11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) ............................................................................ 15

*Jiaxing Bro. Fastener Co. v. United States*,
961 F. Supp. 2d 1323 (2014) ............................................................................................. 25, 29

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
822 F.3d 1289 (Fed. Cir. 2016)............................................................................................ *passim*

*Juancheng Kangtai Chem. Co., Ltd. v. United States*,
No. 14-56, 2017 WL 218910 (Ct. Intl. Trade 2017)......................................................... 39, 44

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024), overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ................................................................................ *passim*

*Mid Continent Nail Corp. v. United States*,
712 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ............................................................. 31

*M S Int'l, Inc. v. United States*,
547 F. Supp. 3d 1254 (Ct. Int. Trade 2021) .............................................................. 45

*Musgrave Pencil Co. v. United States*,
31 CIT 445 (2007) ...................................................................................................... 36

*Nation Ford Chem. Co. v. United States*,
166 F.3d 1373 (Fed. Cir. 1999) ............................................................................ 15, 16

*New American Keg v. United States*,
No. 20-8, 2022 WL 4363320 (Ct. Int'l Trade 2022) ............................................ 41, 42

*Nucor Corp. v. United States*,
612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ............................................................. 11

*QVD Food Co., Ltd. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011) .................................................................................. 21

*Shandong Huarong Gen. Corp. v. United States*,
159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ............................................................... 11

*Shanghai Foreign Trade Enters. Co. v. United States*,
318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ............................................... 30, 32, 36

*Skidmore v. Swift & Co*,
323 U.S. 134 (1944) .............................................................................................. 12, 13

*United States v. Eurodif*,
555 U.S. 305 (2009) .................................................................................................... 31

*Vinh Hoan Corp. v. United States*,
49 F. Supp. 3d 1285 (Ct. Int'l Trade 2015) ........................................................ 21, 22

*Wheatland Tube Co. v. United States*,
161 F.3d 1365 (Fed. Cir. 1998) .................................................................................. 11

*Yantai Xinke Steel Structure Co. v. United States*,
No. 10-00240, 2014 WL 1387529 (Ct. Int'l Trade 2014) ......................................... 35

*Zhejiang DunAn Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) .......................................................................... 15, 16


**Statutes**

5 U.S.C. § 706 ............................................................................................................ 12, 14

19 U.S.C. § 1516a(b) ................................................................................................. 10, 14

19 U.S.C. § 1673 ............................................................................................................... 14

19 U.S.C. § 1677(c) ........................................................................................................... 31

19 U.S.C. § 1677b(a) ......................................................................................................... 21

19 U.S.C. § 1677b(c) ................................................................................................. *passim*


**Regulations**

19 C.F.R. § 351.301 ........................................................................................................... 19

19 C.F.R. § 351.301(a) ................................................................................................. 17, 20

19 C.F.R. § 351.301(c) ............................................................................................... *passim*

19 C.F.R. § 351.309(c) ....................................................................................................... 18

19 C.F.R. § 351.408(b) ...................................................................................................... 22

19 C.F.R. § 351.408(c) ............................................................................................... *passim*


**Rules**

U.S. Ct. Int'l Trade R. 56.2 ................................................................................................. 1


**Administrative Determinations**

*Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China: Final
    Affirmative Determination of Sales at Less Than Fair Value*,
    85 Fed. Reg. 8821 (February 18, 2020) ...................................................................... 27

*Antidumping Methodologies in Proceedings Involving Non–Market Economy Countries: Surrogate Country Selection and Separate Rates*,
72 Fed. Reg. 13,246 (Dep't of Commerce Mar. 21, 2007) ...................................................... 22

*Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018*,
84 Fed. Reg. 68,881 (December 17, 2019) .................................................................. 26

*Certain Fabricated Structural Steel from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*,
85 Fed. Reg. 5,376 (January 30, 2020) ...................................................................... 26

*Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*,
84 Fed. Reg. 35,595 (Dep't of Commerce Jul. 24, 2019) ........................................ 44

*Certain Woven Electric Blankets from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*,
75 Fed. Reg. 38,459 (Dep't of Commerce Jul. 2, 2010) .......................................... 32

*Chlorinated Isocyanurates from the People's Republic of China*
80 Fed. Reg. 4,539 (Jan. 28, 2015) .......................................................................... 39

*Chlorinated Isocyanurates from the People's Republic of China*,
88 Fed. Reg. 43,271 (Dep't of Commerce Jul. 7, 2023) ............................................ 3

*Chlorinated Isocyanurates from the People's Republic of China*,
89 Fed. Reg. 455 (Dep't of Commerce Jan. 4, 2024) ................................................ 2

*Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015–2016*,
83 Fed. Reg. 5,243 (Dep't of Commerce Feb. 6, 2018) .......................................... 38

*Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018*,
85 Fed. Reg. 10,411 (Dep't of Commerce Feb. 24, 2020) ...................................... 39

*Definition of Factual Information and Time Limits for Submission of Factual Information*,
78 Fed. Reg. 21,246 (Dep't of Commerce Apr. 10, 2013) ...................................... 19

*Fresh Garlic Final Results and Final Rescission of the 20th Antidumping Duty Administrative Review; 2013-2014*,
81 Fed. Reg. 39,897 (June 20, 2016) ........................................................................ 18

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   87 Fed. Reg. 48,459 (Dep't of Commerce Aug. 9, 2022) ........................................................... 3

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Final Results of
   the Antidumping Duty Administrative Review*; 2020-2021,
   88 Fed. Reg. 15,671 (March 14, 2023) .................................................................................... 41

*Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates from
   the People's Republic of China*,
   70 Fed. Reg. 24,502 (Dep't of Commerce May 10, 2005) ................................................. 37, 38

*Pure Magnesium Final Results of Antidumping Duty Administrative Review; 2011-2012*,
   79 Fed. Reg. 94 (January 2, 2014) ..................................................................................... 17, 18

*Pure Magnesium from the People's Republic of China: Final Results of the 2008-2009
   Antidumping Duty Administrative Review of the Antidumping Duty Order*,
   75 Fed. Reg.  80,791 (Dep't of Commerce Dec. 23, 2010) .................................................... 32

*Sebacic Acid from the People's Republic of China; Final Results of Antidumping Duty
   Administrative Review*,
   62 Fed. Reg. 65,674 (Dep't of Commerce Dec. 15, 1997) ..................................................... 38

*Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of
   Antidumping Duty Administrative Review; Final Determination of No Shipments; and Partial
   Rescission*; 2020-2022,
   88 Fed. Reg. 62,539 (Dep't of Commerce Sept. 12, 2023) .................................................... 42

*Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of
   Antidumping Duty Administrative Review; Final Determination of No Shipments; and Partial
   Rescission*; 2022-2023,
   89 Fed. Reg. 76,452 (Dep't of Commerce Sept. 18, 2024) .................................................... 42

**Other Authorities**

U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process,
   *Policy Bulletin* 04.1 (2004), *http://enforcement.trade.gov/policy/bull04-1.html* (last October
   17, 2024) ....................................................................................................................... *passim*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., *ET AL.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. ) | |
| AND HEZE HUAYI CHEMICAL CO., LTD., ) | |
| ) | |
| Consolidated Plaintiffs, ) | |
| ) | |
| v. ) | Consol. Ct. No. 24-00024 |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| BIO-LAB, INC., *ET AL.*; JUANCHENG KANGTAI ) | |
| CHEMICAL CO., LTD.; AND HEZE HUAYI ) | |
| CHEMICAL CO., LTD., ) | |
| ) | |
| Defendant-Intervenors and Consolidated ) | |
| Defendant-Intervenors. ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFFS'
RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Court's rules, defendant, the United States, respectfully

responds to the motions for judgment on the agency record filed by consolidated plaintiffs, Heze

Huayi Chemical Co., Ltd. (Heze Huayi) and Juancheng Kangtai Chemical Co., Ltd. (Kangtai)

(collectively, Heze Huayi or respondents), and plaintiffs, Bio-Lab, Inc., Innovative Water Care,

LLC, and Occidental Chemical Corporation (collectively, Bio-Lab or petitioners).  Bio-Lab and

Heze Huayi challenge the Department of Commerce's (Commerce) final results of the

administrative review of the antidumping duty order covering chlorinated isocyanurates

(chlorinated isos) from the People's Republic of China (China).  As demonstrated below,

Commerce's determination is supported by substantial evidence and is in accordance with law.

Accordingly, we respectfully request that the Court sustain Commerce's final results and deny

Bio-Lab's and Heze Huayi's motions for judgment on the agency record.

**STATEMENT PURSUANT TO RULE 56.2**

**I.      The Administrative Determination Under Review**

The administrative determination under review is *Chlorinated Isocyanurates from the*

*People's Republic of China*, 89 Fed. Reg. 455 (Dep't of Commerce Jan. 4, 2024) (final results),

(P.R. 127),[1] and accompanying Issues and Decision Memorandum (IDM) (P.R. 126).  The

review covered producers and exporters Heze Huayi and Kangtai.  The period of review is June

1, 2021, through May 31, 2022.

**II.      Issues Presented For Review**

1.      Whether Commerce's selection of Romania as the primary surrogate country was

in accordance with the law, supported by substantial evidence, and timely.

2.      Whether Commerce correctly determined that sodium and calcium hypochlorites

were comparable products to chlorinated isos.

3.      Whether Commerce properly selected the best available information on the record

for determining surrogate values for all factors of production in selecting Romanian surrogacy

values.

---

[1]  Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of
the underlying administrative review.

## STATEMENT OF FACTS

On August 9, 2022, Commerce initiated the thirteenth administrative review of the antidumping duty order covering chlorinated isos from China for the period June 1, 2021, through May 31, 2022.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 48,459, 48462 (Dep't of Commerce Aug. 9, 2022) (P.R. 7).  The administrative review covered two producers/exporters:  Heze Huayi and Kangtai.  *See* IDM.  Because China is a non-market economy country, the Tariff Act requires Commerce to calculate the normal value of chlorinated isos based on surrogate values found in a comparable market economy.  *See* 19 U.S.C. § 1677b(c)(1).

Pursuant to 19 U.S.C. § 1677b(c)(4), to select a primary surrogate country, Commerce compiled a surrogate country list of market economies that are comparable to China in terms of economic development.  *See Chlorinated Isocyanurates from the People's Republic of China*, 88 Fed. Reg. 43,271 (Dep't of Commerce Jul. 7, 2023) (P.R. 104), and accompanying preliminary decision memorandum (PDM) at 6-7 (P.R. 93).  The surrogate country list included Bulgaria, Costa Rica, Malaysia, Panama, Romania, and Turkey as economically comparable based on per capita gross national income (GNI) data available from the 2021 World Bank's World Development Report.  *See* Letter re: Request for Economic, Development, Surrogate Country and Value Comments and Information (November 15, 2022) (Surrogate Country Request) at Attachment 1 (Surrogate Country List) (P.R. 34); PDM at 20-21.  Commerce compiled this list of countries that were at the "same level of economic development as China in terms of per capital gross national income (GNI)."  Surrogate Country List at 1.  Commerce explained that GNI is the "primary indicator of a country's level of economic development."  *Id.* at 2.  China had a GNI of $11,890, and Commerce selected six countries whose GNI ranged from $14,170

for Romania to $9,830 for Turkey. *Id.* Mexico was not chosen because its GNI was $9,380, and Mexico was not found to be at the same level of economic development as China. *Id.* at 4.

Commerce explained that this list is not exclusive because "{c}ountries that are not at the same level of economic development as China's, but still at a level of economic development comparable to China, should be selected *only* to the extent that data considerations outweigh the difference in levels of economic development." *Id.* at 2 (emphasis added). Commerce's methodology for how it formulates this list, generally three market countries above and three below China sorted by GNI, was placed on the record. PDM at 16; *see* Respondents' Final SV Comments at Exhibit SV2-1 (containing *Final Remand Results in Jacobi Carbons AB et al. v, United States*, Consol. Court No. 15-00286 (CIT April 7, 2017) (*Final Remand Results Jacobi Carbons*), at 2-18 (P.R. 70).

On November 15, 2022, Commerce released the surrogate country list and solicited comments regarding the selection of the primary surrogate country, offering interested parties an opportunity to provide surrogate value data. *See* Surrogate Country List at 1. Commerce set an initial deadline of December 2, 2022, to receive comments regarding surrogate country selection "so that Commerce may have an opportunity to consider these comments for the preliminary results." Surrogate Country Request at 2. Commerce requested pertinent information about whether a country was a "significant producer of merchandise comparable to the merchandise subject to this review," "information regarding data availability and the quality of the data," "and information regarding data availability and quality of financial statements." *Id.* at 1-2. No party challenged that the countries on Commerce's list were not economically comparable to China. PDM at 21.

On November 22nd and November 28th, 2022, Commerce received comments from petitioners, Bio-Lab, and comments from respondents, Heze Huayi, regarding Commerce's surrogate country selection.  *See* Letter from Petitioners re: Surrogate Country Comments, dated November 22, 2022 (P.R. 36); *see* Letter from Respondents re: Surrogate Country Reb. Comments, dated November 28, 2022 (P.R. 37).

Bio-Lab, as petitioners, requested Commerce to consider Mexico as the primary surrogate country and argued that none of countries on Commerce's surrogate country list "have any operations that manufacture chlorinated isocyanurates ('chlor isos') or any comparable product produced from urea."  Pet. Surrogate Country Cmts. at 1; *see also* PDM at 7.  Bio-Lab found fault that Commerce had not identified countries on the surrogate country list with an identical product nor a comparable product that contained "essential raw materials, cyanuric acid or urea."  *Id.* at 2.  Bio-Lab asserted that Commerce had selected Mexico in the past seven administrative reviews for chlorinated isos and that Commerce erred in not first examining whether Mexico was a producer of identical merchandise before looking to economic comparability.  *Id.* at 2-3; IDM at 9.  Bio-Lab also provided export data from a Mexican producer, Aqua-Clor S.A. de C.V., and World Bank economic data from 2014 and 2021.  Pet. Surrogate Country Cmts. at Exhibits 2, 4.

Heze Huayi, as respondents, submitted rebuttal comments to Bio-Lab's comments and explained that there was no reason to stray from the surrogate country list when Malaysia provided all of Commerce's surrogacy requirements.  Resps. Surrogate Country Reb. Cmts. at 1; *see also* PDM at 17.  Heze Huayi explained that Commerce's stated practice was to choose countries on the surrogate country list that are significant producers of comparable merchandise. *Id.* at 2.  Respondent provided information to demonstrate that the two products, sodium

hypochlorite and calcium hypochlorite, are comparable merchandise to chlorinated isos.  *Id.* at 1-2; *see also* Attachment 3.  Heze Huayi also explained that Mexico has not appeared on the surrogate country list in two years due to rapid changes in China's economic development.  *Id.* at 3.  Respondents provided United Nation's Comtrade data and relevant tariff schedules with these comments.  *Id.* at Attachments 1 and 2.

On December 2, 2022, Heze Huayi provided its comments on surrogate country selection and continued to advocate for Malaysia to be selected.  Letter from Respondents re Comments on Surrogate Countries at 1 (P.R. 40).  Heze Huayi remarked that Malaysia was economically comparable to China, while also providing surrogate production values for sodium and calcium hypochlorites.  *Id.* at 2.

On December 2, 2022, Bio-Lab provided additional comments and again argued that Mexico should be selected as the primary surrogate country, despite its exclusion from the surrogate country list, observing that Mexico had been chosen as the primary surrogate in 2021, produced identical products, and is economically comparable to China.  Letter re Petitioners' Comments on Primary Surrogacy (P.R. 41).  Bio-Lab also argued that because the major input in chlorinated isos is cyanuric acid, lacking from both calcium and sodium hypochlorites, that those are not comparable products.  *Id.* at 6-7.  Bio-Lab also argued that the International Trade Commission (ITC) found that sodium and calcium hypochlorites are different products than chlorinated isos due to varies in chemical composition and manufacturing.  *Id.* at 7.  Bio-Lab provided export statistics for the six countries on Commerce's surrogate countries list.  *Id.* at 7; (P.R. 42) at Exhibit 3.  Bio-Lab lastly argued that Mexico was economically comparable to China if one were to compare the World Bank Income Group Classifications scales, which indicate that both countries are upper middle-income.  *Id.* at 10.

On December 12, 2022, Bio-Lab provided rebuttal comments to Commerce and argued that Malaysia was not the proper primary surrogate country. Letter re Pet. Rebuttal Comments on Primary Surrogate Country Selection at 1 (P.R. 54). Bio-Lab argued that Malaysia was not proper because Commerce's practice is to select a country that manufactures identical merchandise and not just comparable merchandise. *Id.* at 3. Bio-Lab further explains that Malaysia does not produce comparable merchandise due to the chemical differences between sodium and calcium hypochlorites and chlorinated isos. *Id.* at 4-7.

On January 23, 2023, Bio-Lab requested that Commerce extend the deadline for the issuance of the preliminary results until June 30, 2023, to allow Commerce time to consider Bio-Lab's surrogate comments. Letter re Request to Extend Deadline for Preliminary Results (P.R. 29). On February 17, 2023, Commerce decided to extend deadline for the preliminary results until June 30, 2023, for Commerce to "evaluate the selection of the primary surrogate country due to the changes in Commerce's surrogacy country list since the last administrative review." Extension of Time Limit for Preliminary Results at 2 (P.R. 55).

This extension enabled the parties to submit additional data regarding the primary surrogate country, including comments from Bio-Lab who argued that if Commerce would not choose Mexico, it should choose Romania as a primary surrogate country. Letter re Pet. Comments Concerning the Preliminary Determination (May 31, 2023) at 4 (P.R.78). Bio-Lab argued that "Romania is a better choice than Malaysia as the primary surrogate. Romania exports a far larger volume of sodium hypochlorite than Malaysia does." *Id.* Further, Bio-Lab observed that Trade Atlas data and other sources provide the factors of production for Romania. *Id.* Bio-Lab asserted that Romania is a larger net exporter of sodium hypochlorite than Malaysia, a net importer, and that Romania was the largest sodium hypochlorite exporter on the surrogate

country list. *Id.* at 26.  Bio-Lab also argued that wages, energy costs, and water rates were available and had been relied upon by Commerce in other proceedings. *Id.* at 27.  Heze Huayi argued that Malaysia provided the best surrogate value data on the record and that Bio-Lab's submission of Romanian surrogate value data was untimely.  Respondents' Case Br. (Sept. 29, 2023) at 1-6 (P.R. 113).

On July 7, 2023, Commerce published its preliminary results.  *See* PDM.  Commerce preliminarily found that the export data supported Romania, a county on the surrogate country list, as a significant producer of comparable merchandise; Romanian import data to be the best available information for the calculation of surrogate values for respondents' factors of production (FOPs);  and that the Romanian company S.C. Chimcomplex S.A. Borzesti (Chimcomplex) had the highest quality surrogate value data for financial ratios on the record. PDM at 22, 29-32, 42.  Commerce considered the factors production including, but not limited to, hours of labor required, quantities of raw materials used, amounts of energy and other utilities consumed, representative capital costs, and transportation costs.  19 U.S.C. § 1677b(c)(3).

Under the statutory framework for analyzing comparable merchandise, Commerce found that Bulgaria, Costa Rica, Malaysia, Romania, and Turkey, all present on the surrogate country list, were significant producers of comparable merchandise.  *Id.* at 11-14.  However, only two countries, Malaysia and Romania, did not have data quality or availability issues.  *Id.* at 23.  Of these two countries, Commerce found, consistent with its past practice, that Malaysian surrogate value data for labor was unusable due to forced labor and that Malaysian surrogate data for water were inferior to Romania's water data because Malaysian water rates included only base water rates and not sewage and sanitation costs, unlike Romanian data.  *Id.* at 30.  Having found Mexico not economically comparable to China and Malaysian data being inferior to Romania,

Commerce preliminarily selected Romania as the primary surrogate country with the best data to value the factors of production.  *Id.* at 32.

On January 4, 2023, Commerce published its final results, elected Romania as the primary surrogate country with the factors of production data sourced from water rates in Sibiu, Romania and Chimcomplex ratios, which remained unchanged in the final results.  *See* IDM at 19.  However, based on a review of the record and the parties' briefs, Commerce made two changes.  *Id.* at 1, 15-17.  Commerce removed the Romanian imports of chlorine when GTA import data showed a zero for import quantity but had import values and decided to rely on data reported in the *World's Bank's Doing Business: 2020 Romania* instead of the Europe and Central Asia Average.  *Id.* at 3.  Commerce adjusted the margin calculations as a result.  *Id.* at 1, 15-17. Commerce re-affirmed that the longstanding evidence of forced labor in Malaysia's manufacturing sector was sufficient to find that labor data from Malaysia were not the best available on the record.  *Id.* at 19.

In sum, Commerce concluded that the Romanian surrogate value data were the best available information on the record, and Commerce continued to rely on Romania as the primary surrogate country for the subject product.  Bio-Lab and Heze Huayi challenge these aspects of the final results.

## SUMMARY OF ARGUMENT

Commerce reasonably and timely selected Romania as the primary surrogate country because Romania is a significant producer of comparable merchandise and was on Commerce's surrogate country list.  The statute does not further define the requirement that Commerce select a market economy that is a "significant producer of comparable merchandise," and Commerce has reasonably interpreted this requirement in its *Policy Bulletin* to prefer primary surrogate

countries that are economically comparable to China and are significant producers with sufficient data.  Because Mexico was not present on the surrogate country list, Mexico was not considered as a primary surrogate country because the countries on the surrogate country list provided adequate data and there was thus no reason to depart from the countries on the list.

Commerce correctly found that sodium and calcium hypochlorites are comparable products to chlorinated isos due to their similar end use, chemical similarities, and comparable production process—aligned with Commerce's past precedent affirmed by this Court.  These products are all just variations of chlorine and all have similar end uses in swimming pools.

Commerce reasonably determined that Malaysian factors of production data were not the best information available on the record due to the use of forced labor in Malaysia and incomplete data for factors of production.  Commerce reasonably concluded that data tainted by forced labor practices were not the best available in the record.  Commerce properly selected Romanian surrogate values as the best available information to value the factors of production with complete data and sufficient information.  Accordingly, the Court should sustain Commerce's final results.

## ARGUMENT

I.     **Standard Of Review**

A.     **Substantial Evidence**

The Court will uphold Commerce's antidumping duty determination if it is supported by "substantial evidence on the record" and is otherwise "in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to support the underlying conclusions.  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The requisite proof amounts to "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and internal quotation marks omitted).

While the Court may draw two inconsistent conclusions from the record, that "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) (citation omitted). Rather, when Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, as in Commerce's antidumping duty determinations, the agency's conclusions may only be set aside if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

Thus, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001); s*ee also Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." (citations and internal quotation marks omitted)). Commerce need not provide an explicit explanation when its path is reasonably discernible. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may 'uphold {an agency's} decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (citation omitted)).

B.    *Loper Bright* **Framework**

Construing the Administrative Procedure Act, 5 U.S.C. § 706, the Supreme Court in

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2254 (2024), overruled *Chevron, U.S.A.,*

*Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984).  Under *Chevron*, courts

employed a two-step framework for an agency's interpretation of statutes that Congress entrusted

them to administer.  *Loper Bright*, 144 S. Ct. at 2254.  Under step one, a court discerned whether

Congress had directly spoken to the precise question at issue, and if congressional intent was

clear, that ended the inquiry.  *Id.*  Under step two, if a court determined that the statute was silent

or ambiguous with respect to the specific issue at hand, the court deferred to the agency's

interpretation if it was based on a permissible construction of the statute.  *Id*.

In *Loper Bright*, the Court held that mere ambiguity in the statute is not a delegation of

law interpreting power to the agency and that "{c}ourts must exercise their independent

judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 2273.

Although the Court overruled step two of the *Chevron* framework, in which courts deferred to

agencies' reasonable interpretation of silent or ambiguous statutes, the Court instructed:

> In exercising such judgment, though, courts may—as they have
> from the start—seek aid from the interpretations of those
> responsible for implementing particular statutes.  Such
> interpretations "constitute a body of experience and informed
> judgment to which courts and litigants may properly resort for
> guidance" consistent with the {Administrative Procedures Act}.

*Id.* at 2262 (quoting *Skidmore v. Swift & Co*, 323 U.S. 134 (1944)).  Further, in cases when a

statutory ambiguity implicates a technical matter, the Court observes:

> the court will go about its task with the agency's "body of
> experience and informed judgment," among other information, at
> its disposal.  And although an agency's interpretation of a statute
> "cannot bind a court," it may be especially informative "to the
> extent it rests on factual premises within {the agency's} expertise."

> Such expertise has always been one of the factors which may give
> an Executive Branch interpretation particular "power to persuade,
> if lacking power to control."

*Id.* at 2267 (quoting *Skidmore*, 323 U.S. at 140; *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)).  Thus, courts are informed by agencies' interpretations and experience with statutes that Congress has entrusted them to administer.

The Court also recognizes instances when a statute either expressly or impliedly authorizes an agency to exercise discretion:

> the statute's meaning may well be that the agency is authorized to
> exercise a degree of discretion. Congress has often enacted such
> statutes.  For example, some statutes expressly delegate{} to an
> agency the authority to give meaning to a particular statutory term.
> Others empower an agency to prescribe rules to fill up the details
> of a statutory scheme, or to regulate subject to the limits imposed
> by a term or phrase that leaves agencies with flexibility, such as
> appropriate or reasonable.

*Loper Bright*, 144 S. Ct. at 2263 (internal citations and quotation marks omitted).  In those instances, reviewing courts "independently interpret the statute and effectuate the will of Congress subject to constitutional limits" "by recognizing constitutional delegations, fix{ing} the boundaries of {the} delegated authority, and ensuring the agency has engaged in reasonable decision making within those boundaries."  *Id.* (internal citations and quotation marks omitted).

Additionally, the Court directed that earlier cases relying on *Chevron* remain good law. *See id.* at 2273 (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 456 (2008); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014); *Dickerson v. United States*, 530 U.S. 428, 443 (2000)).  Thus, precedent sustaining Commerce's interpretation of the antidumping and countervailing duty statutes, including surrogate value determinations necessary to perform its statutory duty, remains in effect under the principle of *stare decisis* even if a court had reached its prior decision under step two of the *Chevron* analysis.

Finally, *Loper Bright* construed the APA, which "specifies that courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action, . . . —even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." 144 S. Ct. at 2261 (quoting 5 U.S.C. § 706) (emphasis in orginal).  Unlike *Loper Bright*'s reliance on the APA, the standard of review for Commerce's antidumping determinations lacks any similar admonition.  19 U.S.C. § 1516a(b)(1)(B)(i) (standard limited to setting aside determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law").

### C.    Legal Framework for Surrogate Value Selections

An antidumping duty represents the amount by which the "normal value" of subject merchandise exceeds its "export price (or the constructed export price)."  19 U.S.C. § 1673.  In proceedings involving a non-market economy, such as China, Commerce determines the subject merchandise's normal value by relying on the "best available information" from a market economy country or countries to derive surrogate valuations for the Chinese entity's factors of production, including raw materials, labor, and utilities.  *See* 19 U.S.C. § 1677b(c).  To those factors, Commerce also adds "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  *Id*. at § 1677b(c)(1)(B).

The statute requires that Commerce use, "to the extent possible," surrogate factors from "one or more market economy countries that are—{(1)} at a level of economic development comparable to that of the nonmarket economy country, and {(2)} significant producers of comparable merchandise."  *Id.* § 1677b(c)(4)(A)-(B).  If more than one market economy country is economically comparable, and a significant producer of comparable merchandise, then Commerce evaluates and compares the reliability and completeness of the record data from those

countries.  Import Admin., U.S. Dep't of Commerce, *Non-Market Economy Surrogate Country Selection Process*, *Policy Bulletin* 04.1 (2004), *http://enforcement.trade.gov/policy/bull04-1.html* (last October 17, 2024) (*Policy Bulletin*); *see also* Letter from Petitioners re: Surrogate Country Comments, dated November 22, 2022 (P.R. 36) at Exhibit 1.

By statute, Commerce must select the "best available information" on record to value the factors of production.  *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016) (citing 19 U.S.C. § 1677b(c)(1)(B)).  However, because the statute is silent regarding what constitutes the "best available information," Commerce possesses "broad discretion" in deciding what record evidence meets the criteria.  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citations omitted); *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (citations omitted).  In practice, Commerce strives to select, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and tax and duty exclusive.  *See generally Policy Bulletin*; *see also Jiaxing Bro.*, 822 F.3d at 1293.

Commerce also has a regulatory preference to use as much data as possible from a single primary surrogate country.  *See* 19 C.F.R. § 351.408(c)(2); *Jiaxing Bro.*, 822 F.3d at 1294, 1294 n.3 (citing *Policy Bulletin*).  This Court has explained that Commerce will "*only resort* to a secondary surrogate country if data from the primary surrogate country are *unavailable or unreliable*." *See Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 132–33 (Ct. Int'l Trade 2014) (citations omitted) (emphasis added), *aff'd, Jiaxing Bro.*, 822 F.3d 1289.

Commerce may rely on "imperfect" data.  *Jiaxing Bro.*, 822 F.3d at 1301 (citing *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)).  Commerce is not

required to duplicate the precise experience of the non-market economy manufacturer. *Nation Ford*, 166 F.3d at 1377. Instead, Commerce seeks to identify and to rely on the record data that "most accurately represents the fair market value" of the relevant factor of production. *Id.* Accordingly, given Commerce's discretion to determine the "best available information," and the fact-specific nature of this deferential case-by-case inquiry, a review of Commerce's determination should question "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing*, 822 F.3d at 1300-01 (citing *Zhejiang*, 652 F.3d at 1341).

## II. Commerce's Selection Of Romania As The Primary Surrogate Country Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Commerce's selection of Romania as the primary surrogate country is in accordance with law and supported by substantial evidence. Commerce determined that Romania was the appropriate primary surrogate country because Romania was at a comparable level of economic development to China, was a significant producer of comparable merchandise, and provides the best data for valuing certain factors of production. IDM at 15; Cmt. 2.

### A. Commerce's Consideration Of Romania As A Primary Surrogate Country And Its Factors Of Production Data Was Timely And In Accordance With The Law And Regulation

It is axiomatic that the record directs the administrative review of the subject merchandise. In this case, Commerce required that "{a}ll submissions of factual information to value factors under § 351.408(c) . . . are due no later than 30 days before the scheduled date of the preliminary results of review." 19 C.F.R. § 351.301(c)(3)(ii).

Kangtai extensively argues that Commerce should not have considered Bio-Lab's Romanian surrogate data because it was submitted after Commerce's deadline for the submission of surrogate information and that Commerce "ignore{d} its own deadlines and practice is thus

arbitrary" by accepting and relying on this data.  Kangtai Br. at 11.  Kangtai contends that

Commerce had set an initial deadline of December 2, 2022, for all comments regarding surrogate

country selection.  Surrogate Country Request at 2 ("comments on the surrogate country

selection must be submitted to Commerce no later than EST, 5:00 pm, December 2, 2022, so that

Commerce may have an opportunity to consider these comments for the preliminary results.")

(emphasis omitted).  Commerce received the Romanian surrogate value data from Bio-Lab on

May 31, 2023.  IDM at 22; Letter re Pet. Comments Concerning the Preliminary Determination

(May 31, 2023) at 4 (P.R.78).

What Kangtai fails to mention, however, is that on February 17, 2023, Commerce, under

its authority under 19 CFR § 351.301(a), extended the time to complete the preliminary results

until June 30, 2023, implicitly extending the deadline to submit surrogate value information.  *See*

Memorandum, "Chlorinated Isocyanurates from the People's Republic of China: Extension of

Deadline for Preliminary Results of Antidumping Duty Administrative Review," dated February

17, 2023 (P.R. 55).  Pursuant to 19 CFR § 351.301(c)(3), the updated deadline was May 31,

2023, and Commerce did not express any other deadline for submission of surrogacy

information.  *Id*.  When Commerce extended the deadline, Commerce also invited comments

from the parties "to evaluate the selection of the primary surrogate country due to changes in

Commerce's surrogate country list since the last administrative review."  *Id*. at 2.  Hence,

Commerce specifically invited submission of surrogacy comments until the statutory deadline.

Further, respondents' reliance on *Pure Magnesium* from China and *Fresh Garlic from

China* as support for their position is misguided.  Respondents' Br. at 8-10 (citing *Pure*

*Magnesium Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg.

94 (January 2, 2014) (*sic*), and accompanying IDM at Cmt. 1; and *Fresh Garlic Final Results*

*and Final Rescission of the 20th Antidumping Duty Administrative Review; 2013-2014*, 81 Fed.

Reg. 39,897 (June 20, 2016), and accompanying IDM at Cmt. 2).  Contrary to Kangtai's claims,

in *Pure Magnesium from China*, a party first suggested Ukraine as a potential surrogate country

*after* the deadline provided pursuant to 19 C.F.R. § 351.301(c)(3) and "during the briefing stage

of the instant review."  *See Pure Magnesium from China* IDM at 10; *see also* 19 C.F.R.

§ 351.309(c)(1) (providing a case brief schedule that occurs 30 days *after* Commerce's

preliminary results).  In *Fresh Garlic from China*, Commerce rejected alternative GNI data

submitted to support finding that Mexico was economically comparable to China.  *Fresh Garlic

from China* IDM at Cmt. 2.  Unlike this proceeding when after the extension request Commerce

did not set a specific deadline for surrogate comments besides the statutory deadline, Commerce,

in *Fresh Garlic from China*, set a specific deadline to comment on the surrogate country list;

moreover, Commerce found such a deadline is not covered under 19 C.F.R. § 351.301(c)(3).  *Id.*

at 19 (stating, pursuant to 19 C.F.R. § 351.301(c)(3)(ii) "the GNI data contained in the

submission are not factual information to value factors of production under 19 C.F.R.

§ 351.408(c)").  Thus, Commerce found the submission of this alternative GNI data was

untimely filed.  *Id*. at Cmt. 2.

      In the alternative, Kangtai argues that Commerce's practice is to bifurcate the deadlines

to submit information used to value factors of production under 19 U.S.C. § 1677b(c)(1).

Kangtai's Br. at 5-6.  Kangtai argues that the deadline for submitting factual information that

would lead to a country being selected as a surrogate country preceded the deadline under

19 C.F.R. § 351.301(c)(3).  *Id*. at 10.  As support, respondents argue that Commerce's decision is

contrary to the "policy goals" of 19 C.F.R. § 351.301(c)(3) and prior decisions support the

rejection of petitioners' information as untimely. *Id*. at 11. Kangtai also contends that

submission of the Romanian data on the last day of the submission was prejudicial. *Id.* at 10.

As to Kangtai's claim that that Commerce's decision "is the opposite of the policy goals

advanced in the 2013 Amendments," Kangtai fails to support its claim. Kangtai's Br. at 11. In

2013, Commerce adopted a change to 19 C.F.R. § 351.301(c) to provide Commerce with the

ability to "analyze factual information at the appropriate stage in the proceeding, rather than be

required to review large amounts of information when it is too late to adequately conduct its

analysis." *Definition of Factual Information and Time Limits for Submission of Factual

Information*, 78 Fed. Reg. 21,246, 21,248 (Dep't of Commerce Apr. 10, 2013). Previously,

19 C.F.R. § 351.301 provided only general time limits for submitting factual information, so

Commerce sought to provide "specific time limits based on the type of information submitted" in

its revision of the regulation. *Id.* at 78 Fed. Reg. 21,247. In promulgating the regulation at

19 C.F.R. § 351.301(c), Commerce considered many comments including the deadline for the

submission of surrogate country information. *Id.* at 78 Fed. Reg. 21,247. Commerce stated,

> Concerning the comment that the domestic interested parties
> should be required to make the initial suggestion of a surrogate
> country and factual information to value factors, it is to all parties'
> advantage to submit surrogate country and corresponding factual
> information to value factors early in the proceeding. We also note
> that all interested parties may submit factual information to rebut,
> clarify, or correct factual information to value factors, as long as
> that information is submitted solely for rebuttal and not for
> purposes of establishing new surrogate values.

*Id.* at 78 Fed. Reg. 21,248; *see also* 19 C.F.R. § 351.301(c)(3)(iv). Commerce did not carve out

a separate deadline specific to the submission of surrogate country information. Instead,

Commerce modified the regulation to provide a deadline for the submission of information used

to value factors of production under section 19 U.S.C. § 1677b(c)(1). *See* 19 C.F.R.

§ 351.301(c)(3)(iv).  Notably, Commerce's regulations also do not bifurcate deadlines for submitting surrogate country information or surrogate value data because both are related to the selection of information used to value factors of production under 19 U.S.C. § 1677b(c)(1).

Commerce's practice also supports this interpretation and treats the deadline, prescribed under 19 C.F.R. § 351.301(c)(3)(ii), as covering information relating to the selection of a surrogate country and surrogate value data.  IDM at 22.  In *Steel Racks from China*, Commerce accepted surrogate country selection information pursuant to the deadline under 19 C.F.R. § 351.301(c)(3).  *See Steel Racks from China* IDM at 9 (stating "{} timely submitted surrogate country selection comments in response to Commerce's request for such comments and timely submitted Romanian SV data for Commerce to consider based on the regulatory requirement to provide such data no later than 30 days before the preliminary determination signature date.").

Kangtai's arguments regarding prejudice fair no better.  There was no bar for it to timely submit comments about the data from Romania, which was present from the start on the surrogacy country list.  IDM at 22.  Regardless, Kangtai had the opportunity to provide additional comments and refute the arguments presented on the record, as petitioners pointed out. *Id*.  Kangtai also did not avail itself of its opportunity to file a request to extend the PDM issuance deadline pursuant to 19 C.F.R. § 351.301(a) and the resulting deadline to submit surrogacy comments.  Thus, no prejudicial effect can be said to occur when Commerce did not violate its regulations in its consideration of the additional surrogate value comments and accompanying data and when Kangtai did not avail itself of its regulatory remedies.

**B.    Commerce's Selection of Romania As The Primary Surrogate Country Is Supported By Substantial Evidence And In Accordance With Law**

Because the Tariff Act is silent with respect to how Commerce may determine which countries are economically comparable, Commerce has promulgated a policy to guide the

surrogate country selection process.  *See Policy Bulletin*.  Commerce's adherence to its

longstanding practice in the *Policy Bulletin* also led it to reject Mexico as a primary surrogate

country because Mexico was not economically comparable to China.

### 1.    Commerce's Formation Of The Surrogacy Country List Was Reasonable And In Accordance With The Law

Commerce has a rigorous process for determining which countries appear on its surrogate

country list.  IDM at 15-16; PDM at 20-23.  The formation of the surrogate country list is

Commerce's first step of a

> four-step process to select a surrogate country:
> (1) the Office of Policy ("OP") assembles a list of potential
> surrogate countries that are at a comparable level of economic
> development to the {non-market economy} country; (2)
> Commerce identifies countries from the list with producers of
> comparable merchandise; (3) Commerce determines whether any
> of the countries which produce comparable merchandise are
> significant producers of that comparable merchandise; and (4) if
> more than one country satisfies steps (1)–(3), Commerce will
> select the country with the best factors data.

*Jiaxing Bro.*, 822 F.3d at 1293 (quoting *Vinh Hoan Corp. v United States,* 49 F. Supp. 3d 1285,

1292 (Ct. Int'l Trade 2015)) (internal quotation marks and citations omitted).  The duty to select

a surrogate country and its resulting data was delegated to Commerce from Congress.  *See QVD*

*Food Co., Ltd. v. United States*, 658 F.3d 1318, 1320 (Fed. Cir. 2011) ("Because it is not always

possible to determine the normal value of goods from nonmarket economy countries in the

manner outlined in 19 U.S.C. § 1677b(a)(1), Congress allows Commerce to value the factors of

production for such goods by looking to the best available information from appropriate market

economy countries, referred to as 'surrogate countries.'" (citations omitted)); *see also* 19 U.S.C.

§ 1677b(c)(1) (*"*the administering authority shall determine the normal value of the subject

merchandise.").

A country's GNI ranking is "a threshold statutory criterion that must be met before other criteria are considered" in forming the initial surrogacy country list.  *Clearon Corp. v. United States*, 2014 WL 3643332, at \*11, 38 C.I.T. 1122 (Ct. Intl. Trade 2014).  This makes sense because, under 19 C.F.R. § 351.408(b), Commerce "will place primary emphasis on per capita GDP as the measure of economic comparability."  Commerce relies on per capita GNI instead of per capita GDP because "while the two measures are very similar, per capita GNI is reported across almost all countries by an authoritative source (the World Bank)," and Commerce "believes that the per capita GNI represents the single best measure of a country's level of total income and thus level of economic development."  *Vinh Hoan*, 49 F. Supp. 3d at 1293 n.5 (quoting *Antidumping Methodologies in Proceedings Involving Non–Market Economy Countries: Surrogate Country Selection and Separate Rates*, 72 Fed. Reg. 13,246, 13,246 n.2 (Dep't of Commerce Mar. 21, 2007)).

After Commerce compiles the initial surrogate country list, Commerce will then consider whether the countries on the list are significant producers of comparable merchandise, and if more than one country is such a producer, Commerce chooses the country with the "'best factors data.'"  *See Policy Bulletin*; *see also Clearon*, 2014 WL 3643332, at \*8.  As required by the statute, Commerce aims to select a surrogate country that is economically comparable and a significant producer of comparable merchandise.  Commerce will stray from the surrogate country list only when Commerce "determines all of the final listed countries lack sufficient data."  *Clearon*, 2014 WL 3643332, at \*5.  "Commerce has a regulatory preference for valuing all factors of production, with the exception of labor, from one surrogate country."  *Id.* (citing 19 C.F.R. § 351.408(c)(2).

Commerce acted according to its past practice and chose Bulgaria, Cost Rica, Malaysia, Panama, Romania, and Turkey as economically comparable using per capita GNI from the 2021 World Bank's World Development Report.  *See* Surrogate Country List; PDM at 20-21. Commerce explained that GNI is the "primary indicator of a country's level of economic development."  Surrogate Country Request at 2.  China was found to have a GNI of $11,890, and Commerce chose six countries whose GNI were at the same level of China, ranging from $14,170 to $9,830.  Surrogate Country List.  Commerce chose countries that were considered to be market economies and chose three countries above and the three countries below the GNI of China in accordance with its past practice.  PDM at 16; *See* Respondents' Final SV Comments at Exhibit SV2-1 (containing *Final Remand Results in Jacobi Carbons AB et al. v, United States*, Consol. Court No. 15-00286 (CIT April 7, 2017) (*Final Remand Results Jacobi Carbons*), at 2-18 (P.R. 70).  Mexico was not chosen because its GNI is $9,380 and was not found to be at the same level of economic development as it well below the other countries sorted by GNI.  *Id.* at 4. Commerce's past practice to formulate the list in this way provides a reasoned and sufficient test to provide the parties with consistent result that allowed for the parties' input in the process.

Bio-Lab argues for Commerce's usual practice to be turned on its head.  Bio-Lab opines that Commerce should treat economic comparability as a secondary consideration and not the first step that Commerce should take in performing its statutory role of identifying an initial surrogate country list.  Bio-Lab Br. at 12.  Bio-Lab essentially argues that Commerce should first look to countries that produce identical products and then look to the economic comparability prong of the analysis.  *Id.*  As we explained above, at 21-22, Commerce's first step is to look to economic comparability.  Bio-Lab relies on some exceptions to attempt to prove a new rule in discussing situations when unusual merchandise was considered, citing this Court's decision in

*Catfish Farmers v. United States,* No. 21-00380, 2023 WL 4560815, at *6 (Ct. Intl. Trade).[2]

However, although Commerce does possess flexibility in forming the surrogate country list when

considering an unusual or rare product, that does not negate Commerce's proper adherence to its

usual practice. *See Fresh Garlic Producers Assn. v. United States*, 121 F. Supp. 3d 1313, 1341-

42 (Ct. Intl. Trade 2015).  No party has suggested that the subject merchandise is an unusual

product.

Further, Bio-Lab calls into question Commerce's practice to exclude from consideration

countries that are not at the same economic level as China citing this Court's opinion in *Catfish

Farmers*, 2023 WL 4560815; Bio-Lab at 18.  However, as Bio-Lab recognizes the remand

decision in that case provided the Court enough information to assure the Court that the statutory

analysis had been conducted even under the existing framework that Commerce uses.  Bio-Lab

at 19; *see supra* 21-22.

Commerce's analysis in this case is statutorily sound and reasonable, as countries at the

same level of economic development are "comparable" within the meaning of 19 U.S.C.

§ 1677b(c)(4), and Commerce's practice leaves flexibility for Commerce to rely on other

economically comparable countries that are not at the same level of economic development when

circumstances warrant, for example, when there is an unusual product.  IDM at 17-18.  Indeed,

Commerce cited various administrative and judicial precedents that address when Commerce

applied, and this Court affirmed, the same methodology that Commerce used in this case.  *See id.*

at 17-18, PDM at 16, 22-23; Final Remand *Jacobi Carbons* at 10-12.

> ### 2.    Commerce Reasonably Determined Not To Consider Mexico As A Surrogate Country Because It Was Not Economically Comparable

Commerce reasonably rejected Mexico as a primary surrogate country.  Because the

---

[2] Despite Bio-Lab's reliance, this case does not discuss unusual merchandise.

record contained useful surrogate value data from countries that were economically comparable to China and produced comparable merchandise (Malaysia and Romania), Commerce found no reason to depart from its surrogate country list and to select as the primary surrogate country Mexico, a country further removed from China when sorted by GNI.  IDM at 16-17.

Bio-Lab argues that Mexico is economically comparable to China.  Petitioners invoke *Loper Bright* to question whether Commerce's decision not to consider Mexico as a potential surrogate country was the "best meaning" of the statutory provision at 19 U.S.C. § 1677b(c)(4). Petitioners' Br. at 1, 9-10, (citing *Loper Bright*, 2024 WL 3208360, at *22).  Petitioners also cite to prior administrative reviews of this proceeding when Commerce selected Mexico as the surrogate country.  Bio-Lab Br. at 15.  Petitioners also point to three different economic metrics used by the World Bank, to argue that Mexico is economically comparable to China.  *Id*. at 14. Bio-Lab concludes that the exclusion of Mexico as a potential surrogate country in this administrative review is inconsistent with the statute.  *Id.* at 18-20.

This is not a case of statutory ambiguity; Commerce was expressly delegated with this task and to use reasonable methods to fulfill it.  *See supra* 13, 21-22 (identifying delegation authority)*.  Loper Bright* does not alter this Court's prior decisions affirming Commerce's discretion and policies.  *See supra,* 13-14 (surveying the standard of review standard post-*Loper-Bright*).  Because of this, Bio-Lab still correctly identifies Commerce's hierarchy and four-step sequential process of selecting an appropriate surrogate country.  *See supra* 21-22.  Bio-Lab Br. at 11 (citing *Jiaxing Bro. Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1328 (2014)).  To that end, Commerce identified a group of countries, three above and three below China, in its surrogate country list, consistent with the statutory requirement under 19 U.S.C. § 1677b(c)(4) of the Tariff Act and its practice.  Mexico was simply outside the range and the inclusion of Mexico

on the list despite being outside of the range would force Commerce to depart from its consistent

past practices.  There was no reason for the agency to depart because Malaysia and Romania

provided sufficient data and were on the surrogate country list.

Bio-Lab does not contest that Romania and Malaysia are at a level of economic

development comparable to China, the nonmarket economy country.  *See* Petitioners' Br. at 15-

16; PDM at 21.  Instead, Bio-Lab argues that Commerce should skip over Romania and Malaysia

to select Mexico as the surrogate country because Mexico produces the subject merchandise.

Bio-Lab Br. at 10-13.  Bio-Lab, however, misconstrues the statute and this Court's prior

decisions.  This Court has routinely affirmed Commerce's treating the *per capita* GNI ranking as

a threshold statutory criterion that must be met before the other criteria are considered.  *Clearon*,

2014 WL 3643332, at *11.

Other countries may, when necessary, be selected from outside of the range of countries

identified by Commerce in its surrogate country list, but those countries are not considered to be

at the same level of economic development.  *See Clearon*, 2016 WL 6892556, at *3.  This

approach has been applied in numerous Commerce proceedings.  *See, e.g.*, *Certain Activated*

*Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative*

*Review; 2017-2018*, 84 Fed. Reg. 68881 (December 17, 2019), and accompanying IDM at Cmt.

1 (explaining that "Malaysia and Romania are both economically comparable to China, as both

countries are on the OP List, and are therefore determined, based on *per capita* GNI, to *be at the*

*same level of economic development* as China." (internal citations omitted and emphasis added));

*Certain Fabricated Structural Steel from the People's Republic of China: Final Affirmative*

*Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5376 (January 30, 2020), and

accompanying IDM at Cmt. 2 (observing that "pursuant to {19 U.S.C. § 1677b(c)(4)(A)}, both

Russia and Brazil are considered to be at *the same level of economic development* as China. Thus, they are not ranked and are considered equal in terms of economic comparability." (internal citations omitted and emphasis added)); *Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 8821 (February 18, 2020), and accompanying IDM at the section titled "Surrogate Country" (explaining that "{w}e selected Romania as the primary surrogate country, pursuant to {19 U.S.C. 1677b(c)(4)} and 19 C.F.R. 351.408(c)(2), because it is at *the same level of economic development* as China, because it is a significant producer of merchandise comparable to subject merchandise, and because of the availability and quality of Romanian data for valuing FOPs." (internal citations omitted and emphasis added)).

Bio-Lab also argues that Mexico should be chosen based on its history of being selected as the primary surrogate country in prior administrative reviews. Bio-Lab Br. at 15. Although, Mexico has been selected in the past, this Court has also upheld Commerce's long-standing practice to treat each segment of an antidumping proceeding as independent segments with separate records that lead to independent determinations. *See E.I. DuPont de Nemours & Co. v. United States*, No. 96-11-02509, 1998 WL 42598 (Ct. Int'l Trade Jan. 29, 1998); *Clearon*, 2014 WL 3643332, at *9 ("Commerce is not required by statute or regulation to select the same surrogate country it did in previous reviews.").

Although, Commerce seeks to ensure a consistent process to establish the surrogate country list, there is no requirement that the process must yield an identical result from one review period to the next including a surrogacy country with GNI rankings possibly changing every year, as discussed below. *See* IDM at 16-17. Thus, Bio-Lab's argument as to what Commerce did in the past avails it nothing. Bio-Lab Br. at 15-16.

27

Commerce relies on the annual release of the *World Bank Development Report*, which includes the latest *per capita* GNI data by country, when Commerce initiates the process of generating a list of countries at the same level of economic development as the non-market economy country in question. Surrogate Country List. Commerce examines the new *per capita* GNI data for the non-market economy (and the change in *per capita* GNI from the year before) and compares the change in the country's *per capita* GNI to the respective changes in *per capita* GNIs of the surrogate countries from the prior list. *Id*; *Final Remand Jacobi Carbons* at 2-12-13; *See* PDM at 16. Commerce places emphasis on achieving a degree of balance in the GNI range represented by the list. *Final Remand Jacobi Carbons* at 2-12-13. Commerce achieves balance by preserving the same number of surrogate countries above and below the non-market economy country (three countries with *per capita* GNIs higher/lower than the *per capita* GNI for the non-market economy, for a total of six). *Id.*

Bio-Lab also tries to criticize Commerce's longstanding reliance on GNI to rank the countries on its surrogate country list. Bio-Lab tries to bring in various other economic measures that have not been supported by this Court or past practice of Commerce. Bio-Lab Br. at 14-16. Measures that would not represent a predictable method to formulate a surrogate country list that includes Bio-Lab's non-numerical classification proposals to use World Bank classification by income, which Commerce has explained would result in the loss of a center and upend the surrogate country selection process. *Final Remand Jacobi Carbon* at 12; Bio-Lab Br. at 15. Regardless of any mentions to this data in the record, Commerce does not use the non-numerical World Bank income group data to fulfill its statutory duty but to demonstrate reasonableness of its own range. *Final Remand Jacobi Carbon* at 12. Commerce's method ensures consistency and objectivity in this way to generally choose three countries above and three below as

economically comparable and then allow parties to comment on the selection and formation of this list. Surrogate Country List.

This practice has long been affirmed by this Court. *See Clearon,* 2014 WL 3643332, at *10 ("Commerce's use of GNI as a measure of economic comparability in the instant review is reasonable interpretation of the statute and is in accordance with law.") (citing *Jiaxing Brother*, 961 F. Supp. 2d at 1329). In contrast, Bio-Lab's position on what economic metric Commerce should use is not substantiated in Commerce's past precedent or by this Court and exhibits no more than disagreement with Commerce's results and precedent.

In short, Commerce applied its practice— consistent with numerous agency decisions and court precedent—in generating a surrogate country list and focusing its analysis on Romania, a country that was at a comparable level of economic development. This administrative review does not present an instance when "none of the countries on the list are significant producers of comparable merchandise or have suitable sources of surrogate value data," requiring the selection of a country that was not at the same level of economic development. *See Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1318 n.12 (Ct. Int'l Trade 2018). Additionally, petitioners fail to demonstrate that Commerce's approach was unlawful, or that Malaysia or Romania were not economically comparable to China,[3] to support the consideration of Mexico as a surrogate country—a country that Commerce did not determine was to be placed on the surrogate country list. Accordingly, Commerce's decision not to consider Mexico, and instead to select Romania as the primary surrogate country is supported by substantial evidence.

---

[3] Indeed, the parties failed to challenge this aspect below. PDM at 21.

**III.    Commerce's Comparability Analysis Is Supported by Substantial Evidence And In Accordance With Law**

To find that Romania was the proper primary surrogate country, Commerce determined, in keeping with its past practice, that sodium and calcium hypochlorites are comparable products to chlorinated isos. During the administrative review, both Bio-Lab and Kangtai submitted export data to show whether the countries on Commerce's surrogate country list were significant producers of comparable merchandise. This export data supported a finding that Malaysia and Romania had significant exports of comparable merchandise during the period of review. PDM at 24-25 (citing Petitioners' Comments Concerning the Preliminary Determination (May 31, 2023) at Ex. 1); *see also* Respondents' Rebuttal Comments on GNI List (Nov. 28, 2022) at Att. 1-2. The comparable merchandise for Malaysia and Romania included calcium and sodium hypochlorites. IDM at 7; *see also* Respondents' Rebuttal Comments on GNI List (Nov. 28, 2022) at Att. 1-3; and Petitioners' Pre-Preliminary Comments at Ex. 1. Accordingly, Commerce determined that Romania was a significant producer of comparable merchandise, in accord with 19 U.S.C. § 1677b(c)(4) requirements.

Bio-Lab argues that Commerce has not chosen comparable merchandise. Bio-Lab asserts that sodium and calcium hypochlorites lack key components that differentiate them from the chlorinated isos. Bio-Lab also opines that chlorinated isos have a more complex production process, different end use, and differing physical characteristics. Bio-Lab Br. at 20-31. However, in each of these arguments Bio-Lab misses the point. The statute does not require Commerce to identify an identical product; the product must be only comparable, per Commerce three-part test laid out below. *See, e.g, Shanghai Foreign Trade Enters. Co. v. United States,* 318 F. Supp. 2d 1339, 1349 (Ct. Int'l Trade 2004) (listing prior administrative reviews where Commerce had "given the term 'comparable' an expansive interpretation.").

A.    <u>**Legal Framework for Merchandise Comparability**</u>

Congress required that Commerce "shall determine the normal value of the subject merchandise on the basis of the price at which merchandise that is comparable to the subject merchandise" is sold. 19 U.S.C. § 1677b(c)(2)(A). As this Court has explained, "{t}he statute does not speak directly to the meaning of 'comparable'; therefore, Commerce's interpretation will govern if it is reasonable." *Heze Huayi Chemical v. United States*, No. 17-0032, 2018 WL 2328183, at *4 (Ct. Int'l Trade May 22, 2018) (citing *United States v. Eurodif*, 555 U.S. 305, 316 (2009)); *see also* 19 U.S.C. § 1677(c)(4)(B); Pls. Br. at 3. In its *Policy Bulletin*, Commerce developed this statutory reasonable methodology for assessing comparability.

Commerce's *Policy Bulletin* explains that "{c}omparable merchandise is not defined in the statute or the regulations, since it is best determined on a case by case basis." The *Policy Bulletin* continues: "{e}ven so, there are some basic rules that every team should follow." The *Policy Bulletin* elaborates on the significance of finding identical merchandise: "{i}n cases where identical merchandise is not produced, the team must determine if other merchandise that is comparable is produced." *Id.*

Although identical products are preferable*, see Mid Continent Nail Corp. v. United States*, 712 F. Supp. 2d 1370, 1377 n.7 (Ct. Int'l Trade 2010), and *Heze Huayi Chemical*, 2018 WL 2328183, at *4 n.3., the statute does not require that they be identical. The statute allows Commerce flexibility to do a fact-specific inquiry including discarding countries with identical products for other considerations like data quality. *See Dorbest Ltd. v. U.S.,* 462 F. Supp. 2d 1262, 1274 (Ct. Intl. Trade 2006). Bio-Lab argues that Mexico must be selected because it is the only producer with identical merchandise. Bio-Lab Br. at 17. However, Bio-Lab stretches the statutory standard. 19 U.S.C. § 1677b(c)(4)(A)-(B). Although it is certainly easier for

Commerce to use identical merchandise, the Tariff Act requires only "comparable," not identical, merchandise. *Id.* If the product is comparable and the country economically comparable to the non-market economy, then Commerce has fulfilled its statutory duty. *See Dorbest,* 462 F. Supp. 2d at 1274-75 ("The statute does not require Commerce to find a producer of identical merchandise, but rather a producer of comparable merchandise").

To determine whether a producer produces "identical or comparable merchandise," Commerce often applies a three-part test examining "physical characteristics, end uses, and production processes." *Shanghai For.,* 318 F. Supp. 2d at 1348 (citation omitted); *see e.g., Pure Magnesium from the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 80,791 (Dep't of Commerce Dec. 23, 2010), and accompanying IDM at Cmt. 2; and *Certain Woven Electric Blankets from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 75 Fed. Reg. 38,459 (Dep't of Commerce Jul. 2, 2010), and accompanying IDM at Cmt. 2.

**B.    Sodium and Calcium Hypochlorites Are Comparable Products to Chlorinated Isos: Major Inputs**

Applying its three-part test to the record evidence, *see* IDM at Cmt. 1, Commerce determined that sodium and calcium hypochlorites were comparable merchandise. IDM at 7. Commerce first looked at the key components, part of the physical characteristics of the products. Commerce found that all of them are in the chlorinate family with both unstabilized and stabilized chlorines. IDM at 8; PDM at 25. Commerce determined that no major input warranted a finding that these were not comparable products because of the presence of a different ingredient, cyanuric acid.

Petitioners argue that cyanuric acid (CYA) imparts unique properties that are essential of chlorinated isos and that are not found in calcium or sodium hypochlorites, and that this distinction alone demonstrates that calcium hypochlorite and sodium hypochlorite are not comparable to the subject merchandise.  Bio-Lab Br. at 20-22.  Petitioners further argue that these unique properties classify CYA as a "specialized or dedicated" major input because it is "critical to maintaining the correct chlorine level in a pool" and reducing pathogens harmful to humans.  *Id.* at 21.  Petitioners further contend "that many chemical products include chlorine, but do not primarily function as swimming pool chemicals."  *Id.*

Commerce reasonably found that CYA did not meet the definition of a "major input" as defined in Commerce's *Policy Bulletin* as part of this three-part test.  The *Policy Bulletin* provides guidance for Commerce's analysis of a "major input."  A major input is "specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate."  *Policy Bulletin* at 3; PDM at 26.  Commerce reasonably determined that CYA does "not impart any special qualities that separates subject merchandise from the comparable products, which is the basic function of chlorination."  IDM at 8.  Commerce explained that CYA does not impart such special characteristics as to later the products similar end use—to sanitize swimming pools.  IDM at 8; PDM at 27, 29.  As we explain below, Commerce rejected the petitioners' primary focus on one difference, CYA, and instead took a holistic approach, focusing on all aspects of its test to determine comparability.  PDM at 26.

Commerce concluded that CYA "merely acts as a binding agent that allows for the slower release of chlorine," and this one difference does not meet the definition of a major input.

PDM at 26; *see also* Petitioners' Case Br. at 9-10 (Sept. 29, 2023) (P.R 115; C.R. 100), and

Petitioners' Rebuttal Comments on Surrogate Values (Dec. 29, 2022) at Ex. 2 (P.R. 48; C.R. 36)

(defining CYA as a pool stabilizer, which is used to regulate the chlorine level in a swimming

pool.).  Commerce found that petitioner has even agreed with Commerce in the prior proceedings

recognizing the comparability of the chlorination levels and the common chlorine and caustic

soda components that "are essential for chlorination."  PDM at 26 (citing *Chlorinated Isos from*

*China Investigation* IDM at Cmt. 2).  Commerce focused on its statutory test and the clear

similarities in reasonably finding that CYA did not constitute a major input, and its

determination should be affirmed.

### C.    Sodium and Calcium Hypochlorites Are Comparable Products to Chlorinated Isos:  Physical Characteristics

Bio-Lab makes several arguments in its critique of Commerce's analysis of calcium and

sodium hypochlorites' physical characteristics.  Petitioners' Br. at 20-26.  Specifically,

petitioners argue that Commerce merely focused on "chlorine and caustic soda" inputs and their

use in swimming pools, and ignored the importance of CYA as a major input that distinguishes

subject merchandise from calcium hypochlorite and sodium hypochlorite.  *Id*. at 21.  Petitioners

further claim that calcium hypochlorite and sodium hypochlorite and subject merchandise are

incompatible with each other, and that the United States International Trade Commission

(USITC), placed on the record for the first time relative to prior review, found that their

combined use could result in a "rapid explosion and fire."  *Id*. at 22.  Petitioners also argue that

Commerce overlooked that subject merchandise is produced into granules or tablets and, and

thus in a different physical form than sodium hypochlorite, which is produced in a liquid

solution.  Petitioners' Br. at 28.

However, Commerce found that calcium hypochlorite and sodium hypochlorite are all part of the same chlorine family as subject merchandise. PDM at 29. For example, Commerce found that calcium hypochlorite and chlorinated isos contain similar chlorine content (65 percent and 56-90 percent, respectively), and that sodium hypochlorite and chlorinated isos share similar inputs (for example, chlorine gas, caustic soda, and salt). *Id*. at 28. Commerce's test does not require the chemical to be interchangeable or able to be mixed together unlike the ITC's test. Instead, the products only need to be similar in physical characteristics. Commerce focused on the fact that all these products are essentially a chlorine. *Id.* at 28. Factoring with all the other tests, Commerce reasoned that calcium hypochlorite and sodium hypochlorite share similar physical characteristics with subject merchandise because, in the end, they are all in the chlorine family.

**D.    Sodium and Calcium Hypochlorites Are Comparable Products to Chlorinated Isos:  End Uses**

Petitioners argue that subject merchandise and calcium and sodium hypochlorites share different end-uses. Yet, petitioners appear to concede that calcium hypochlorite, sodium hypochlorite, and subject merchandise all share a common purpose—as sanitizers for swimming pools. Petitioners' Br. at 25; IDM at 8. Commerce emphasized the record evidence supporting sodium hypochlorite's use a "disinfectant for swimming pools in theme parks." IDM at 8 (citing Petitioners' Pre-Preliminary Comments at 29). Thus, petitioners' claims that these products are distinguished by the size of the pool where the products are being used does not support the contention that the products do not share *comparable* end-uses. Petitioners' Br. at 21. "The conclusion that two products may be comparable for the purposes of surrogate valuation, and yet have different end uses, is not novel." *Yantai Xinke Steel Structure Co. v. United States*, No. 10-00240, 2014 WL 1387529, at *19 (Ct. Int'l Trade 2014) (citing, *e.g., Musgrave Pencil Co. v.*

*United States*, 31 CIT 445, 450 (2007); *Shanghai For.*, 318 F. Supp. 2d at 1348 (2004) (listing past cases in which Commerce "has found comparability despite differences in shape, size and end use," because the "two classes of products {were} made using similar materials and production processes"). Because the common end use is a swimming pool sanitizer for chlorinated isos and the sodium and calcium hypochlorites, Commerce reasonably determined that subject merchandise and calcium hypochlorite and sodium hypochlorite share comparable end-uses. IDM at 6-9.

### E. Sodium and Calcium Hypochlorites Are Comparable Products to Chlorinated Isos: Production Process

Petitioners argue that Commerce conducted an "overly simplistic comparison of the production processes" of calcium hypochlorite and sodium hypochlorite to the subject merchandise. Petitioners' Br. at 26-31. Petitioners point to a declaration to support their contention that calcium and sodium hypochlorites and chlorinated isos are not "manufactured in common facilities with common employees," and highlight the cost differences of building a new calcium hypochlorite and sodium hypochlorite facility versus a new facility dedicated to subject merchandise. *Id.* at 27-28. Petitioners further rely on an ITC investigation of calcium hypochlorite to conclude that calcium hypochlorite and subject merchandise are not "manufactured in common facilities with common employees." *Id.* at 27 (citing Petitioners Comments on Primary Surrogate Country Selection, (Dec. 2, 2022) at Ex. 1 (USITC Pub. 4515) (P. R. 41-42; C.R. 32-33).

Nevertheless, Commerce reasonably determined that the production process of subject merchandise sufficiently mirrors that of calcium hypochlorite and sodium hypochlorite. PDM at 28. Commerce determined that the production process of subject merchandise entails a multi-stage process that involves making intermediate inputs, combining these inputs, and shaping the

finished products.  *Id*. at 28 (citing *Chlorinated Isos from China Investigation* IDM at Cmt. 2); *see also* Petitioners' Case Br. at 17, and Respondents' Final Surrogate Value Submission at Ex. SV2-13 (section "Process & Products-Overview")).  Commerce found that the production of calcium hypochlorite and sodium hypochlorite and chlorinated isos involves many of the same inputs.  PDM at 27-28 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates from the People's Republic of China*, 70 Fed. Reg. 24,502, 24,505 (Dep't of Commerce May 10, 2005) (*Chlorinated Isos from China Investigation*), and accompanying IDM at Comment 2).; IDM at 8; Petitioners' Case Br. at 17; and Respondents' Final Surrogate Value Submission at Ex. SV2-13 (section "Process & Products-Overview")). For instance, Commerce found that sodium hypochlorite, "involves a multi-stage production process requiring the production of two of the three same intermediate inputs, caustic soda and chlorine."  IDM at 8; *see also Chlorinated Isos from China Investigation* IDM at Cmt. 2; and Petitioners' Case Br. at 17; and Respondents' Final Surrogate Value Submission at Ex. SV2-13 (section "Process & Products-Overview")).  There is no statutory mandate that the chemicals could be made side-by-side.

Commerce also found that the criteria underlying the ITC's investigation and its domestic-like product determination test are not the same as those underlying Commerce's comparability analysis.  *Id*. at 8-9; *see also Jeld-Wen, Inc. v. United State*s, 567 F. Supp. 3d 1344, 1354-55 (Ct. Int'l Trade 2022) (discussing factors the ITC uses including interchangeability of the product, consumer perceptions, and price).  The provided ITC Investigation report examined whether calcium hypochlorite, sodium hypochlorite, and chlorinated isos are part of a "single domestic-like product."  Petitioners' Comments on Primary Surrogate Country Selection, (Dec. 2, 2022) at Ex. 1 (USITC Pub. 4515) (P. R. 41-42; C.R. 32-

33).  Commerce conducted an analysis to determine whether the products were *comparable* to

subject merchandise.  IDM at 6-9.  ITC's findings are only instructive, not dispositive.  PDM at

28.  Further, unlike the ITC, Commerce's analysis is guided by its *Policy Bulletin* and prior

reviews.  IDM at 8; (citing *Sebacic Acid from the People's Republic of China; Final Results of*

*Antidumping Duty Administrative Review*, 62 Fed. Reg. 65674, 65675-676 (Dep't of Commerce

Dec. 15, 1997) ("to impose a requirement that merchandise must be produced by the same

process and share the same end uses to be considered comparable would be contrary to the intent

of the statute.").

### F.    Precedent Supports Commerce's Decision As To Comparability

Commerce's application of the three-part test did not yield inconsistent results.

Commerce has a long history of finding calcium and sodium hypochlorites to be comparable to

the subject merchandise.  IDM at 6 (citing *Notice of Final Determination of Sales at Less Than*

*Fair Value: Chlorinated Isocyanurates from the People's Republic of China*, 70 Fed. Reg.

24502, 24505 (May 10, 2005) (*Chlorinated Isos from China Investigation*), and accompanying

IDM at Comment 2 (finding calcium hypochlorite to be comparable merchandise); *see also*

*2010- 2011 Chlorinated Isos from China Final Results* IDM at Comment 1 (finding sodium

hypochlorite to be comparable merchandise); *2012-2013 Chlorinated Isos from China Final*

*Results* IDM at Comment 2 (noting Commerce has found both calcium hypochlorite and sodium

hypochlorite to be comparable merchandise)); *see also Chlorinated Isocyanurates From the*

*People's Republic of China: Final Results of Antidumping Duty Administrative Review*; 2015–

2016, 83 Fed. Reg. 5,243 (Dep't of Commerce Feb. 6, 2018), and accompanying IDM at 13

(stating "Commerce continues to find that calcium hypochlorite and sodium hypochlorite are

comparable to subject merchandise because, as determined in prior segments of this proceeding

and on this record, it has similar physical characteristics and end uses, and a similar production process, as the subject merchandise."), *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*; 2017-2018, 85 Fed. Reg. 10,411 (Dep't of Commerce Feb. 24, 2020) (finding that both calcium hypochlorite and sodium hypochlorite are comparable to subject merchandise).

Further, this Court recognizes that "in prior reviews of the AD order, Commerce had found calcium hypochlorite and sodium hypochlorite comparable to subject merchandise because those compounds all share similar physical characteristics, end uses, and production processes." *Heze Huayi Chem.*, 2018 WL 2328183, at *3 (Ct. Intl. Trade 2018) (citing *Chlorinated Isocyanurates from the People's Republic of China*, 80 Fed. Reg. 4,539 (Jan. 28, 2015) (final results of AD admin. review), and accompanying I&D Memo at cmt. 2); *see also Juancheng Kangtai Chem. Co., Ltd. v. United States*, No. 14-56, 2017 WL 218910, at *4 (Ct. Intl. Trade 2017) ("Kangtai has not identified any record evidence that the Philippines' production of the comparable merchandise, sodium hypochlorite, was so low that it completely failed to affect world trade.").

Accordingly, Commerce's comparability decision was supported by substantial evidence, supported by its past practice affirmed by this Court, and otherwise in accordance with law.

## IV.    Commerce Properly Selected The Best Available Information On The Record For Determining Surrogate Values For All Factors Of Production

Commerce's selection of Romanian surrogate values for all factors of production is in accordance with law and supported by substantial evidence.  The record contains factors of production information for three countries:  Malaysia, Mexico, and Romania.  IDM at 2.  Of these, Commerce found that only Romania and Malaysia were economically comparable to

China and that Romanian surrogate financial statements were the best available information on the record.  IDM at Cmt. 2.

A.    **Romanian Surrogate Values Are The Best Available Information On The Record**

Under 19 U.S.C. § 1677b(c)(3), factors of production include, but are not limited to hours of labor required, quantities of raw materials used, amounts of energy and other utilities consumed, representative capital costs, and transportation costs.  *See also* PDM at 22. Commerce will value respondent's costs incurred in the production of subject merchandise (that is, factory overhead, selling, general and administrative expenses, and profit) by deriving financial ratios in accordance with 19 C.F.R. § 351.408(c)(4).  *Id.* at 26.  Commerce normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country.  19 C.F.R. § 351.408(c)(4).

Kangtai argues that Malaysia provides the best available surrogate value information with respect to labor, financial ratios, and chlorine.  Kangtai Br. at 12.  Commerce reasonably addressed the deficiencies of the Malaysian surrogate value data that made it unusable.  IDM at Cmt. 2.

Commerce reasonably found that the Malaysian labor data on the record of the administrative review was unusable.  PDM at 30; IDM at 19-20.  Respondents provided Malaysian labor data from the chemical manufacturing industry, as published by the Malaysian Department of Statistics.  PDM at 16; *see also* Respondents' Final Surrogate Value Submission at Ex. SV-2.  Commerce, however, determined that the Malaysian labor data were unusable due to record evidence supporting an allegation of forced labor and distortions in the labor rate as a result.  *Id.* at 30; *see also* IDM at 19; Respondents' Final Surrogate Value Submission at Ex. SV-2.  Commerce concluded that evidence of widespread forced labor practices in Malaysia was

likely to influence wages, even if it related to different manufacturing subsectors.  IDM at 19; *see also* Respondents' Final Surrogate Value Submission at Ex. SV-2.

This Court upheld Commerce's decision to refrain from relying on tainted labor data in *New American Keg v. United States*, No. 20-8, 2022 WL 4363320, at *2-3 (Ct. Int'l Trade 2022). In the underlying proceeding in *New American Keg*, Commerce relied on evidence of widespread forced labor practices in the Malaysian electrical and electronics sector, a subsector of the manufacturing sector, to determine that Malaysia labor data for the manufacturing sector was unusable as a labor surrogate value.  *Id.*; s*ee also Final Results of Redetermination Pursuant to Court Remand, New American Keg v. United States*, Court No. 20-00008, 2022 WL 4363320 (Ct. Int'l Trade 2022) available at https://access.trade.gov/Resources/remands/22-106.pdf (New American Keg Remand); and *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review*; 2020-2021, 88 Fed. Reg. 15,671 (March 14, 2023) (LWRPT from China), and accompanying IDM at Cmt. 2. Specifically, Commerce determined that the Malaysian electrical and electronics sector represented a significant portion of the overall manufacturing sector in Malaysia and the record demonstrated the presence of forced labor.  *New American Keg Remand* at 6 (stating "{t}hus, because 28 percent of employees in the Malaysian E&E subsector, at minimum, were employed in conditions of forced labor in the most recent period for which we have data available on the record . . . we conclude that over 22 percent of employees in the Malaysian manufacturing sector exhibited such characteristics.").

Nevertheless, respondents argue that the *New American Keg* decision can only support a finding that the labor rate of the Malaysian electrical and electronics sector is unreliable. Respondents' Br. at 21-22.  Respondents further argue that the provided Malaysian labor rate is

specific to the "manufacture of chemicals and chemical products," and more contemporaneous with the period of review because it is reported on a monthly basis. *Id*. As such, respondents claim that there is no reliability concern with the provided Malaysian labor rate, and that the data allows for a better comparison than the Romanian data. *Id*. According to respondents, these claims support finding that the Malaysian labor rate is more reliable, specific, and contemporaneous than that of Romania.

Similar to the finding in *New American Keg Remand*, Commerce found that the presence of forced labor in electrical and electronics sector was large enough to influence the wages in other subsectors of manufacturing, including the chemicals subsector. IDM at 19 (citing *New American Keg Remand*); *see also* Respondents' Final Surrogate Value Submission (May 31, 2023) at Exhibit SV2-11 (P.R. 69-70). Thus, Commerce determined not to rely on the Malaysian labor data. IDM at 19. Commerce's decision is consistent with its practice to find Malaysian labor data unusable in other antidumping proceedings involving merchandise outside of the electrical or electronics industry. For example, in *Wood Mouldings from China 2020-2022* and *Wood Mouldings from China 2022-2023*, Commerce similarly determined in cases relating to wood products that the provided Malaysian surrogate labor data were tainted by allegations of forced labor in the electronics industry. *See, e.g., Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; and Partial Rescission*; 2020-2022, 88 F.R. 62,539 (Dep't of Commerce Sept. 12, 2023) (W*ood Mouldings from China 2020-2022*), and IDM at 5-7; *Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; and Partial Rescission*; 2022-2023, 89 Fed. Reg. 76,452 (Dep't of Commerce Sept. 18, 2024) (*Wood*

*Mouldings from China 2022-2023*), and accompanying IDM at 15-16. Thus, contrary to respondents' claims, Commerce has consistently found Malaysian labor data to be tainted across a range of manufacturing industries. *See, e.g., FedEx Trade Networks Transp. & Brokerage, Inc. v. Airboss Def. Group, LLC*, No. 22 -01313, 2024 WL 1485441, at *2 (D. Md. Apr. 4, 2024) ("United States Government issued a withhold release order directing the detention of disposable gloves produced in Malaysia, due to concerns about the use of forced labor during the manufacturing of the gloves." (citation omitted)).

Commerce reasonably found that the Romanian surrogate value data for other factors of production were equal or superior to the Malaysian surrogate value data. PDM at 32; IDM at 19-20. Contrary to respondents' arguments, Commerce found that the chlorine surrogate value from Romania was usable and that the record contained usable financial statements from both Malaysia and Romania. PDM at 31-32; IDM at 20-21.

Respondents argue that there are certain "abnormalities" with the Romanian import data with respect to chlorine as provided by petitioners and sourced by Global Trade Atlas and is, thus, not the best available information. Respondents' Br. at 15. Specifically, respondents contend that the Romanian import value for chlorine is unreliable because several imports include a "0" as the reported quantity, certain data is missing, the average unit values (AUVs) vary widely with no logical explanation, and the quantities of imports are low. *Id*. In contrast, respondents claim that the Malaysian import AUVs are consistent and reasonably connected to the larger quantities of chlorine imports. *Id*.

Commerce, however, removed the Romanian chlorine import data from countries that reported a zero quantity. IDM at 26-27; *see also* Respondents' Case Br. at Att. 1. Thus, although Commerce agreed with respondents and found the Romanian import value data ranged

from very low to very high from countries who reported zero as an import quantity, Commerce did not to rely on that data. *Id.* Therefore, respondents' claims are unconvincing. Moreover, although Commerce did not use the data with a zero quantity, it is not barred from relying on such data. *Id.* See *Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 35,595 (Dep't of Commerce Jul. 24, 2019) (Steel Racks from China), and accompanying IDM at 8 (stating "Commerce {has} found that it is appropriate to include in its {surrogate value} calculations imports with zero quantities and low values.").

Moreover, respondents' arguments regarding Romanian import quantities do not demonstrate that Romania is not a significant producer. See Respondents' Br. at 16. This Court addressed a similar argument in a prior segment of this proceeding, finding that "'{t}here are not degrees of significant production' and that {Commerce} need not select the country that is 'the most significant producer' of comparable merchandise . . . is consistent with the statutory language requiring 'significant producers of comparable merchandise.'" *Juancheng Kangtai*, 2017 WL 218910, at *4 (internal citations omitted); *see also Heze Huayi*, 2018 WL 2328183, at *5 ("the ability to influence world trade is not a standard required by the statute). Respondents have also not demonstrated that more than 400 tons of chlorine is not a commercial quantity — even if influence on world trade were a statutorily required component of significance. IDM at 28 (stating "we find the Romanian import quantities of 413.35 MT of chlorine which exclude the zero import quantities, represent a commercially significant import quantity.").

Kangtai also briefly argues that the import values from Mexico and Malaysia were similar and that Romanian values were higher means that Romanian import data were aberrational as the cost per kg was $1.88 compared to $0.31 for Malaysia. Kangtai Br. at 18.

Contrary to Kangtai's claim that Commerce did not examine this information, Commerce explained its methodology. Commerce advised that "showing that a price is high is not enough." IDM at 28. Commerce explained that there were only two chlorine surrogate values to compare that were economically comparable to China. Having only two data points, provides "an inadequate number of data points to analyze whether the aggregate SV for Romania is aberrational." *Id.* Commerce pointed to its past practice to demonstrate that its decision in this case is in line with its past practice when only two countries could provide the pricing average. *Id.*; citing *M S Int'l, Inc. v. United States*, 547 F. Supp. 3d 1254, 1274 (Ct. Int. Trade 2021) ("Commerce was left with only two countries whose data could be compared—Mexico and Malaysia—and the mere fact that Mexico's data were higher did not demonstrate that Mexico's data were aberrational").

With respect to the calculation of financial ratios, respondents point to the fact that there are two Malaysian financial statements on the record–Chemical Company of Malaysia Berhad (CCM) and Malay-Sino Chemical Industries Sendirian Berhad (Malay-Sino)–whereas there is only one Romanian financial statement for Chimcomplex and that the Malaysian financial statements are superior because they provide more surrogate financial data and, thus, increase the likelihood of yielding an accurate surrogate value. Respondents' Br. at 12-14. Respondents further claim that the Malaysian financial statements are more representative of the respondents' production experience because CCM produces calcium hypochlorite and Malay-Sino produces sodium hypochlorite–two products that Commerce found to be comparable merchandise– whereas Chimcomplex produces several chemical products. *Id.* at 14. Thus, respondents argue that Commerce failed to consider the significance of financial ratio data provided by the Malaysian companies' financial statements. *Id.* at 12-14.

Commerce agreed with respondents that its preference is to use multiple financial statements to calculate surrogate financial ratios.  IDM at 21.  However, Commerce found Malaysian labor data to be unusable.  *Id*.  Thus, the Malaysian surrogate value information was not the best available information.  Accordingly, Commerce lawfully selected Romania as the primary surrogate country because it found usable surrogate values from Romania for all factors of production and satisfied its regulatory preference to source all surrogate values from one country.  19 C.F.R. § 351.408(c)(2).  Commerce stood by its longstanding practice to use only one surrogate country in these circumstances in accordance with its regulatory preference to use as much data as possible from a single primary surrogate country.  *See* 19 C.F.R. § 351.408(c)(2); *Jiaxing Bro.*, 822 F.3d at 1294, 1294 n.3 (citing *Policy Bulletin*)

Additionally, Commerce's finding that Romania had quality data in which to value the factors of production demonstrates that Bio-Lab did not meet its burden to show that Mexico should have been selected because "the party proposing a non-listed country {must first demonstrate} that no country on the surrogate country list provides the scope of 'quality' data that {Commerce} requires in order to make a primary surrogate country selection."  *Clearon*, 2015 WL 4978995, at *4.  Thus, Bio-Lab would need to succeed in showing that both Malaysia's and Romania's data are both of insufficient quality.  That it fails to do.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny Kangtai's and Bio-Lab's

motions for judgment on the administrative record and sustain Commerce's final results.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.

OF COUNSEL                              Assistant Director
Jesus Saenz
Attorney                                /s/ Tate N. Walker
Office of Chief Counsel                 TATE NATHAN WALKER
for Trade Enforcement & Compliance      Trial Counsel
Department of Commerce                  U.S. Department of Justice
                                        Civil Division
                                        Commercial Litigation Branch
                                        P.O. Box 480
                                        Ben Franklin Station
                                        Washington, D.C.  20044
                                        Tel: (202) 307-0163
                                        Fax: (202) 305-7643

November 6, 2024                        *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that defendant's motion in this matter complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the motion was prepared, the brief contains a total of 13,660 words.


November 6, 2024                              /s/ Tate Walker