**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |  |
|---|---|---|
| BIO-LAB, INC., ET AL. | ) | |
| *Plaintiffs and Consolidated* | ) | |
| *Defendant-Intervenors*, | ) | |
|  | ) | |
| v. | ) | Consol. Ct. No.  24-00024 |
|  | ) | |
| UNITED STATES, | ) | |
| *Defendant,* | ) | |
| AND | ) | |
|  | ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. AND | ) | |
| HEZE HUAYI CHEMICAL CO., LTD., | ) | |
| *Defendant-Intervenors and* | ) | |
| *Consolidated Plaintiffs.* | ) | |

## <u>ORDER</u>

Upon consideration of the Rule 56.2 Motions for Judgment upon the Agency Record filed by consolidated plaintiffs and defendant-intervenors Heze Hauyi Chemical Co., Ltd. and Juancheng Kangtai Chemical Co., Ltd., and plaintiffs and consolidated defendant-intervenors Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation ("Petitioners"), the supporting memoranda of law, all responses thereto, and all other papers and proceedings in this action, it is hereby:

ORDERED that consolidated plaintiffs' Motion for Judgment Upon the Agency Record is in all respects DENIED; and it is further

ORDERED that plaintiffs' Motion for Judgment Upon the Agency Record is granted; and it is further

ORDERED that the final results of the Department of Commerce's administrative review of the antidumping duty order covering chlorinated isos from China, *Chlorinated Isocyanurates*

*from the People's Republic of China: Final Results of Antidumping Duty Administrative Review;*

*2021-2022, 89 Fed. Reg. 455 (Jan. 4, 2024)*, are remanded to Commerce for further proceedings

for the agency to:

(1) consider that Mexico is comparable to China in terms of economic development and

analyze whether Mexico is a more appropriate surrogate for purposes of 19 U.S.C. § 1677b(c)(4)

because it is a significant producer of Chlor isos identical to the subject merchandise imported

from China; and

(2) reconsider the finding that calcium or sodium hypochlorite produced in Romania or

any other potential surrogate is "comparable merchandise" for purposes of 19 U.S.C. §

1677b(c)(4) based on the substantial record evidence compiled in the challenged administrative

review.

**SO ORDERED.**

Dated:  _____          _____
          New York, New York                                    Timothy M. Reif, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | | |
|---|---|---|
| BIO-LAB, INC., ET AL. | ) | |
| *Plaintiffs and Consolidated Defendant-Intervenors*, | ) ) ) | |
| v. | ) ) | Consol. Ct. No.  24-00024 |
| UNITED STATES, | ) ) | |
| *Defendant,* | ) | **PUBLIC DOCUMENT** |
| AND | ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD., | ) ) ) | |
| *Defendant-Intervenors and Consolidated Plaintiffs.* | ) ) ) | |

**BIO-LAB, INC., ET AL'S RESPONSE IN OPPOSITION TO CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

<div style="margin-left:40%">

James R. Cannon Jr.
Chase J. Dunn
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W., Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Consolidated Defendant-Intervenors Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

</div>

Date:   November 18, 2024

i

**Table of Contents**

**Page**

I.   Statement Pursuant to Rule 56.2 ...................................................................... 1

    A. Administrative Determination Under Review ........................................... 1

    B. Statement of the Issues ............................................................................. 2

II.  Statement of Facts ........................................................................................... 2

III. Summary of Argument ..................................................................................... 5

IV. Argument ......................................................................................................... 6

    A. Standard of Review ................................................................................... 6

    B. Commerce's Selection of Romania, Rather than Malaysia, as the
    Primary Surrogate Country Was Lawful, Timely, and In Accordance
    with Practice ............................................................................................... 8

        1.   Huayi and Kangtai ignore Commerce's authority to select a surrogate
        country irrespective of whether an interested party has advocated for that country . 8

        2.   Huayi and Kangtai ignore Commerce practice, the deadlines established in
        the regulations, and the record ............................................................... 9

        3.   Garlic from China and Magnesium from China are readily distinguished ... 11

    C. Romania, Not Malaysia, Provided the Best Information Available to
    Value Respondents' FOPs ......................................................................... 13

        1.   Commerce reasonably relied on Romanian financial statements given
        evidence that Chimcomplex was a significant producer of sodium hypochlorite ... 14

        2.   The Malaysian surrogate value for labor is distorted by widespread forced
        labor in the Malaysian manufacturing sector .......................................... 15

        3.   The Romanian surrogate value for Chlorine is not aberrational or otherwise
        inferior to the Malaysian value .............................................................. 18

        4.   Heze Huayi and Kangtai ignore evidence that Romania provided superior
        surrogate value data for water ................................................................. 21

V.   Conclusion ....................................................................................................... 21

## Table of Authorities

**Page(s)**

**Statutes**

5 U.S.C. § 706 .................................................................................................................6

19 U.S.C. § 1677b(c) .....................................................................................................2, 8

19 U.S.C. § 1677b(c)(4) ................................................................................................15

19 U.S.C. § 1516a(b)(1)(B) ...........................................................................................6

28 U.S.C. § 2640(b) ......................................................................................................6

**Regulations**

19 C.F.R. § 351.301(c)(3)(ii) ........................................................................... 5, 9, 11-12

19 C.F.R. § 351.408 ....................................................................................... 8-9, 11

19 C.F.R. § 351.408(c)(2) ..............................................................................................14

19 C.F.R. § 351.408(d)(1)(ii) .....................................................................................6, 15

**Court Decisions**

*Ad Hoc Shrimp Trade Action Committee v. United States*, 219 F. Supp.
3d 1286 (Ct. Int'l Trade 2017) .....................................................................................16

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ........................................7

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) .................................................................7

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 281(1962) ............................8

*Calgon Carbon Corp. v United States*, 443 F. Supp. 1334 (Ct. Int'l
Trade 2020) ...................................................................................................................20

*Catfish Farmers of America v. United States*, Consol. Court No. 08-
00111 (Sept. 14, 2009) ECF No. 100-1 .......................................................................20

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ............................................7

*Consolo v. Federal Maritime Comm'n*, 383 U.S. 607 (1966) ......................................7

*Jiaxing Bro Fastener Co., Ltd. v. United States*, 822 F.3d 1289 (Fed.
Cir. 2016) ......................................................................................................................9

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ...........................................................................................................7

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) ...........................................................................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...........................................................................7, 9

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)....................................6-7

*Solarworld Ams., Inc. v. United States*, 320 F. Supp. 3d 1341 (Ct. Int'l Trade 2018)..........................................................................................20

*SolarWorld AMS., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020)....................................20

*Tri Union Frozen Products, Inc. v. United States*, 277 F. Supp. 3d 1387 (Ct. Int'l Trade 2017) ....................................................................16

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)........................................6

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ..............................7

## Administrative Determinations

*Certain Collated Steel Staples from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2021-2022*, 88 Fed. Reg. 85242 (Dec. 7, 2023) ............................................................................................17

*Certain Corrosion Inhibitors from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2020-2022*, 88 Fed. Reg. 69905 (Oct. 10, 2023)................................................17

*Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 35595 (July 24, 2019) ......................................19

*Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2018-2019*, 85 Fed. Reg. 67709 (Oct. 26, 2020) ...........................................................................15

*Chlorinated Isocyanurates From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 43271 (July 7, 2023)........................................... *passim*

*Chlorinated Isocyanurates from the People's Republic of China: Final*

*Results of Antidumping Duty Administrative Review; 2021-2022*, 89
Fed. Reg. 455 (Jan. 4, 2024) ................................................................ *passim*

*Drawn Stainless Steel Sinks From the People's Republic of China: Final*
*Results of Antidumping Duty Administrative Review; 2021-2022*, 88
Fed. Reg. 76174 (Nov. 6, 2023)...................................................................18

*Fresh Garlic from the People's Republic of China: Final Results and*
*Final Rescission of the 20th Antidumping Duty Administrative Review;*
*2013-2014*, 81 Fed. Reg. 39897 (June 20, 2016)................................... 9, 11-12

*Pure Magnesium from the People's Republic of China: Final Results of*
*Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 94
(Jan. 2, 2014)...............................................................................................12

*Raw Honey from the Socialist Republic of Vietnam: Final Results of*
*Antidumping Duty Changed Circumstances Review*, 89 Fed. Reg. 64411
(Aug. 7, 2024) .............................................................................................16

*Xantham Gum from the People's Republic of China: Preliminary*
*Results of Antidumping Duty Administrative Review, Rescission, In Part,*
*and Preliminary Determination of No Shipments; 2022-2023*, 89 Fed.
Reg. 68136 (Aug. 23, 2024)..........................................................................18

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, consolidated Defendant-Intervenors Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation ("Bio-Lab, IWC, and OxyChem" or "Petitioners") respectfully submit this response brief in opposition to the Motion for Judgment on the Agency Record filed by Heze Hauyi Chemical Co., Ltd. ("Huayi") and Juancheng Kangtai Chemical Co., Ltd. ("Kangtai"). *See* Consolidated Plaintiffs' Rule 56.2 Memorandum in Support of Motion for Judgment on the Agency Record (July 16, 2024) ("Kangtai's Br."); *see also* Defendant's Response to Plaintiffs' and Consolidated Plaintiffs' Rule 56.2 Motions for Judgment on the Agency Record (Nov. 6, 2024) ("Defendant's Br.").

## I.    Statement Pursuant to Rule 56.2

### A.  Administrative Determination Under Review

Bio-Lab, IWC, and OxyChem are domestic producers of Chlorinated isocyanurates ("Chlor isos") and oppose Huayi's and Kangtai's challenge to certain aspects of the final results of Commerce's antidumping duty administrative review of Chlor isos from the People's Republic of China. *See Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 455 (Jan. 4, 2024) ("*Final Results*") (P.R. 127) and accompanying Issues and Decision Memorandum ("IDM") (P.R. 126); *Chlorinated Isocyanurates From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 43271 (July 7, 2023) ("*Preliminary Results*") (P.R. 104) and accompanying Decision Memorandum ("PDM") (P.R. 93).[1]

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__".

### B. Statement of the Issues

(1) Commerce included Romania among six potential surrogate countries found to be economically comparable to China. Bio-Lab, IWC, and OxyChem argued that Mexico should also be considered economically comparable, but in the alternative, Romania also met this statutory requirement. The Petitioners timely submitted Romanian surrogate value data for all of the factors of production utilized by Huayi and Kangtai. The question presented is whether Commerce's selection of Romania as the primary surrogate for China was in accordance with the statute.

(2) The record included evidence regarding the surrogate values for financial ratios, chlorine, labor, and other factors of production in both Romania and Malaysia. The question presented is whether the selection of Romanian values rather than Malaysian values was supported by substantial evidence and otherwise consistent with law.

## II. Statement of Facts

Because China is a non-market economy ("NME"), the statute requires Commerce to calculate normal value using surrogate values for the factors of production ("FOPs") used in China to produce the subject merchandise. *See* 19 U.S.C. § 1677b(c). For this purpose, Commerce's Office of Policy identifies a list of six potential surrogates deemed to be "the same" as China in terms of the level of economic development. Commerce Memorandum, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information" (Nov. 15, 2022) ("*SC Memo*") (P.R. 34) at Attachment 1 (Commerce Memorandum, "List of Surrogate countries for Antidumping Investigations and Reviews from the People's Republic of China ("China")" (Aug. 19, 2022) ("*2022 GNI List*")). Commerce places the GNI List on the record in all investigations and administrative reviews involving merchandise from China. In any investigation or review segment pending or initiated after the GNI List is posted on its website, Commerce issues an invitation to parties to comment on the "non-exhaustive list." *See SC Memo*.

Consistent with practice, Commerce invited interested parties to comment on the "non-exhaustive" *2022 GNI List* "as a starting point for surrogate country selection." *SC Memo* at 1.

The *2022 GNI List* on the record included Romania, Panama, Costa Rica, Malaysia, Bulgaria, and Turkey, and Commerce specifically requested that interested parties "propose for consideration other countries that are at a level of economic development comparable to China." *Id.*

In response to Commerce's request, Bio-Lab, IWC, and OxyChem proposed Mexico for consideration as a primary surrogate for China. *See* Letter from Petitioners, "Comments on Surrogate Country List" (Nov. 22, 2022) ("*GNI List Cmts*") (P.R. 36) at 3-9. At this point, and in all of their subsequent comments, Bio-Lab, IWC, and OxyChem did not contest that Romania, Panama, Costa Rica, Malaysia, Bulgaria, or Turkey were comparable to China in terms of economic development. *See, e.g.*, Letter from Petitioners, "Comments on Primary Surrogate Country Selection" (Dec. 2, 2022) ("*SC Selection Cmts*") (P.R. 41-43) at 5-9; Letter from Petitioners, "Rebuttal Comments on Primary Surrogate Country Selection" (Dec. 12, 2022) ("*SC Selection Rebuttal Cmts*") (P.R. 44) at 2-7.[2] Rather, Bio-Lab, IWC, and OxyChem observed that Mexico was the only economically comparable country that actually produced Chlorinated Isos. *See SC Selection Cmts*.

Nevertheless, in the event that Commerce persisted in limiting the selection of a surrogate from among the six *2022 GNI List* countries, Bio-Lab, IWC, and OxyChem pointed out that Romania was included on the *2022 GNI List* and provided an alternative surrogate. *See* Petitioners, "Initial Surrogate Value Data" (Dec. 19, 2022) ("*SV Cmts*") (P.R. 45-47) at 4. The Petitioners included a copy of the annual report of a Romanian chemical producer,

---

[2] This issue is under review in the companion action that is part of this consolidated appeal.

Chimcomplex, that could be utilized to calculate financial ratios based on "actual production of chlorine, caustic soda, and downstream derivatives in Romania." *Id.* at 4 and Exhibit 11.

Given that Romania was explicitly included on the *2022 GNI List* and that Bio-Lab, IWC, and OxyChem identified Romania as a second-best surrogate based on evidence that it was a significant producer of comparable merchandise, the Petitioners subsequently and timely submitted additional evidence showing that Romania, unlike Malaysia, was a net exporter of sodium hypochlorite. *See* Petitioners, "Comments Concerning the Preliminary Determination" (May 31, 2023) ("*Preliminary Cmts*") (P.R. 78) at Exhibit 1. In addition, Bio-Lab, IWC, and OxyChem provided Romanian surrogate value data for every FOP used in the production of Chlorinated Isos in China, including each raw material and by-product produced by Huayi and Kangtai, based on POR import statistics. *See Preliminary Cmts* at 25-27 and Exhibits 7-13. Also included were Romanian labor costs and electricity rates published by Eurostat. *Id.* at Exhibits 10, 11. Finally, the submission included freight costs and brokerage and handling costs supplied by "Doing Business in Romania." *Id.* at Exhibit 13. All of these sources are well-known to Commerce, to counsel for Huayi and Kangtai, and are regularly relied upon as sources for surrogate factor values.

Commerce published its *Preliminary Results* on July 7, 2023, and selected Romania as the primary surrogate country. *See Preliminary Results*. Commerce refused to consider Mexico as a surrogate because it was not on the *2022 GNI List* and therefore not at the "same" level of economic development as China. PDM at 21-23. Commerce also rejected Malaysia as a primary surrogate after finding that Romania provided the best available information for valuing the respondents' FOPs. Among other things, Commerce found that the Romanian surrogate value data for labor and water were superior to the available Malaysian data. *Id.* at 32. With respect to

4

labor, Commerce found that "allegations of forced labor practices in Malaysia's manufacturing sector…preclude reliance on Malaysia as the source of the best information available for surrogate labor values. *Id.* at 30.

On January 4, 2023, Commerce published its *Final Results* and continued to utilize Romania as the primary surrogate for China. Based on the record evidence, Commerce concluded that "two SC List countries, Malaysia and Romania, were economically comparable to China, were significant producers of comparable merchandise, and had SV data on the record." IDM at 17. As between Malaysia and Romania, however, Commerce concluded that "Romania is the only country on the SC List that is both a significant producer of comparable merchandise and provides reliable SV information for all FOPs, packing materials, and financial ratios." *Id.* at 18 (citing Malaysia's labor cost data are particularly unreliable); *see also id.* at 19 (citing Malaysia's water rates as relatively lower quality than the Romanian data).

### III.     Summary of Argument

Commerce's selection of Romania as the primary surrogate country was lawful and consistent with prior practice. By placing it on the *2022 GNI List*, Commerce indicated that Romania was at "the same" level of economic development as China and thus a contender to be the primary surrogate. Despite their advocacy for Mexico, Bio-Lab, IWC, and OxyChem clearly and timely indicated that Romania could be a second-best choice as surrogate and timely submitted complete and accurate Romanian surrogate value information for all factors of production pursuant to 19 C.F.R. § 351.301(c)(3)(ii). Putting aside the issue whether Mexico should have been selected as the primary surrogate, the selection of a GNI List country, Romania, as the primary surrogate was fully consistent with Commerce practice and supported by substantial evidence.

Commerce's determination that Romania, and not Malaysia, provided the best information available to value Chinese producers' financial ratios, labor costs, chlorine costs, and water rates was likewise supported by substantial evidence. Regarding the financial ratios, the record showed that the Romanian producer, Chimcomplex, was a significant producer of comparable merchandise. By comparison, the record did not provide any basis to determine the significance of any comparable merchandise produced in Malaysia. Regarding labor costs, the Malaysian labor rates were impacted by forced labor practices in Malaysia. Consistent with recent precedent and with 19 C.F.R. § 351.408(d)(1)(ii), Commerce's findings regarding Malaysia labor costs were reasonable and supported by the record. Regarding chlorine costs, Huayi and Kangtai assert that the Romanian costs pertain to small-quantity importations, but ignore that the zero-quantity imports were not utilized and the resulting values were not "aberrational" as measured by well-established precedent. Finally, Huyai and Kangtai failed to mention that the Romanian water rates were also superior to the Malaysian values. For these reasons, Commerce reasonably considered the pros and cons of Malaysian and Romanian factor value data and appropriately selected Romania as the primary surrogate.

## IV.    Argument

### A.  Standard of Review

In appeals of antidumping duty determinations, this Court will hold Commerce's determination unlawful if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B); *see also* 28 U.S.C. § 2640(b); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) (citing the Administrative Procedures Act at 5 U.S.C. § 706). A "party challenging {Commerce's} determination under the substantial evidence standard 'has chosen a course with a higher barrier to reversal.'" *Nippon Steel Corp. v.*

*United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting *Mitsubishi Heavy Indus., Ltd. v.*

*United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)). The substantial evidence standard is a

deferential standard which tests whether a determination is supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir.

1984).  The Court must affirm Commerce's determination "if it is reasonable and supported by

the record as a whole, even if some evidence detracts from the {agency's} conclusion." *Nippon*

*Steel Corp. v. United States*, 458 F.3d at 1352 (Fed. Cir. 2006) (quoting *Altx, Inc. v. United*

*States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).  Therefore, "even if it is possible to draw two

inconsistent conclusions from evidence in the record," this does not mean that Commerce's

findings are unsupported by substantial evidence within the meaning of the statute.  *Nippon*

*Steel*, 458 F.3d. at 1352; *see also Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620

(1966).  Succinctly stated by the Supreme Court: a reviewing court "should not supplant the

agency's findings merely by identifying alternative findings that could be supported by

substantial evidence." *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992).  Likewise, it is

reversible error for the Court to "assess{} credibility and reweigh{} the evidence," as "it is the

role of the expert factfinder…to decide which side's evidence to believe." *Nippon Steel*, 458

F.3d at 1359.

Furthermore, the "scope of review under the 'arbitrary and capricious' standard is narrow

and a court is not to substitute its judgment for that of the agency…." *Motor Vehicle Mfrs. Ass'n*

*of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency decision is not

arbitrary or capricious so long as the agency "examine{s} the relevant data and articulate{s} a

satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 281, 285 (1962)). In short, a reviewing court "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (citations omitted).

### B. Commerce's Selection of Romania, Rather than Malaysia, as the Primary Surrogate Country Was Lawful, Timely, and In Accordance with Practice

#### 1. *Huayi and Kangtai ignore Commerce's authority to select a surrogate country irrespective of whether an interested party has advocated for that country*

Commerce's selection of Romania as the primary surrogate country for valuing Huayi's and Kangtai's FOPs was lawful, timely, and in accordance with longstanding practice.[3] Huayi and Kangtai assert that "Romania cannot be relied upon as a primary surrogate country" because "*Petitioner* only suggested Romania as a potential primary surrogate country in its final surrogate value submission and Preliminary Comments." Kangtai Br. at 4 (emphasis added). However, Commerce, not interested parties, selects a surrogate country pursuant to 19 U.S.C. § 1677b(c). Neither the statute nor Commerce's regulations limit Commerce's authority to only selecting a surrogate from among countries that have been identified by interested parties.

Fundamentally, neither the statute nor the regulations limit Commerce to only selecting a surrogate country nominated or preferred by interested parties. *See, e.g.,* 19 U.S.C. § 1677b(c);

---

[3] It will be noted that Bio-Lab, IWC, and OxyChem, as plaintiffs in this consolidated appeal, contest the selection of Romania, rather than Mexico, on the grounds that Mexico was also economically comparable to China but was the only potential surrogate that had actual production of the subject merchandise, Chlorinated Isos. As defendant-intervenor in this action, Bio-Lab, IWC, and OxyChem defend the selection of Romania as the primary surrogate only insofar as the record establishes that Romania was a better surrogate than Malaysia.

19 C.F.R. § 351.408. "While the Department is required to consider the evidence on the record and the parties' arguments to select the country that best matches the established statutory criteria, there is no provision in the statute that requires the Department to defer to the preferences of respondents {or petitioners} in making its choice as long as the Department is following its statutory mandate." *Fresh Garlic from the People's Republic of China: Final Results and Final Rescission of the 20th Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 39897 (June 20, 2016) ("*Garlic from China*"); *see also Jiaxing Bro Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1298 (Fed. Cir. 2016) ("We discern nothing in the statute that requires Commerce to consider any particular country as a surrogate country."). Huayi and Kangtai "do not contest that parties could submit Romanian data, *or indeed any surrogate value data*, to the record up to the 30-day surrogate value deadline." Kangtai Br. at 7 (emphasis added). It is undisputed that Bio-Lab, IWC, and OxyChem timely submitted Romanian surrogate value data before the deadline set forth in 19 C.F.R. § 351.301(c)(3)(ii). It follows that the record included Romanian surrogate value data and Commerce's reliance on that surrogate value information was in accord with the agency's regulations and practice. *See* IDM at Comment 3.

In sum, Commerce's reliance on Romanian factor value data is not arbitrary and capricious. As noted above, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. That is precisely what Commerce did in this instance by considering the entire administrative record and relying on timely and relevant surrogate value data contained in that record.

### 2. *Huayi and Kangtai ignore Commerce practice, the deadlines established in the regulations, and the record*

As illustrated by the procedure followed in this review, at the outset of every NME proceeding Commerce first issues an invitation to comment on the most recently issued *GNI List*

for purposes of selecting a surrogate country. *See SC Memo* at 1. Countries on the GNI List are deemed economically comparable to China and therefore contenders as the primary surrogate. *Id.* (inviting parties to "propose for consideration *other* countries that are at a level of economic development comparable to China") (emphasis added). As such, all parties are on notice that any of the *2022 GNI List* countries might be selected as a primary surrogate, in addition to any other country proposed by parties that is economically comparable to the NME country.

Here, Bio-Lab, IWC, and OxyChem did propose that Mexico should be included in the list of potential surrogates. *GNI List Cmts* at 3-8. In response, Huayi and Kangtai filed rebuttal comments arguing that Commerce need not "resort to a country off of the surrogate country list" (*i.e.*, Mexico) and asserting that "at least one country on that list, Malaysia," was a significant producer of comparable merchandise. Letter from Huayi and Kangtai, "Rebuttal Comments on GNI List" (Nov. 28, 2022) (P.R. 37) at 1, 3. Neither Huayi nor Kangtai argued that any other country on the *2022 GNI List* should be disqualified or removed from consideration. *See generally id.*

Moreover, Commerce's *SC Memo* sets deadlines for comments and rebuttal with respect to three issues. First, the *SC Memo* asks parties to comment on the list of six countries included on the *GNI List* and to identify any additional countries that should be considered. Second, the *SC Memo* asks the parties to comment on which surrogate country should be selected as the primary surrogate. Third, the *SC Memo* instructs the parties to provide initial comments regarding surrogate values. The procedure established by Commerce practice and the regulations establishes the initial universe of potential surrogates based on the GNI List issued to the parties early in the review.

In the context of an investigation or review, however, this is not the final deadline for

submitting evidence with respect to appropriate surrogate values. Recognizing that statistical and other factual information concerning surrogate values may not be fully available at the beginning of an administrative review, the regulations provide that "{f}actual information submitted to value factors under § 351.408(c) {FOPs} … are due no later than 30 days before the scheduled date of the preliminary results of review." 19 C.F.R. § 351.301(c)(3)(ii).

Here, in the event that Commerce persisted in limiting the selection of a surrogate from among the six *2022 GNI List* countries, Bio-Lab, IWC, and OxyChem provided evidence that "there is actual production of chlorine, caustic soda, and downstream derivatives in Romania," including the annual report of a Romanian chemical producer of these products. *SV Cmts* at 4 and Exhibit 11. These comments were timely filed on December 2, 2022, well ahead of the deadline for submitting factor values pursuant to 19 C.F.R. § 351.301(c)(3)(ii). Notably, Huayi and Kangtai did not file any rebuttal comments contesting that Romania – already identified as economically comparable – was also a significant producer of comparable merchandise, as shown by the annual report of Chimcomplex. *SV Cmts* at 4 and Exhibit 11.

### 3. *Garlic from China and Magnesium from China are readily distinguished*

Given this sequence of events, Kangtai's reliance on *Garlic from China* is misplaced. *See* Kangtai's Br. at 8-9. *Garlic from China* concerned the attempt by a respondent to submit information concerning the economic comparability of a country that was not included on the *GNI List*. This information was not submitted in surrogate country list comments or surrogate country selection comments; rather, the information was submitted for the first time 30 days prior to the preliminary determination, *i.e.*, the deadline for information to value factors of production under § 351.408. Commerce found that this submission was untimely pursuant to § 351.301(c)(3)(ii), explaining that the "GNI data contained in the {rejected} submission are not

factual information to value factors of production under 19 CFR 351.408(c)." *Garlic from China*, IDM at Comment 2. In other words, Commerce rejected a late attempt to add another potential surrogate, Mexico, to the GNI List. However, Commerce accepted the respondent's timely submission of Mexican surrogate values pursuant to § 351.301(c)(3)(ii), but ultimately did not select Mexico as the primary surrogate given the lack of evidence regarding economic comparability. *Id.*

The fact pattern here is unlike *Garlic from China*. Here, there was no question that Romania was economically comparable to China – it was included on the *2022 GNI List*. Moreover, Bio-Lab, IWC, and OxyChem timely submitted evidence concerning the financial ratios in Romania of a significant producer of comparable merchandise and explicitly observed that although Romania was not of producer of identical merchandise, it was nevertheless a better surrogate than Malaysia. *SV Cmts* at 4 and Exhibit 11.

Likewise, respondents' citation to *Pure Magnesium from China* is unavailing. That case concerned a request by a party for an alternative surrogate country after the preliminary determination and during the briefing stage. *See* Defendant's Br. at 18 (citing *Pure Magnesium from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 94 (Jan. 2, 2014), IDM at Comment 1). In contrast to that case, Petitioners here timely submitted Romania surrogate value data that was superior to the Malaysian surrogate value data on the record. Accordingly, Commerce's reasoning and holding in *Pure Magnesium from China* is not applicable to the facts presented here.

In summary, Commerce's selection of Romania, rather than Malaysia, as the primary surrogate country was consistent with the statute, agency regulations, and past practice. Neither the statute nor Commerce's regulations require Commerce to ignore its GNI List unless

interested parties endorse specific countries on that list. It is undisputed that the Romanian surrogate value information was timely submitted, and it was contained in the administrative record. Commerce evaluated all surrogate value information in the record and found Romania provided the best information available for valuing respondents' FOPs. Therefore, Commerce's reliance on that information in selecting Romania as the primary surrogate was not arbitrary or capricious, or otherwise inconsistent with the statute.

### C. Romania, Not Malaysia, Provided the Best Information Available to Value Respondents' FOPs

Huayi and Kangtai claim that the selection of Romania as the primary surrogate was not supported by substantial evidence because "Malaysia sources superior surrogate data for financial ratios, chlorine, and labor." Kangtai Br. at 12. As discussed below, the mere fact that there are two Malaysian financial statements and one Romanian financial statement does not undermine Commerce's use of the Romanian financial ratios or address the relative quality of the financial statements. Nor do Huayi or Kangtai provide any reasonable basis to set aside Commerce's finding that the widespread use of forced labor in Malaysia disqualifies the Malaysian labor rates as a quality source of surrogate values. Regarding the relative merit of Romanian and Malaysia chlorine values, the record does not show that the Romanian values are aberrational simply because they are higher than the Malaysian values, and there is no principled basis to reject the values pursuant to past practice. Finally, the respondents ignore that Romania provided a more granular and specific water rate than Malaysia – yet another reason supporting Commerce's selection of Romania as the primary surrogate.

### 1. *Commerce reasonably relied on Romanian financial statements given evidence that Chimcomplex was a significant producer of sodium hypochlorite*

Huayi and Kangtai assert that Commerce should have selected Malaysia as the primary surrogate country because Malaysia provides two financial statements of producers of comparable merchandise whereas Romania only provides one. *See* Kangtai Br. 12-14. However, as Commerce explained in the *Final Results*, the preference for using multiple financial statements only applies when "the overall quality of the remaining SVs of the two competing countries are considered equal." IDM at Comment 2. Here, Commerce found "Malaysia to have an unreliable labor rate and a less preferable water rate," whereas Romania "has usable SVs for all FOPs as well as usable financial ratios calculated from Chimcomplex's financial statements which have been used in other proceedings." *Id.*

As an initial matter, Commerce's reasoning in the *Final Results* reflects the preference stated in 19 C.F.R. § 351.408(c)(2): "The Secretary normally will value all factors in a single surrogate country." For this reason alone, Commerce reasonably selected Romania rather than Malaysia as the primary surrogate country.

However, the record in this proceeding also establishes that the Malaysian financial statements do not clearly establish that either Malaysian company actually produced a significant amount of comparable merchandise in Malaysia. Huayi and Kangtai have submitted financial statements from the same two Malaysia producers in prior administrative reviews of the Chlor Isos order. For example, Commerce's preliminary results in the 2018-2019 administrative review found that the Malaysian producers may have manufactured comparable merchandise, but there was no evidence that such production was "significant" or that the financial statements themselves were usable for the purposes of calculating financial ratios:

14

we preliminarily find CCM and Malay-Sino to be the only Malaysian companies that have sufficient information on the record showing them to be a producer of comparable merchandise. However, the respondents have not provided any corroborating information to show that either company is a significant producer of comparable merchandise.

*Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2018-2019*, 85 Fed. Reg. 67709 (Oct. 26, 2020), PDM at 13 (unchanged in *Final Results*, 85 Fed. Reg. 10411).

Here, in the *Preliminary Results* Commerce again found that two Malaysia producers, CCM and Malay-Sino were producers of comparable merchandise. PDM at 32. However, Commerce did not identify any evidence that would indicate whether either Malaysian company was a "significant" producer within the meaning of 19 U.S.C. § 1677b(c)(4). By comparison, the financial statements of Chimcomplex indicated that the Romanian producer held "75 to 90 percent of the 'Chlorosodic' domestic market" in Romania. *Id.* at 32 (*citing SV Cmts* at Exhibit 11 at Note 1.1.1). As such, the record here, consistent with the record in the 2018-2019 review, established that the Romanian financial statement was more likely to represent significant production of comparable merchandise than either Malaysian financial statement on the record.

### 2. The Malaysian surrogate value for labor is distorted by widespread forced labor in the Malaysian manufacturing sector

Commerce's longstanding practice is to reject labor surrogate values that are distorted by forced labor. The regulations, 19 C.F.R. § 351.408(d)(1)(ii), provide that Commerce "may disregard a proposed surrogate value" if the evidence shows that the value "is derived from … a country with weak, ineffective, or nonexistent" human rights or labor protections. Here, given record evidence of widespread forced labor in Malaysia, Commerce reasonably rejected Malaysia's labor rates. Although there may not be specific evidence of the use of forced labor in

the chemical sector, *see* Kangtai Br. at 21-23, Commerce reasonably relied on prior findings that extensive use of forced labor in the Malaysian manufacturing sector distorts labor costs in the sector as a whole. By comparison, the Romanian labor surrogate value relied upon by Commerce is not tainted by forced labor, is from the primary surrogate country, and is otherwise specific and reliable. Accordingly, Commerce's reliance on the Romanian labor surrogate value as the best information available on the record is supported by substantial evidence.

Forced labor "distort{s} the market by unfairly lowering labor costs and undermining fair competition." *Raw Honey from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Changed Circumstances Review*, 89 Fed. Reg. 64411 (Aug. 7, 2024) at Factor 2, Section C.5. Companies that "rely upon forced labor can reduce their operational costs dramatically, as they do not need to comply with fair wage laws or provide safe working conditions." *Id.* As a result, and as this Court has previously recognized, it "is a fair inference that the wage rates of workers subject to systematic labor abuses cannot be trusted." *Tri Union Frozen Products, Inc. v. United States*, 277 F. Supp. 3d 1387, 1398 (Ct. Int'l Trade 2017); *see also Ad Hoc Shrimp Trade Action Committee v. United States*, 219 F. Supp. 3d 1286, 1297 (Ct. Int'l Trade 2017) ("It is reasonable to presume that an industry with abusive labor practices, including child labor and forced labor as is alleged here, is not a fair surrogate by which to construct a market price for these NME goods.").

In the *Final Results*, Commerce found that "Malaysia does not have a reliable SV for labor due to evidence of forced labor" and therefore "followed {its} strong preference to value all FOPs from a single {surrogate country} in finding Romania's SV to be better overall than Malaysia's SV data." IDM at Comment 2. Commerce correctly cites its decision in *New American Keg* and *New American Keg Final Redetermination*, which found "the labor SV based

16

on the overall manufacturing sector was not the best available information to value labor because of evidence of widespread forced labor practices, such as in the Malaysian electrical and electronics (E&E) sector, a subsector of the manufacturing sector." *Id.* Although Kangtai asserts that the "Malaysia labor rate on this record is not related to the E&E sector," Kangtai fails to grapple with Commerce's prior determination that the "Malaysian E&E subsector employs a substantial proportion of the total workers in the Malaysian manufacturing sector," with "over 22 percent of employees in the Malaysian manufacturing sector exhibit{ing} {forced labor} characteristics." *Final Results of Redetermination Pursuant to Court Remand, New American Keg v. United States*, Court No. 20-00008, 2022 WL 4363320 (Ct. Int'l Trade 2022) available at https://access.trade.gov/Resources/remands/22-106.pdf ("*New American Keg Remand*"). Given that nearly a quarter of Malaysia's manufacturing sector exhibits forced labor characteristics, Commerce reasonably concluded that all Malaysian labor rates are distorted and cannot be trusted. *See* IDM at Comment 2.

Since the issuance of the *New American Keg Final Redetermination*, "it has been public information that Commerce has refrained from using Malaysian labor data for" surrogate values. *Certain Corrosion Inhibitors from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2020-2022*, 88 Fed. Reg. 69905 (Oct. 10, 2023), IDM at Comment 6. Indeed, Commerce has consistently rejected Malaysian labor data in recent cases, including cases that were not related to the E&E sector. *See, e.g., Certain Collated Steel Staples from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2021-2022,* 88 Fed. Reg. 85242 (Dec. 7, 2023), IDM at Comment 2 ("recent final determinations indicate that labor data from the Malaysian manufacturing sector are unsuitable for that purpose due to the existence of forced labor in

Malaysia"); *Xantham Gum from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Rescission, In Part, and Preliminary Determination of No Shipments; 2022-2023*, 89 Fed. Reg. 68136 (Aug. 23, 2024), PDM at I.4 ("We find that allegations of forced labor practices in Malaysia's manufacturing sector…preclude reliance on Malaysia as the source of the best information available for surrogate labor values."); *Drawn Stainless Steel Sinks From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 76174 (Nov. 6, 2023), IDM at Comment 5 ("we find that allegations of forced labor practices in Malaysia's {electrical and electronics sector}….has compelled us to consider another source to value labor in this case").

In summary, Commerce evaluated two different labor surrogate data in the *Final Results*: (1) Malaysian labor data tainted by forced labor, and (2) Romanian labor data that was free from any such distortions. Consistent with longstanding practice, Commerce rejected the Malaysian labor data and found that the Romanian data to be the best information available. Commerce's determination is reasonable, consistent with its recent practice, and supported by substantial evidence.

### 3. *The Romanian surrogate value for Chlorine is not aberrational or otherwise inferior to the Malaysian value*

Huayi and Kangtai contend that Commerce erred in selecting Romania as the primary surrogate, in part, because the Romanian "import value for chlorine shows abnormalities and renders it an unreliable surrogate value." Kangtai Br. at 14. Kangtai's analysis, however, is based on a selective interpretation of record evidence and fails to address Commerce practice and judicial precedent regarding whether surrogate data is aberrational or unreliable. As discussed below, the Romanian surrogate value for chlorine, an essential input in the production of Chlor isos, was from the primary surrogate country, reflects commercial quantities and values, and thus

was a reliable surrogate value.

*First*, Kangtai's assertion that the Romanian data is not reliable because there are imports with a reported zero quantity fails to recognize that Commerce excluded all monthly import data that reported zero quantities. *See* Kangtai Br. at 15; IDM at Comment 4. Commerce "did not use the data with a zero quantity," even though it is "not barred from relying on such data." Defendant's Br. at 44 (citing *Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 35595 (July 24, 2019), IDM at 8). Accordingly, any distortion arising from import data with a reported zero quantity was ameliorated by Commerce's exclusion of such data from its calculation. *See* IDM at Comment 4.

*Second*, contrary to Kangtai's assertion, the variation in monthly import quantities shown by the Romanian GTA statistics does not distinguish the Romania import data from the Malaysian data. *See* Kangtai Br. at 16. The record demonstrates that "Malaysia and Romania both contain small and large monthly import quantities from various countries which suggest that these countries have similar transactions that fall along a spectrum of different quantities sold and imported into these countries." IDM at Comment 4 (citing Respondent's SV Comments at Exhibit 2). In fact, "{l}ike Romania, Malaysia includes some chlorine imports under one metric ton, as well as several other imports below 20 metric tons…Malaysia had multiple monthly imports of chlorine from various countries well below one metric ton, including two imports as low as 100 kg and 300 kg during the POR." *Id.* Accordingly, record evidence demonstrates that Romanian import quantities are consistent with the import quantities of other potential surrogates, including Malaysia, even if Romania imported a smaller volume overall.

*Finally*, the Romanian value for chlorine is not aberrational. *See* Kangtai Br. at 18.

Commerce considers import data to be aberrationally high if the data is "many times higher than the import values from other countries." *Solarworld Ams., Inc. v. United States*, 320 F. Supp. 3d 1341, 1351 (Ct. Int'l Trade 2018). The Merriam-Webster dictionary defines "many" as "being one of a _large_ but indefinite number." *See* Merriam-Webster, *Definition of "Many,"* https://www.merriam-webster.com/dictionary/many (emphasis supplied). In interpreting Commerce's practice, this Court has previously found an AUV aberrational (*i.e.*, "many times higher") when it was "almost 30 times higher than" other AUVs for the same input from other surrogate countries. *Calgon Carbon Corp. v United States*, 443 F. Supp. 1334, 1350 (Ct. Int'l Trade 2020); *see also SolarWorld AMS., Inc. v. United States,* 962 F.3d 1351, 1361 (Fed. Cir. 2020) (inclusion of multiple of 191 times was remanded for reconsideration); *Catfish Farmers of America v. United States*, Consol. Court No. 08-00111, at 5-6 (Sept. 14, 2009), ECF No. 100-1 (excluding unit values from Japan and the Netherlands from the import value used as surrogate value for respondent's labels because the unit value from the Netherlands and Japan were more than 79 and 30 times greater respectively, than the overall average import values).

The Romanian AUVs for chlorine are not "many times higher" than other values on the record. As acknowledged by Kangtai, the Malaysian AUV (*i.e.*, $1.88) is only three and a half times the Mexican AUV (*i.e.,* $0.51) and only six times higher than the Romanian AUV (*i.e.*, $0.31) on the record. *See* Kangtai Br. at 18. These multiples are not "many times higher" than the Malaysian value. Furthermore, Kangtai's attempt to exaggerate the different AUVs by reference to percentage differences is misleading and should be rejected. The percentage difference between one and two is 100%; however, in no meaningful sense is two "many times higher" than one. Accordingly, analyzing AUV data on a multiple basis, rather than percentage basis, is a more accurate analysis of whether a value is aberrational.

In sum, Commerce reasonably found that the Romanian chlorine value was not aberrant and excluded all zero quantities in its analysis to avoid any potential distortion arising from such data. Commerce explained that both Malaysia and Romania reported high and low quantities of imports, and that the Romanian chlorine value was not many times higher than other values on the record. Accordingly, Commerce's determination that the Romanian chlorine value was accurate and probative, and thus supported selecting Romania as the primary surrogate, was supported by substantial evidence.

### 4. *Heze Huayi and Kangtai ignore evidence that Romania provided superior surrogate value data for water*

Huayi's and Kangtai's arguments that Malaysia provided the best information available for valuing respondents' FOPs ignore record evidence that detracts from its argument. Specifically, Commerce found that the "the Romanian water rates to be better in quality than the Malaysian rates" because "Commerce could separately identify the relevant costs in the Romanian rates but not in the Malaysian MIDA water rates, which were inclusive of all costs." IDM at Comment 2. Thus, not only did Commerce find the Malaysian labor data to be distorted by forced labor and the Romanian chlorine value to be reliable, Commerce also found Romania provided superior surrogate data for water. This finding, ignored by Kangtai, further supports Commerce selection of Romania rather than Malaysia as the primary surrogate country.

### V.    Conclusion

For the reasons discussed above, this Court should reject Huayi's and Kangtai's arguments that Commerce's selection of Romania as the primary surrogate, rather than Malaysia, was arbitrary, capricious, and unsupported by substantial evidence. As demonstrated above, Commerce evaluated all surrogate data on the record and reasonably found that Romania, not

Malaysia, provided the best information available for valuing respondents' FOPs. Accordingly,

Commerce's selection of Romania rather than Malaysia as the primary surrogate country was in

accordance with the statute, past practice, and is supported by substantial evidence.

Respectfully submitted,

/s/ James R. Cannon, Jr.
James R. Cannon, Jr.
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W.
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

Date:   November 18, 2024

Court. No. 24-00024

## <u>Certificate of Compliance</u>

The undersigned hereby certifies that the forgoing submission of "Bio-Lab, Inc., et al.'s Response in Opposition to Consolidated Plaintiffs' Rule 56.2 Motion for Judgement on the Agency Record" filed by defendant-intervenors on November 18, 2024, contains 6,374 words, including footnotes, and excluding the table of contents, table of authorities, and signature block, and therefore, complies with the maximum 14,000-word limitation set forth in the Standard Chambers Procedures.

BY: <u>/s/  James R. Cannon Jr.</u>