UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., ET AL.<br>    Plaintiffs,<br><br>and<br><br>JUANCHENG KANGTAI CHEMICAL CO., LTD.<br>AND HEZE HUAYI CHEMICAL CO., LTD.,<br>    Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br>    Defendant,<br><br>and<br><br>BIO-LAB, INC., ET AL;  JUANCHENG KANGTAI<br>CHEMICAL CO., LTD. ET AL.<br>    Defendant-Intervenors and<br>    Consolidated Defendant-Intervenors.. | Consol.  Ct No. 24-00024 |

## **DEFENDANT-INTERVENORS' RESPONSE BRIEF**

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 Fifteenth Street, N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs*

Dated: November 18, 2024

**TABLE OF CONTENTS**

I. Introduction ........................................................................................................... 1

II. Standards of Review ............................................................................................. 1

III. ARGUMENT ......................................................................................................... 2

    A. The Department Properly Found that Mexico was Not Economically Comparable to China ................................................................................... 4

    B. The Department Properly Found that Identical Merchandise Production is not Required under the Statute .................................................................. 6

        1. Identical Merchandise Production is not Required under the Statute .. 6

        2. Calcium Hypochlorite and Sodium Hypochlorite are Comparable Merchandise ........................................................................................ 11

    C. Mexico Does not Source the Beset Available Surrogate Values ................ 13

IV. Conclusion and Prayer for Relief ........................................................................ 16

i

# TABLE OF AUTHORITIES

**Cases**

*Baoding Yude Chem. Indus. Co., Ltd. v. United States*, 170 F. Supp. 2d 1335, 1343 (2001) .........5

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938).........................................2

*CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 295 (2011).................................6

*Fresh Garlic Producers Ass'n v. United States*, 2015 Ct. Intl. Trade LEXIS 133 (Ct. Int'l Trade Nov. 30, 2015) ...............................................................................................................................7

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1318-21 (Ct. Int'l Trade 2018) ..... 4-5

*Jiaxing Brother Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1330 (2014) ......................6

*Juancheng Kangtai Chem. Co., Ltd. v. United States*, SLIP OP. 2015-93, Slip Op. 15-93, 2015 WL 4999476, at *25 (CIT Aug. 21, 2015) ......................................................................................5

*Michigan v. Bay Mills Indian Community*, Ed. 2d 1071, 1086 (U.S. 2014)...................................6

*Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001) ................................................................................................................................................2

*Shandong TTCA Biochemistry Co., Ltd. v. United States*, 774 F. Supp. 2d 1317, 1321 (Ct. Int'l Trade 2011) ......................................................................................................................................2

*Shenzhen Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333, 1383 (Ct. Int'l Trade 2014) ..............................................................................................................................................15

*Torrington Co. v. United States*, 19 C.I.T. 403, 409 (1995), aff'd, 127 F.3d 1077 (Fed. Cir. 1997) ................................................................................................................................................2

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...............................................................2

**Statutes & Regulations**

19 U.S.C. § 1516a(b) .................................................................................................................. 1-2

19 U.S.C. § 1677b(c) .................................................................................................................. 2-3

**Administrative Decisions**

*Steel Racks and Parts Thereof From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 7,326 (March 4, 2019) ...............14

I.  Introduction

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Defendant-Intervenors Heze Huayi Chemical Co., Ltd. ("Heze Huayi") and Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") respectfully submit this response in opposition to Plaintiffs' Bio-Lab, Inc., Innovative Water Care, LLC., and Occidental Chemical Corporations' (collectively Petitioner) Motion for Judgment on the Agency Record and Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record (July 16, 2024) ("Pet. R.56.2 Br."). In their moving brief, Plaintiffs ask for a remand to reconsider whether the U.S. Department of Commerce ("the Department")'s selection of Romania instead of Mexico was supported by substantial evidence. *See Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2021-2022,* 89 Fed. Reg. 455 (January 4, 2024), *incorporating* Issues & Decision Memorandum ("IDM"). While Defendant-Intervenors also appealed the surrogate country selection, Defendant-Intervenors support the Department's rejection of Mexico for not being economically comparable. The Department's determination that Mexico is not economically comparable to China is supported by the Department's practice, which the trade courts have upheld and the record of this case. The Department's determination that Romania and Malaysia are significant producers of comparable merchandise, such that the Department did not need to depart from its surrogate country list, is also supported by the law and record. The Court should not remand this matter for reconsideration of the selection of Mexico.

II.  **Standard of Review**

The Court will sustain any determination, finding, or conclusion found by an agency that is supported by "substantial evidence on the record," and is otherwise "in accordance with law."

1

19 U.S.C. § 1516 a(b)(1)(B)(i). "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." C*onsol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Congress intended, and this Court has affirmed that, "Commerce is afforded great latitude in the choice of methodology to be employed in {AD and CVD} investigations." *Torrington Co. v. United States*, 19 C.I.T. 403, 409 (1995), aff'd, 127 F.3d 1077 (Fed. Cir. 1997) (citation omitted). As long as Commerce's methodology is reasonable and its conclusions are supported by substantial evidence, "the Court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Id*. (citation omitted).

Thus, under the substantial evidence standard, "{t} he reviewing court may not, 'even as to matters not requiring expertise ... displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Shandong TTCA Biochemistry Co., Ltd. v. United States*, 774 F. Supp. 2d 1317, 1321 (Ct. Int'l Trade 2011) (citing *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 488 (1951)); s*ee also Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001) (the Court sustains determinations that are reasonable and supported by the record as a whole, "even if there is some evidence that detracts from the agency's conclusion.").

**III.   ARGUMENT**

The statute directs the Department that the "valuation of the factors of production **shall be** based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  19 U.S.C. 1677b(c)(1)(b) (emphasis added).  The statute then continues to require that the

2

Department should "utilize, **to the extent possible**, the prices or costs of factors of production in one or more market economy countries that are— (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. 1677b(c)(4) (emphasis added).  Based on these statutory provisions the Department has created a sequential three-step analysis for surrogate country selection, analyzing for each potential surrogate country (1) its economic comparability to the NME country; (2) whether the country is a significant producer of comparable merchandise; and (3) the quality and availability of data for calculating surrogate values.

The reason behind the statutory guidelines to source surrogate values from a country that is both economically comparable and a producer of comparable merchandise is in pursuit of the primary goal of finding the best available information---i.e., quality available surrogate values that are most similar to the subject merchandise production in China so that surrogate costs can be attained as accurately as possible.

Petitioner attempts to undermine the Department's surrogate country process by elevating identical merchandise, which is not actually required by the statute, above economic comparability.  Petitioner's arguments nitpick different elements of the Department's long-standing practice, asking the Department on the one hand to define economic comparability much broader and on the other hand asking the Department to narrow its definition of comparable merchandise down to identical merchandise.  Ultimately, petitioner's contrary arguments also fail to address the ultimate goal of the surrogate country process—locating the best available information.  Nothing in petitioner's arguments that Mexico should be relied upon support petitioner's new approach to the surrogate country selection process to force the inclusion of Mexico.  Petitioner's suggested tactic would not result in more specific or more

3

comparable surrogate values.

### A. The Department Properly Found that Mexico was Not Economically Comparable to China.

The Department has already determined that Mexico is not economically comparable to China and therefore Mexico fails to fulfill the first criteria for surrogate country selection. Indeed based on both 2021 and 2020 GNI, the Department has excluded Mexico from the surrogate country list because its GNI was too different in comparison to China. Dep't SC list (November 11, 2022); PR34. Petitioner attempts to argue that Mexico should still be considered economically comparable to China, but these argument must fail. First, petitioner argues that even based on the Department's normal metric of per capita GNI (atlas method), Mexico is close enough to Turkey (on the list). Pet. R56.2 Br. at 14. Mexico's per capita GNI is $400 lower than Turkey. But petitioner provides no actual metric or reasoning for this, but merely postulates that this is "close." In the same vein, petitioner argues that Mexico is almost in the same per capita GNI range above China as Romania is below China, so the Department should find Mexico to be comparable. Again, petitioner provides no support that Mexico is "close enough." Moreover, the Department has explained that it considers numerous factors in compiling its list, and does not employ bright line rules of what above or below is economically comparably. In other words, the GNI range changes from year to year and is not always the same GNI band above and below China's GNI. In a remand upheld by this Court, the Department explained:

> The Department examines the new *per capita* GNI data for the PRC and the change in *per capita* GNI from the year before, and compares the change in the PRC's *per capita* GNI to the respective changes in *per capita* GNIs of the existing set of surrogate countries. Next, we determine whether it is necessary to re-center the GNI range in light of the year-to-year GNI changes. Due to the PRC's rapid GNI growth rate, it is almost always the case that the GNI range relied on in the previous year may need to be reset or re-centered.

4

Resp. Final SVs at Exhibit 1, pg 10, P PR69; *see also Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1318-21 (Ct. Int'l Trade 2018). The Department also explained that it did "not employ, or endorse, this particular ratio or bright line" to its surrogate country GNI range, but rather it was flexible to the various factors it considered each year and that it changes each year. *Id*. The Court upheld the Department's determination in its expertise of what countries are economically comparable to China. *Juangcheng Kangtai Chem. Co., Ltd. v. United States*, Slip Op. 15-93, SLIP OP. 2015-93, 2015 WL 4999476, at *7-8 (CIT 2015) (Commerce properly may "narrow a list of countries within a band for purposes of administrative feasibility,"); *Baoding Yude Chem. Indus. Co., Ltd. v. United States*, 170 F. Supp. 2d 1335, 1343, SLIP OP. 2001-117 (2001) (Commerce's decision to limit OP's list of potential surrogates to six countries represents "precisely the type of discretion left within the agency's domain.").

Second, petitioner argues that a different metric should be used. Petitioner argues that Mexico is "closer" to China when considering the purchasing power parity instead of the atlas method per capita GNI. Then based on this alternative metric, petitioner argues that Mexico should be considered economically comparable because the GNI difference would not be greater than Mexico's GNI difference with China in 2015 when it was on the surrogate country list. Petitioner also suggests that Mexico's classification as an upper middle income country should also qualify it as economically comparable. However, Commerce has considered all of these arguments before and has rejected them both in this review, as well as in the remand cited above:

> This Court has acknowledged that "per capita GNI is a 'consistent, transparent, and objective measure to determine economic comparability,'" and that "Commerce's reliance on per capita GNI 'is a reasonable interpretation of the statutory mandate to identify and select a primary surrogate country at a level of economic development comparable to the nonmarket economy country.'"
> …
> As a matter of policy, the Department decided not to adopt the World Bank income groups as is for the purpose of defining a "level of economic

5

> development" under section 773(c)(4)(A) of the Act. One of the primary reasons behind this decision is that these income groups are not sufficiently "centered" on the NME countries that are subject to our AD proceedings. For example, the PRC ($6,560) is close to the lower end of the upper middle income group cut-off ($4,125); so, if the World Bank's upper middle income group were adopted "off-the-shelf," this would eliminate a number of potential surrogate countries that are close to the PRC on the lower range.

Resp. Final SVs at Exhibit 1, pgs 4, 12, PD69; *see also Jiaxing Brother Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1330 (2014) (Rejecting plaintiff's arguments to consider various alternative metrics and upholding the Department's reliance on per capita GNI). The Department's use of GNI and its agency discretion in creating the surrogate country list has been consistently upheld by the Courts.

### B. The Department Properly Found that Identical Merchandise Production is not Required under the Statute.

#### 1. Identical Merchandise Production is not Required under the Statute.

Petitioner argues that the fact that Mexico produces identical merchandise means that Mexico best fulfills the significant production criterion. However, the statute does not direct, even to the extent possible, the Department to rely on countries that are significant producers of *identical* merchandise, but directs the Department to rely on significant producers of *comparable* merchandise. The statute does not contemplate that identical production is necessary or even superior. Congress chose to use comparable merchandise, and petitioner's argument is impermissible because it removes any meaning from the term "comparable" in the statute. *Michigan v. Bay Mills Indian Community*, Ed. 2d 1071, 1086 (U.S. 2014) (Congress wrote the statute it wrote--meaning, a statute goes so far and no further; "This Court has no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view that … Congress 'must have intended'" something different.) *citing CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 295 (2011).

6

Petitioner also cites to a line of *Fish Fillets* cases for support that production of identical merchandise should trump other concerns, such as economic comparability. Pet. R56.2 br. at 12, 18-20. But that product is precisely the type of "unique" product contemplated in the policy bulletin on surrogate country selection that would necessitate a unique approach. Policy Bulletin 04.1. For that product, the Department requires surrogate values for catfish, fish food, and other surrogate values unique to the catfish industry. These are unique, difficult to value surrogate values that have not only necessitated a different approach to surrogate country selection, but have involved relying on surrogate values in secondary countries that are not economically comparable because they provided the only surrogate values specific to the input. None of these facts are present here. Chlorinated Isocyanurates is not so unique of a product with such unique surrogate values such that the Department must throw out its normal methodology. The raw materials for chlorinated isocyanurates are used in numerous industries, and no such unique approach has ever been needed to find reliable surrogate values. This line of cases is not relevant.

Further, petitioner's assertion that Mexico is a *significant* producer of identical merchandise remains unsupported. The only country with a known quantity of exports of chlorinated isocyanurates on the record is Mexico. Significance is a term of comparison, therefore there is no comparison to establish that the figure exported from Mexico is significant and renders Mexico a significant producer of identical merchandise. *See Fresh Garlic Producers Ass'n v. United States*, 2015 Ct. Intl. Trade LEXIS 133 (Ct. Int'l Trade Nov. 30, 2015) (discussing that the term significant holds meaning and suggesting that a significant producer is a country "whose domestic production could influence or affect world trade…" "This follows from the plain meaning of the word "significant" as something "having or likely to have influence or

7

effect."). While Mexico has *some* production of identical merchandise, the record does not establish that Mexico is a significant producer of identical merchandise that could influence or affect world trade.[1] Therefore, while there is evidence that Mexico has some production of identical merchandise, the record does not establish that it is a significance producer of identical merchandise.

In contrast, the record contains substantial information that Malaysia and Romania are significant producers of highly comparable merchandise. The Department has found that sodium hypochlorite and calcium hypochlorite are highly comparable products to chlorinated isocyanurates, which is discussed further below, and has relied on the HTS classifications that are specific to these two products for its consideration of comparable production in the past segments to select surrogate countries. The record contains world export data for these HTS categories for all countries, and we provide an excerpt here:

| Country | Net weight (KG) |
|---|---|
| China | 293,729,951 |
| Canada | 216,676,932 |
| Spain | 124,388,906 |
| Germany | 117,356,216 |
| United States of America | 110,758,012 |
| Netherlands | 108,041,837 |
| Belgium | 104,430,900 |
| Portugal | 65,738,630 |
| India | 65,278,754 |
| Italy | 47,115,658 |
| Guatemala | 45,891,689 |
| Hungary | 39,547,158 |
| Slovakia | 29,000,434 |
| Romania | 27,295,230 |

---

[1] The Department has consistently found throughout the entire history of reviewing chlorinated isocyanurates, including this review, that HTS 2933.69 is a basket category of products and not probative of significant production. Therefore, the six digit world export data cannot be used for this comparison.

| | |
|---|---|
| Slovenia | 26,259,143 |
| Norway | 26,232,459 |
| Turkey | 24,769,256 |
| Japan | 22,053,280 |
| Russian Federation | 16,004,317 |
| United Kingdom | 15,256,068 |
| South Africa | 13,254,856 |
| Tunisia | 9,527,974 |
| Malaysia | 9,217,187 |
| Greece | 8,237,251 |
| El Salvador | 8,088,591 |
| Brazil | 7,883,416 |
| China, Hong Kong SAR | 7,569,999 |
| Czech Rep. | 5,720,615 |
| Dominican Rep. | 3,972,659 |
| Australia | 3,483,859 |
| Poland | 3,222,977 |
| Singapore | 2,766,710 |
| Denmark | 2,243,850 |
| Switzerland | 2,205,368 |
| Pakistan | 1,673,192 |
| Rep. of Moldova | 1,649,889 |
| Bulgaria | 1,577,750 |
| Belarus | 1,243,611 |
| Kenya | 1,106,902 |
| Sweden | 1,073,020 |
| Mexico | 919,122 |

Resp. Rebuttal GNI Cmts. at Attachment 1, PR37. The data on comparable production allows for actual comparison, in keeping with the definition of significance, and does not unreasonably limit the basket of countries for comparison. Petitioner's argument excludes any ability to make a comparative analysis. Indeed, petitioner's argument effectively limits the basket of potential countries to only one—Mexico. This is not reasonable and does not lead to finding the surrogate country with the "best available" information.

   The inquiry into significant production cannot be separated from the purpose of the

inquiry: to find a representative surrogate country for a Chinese chlorinated isocyanurates producer.  The purpose of this inquiry is to find available and representative pricing for surrogate values (i.e., production costs).  As elaborated further below, Sodium hypochlorite and calcium hypochlorite have the same key raw material inputs as chlorinated isocyanurates and are used in the same water treatment market. *See* Resp. Rebuttal GNI Comments at Attachment 3; PR37.  Unlike some other products and investigations, the subject merchandise, *i.e.* chlorinated isocyanurates, is highly similar to the comparable merchandise, *i.e.* sodium hypochlorite and calcium hypochlorite. They are substitutable products offering the same functions and share the same fundamental factors of production and production processes, such as chlorination.  Therefore, the presence of a robust and comparable sodium hypochlorite and/or calcium hypochlorite industry is equally probative of fulfilling the underlying purpose of this surrogate country criterion: representative surrogate values.

Further, petitioner's argument that Mexico sources better quality data because of identical production is divorced from the surrogate record.  While Mexico may have identical production, the only Mexican financial statement is from CYDSA, which does not produce identical merchandise.  There is only evidence of one producer of identical merchandise in Mexico, Aquachlor, but that financial statement is not on the record.  Therefore, the fact that Mexico has some production of identical merchandise has only a very minimal perceived impact on the quality of the surrogate values.  The only presumed impact is the assumption that at least some of the import data into Mexico *may* be used in chlorinated isocyanurates production—a very attenuated assumption particularly when there is only one identical producer in the entire country.  In contrast, the fact that Mexico is not economically comparable to China certainly has a more significant impact on the quality of every single surrogate value.  Every single surrogate

value in Mexico is of lesser quality in comparability to the cost of the item in China because Mexico is not at the same economicly comparable level as China.

### 2. Calcium Hypochlorite and Sodium Hypochlorite are Comparable Merchandise.

In an attempt to undermine the Department's conclusions that it has a suitable surrogate country in either Malaysia or Romania because they fulfill all prongs of the statute, petitioners attempt to argue that Malaysia and Romania are not significant producers of comparable merchandise arguing that sodium hypochlorite and calcium hypochlorite should not be considered comparable products. Notably, this stands in contradiction to petitioner's own arguments in the investigation and sixth review that the manufacture of these products should be found comparable. The Department explained in detail that calcium hypochlorite was a comparable product in the investigation, supporting petitioners own statements. *See* Resp. Final SV at Exhibit 2; PR69. Then, in the sixth review, the Department explained in detail, based on petitioner's own request that sodium hypochlorite be considered comparable, its finding that both calcium and sodium hypochlorite are comparable products. *Id*.

After numerous years and reviews of all parties agreeing that calcium and sodium hypochlorite are highly comparable products, in this review petitioner takes the opposite approach only because it may help their argument to rely on a surrogate country that is not economically comparable, Mexico. Despite the well-established practice that calcium and sodium hypochlorite are comparable products, the Department still considered all of the arguments that petitioner made and nevertheless again concluded that these products are comparable products. The Department carefully reanalyzed the factors of physical characteristics, production process, and end uses. Prelim. IDM at 25-29, PR93; *see also* IDM at Cmt 2, PR126. After this careful analysis, the Department properly still concluded "calcium

11

hypochlorite and sodium hypochlorite to be comparable merchandise." Prelim. IDM at 29. The Department discussed the similar raw materials, similar manufacturing process and equipment, similar end-uses, and similar functionality within the chlorine family. In its response brief, the United States again explained in detail how similar these products are. U.S. Resp. Brief at 32-38. Defendant-intervenors support these arguments.

In reality, chlorinated isocyanurates is highly similar to the comparable merchandise, *i.e.* sodium hypochlorite and calcium hypochlorite. They are substitutable products offering the same functions and share the same fundamental factors of production and production processes, such as chlorination. *See* Respondent Rebuttal GNI Cmts at Exhibit 3 (information on comparability) PR37. All three products are used in water sanitation. Petitioner nitpicks very small differences that the Department squarely addresses. U.S. Resp. Brief at 32-38. For example, petitioner focuses on the fact that cyanuric acid is not an input for calcium or sodium hypochlorite. However, this is not a major input, but rather acts as a binding agent. For end use, despite all three products being used in the sanitization of water, petitioner focuses on subject merchandise being primarily used in residential pools while calcium and sodium hypochlorite may be used in larger pools or bodies of water. This distinction is so small and petitioner fails to support how this renders the product not comparable.

Petitioner's concept of comparable merchandise is so narrow that it removes any meaning of the term comparable. Petitioner's argument supports only that nearly identical merchandise could qualify for this meaning, and that is not supported by the plain language of the statute. Congress directed the Department to rely on information from a country, to the extent possible, that is a significant producer of <u>comparable</u> merchandise. The Department has done so here.

Lastly, these nitpicking, very small differences between these products would have no

impact on the availability of comparable surrogate values.  For example, petitioner discusses machinery, slightly more complex manufacturing, and labor differences as import distinctions between calcium/sodium hypochlorite and subject merchandise.  Pet. R56.2 Br. at 26-30.  Not only are these extremely minor, but it would not impact the comparability of surrogate values in the competing surrogate countries.  There is no surrogate value for machinery or manufacturing; these are a part of the financial ratios. As discussed above, the financial ratios are not sourced from a company that produces identical merchandise.  The labor rate applied is a general manufacturing labor rate.  Thus, even assuming that since Mexico has some identical production, it has some manufacturing with these more comparable machinery or processes, that increased comparability would not impact any surrogate value relied upon.

     Petitioner's arguments are in a void.  They fail to consider that the statute specifically called for comparable merchandise, not identical or nearly identical.  They fail to consider that the entire point of the surrogate country process is to arrive at the best available surrogate values—quality, comparable, and available surrogate values.  By determining to rely on a country that is a significant producer of calcium or sodium hypochlorite, the Department has not overly narrowed the basket but, as intended by Congress, has narrowed it enough that parties could locate multiple potential surrogate values that sources all inputs and had comparable financial statements.

     **C.    Mexico Does not Source the Beset Available Surrogate Values**

     The Mexico surrogate value record also has other data flaws.  First, the Mexican import values are reported on an FOB basis.  The Department relies on a CIF value and therefore if the Department relies upon Mexico, it must add facts available for international freight, marine insurance, and brokerage & handling expenses to each import value to arrive at an approximate CIF value for each of the respondents' material and packing inputs, decreasing the accuracy of

each value. While the Department can make adjustments to the FOB data—it is only a very rough approximation of the actual CIF costs. Therefore, every single import value into Mexico is less preferable than Malaysia, which reports its import values on a CIF basis. Indeed, the Department has found this to be a tiebreaker between competing surrogate countries, preferring to rely upon the CIF country. *Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value* (July 17, 2019) ("Conversely, the Romanian SV data are already reported on a CIF basis and require no adjustment because they include specific actual costs for inputs used in the production of subject merchandise. While this difference alone may not necessarily be sufficient to determine that Romania is preferable to Brazil as a surrogate country, the totality of the evidence, as discussed above, leads us to find that Romania is the appropriate primary surrogate country in this case."); *Activated Carbon from China* Remand Results, CIT 16-185 (June 17, 2019) at 11 (Selecting Malaysia and finding "While the underlying record of this administrative review contains international freight SVs to put the Philippine GTA import data on a cost-insurance-and-freight (CIF) basis, the Malaysian GTA import data available on the record are already on a CIF basis.").

    Further, Respondents have submitted information suggesting that the import values into Mexico overall may suffer from further data quality issues. GTA, TDM, and UN Comtrade all source their import statistics for Mexico from the Mexico National Institute of Statistics (INEGI). Resp. Final SVs at Exhibit 3-5, PR69. Due to confidentiality measures implemented by INEGI, certain import data is being suppressed. *Id*. at 3. TDM, a source that the Department itself also relies upon, reports that "there is a significant suppression of both export and import trade." *Id*. In contrast, there is no data warning for Malaysia and no suggestion that any

14

information is not being fully reported.  Accordingly, this is a further reason to find the import data into Mexico is not the best available information to value the various inputs.

Lastly, Mexico is less preferable to Romania and Malaysia because of the quality and quantity of financial statements.  The record contains financial statements in each country from companies that are engaged primarily in the chemical industry, and in the case of Malaysia, the records contains multiple statements from companies solely engaged in comparable chemical production.  In contrast, CYDSA has five business segments: 1) salt, 2) chlorine, caustic soda, and related specialties, 3) electricity and steam cogeneration, 4) hydrocarbon processing, and 5) underground storage.  Only one of these divisions is at all comparable to the production of subject merchandise. Pet. Prelim. SVs (December 19, 2022) at Exhibit 10, PR45-46.  The so-named chlorine, caustic soda, and related specialties division does produce sodium hypochlorite.  However, as noted by the name of the division, chlorine and caustic soda are the primary products of this business division, not sodium hypochlorite.  Further, CYDSA's electricity and steam cogeneration division supplies all electricity needs for the company.  These costs are dissimilar to the costs incurred by Respondents and means that CYDSA is at a different level of integration than the Respondents, who purchase electricity.

Lastly, CYDSA is a massive conglomerate with 20 subsidiaries in 8 different cities in Mexico.  Its annual report attests to the numerous brand names the company owns and its extensive plans and initiatives to enhance brand image and invest in development. The advertising and promotion of numerous global brand names is also radically dissimilar from the respondents' situations.  In fact, Heze and Kangtai sell the subject merchandise in containers provided by the customer with the customer's own brand name on it so they do not incur any branding expenses; and neither of the respondents have advertising costs. *Compare Shenzhen*

15

*Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333, 1383 (Ct. Int'l Trade 2014) (finding the marketing and branding expenses of a large company were critically different for respondent Xinboda: "In sharp contrast, Xinboda's sales process is quite modest, involving an established customer base and virtually zero marketing. Xinboda sells very few products (i.e., garlic, onion shoots, and ginger) and does not develop or market its own brands. Xinboda merely labels its garlic products as instructed by its customers, which design and market their own brands and provide their label artwork to Xinboda.  It is thus Xinboda's customers that incur the SG&A associated with — and reap the profits that flow from — developing, marketing, and selling branded products.") (internal citations committed).

In sum, Mexico fails to meet one of the surrogate country criteria—economic comparability.  Further, the Mexico record suffers from various data quality issues.  In contrast, there are two countries that fulfill every single surrogate country criteria, Romania and Malaysia. As submitted in the opening brief, Defendant-Intervenor submit that Malaysia sources the best available information.

## IV.   Conclusion and Prayer for Relief

In light of the foregoing, Defendant-Intervenors respectfully request that the Court not remand for any of the issues raised by petitioner.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Judith L. Holdsworth
Vivien Jinghui Wang[**]
**deKieffer & Horgan, PLLC**
*Counsel for Defendant-Intervenors*

Dated:  November 18, 2024

---

[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

16

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **4,674** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth Street., N.W.  20005
Suite 1101
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com

1