**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| BIO-LAB, INC., ET AL. )<br> )<br>*Plaintiffs and Consolidated* )<br>*Defendant-Intervenors*, )<br> )<br>v. )<br> )<br>UNITED STATES, )<br> )<br>*Defendant,* )<br>AND )<br> )<br>JUANCHENG KANGTAI CHEMICAL CO., LTD. AND )<br>HEZE HUAYI CHEMICAL CO., LTD., )<br>*Defendant-Intervenors and* )<br>*Consolidated Plaintiffs.* )<br> ) | Consol. Ct. No.  24-00024<br><br>**PUBLIC DOCUMENT** |

**BIO-LAB, INC., ET AL'S REPLY BRIEF**

James R. Cannon Jr.
Chase J. Dunn
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W., Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Consolidated Commerce-Intervenors*
*Bio-Lab, Inc., Innovative Water Care, LLC, and*
*Occidental Chemical Corporation*

Date:   December 16, 2024

i

## Table of Contents

**Page**

ARGUMENT ............................................................................................................ 1

I.   The Statute Requires Commerce to Balance the Relative Importance of Both
     Economic and Merchandise Comparability Rather Than Elevate One Factor in
     Importance or to the Exclusion of Relevant Evidence Regarding the Other .................. 1

     A. Under *Loper Bright*, this Court Must Determine the Best Reading of
        the Statute .................................................................................................... 2

     B. The Structure and Language of the Statute Calls for Commerce to
        Conduct a Comparative Analysis by Balancing Economic
        Comparability and Merchandise Comparability ......................................... 3

     C. Commerce Misapplies § 1677b(c) When the Sequence in which it
        Considers the Statutory Factors Controls the Selection of the Best
        Available Values or the Evaluation of Record Evidence ........................... 6

II.  Commerce Should Consider the Entire Record, Including Evidence with Respect
     to Countries Outside the SC List ...................................................................... 8

     A. A Sequential Process Does not Excuse the Failure to Consider Whether
        Chlor Isos Produced in Mexico are More Comparable to the Subject
        Merchandise than Sodium Hypochlorite Produced in Romania .............. 8

     B. Record Evidence Demonstrated that Mexico was Economically
        Comparable to China During the Period of Review .............................. 11

III. Commerce's Determination that Calcium and Sodium Hypochlorite Are
     Comparable to Chlor Isos is Not Supported By Substantial Evidence .................. 13

     A. Common Inputs Such as Chlorine Do Not Demonstrate That Chlor Isos
        and Calcium/Sodium Hypochlorite Have Comparable Physical
        Characteristics .......................................................................................... 13

     B. Chlor Isos and Calcium or Sodium Hypochlorite Do Not Have
        Significant Overlap in End Uses ............................................................. 15

     C. Chlor Isos and Calcium or Sodium Hypochlorites Have Significantly
        Different Production Processes, Which Is a Compelling Reason to
        Prefer a Surrogate that Produces Chlor Isos .......................................... 17

        1.   The Differences in Production Process Do Not Simply Amount to
             Differences in Physical Inputs ............................................................. 18

        2.   Commerce's Reliance on Prior Determinations Ignores the Different Factual

Records and Lack of Evidence Regarding the Production Process ......................... 19

IV. Conclusion............................................................................................................ 22

## Table of Authorities

**Page(s)**

**Statutes**

19 U.S.C. § 1677b(c)(1)............................................................................................2, 4, 5

19 U.S.C § 1677b(c)(4)................................................................... 1, 4-9, 13, 16

19 U.S.C. § 1677b(c)(4)(A) ...................................................................................5, 8

19 U.S.C. § 1677b(c)(4)(B) ...................................................................................5, 16

**Court Decisions**

*Ad Hoc Shrimp Trade Action Committee v. United States*, 36 C.I.T. 1557
(2012)...........................................................................................................................5, 7

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998) .............................8

*Bonney Forge Corporation v. United States*, 560 F. Supp. 3d 1303 (Ct.
Int'l Trade 2022) ...........................................................................................................19

*Catfish Farmers of America v. United States*, 2023 WL 4560815  (Ct.
Int'l Trade 2023) ...................................................................................................... 9-10

*Catfish Farmers of America v. United States*, 2024 WL 775181 (Ct. Int'l
Trade 2024) .............................................................................................................. 9-10

*Catfish Farmers of America v. United States*, 2024 WL 2843039 (Ct.
Int'l Trade 2024) ...................................................................................................... 9-10

*Clearon Corp. v. United States*, 2014 WL 3643332 (Ct. Int'l Trade
2014) ..............................................................................................................................2

*Crandon v. United States*, 494 U.S. 152 (1990) ...........................................................4

*Fujian Lianfu Forestry Co., Ltd. v. United States,* 638 F. Supp. 2d 1325
(Ct. Int'l Trade 2009*)*...................................................................................................10

*Green Farms Seafood Joint Stock Company v. United States*, 2024 WL
1653791 (Apr. 17, 2024)...............................................................................................9

*Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289 (Fed.
Cir. 2016) ......................................................................................................................7

*Loper Bright Enterprises v. Raimondo,* 144 S.Ct. 2244 (2024) ............................... 2-3

*Magnesium Corp. of Am. V. United States,* 166 F.3d 1364 (Fed. Cir. 1999)................................................................................................................4

*Nation Ford Chemical Co. v. United States,* 166 F.3d 1373 (Fed. Cir. 1999)........................................................................................................4, 6, 17

*Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO,* 451 U.S. 77 (1981)..............................................................................4

*Peer Bearing Co.-Changshan v. United States,* 587 F. Supp. 2d 1319 (Ct. Int'l Trade 2008)..................................................................................20

*Reves v. Ernst & Young,* 507 U.S. 170 (1993)..............................................5

*Shandong Huarong Mach. Co. v. United States,* 29 C.I.T. 484 (2005)........................................20

*Shanghai Foreign Trade Enterprises Co., Ltd. v. United States,* 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004)...........................................................19

*Tudor v. Department of Treasury,* 639 F.3d 1362 (Fed. Cir. 2011) ...................................................15, 17

*Ventura Coastal, LLC v. United States,* __ F. Supp. 3d__, 2024 WL 4799469 (Ct. Int'l Trade Nov. 7, 2024)...........................................................3

## Administrative Determinations

*1,1,1,2-Tetrafluoroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 79 Fed. Reg. 62597 (Oct. 20, 2014)* ............................................................................... 13-14, 16

*Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015–2016,* 83 Fed. Reg. 5243 (Feb. 6, 2018) ................................................................20

*Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021-2022,* 89 Fed. Reg. 455 (Jan. 4, 2024) ...................................................... *passim*

*Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates from the People's Republic of China,* 70 Fed. Reg. 24502 (May 10, 2005)...........................................................21

*Steel Wire Garment Hangers from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 73 Fed. Reg. 47587 (Aug. 14, 2008)...........................................................19

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs

Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation ("Bio-Lab,

IWC, and OxyChem" or "Plaintiffs") respectfully submit this reply brief responding to briefs

for the Defendant, the United States, and Defendant-Intervenors Heze Hauyi Chemical Co., Ltd.

("Huayi") and Juancheng Kangtai Chemical Co., Ltd. ("Kangtai"). *See* Defendant's Response to

Plaintiffs' and Consolidated Plaintiffs' Rule 56.2 Motions for Judgment on the Agency Record

(Nov. 6, 2024) ("Defendant's Br."); Defendant-Intervenors' Response Brief (Nov. 18, 2024)

("Intervenors' Br."); *see also Chlorinated Isocyanurates from the People's Republic of China:*

*Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 455 (Jan.

4, 2024) ("*Final Results*") (P.R. 127) and accompanying Issues and Decision Memorandum

("IDM") (P.R. 126).[1]


# ARGUMENT

## I.  The Statute Requires Commerce to Balance the Relative Importance of Both Economic and Merchandise Comparability Rather Than Elevate One Factor in Importance or to the Exclusion of Relevant Evidence Regarding the Other

In non-market economy ("NME") cases, the statute requires the U.S. Department

Commerce to identify a surrogate country for the NME in order to calculate a normal value that

is an accurate representation of the value that would be used in a comparable market economy

country producing comparable merchandise. *See* 19 U.S.C § 1677b(c)(4). To this end, the statute

instructs Commerce to use the "best available information" to calculate the normal value, as

measured by both the comparability of the surrogate country vis-à-vis the NME and the

comparability of the merchandise produced in that surrogate vis-à-vis the merchandise subject to

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__".

the antidumping investigation. *See* 19 U.S.C. §§ 1677b(c)(1), (c)(4). The statute does not prioritize either criterion. Instead, it requires Commerce to balance the relative importance of each insofar as "comparable," by definition, calls for a comparison of the relative merit of each surrogate with respect to each factor, based on the record facts, in order to arrive at the "best available information" to value the factors of production.

Here, though, Defendant persists in defending Commerce's decision to select Romania as the primary surrogate on the sole basis that Mexico—a producer of identical merchandise—is slightly less economically comparable to China than Romania is without evaluating, in tandem, the degree to which the sodium hypochlorite produced in Romania was comparable to the Chlorinated isocyanurates ("Chlor isos") produced in Mexico and China. As discussed below, Commerce's refusal to balance the relative importance of economic and merchandise comparability is not a reasonable interpretation of the statute, is inconsistent with Commerce's Policy Bulletin 04.1, and ignores the critique of Commerce's surrogate country selection process recently put forward by this Court in *Catfish Farmers of America v. United States*, discussed *infra*.

### A. Under *Loper Bright*, this Court Must Determine the Best Reading of the Statute

Defendant asserts that the Supreme Court's decision in *Loper Bright* "does not alter this Court's prior decisions affirming Commerce's discretion and policies." Defendant's Br. at 25-26. It then argues that Commerce's surrogate selection process is in accordance with law because this "Court has routinely affirmed Commerce's treating the per capita GNI ranking as a threshold statutory criterion that must be met before the other criteria are considered." *Id.* at 26 (*citing Clearon Corp. v. United States*, 2014 WL 3643332 at *11 (Ct. Int'l Trade 2014)). However, whether or not *Loper Bright* alters prior decisions regarding the correct interpretation of 19

2

U.S.C. § 1677b(c)), it does alter the approach that should be taken by Federal Courts with respect to statutory construction and the persuasiveness of past precedent affirming Commerce's interpretations of the law.

*Loper Bright* instructs this Court to evaluate Commerce's interpretation of the statute without *Chevron* deference, using "every tool at {its} disposal to determine the best reading of the statute." *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2266 (2024). In other words, this Court in the first instance should consider "'the reading the court would have reached' if no agency were involved." *Id.* (citations omitted). Even "when the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, *to independently interpret the statute and effectuate the will of Congress subject to constitutional limits*." *Id.* at 2263. (emphasis supplied).

Of course, past decisions affirming Commerce interpretations of the antidumping law may pass muster under this approach to statutory construction, and the rationale expressed in those precedents may be persuasive regarding the best reading of the statute. That is, the agency's interpretation may be the same as the reviewing court's interpretation. This Court, however, should not fail to conduct its statutory analysis simply because there are pre-*Loper Bright* decisions affirming an agency's interpretation of the law. This is because the Court has a "duty to address questions of statutory meaning." *Ventura Coastal, LLC v. United States*, __ F. Supp. 3d__, 2024 WL 4799469 at *8 (Ct. Int'l Trade Nov. 7, 2024) (citing *Loper Bright*, 144 S.Ct. at 2259).

**B.  The Structure and Language of the Statute Calls for Commerce to Conduct a Comparative Analysis by Balancing Economic Comparability and Merchandise Comparability**

In "matters of statutory construction, it is appropriate to begin with the language of the

statute itself." *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO*, 451

U.S. 77, 91 (1981). Furthermore, in "determining the meaning of {a} statute," it is appropriate to

"look not only to the particular statutory language, but to the design of the statute as whole and

to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158 (1990).

 Here, 19 U.S.C. § 1677b(c)(1) provides that "the valuation of the factors of production

shall be based on the best available information regarding the values of such factors in a market

economy country or countries considered to be appropriate by the administering authority."

Section 1677b(c)(4) then identifies two specific factors that Commerce should consider in

selecting an "appropriate" surrogate. Read together, Sections 1677b(c)(1) and 1677b(c)(4) set the

parameters defining the best available information with respect to an appropriate surrogate

country. *See, e.g.*, *Nation Ford Chemical Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir.

1999) (noting that the statute "mandates" that Commerce value FOPs using the best information

available from a surrogate market economy); *Magnesium Corp. of Am. V. United States*, 166

F.3d 1364, 1372 (Fed. Cir. 1999) (noting that an "overriding purpose of Commerce's

administration of the antidumping laws is to calculate dumping margins as accurately as

possible").

 Pursuant to 19 U.S.C. § 1677b(c)(4), Commerce is instructed to select a surrogate

country that is "(A) at a level of economic development comparable to that of the nonmarket

economy country, and (B) {a} significant producer of comparable merchandise." Congress' use

of the conjunctive "and" indicates that both factors must be met and that neither factor is

preeminent. Indeed, Commerce's own Policy Bulletin 04.1 "makes clear that the relative weight

attached to each of the two selection criteria…is unspecified because the relative importance that

the Department attaches to each will necessarily vary depending on the specific facts in each

case." Policy Bulletin 04.1. This makes sense because, as this Court has recognized, "the most economically comparable country would be an unreasonable surrogate choice if it were not a significant producer of comparable merchandise, and the country with the absolute best dataset would similarly be an unreasonable surrogate choice if it were not economically comparable to the NME in question." *Ad Hoc Shrimp Trade Action Committee v. United States*, 36 C.I.T. 1557, 1565 (2012).

Furthermore, as explained in Bio-Lab, IWC, and OxyChem's opening brief, the legislative history of this provision also makes clear that Commerce is to consider both economic comparability and merchandise comparability. *See* Plaintiffs' 56.2 Brief at 10-11. If Congress had desired to elevate one factor over another it could have written the statute to reflect that intent; it did not. *Cf. Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993) ("In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'").

Additionally, Congress' use of "comparable" in 19 U.S.C. § 1677b(c)(4)(A) calls for analysis of the relative economic development of the subject NME and potential market-economy surrogates. Likewise, "comparable" as used in § 1677b(c)(4)(B) calls for an analysis of the relative similarity of merchandise produced in the potential surrogate countries as compared to the merchandise under investigation. In both cases, the search for a comparable economy and comparable merchandise is conducted in the overall context of finding the best available surrogate pursuant to 19 U.S.C. § 1677b(c)(1).

It follows that *both* the economic development of the country where the subject merchandise is produced and the nature of the merchandise itself are equally important to the

selection of the best available surrogate. More precisely, the goal of 19 U.S.C. § 1677b(c)(4) is to "construct{} a hypothetical 'market value' representative of the foreign producers under investigation." *Nation Ford Chemical*, 166 F.3d at 1378. Here, the best available surrogate country that yields the best representation of the Chinese production of Chlor isos will be the country that is most comparable to China in terms of economic development *and* that produces merchandise most comparable to Chlor isos.

### C. Commerce Misapplies § 1677b(c) When the Sequence in which it Considers the Statutory Factors Controls the Selection of the Best Available Values or the Evaluation of Record Evidence

Defendant and the Intervenors misread the argument made by BioLab, IWC, and OxyChem. Defendant claims that "Bio-Lab argues for Commerce's usual practice to be turned on its head…essentially argu{ing} that Commerce should first look to countries that produce identical products and then look to the economic comparability prong of the analysis" Defendant's Br. at 23. Intervenors argue that "Petitioner attempts to undermine the Department's surrogate country process by elevating identical merchandise, which is not actually required by the statute, above economic comparability." Intervenors' Br. at 3. Neither description is correct. *See* Plaintiffs' 56.2 Br. at 10-13 (arguing that *both* statutory criteria must be evaluated equally).

As shown above, the statute requires Commerce to collect evidence with respect to both economic and merchandise comparability and then evaluate the relative comparability of each potential surrogate with respect to each statutory factor. This is not a matter of sequence or procedure. Rather, it is a question of reasonably applying record evidence to both statutory factors to determine which surrogate will yield the best available information for constructing a "hypothetical" market economy normal value. *See Nation Ford Chemical*, 166 F.3d at 1378.

Here, Defendant's and Intervenors' arguments reveal the fundamental problem with

Commerce's reliance on a sequential selection process. The sequence for considering economic versus merchandise comparability should not be an obstacle to considering all of the record evidence regarding both factors, which would allow for the selection of the best available normal value in terms of both economic and merchandise comparability. In some cases, Commerce may readily find one or more surrogates on its surrogate country list ("SC List") that produce merchandise identical or comparable to the subject merchandise. However, when there is record evidence demonstrating that no country on the SC List produces identical merchandise and there is an off-list country (*i.e.,* Mexico) which produces identical merchandise, that evidence should be not disqualified or disregarded on the grounds that Mexico is slightly less economically comparable to the NME than are the countries on the SC List. This is even more important where, as here, the off-list country is only slightly less comparable in terms of economic development than the SC List countries and thus qualifies as economically comparable to the NME under the statutory standard.

In short, the legislative history, text, and structure of 19 U.S.C. § 1677b(c)(4) unambiguously demonstrate that both economic comparability and merchandise comparability are equal factors that Commerce must consider in the selection of a surrogate country. The core of Defendant's defense is that the economic-comparability-first approach is current practice and approved by past cases. That is insufficient. *See, e.g., Ad Hoc Shrimp Trade Action Committee*, 36 C.I.T. at 1564 ("A policy that, though not expressly prohibited, is nevertheless unreasonable, cannot serve as a basis for Commerce's reasoned decision-making."); *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016) ("Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition."). Commerce's sequential practice ignores the language of the statute calls for it to

7

consider the relative merits of both criteria, not invoke a rigid procedure. *Cf. Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational."). For all of these reasons, Commerce's surrogate country selection process is not in accordance with law.

## II. Commerce Should Consider the Entire Record, Including Evidence with Respect to Countries Outside the SC List

### A. A Sequential Process Does not Excuse the Failure to Consider Whether Chlor Isos Produced in Mexico are More Comparable to the Subject Merchandise than Sodium Hypochlorite Produced in Romania

Defendant admits that Commerce's surrogate country practice is to "exclude from consideration countries that are not at the same economic level as China." Defendant's Br. at 24. Indeed, Defendant concedes that the only reason "Mexico was not chosen" as a potential surrogate is because its GNI ranking indicated that it was not "at the *same level* of economic development {as China} as it was well below the other countries sorted by GNI." *Id.* at 23 (emphasis supplied); *see also* IDM at Comment 2 ("we continue to find that because Mexico's GNI is not within the range of GNIs on the GNI List, we will not consider Mexico as a possible SC").

The statute, however, calls for the selection of a surrogate at a "comparable" level of economic development. 19 U.S.C. § 1677b(c)(4)(A). The statute does not impose any arbitrary limit on "comparable" economies. Rather, the plain language anticipates that economic development is necessarily a relative metric, one to be compared. This Court, in turn, has repeatedly held that the statute requires consideration of all potential market economy countries that may be economically comparable to the NME country in question.

As explained in *Catfish Farmers*, refusing to consider potential surrogates simply because they are not included on the SC List "shows a conscious choice to disregard the statutory standard." *Catfish Farmers of America v. United States*, 2023 WL 4560815 at *6 (Ct. Int'l Trade 2023) ("*Catfish Farmers I*"). Subsequent decisions to *Catfish Farmers* explain that the "statute…does not require a surrogate to be at the 'same' level of economic development as the nonmarket-economy country," but only "dictates that a surrogate have a 'comparable' level of economic development" and that Commerce's practice of "presumptively disqualif{ying} countries that are only 'comparable' in favor of its own stricter criterion…{is} not in accordance with law." *Catfish Farmers of America v. United States*, 2024 WL 775181 at *2 (Ct. Int'l Trade 2024); *see also Green Farms Seafood Joint Stock Company v. United States*, 2024 WL 1653791 at *7 (Apr. 17, 2024) ("As the court has now twice explained, the Department's discretion does not permit it to disregard the statutory 'comparable level of economic development' standard.").

Defendant attempts to distinguish *Catfish Farmers* by claiming that the issue in that case was factual, not methodological, and that "the remand decision in that case provided the Court enough information…that the statutory analysis had been conducted even under the existing framework that Commerce uses." Defendant's Br. at 24. What Defendant fails to grapple with, however, is that the economies of all countries can be compared for purposes of 1677b(c)(4), or otherwise. As such, the real problem with Commerce's methodology is not the record in a specific case, but the rigid refusal to compare off-list countries with the six SC List countries based on an arbitrary decision that six countries are at the "same level" of economic development when the statue only requires that a surrogate be at a "comparable" level of economic development.

As a result of this rigid methodology, rather than considering whether Mexico, as a

producer of identical merchandise, provided superior surrogate value data than other surrogates on the SC List, Commerce simply rejected Mexico from consideration because it was not on the SC List. *See* IDM at Comment 2. Commerce then did not have to balance the relative economic comparability of Mexico against the fact that Mexico was home to actual production of Chlor isos. This contrasts with the remand results in *Catfish Farmers*, where Commerce "went ahead and compared the quality of the dueling Indian and Indonesia data sets on the merits rather than preemptively disqualifying the latter as before." *Catfish Farmers of America v. United States*, 2024 WL 2843039 at *1 (Ct. Int'l Trade 2024) ("*Catfish Farmers II*"). Because Commerce had evaluated both statutory criteria in that case, the Court continued to "disagree with the agency's flawed interpretation of the legal standard" but held that a "remand on that issue would serve no purpose given that the rest of Commerce's analysis mitigates that error." *Id.*

Notably, Commerce has previously acknowledged that "if parties suggest the consideration of another economically comparable country that did not appear on {the GNI List}, the Department will also consider the appropriateness of using that country in its analysis." *Fujian Lianfu Forestry Co., Ltd. v. United States*, 638 F. Supp. 2d 1325, 1348-1349 (Ct. Int'l Trade 2009). In fact, Commerce's own SC List memorandum invited parties to "propose for consideration other countries that are at a level of economic development comparable to China" so that all factors could be considered with respect to surrogate country selection. *See* Commerce Memorandum, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information" (Nov. 15, 2022) ("*SC Memo*") (P.R. 34). Yet, here, Commerce used the absence of Mexico from the SC List as a reason to disregard the record evidence regarding merchandise comparability. *See* IDM at Comment 2.

Commerce defends this approach on the basis of precedent upholding the use of the GNI

List to determine whether countries are economically comparable. *See* Defendant's Br. at 20-24. However, Bio-Lab, IWC, and OxyChem did not challenge Commerce's methodology or procedure for creating the SC List or selecting six countries as the "starting point" in its analysis. *See* SC Memo at 1 (noting the SC List is a "starting point for surrogate country selection"). The issue here is whether, after creating the SC List as a starting point, it was reasonable for Commerce to refuse to consider evidence demonstrating that Mexico was economically comparable to China simply because a country on SC List produced comparable merchandise. *See* IDM at Comment 2. This approach ensures that only surrogates deemed at the "same level" of economic development as China are considered, irrespective of whether there are other potential surrogates producing identical merchandise that are at a comparable level of economic development as China. *See* Plaintiffs' 56.2 Br. at 13-20. For this reason, the sequential approach as applied in this case is not reasonable or consistent with the statute.

### B. Record Evidence Demonstrated that Mexico was Economically Comparable to China During the Period of Review

In the underlying review, the record showed that Mexico was economically comparable to China on the basis of the World Bank's three metrics of economic comparability: per capita GNI (Atlas), per capita GNI (PPP), and its Income Group Classification criteria. *See, e.g.*, Plaintiffs' 56.2 Br. at 4-5. Regarding this evidence, Defendant and Intervenors argue that Commerce had no obligation to consider any metric of economic comparability other than per capita GNI (Atlas) in evaluating whether countries are economically comparable. *See* Defendant's Br. at 24-29; Intervenors' Br. at 4-6. These arguments are misplaced, however, because Commerce did not evaluate whether Mexico was economically comparable to China under any metric of economic comparability.

As an initial matter, contrary to Defendant's and Intervenors' assertion, Commerce did not evaluate whether Mexico was economically comparable to China during the period of review. *See generally* IDM at Comment 2. Commerce refused to consider whether Mexico was economically comparable to China during the POR using its preferred metric for economic comparability (*i.e.,* per capita GNI (Atlas)), which is the same metric relied upon by Commerce to establish its SC List. *See* SC Memo. Instead, Commerce presumptively excluded Mexico from consideration as a surrogate because "Mexico's GNI is not within the range of GNIs on the GNI List." *Id.* Commerce explained that Mexico "is not on the GNI List because its GNI falls outside the range of countries on the list, and therefore, is not 'at the same level of economic development,' even if it is, as the petitioner argues, at a comparable level of economic development." *Id.* In other words, although Commerce appears to have agreed, in passing, that Mexico was economically comparable to China, the agency nevertheless excluded Mexico from consideration because it was not at the "same level" of economic development. *Id.*

Further, Defendant's and Intervenors' argument that Commerce is not required to analyze economic comparability using any metric other than per capita GNI (Atlas) misses the point. *See* Defendant's Br. at 28-29; Intervenors' Br. at 5-6. Bio-Lab, IWC, and OxyChem did not argue that Commerce was required to use a metric other than per capita GNI (Atlas) to evaluate whether Mexico was economically comparable to China. *See* Plaintiffs' 56.2 Br. at 14-16. Rather, Bio-Lab, IWC, and OxyChem argued that Mexico was economically comparable to China under Commerce's preferred benchmark (per capita GNI (Atlas)) insofar as Mexico's per capita GNI was not meaningfully different from the per capita GNI of Turkey and Romania, countries at the "same level" of economic development as China. *See* Plaintiffs' 56.2 Br. at 14 (citing *Preliminary Cmts* (C.R. 64) at Exhibit 6). In addition, Mexico was economically

comparable to China using other measures of economic comparability, including the World

Bank's two other metrics of economic comparability (*i.e.,* per capita GNI (PPP) and country

classification by income) as well as prior segments of the same proceeding. *See Id.* at 14-16

(noting "the record contained several different metrics of economic comparability, and all

indicated that Mexico and China were at comparable levels of economic development during the

POR"). Accordingly, uncontested record evidence demonstrates that Mexico was economically

comparable to China during the period of review within the meaning of 19 U.S.C. § 1677b(c)(4).

**III.  Commerce's Determination that Calcium and Sodium Hypochlorite Are
     Comparable to Chlor Isos is Not Supported By Substantial Evidence**

 **A.  Common Inputs Such as Chlorine Do Not Demonstrate That Chlor Isos and
     Calcium/Sodium Hypochlorite Have Comparable Physical Characteristics**

Defendant's sole argument that Chlor isos have comparable physical characteristics to

calcium and sodium hypochlorite is that all three products include chlorine. *See* Defendant's Br.

at 35 ("Commerce focused on the fact that all these products are essentially a chlorine"); *see also*

IDM at Comment 1 (finding that all three products are "of the same chlorine family that includes

unstabilized and stabilized chlorines"). However, there are dozens of chlorine salts, esters, and

derivates in the market. Some are more comparable to Chlor isos than others, ranging across a

broad spectrum. But neither Defendant nor the Intervenors explain why the common chlorine

element demonstrates that Chlor isos and calcium/sodium hypochlorites have comparable

physical characteristics and otherwise failed to address Bio-Lab, IWC, and OxyChem's

arguments.

As an initial matter, Commerce has previously found products to not be comparable even

when both products contained similar inputs. For example, R-134a is a hydrofluorocarbon

("HFC") gas used in air conditioning applications. R-134a is comprised of fluorine, carbon, and

hydrogen. In evaluating whether other products were comparable to R-134a, Commerce found that hydrocarbons, which are comprised of carbon and hydrogen but lack fluorine, were not comparable even though both contained carbon and hydrogen. This is because fluorine is a major input of R-134a and imparted unique physical characteristics to R-134a that were not shared by hydrocarbons. *See 1,1,1,2-Tetrafluoroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62597 (Oct. 20, 2014) ("*R-134a from China*"), IDM at Comment 16 ("We disagree that hydrocarbon products are comparable merchandise").

The same logic applies here. Chlor isos are made up of three different inputs: CYA, chlorine, and caustic soda. Although Chlor isos contain chlorine, they are in fact "derivatives of cyanuric acid" and have a unique chemical composition that imparts physical characteristics different from calcium and sodium hypochlorites. *See SC Selection Cmts* (C.R. 32-34) at 5. CYA is critical to regulating the amount of chlorine released in a given body of water, which is essential to protecting human health and ensuring the efficacy of the chlorine in the water. *See* Plaintiffs' 56.2 Br. at 20-23. As the USITC explained, "significant differences exist in {the} chemical compositions" of Chlor isos and calcium/sodium hypochlorites, "particularly in the level of available chlorine, as well as the differing non-chlorine inputs involved." *Id.* at 24 (quoting *SC Selection Cmts* at Exhibit 1). CYA stabilizes chlorine to such an extent that Chlor isos are stable, dry solids that can be manufactured and shaped into granules or tablets and can have a shelf stability of several years, in contrast to the short shelf life and liquid form of sodium hypochlorite. *Id.* at 23. It is for this reason that respondents admit that CYA is the "major material" input used in Chlor isos. Letter from Heze Huayi Chemical Co., Ltd., "Section C&D Response" (Nov. 14, 2022) (C.R. 9-20) at 3, 5.

14

Defendant addressed none of this evidence in its response, *see* Defendant's Br. at 32-35, rendering its analysis unsupported by substantial evidence. *See Tudor v. Department of Treasury*, 639 F.3d 1362, 1366 (Fed. Cir. 2011) (noting "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

### B. Chlor Isos and Calcium or Sodium Hypochlorite Do Not Have Significant Overlap in End Uses

Defendant argues that Chlor isos and calcium or sodium hypochlorites are comparable merchandise because "the common end use" of these products "is {as} a swimming pool sanitizer." Defendant's Br. at 35-36; *see also* Intervenors' Br. at 11-12. Although the record demonstrates that Chlor isos are used almost exclusively in residential pools whereas sodium hypochlorite is used only in very limited pool applications, such as theme parks, Defendant asserts that the "size of the pool where the products are being used does not support the contention that the products do not share *comparable* end-uses." Defendant's at 35. This argument is a stretch too far.

The large majority of applications for sodium hypochlorite, in particular, do not overlap with the use of Chlor isos in residential swimming pools. Sodium hypochlorite is predominantly used as a disinfectant and deodorant in dairies, creameries, water supplies, sewage disposal, and households, or as a bleach in laundries. Plaintiffs' 56.2 Br. at 24-25 (citing *Preliminary Cmts* (C.R. 64) at Exhibit 3 at 2.475 and *SV Cmts* (P.R. 45-47) at Exhibit 11 at 4). The Romanian producer of sodium hypochlorite did not even identify pools, of any size, as an application for sodium hypochlorite, and the USITC found that Chlor isos, calcium and sodium hypochlorite were not like products. *Id.* (citing *Preliminary Cmts* at Exhibit 5 (USITC Pub. 4494)).

Defendant further argues that BioLab, IWC and OxyChem "appear to concede" that

Chlor isos had a common end use in swimming pools. Defendant's Br. at 35. In fact, Plaintiffs

conceded some minor overlap in end-use, despite the significant absence of CYA as a stabilizer

and the even more important distinctions in production process. Commerce's reliance on a quote

from a single Malaysian supplier that hypochlorites can be used as a "disinfectant for swimming

pools in theme parks" is not sufficient evidence against the Chemical Process textbook (Speight),

the annual report of a Romanian producer that actually manufactures sodium hypochlorite, or the

USITC's determinations. Indeed, the annual report of another Malaysian supplier, Malay-Sino

Chemical Industries Sendirian Berhad, states that "Sodium Hypochlorite is used as a bleaching

agent in textile, pulp and paper industries, disinfectant in wastewater treatment and chlorinating

agent in chemical industries." *See* Letter from Respondents, "Final Surrogate Value Submission"

(May 31, 2023) (P.R. 69-77) at Exhibit SV2-13 (PDF 830). This is additional evidence

supporting the same applications identified by Speight and Chimcomplex.

Commerce's approach to the overall record is also inconsistent with past precedent.

Commerce has previously found that a minimal level of overlap in general end use does alone

suffice to make two products comparable for purposes of § 1677b(c)(4)(B). For example, in *R-

134a from China* Commerce found that hydrocarbons and hydrofluorocarbons like R-134a were

not comparable merchandise even though both could be used as refrigerants. *See R-134a from

China*, IDM at Comment 16. Commerce noted that although both could be used as refrigerants of

some kind, "there is no information on the record which indicates that hydrocarbon refrigerants

are used in the automobile industry, unlike {R-134a}, whose primary end-use is in automobiles."

*Id.* As a result, these products were not "interchangeable" for the specific end-use to which they

were dedicated, which undermined a finding that they shared comparable end uses. *Id.*

The same logic applies here. Record evidence confirmed that Chlor isos are used almost

exclusively as residential pool sanitizers, which reflects the unique physical characteristics imparted by CYA discussed above, whereas calcium and sodium hypochlorites are not. *See* Plaintiffs' 56.2 Br. at 24-25. In short, the overlap between Chlor isos and calcium or sodium hypo in end-use applications is minor. To be safe and effective, water disinfectants have unique properties and chemicals that restrict the type of end-use for which they can be used (*e.g.,* in your home, in your pool, or in wastewater). Defendant addressed none of the evidence discussed above, *see* Defendant's Br. at 35-36, including the fact that two other producers of sodium hypochlorite on the record did not identify disinfectant in swimming pools of any kind as an end use. Accordingly, Commerce's finding that Chlor isos and calcium/sodium hypochlorite have comparable end uses is unsupported by substantial evidence. *See Tudor v. Department of Treasury*, 639 F.3d at 1366 (noting "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

**C.  Chlor Isos and Calcium or Sodium Hypochlorites Have Significantly Different Production Processes, Which Is a Compelling Reason to Prefer a Surrogate that Produces Chlor Isos**

As noted above, the purpose for selecting a surrogate is to "construct{} a hypothetical 'market value' representative of the foreign producers under investigation." *Nation Ford*, 166 F.3d at 1378. As such, the complexity of the multi-stage Chlor isos production process is a compelling distinction between Chlor isos and calcium or sodium hypochlorites. Bio-Lab, IWC, and OxyChem provided a detailed analysis of the significant differences in the production of Chlor isos and calcium/sodium hypochlorite, demonstrating that Chlor isos require significantly more investment, workers, equipment and processing stages. *See* Plaintiffs' 56.2 Br. at 31. Defendant ignored this evidence and instead asserted that the production of calcium or sodium hypochlorite "sufficiently mirrors" the process used to produce Chlor isos because all three

17

processes "involve{} many of the same inputs." Defendant's Br. at 36-38. Intervenors likewise did not respond to the arguments and evidence presented regarding the actual production processes. *See* Intervenors' Br. at 11-13. But these arguments are unavailing. The absence of CYA is a major physical difference between Chlor isos and sodium and calcium hypochlorite, and it also demonstrates a major difference in the production process, which is far more complex for Chlor isos.

### 1. The Differences in Production Process Do Not Simply Amount to Differences in Physical Inputs

In their opening brief, Bio-Lab, IWC, and OxyChem demonstrated that production of Chlor isos involved a workforce, plant, and investment that is an order of magnitude greater than the number of workers and investment involved in the production of calcium/sodium hypochlorite. *See* Plaintiffs' 56.2 Br. at 27. The significant differences in plant costs and number of employees reflects the fact that the production of Chlor isos is a multistep process that involves the production of several intermediate chemicals whereas the production of calcium/sodium hypochlorite do not. *Id.* Plaintiffs further explained, quoting the USITC, that Chlor isos and calcium/sodium hypochlorite are not "manufactured in common facilities with common employees" and that a manufacturer of calcium/sodium hypochlorite cannot switch production to Chlor isos using the same facilities and machinery, demonstrating a significant difference in the production process. *Id.* at 27-28.

Neither Defendant nor the Intervenors dispute the complexity of the manufacturing process actually employed by Huayi and Kangtai to produce CYA and then to chlorinate the CYA to produce Chlor isos. Neither disputes or discredits the evidence showing that the production of subject merchandise, whether in China or Mexico, involves far more processing stages, equipment, investment, labor, and energy than does the production of sodium

hypochlorite. Instead, Defendant focuses solely on the fact that the production of Chlor isos and calcium/sodium hypochlorite use chlorine, one of the same inputs, in the production process. *See* Defendant's Br. at 36-38; *see also* Intervenors' Br. at 12-13. But common inputs used in the production process does not demonstrate that the production process itself is comparable. For example, Commerce has found that producers of steel wire do not have a comparable production process to those of steel wire hangers "because wire hangers are a downstream product of wire requiring additional manufacturing processes." *Steel Wire Garment Hangers from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 47587 (Aug. 14, 2008), IDM at Comment 3. Accordingly, the mere fact that Chlor isos and calcium/sodium hypochlorite have common inputs does not demonstrate that the production processes of these chemicals are comparable.

Stated differently, Defendant and Intervenors fail to address the differences in production process, one of three factors for determining whether merchandise is comparable. *See Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2004) (describing the three-part test). As such, the opposing parties sidestep any significant analysis of the evidence regarding the differences in production processes, or the implications of such differences when selecting the best available surrogate. *Cf. Bonney Forge Corporation v. United States*, 560 F. Supp. 3d 1303, 1312 (Ct. Int'l Trade 2022) (noting "a failure to address an essential argument in making a final decision is sufficient grounds for remand").

### 2. *Commerce's Reliance on Prior Determinations Ignores the Different Factual Records and Lack of Evidence Regarding the Production Process*

The crux of the response by Defendant and the Intervenors is that Commerce previously found calcium and sodium hypochlorite to be comparable to Chlor isos. *See* Defendant's Br. at 38-39 (stating that Commerce "has a long history of finding calcium and sodium hypochlorites to

be comparable to the subject merchandise"); Intervenors' Br. at 11-12. This argument fails because the record in this case contained more information distinguishing the production of Chlor isos from calcium and sodium hypochlorite than existed in prior segments of the proceeding. As a result, prior decisions by Commerce are not dispositive on this record as to whether Chlor isos and calcium/sodium hypochlorite are comparable merchandise.

It is well-established that "each administrative review is a separate segment of proceedings with its own unique facts. Indeed, if the facts remained the same from period to period, there would be no need for administrative reviews." *Shandong Huarong Mach. Co. v. United States*, 29 C.I.T. 484, 491 (2005); *see also Peer Bearing Co.-Changshan v. United States*, 587 F. Supp. 2d 1319, 1325 (Ct. Int'l Trade 2008) (affirming Commerce's denial of a separate rate for an entity previously assigned a separate rate because "{e}ach individual review consists of different" information). Each administrative review "is a separate proceeding covering merchandise entering the United States during a specific time period, and the facts of each review are considered separately, based on information submitted for that review." *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015–2016*, 83 Fed. Reg. 5243 (Feb. 6, 2018), IDM at Comment 5.A.

Here, Commerce "recognized…that the petitioners have provided more detailed information about the comparable products in this review in comparison to the record information of previous reviews." IDM at Comment 1. This included information related to the physical characteristics, end uses, and production process, as discussed above. Given the different factual record before Commerce, Defendant's assertion that Commerce's finding that Chlor isos and calcium/sodium hypochlorite were comparable is not supported by substantial evidence on this record.

Furthermore, the prior cases cited by Commerce concerned different factual arguments and, therefore, may have warranted a different conclusion than Commerce's analysis and conclusion here. For example, in the underlying investigation Commerce selected India as the primary surrogate country. India, however, did not produce identical merchandise. The record there indicated India was a producer of calcium hypochlorite and stable bleaching powder. Therefore, Commerce conducted an analysis as to whether calcium hypochlorite or stable bleaching powder was more comparable to subject merchandise. *Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates from the People's Republic of China*, 70 Fed. Reg. 24502 (May 10, 2005), IDM at Comment 2 ("the petitioners claim that calcium hypochlorite…is more comparable to the subject merchandise than is stable bleaching powder"). Thus, Commerce's (and Petitioners') arguments in the investigation are distinguishable from the analysis here.

Perhaps more importantly, though, Defendant's insistence that sodium and calcium hypochlorite are comparable to Chlor isos is the entire basis for its refusal even to consider Mexico as a potential surrogate. Having found that at least one country on the SC List was a significant producer of sodium hypochlorite, Commerce refused to acknowledge that there was production of identical merchandise – using the same complex production process – in Mexico. Yet, "comparable" is not a yes/no variable. It is a sliding scale. The purpose for conducting the search for a surrogate is to find one that reasonably reflects the production of Chlor isos using the production process employed by Huayi and Kangtai. By refusing to consider that the production of Chlor isos is far more complex than the production of hypochlorites, Commerce fails to identify a surrogate country that satisfies both prongs of 19 U.S.C. § 1677b(c).

## IV.    Conclusion

For the reasons discussed above, this Court should find Commerce's selection of Romania as the primary surrogate country to be not in accordance with law and unsupported by substantial evidence.

Respectfully submitted,

/s/ James R. Cannon, Jr.
James R. Cannon, Jr.
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W.
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

Date:    December 16, 2024

Court. No. 24-00024

**<u>Certificate of Compliance</u>**

The undersigned hereby certifies that the forgoing submission of Bio-Lab, Inc. et al's Reply Brief" filed by Bio-Lab, IWC, and OxyChem on December 16, 2024, contains 6,439 words, including footnotes, and excluding the table of contents, table of authorities, and signature block, and therefore, complies with the maximum 7,000-word limitation set forth in the Standard Chambers Procedures.

BY: <u>/s/ James R. Cannon Jr.</u>