UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., ET AL.<br>    Plaintiffs,<br><br>and<br><br>JUANCHENG KANGTAI CHEMICAL CO., LTD.<br>AND HEZE HUAYI CHEMICAL CO., LTD.,<br>    Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br>    Defendant,<br><br>and<br><br>BIO-LAB, INC., ET AL; JUANCHENG KANGTAI<br>CHEMICAL CO., LTD. ET AL.<br>    Defendant-Intervenors and<br>    Consolidated Defendant-Intervenors.. | Consol. Ct No. 24-00024 |

## CONSOLIDATED PLAINTIFFS' REPLY BRIEF

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinhui Wang
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 Fifteenth Street, N.W.  20005
Tel: (202) 783-6900
email: gmenegaz@dhlaw.com
*Counsel to Consolidated Plaintiffs*

Dated: December 16, 2024

## TABLE OF CONTENTS

I.    The Department's Decision that it Could Consider Romania as a Primary Surrogate Country is Arbitrary and Capricious ........................................................... 1

II.   The Department's Decision that Romania Sources the Best Available Information Is Not Supported by Substantial Evidence ................................................................... 6

III.  Conclusion and Prayer for Relief ................................................................................ 11

# TABLE OF AUTHORITIES

**Cases**

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (Ct. Int'l Trade 2003). ...................................10

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)............................................6

*Fresh Garlic Producers Ass'n v. United States*, 2017 Ct. Intl. Trade LEXIS 128 ..........................2

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) .........................10

*New Am. Keg v. United States*, No. 20 - 00008, 2024 Ct. Intl. Trade LEXIS 131 (Ct. Int'l Trade Nov. 25, 2024). ...................................................................................................................2, 7

*Peer Bearing Company-Changshan v. United States*, 752 F. Supp. 2d 1353 (January 28, 2011) ..9

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)......................................................6

*Vinh Hoan Corp. v. United States*, 2015 Ct. Intl. Trade LEXIS 156, *81 (2015).........................10

**Regulation**

19 C.F.R. 351.301 (c)................................................................................................................. 1-2

**Administrative Decisions**

*Fresh Garlic Final Results and Final Rescission of the 20th Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 39,897 (June 20, 2016)............................................................3

*Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 28,801 (May 16, 2013)............................................................................................................................. 4-5

*Pure Magnesium Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 94 (January 2, 2024)............................................................................................................... 4-6

ii

Pursuant to Rule 56.2 (c)(1), Consolidated Plaintiffs Heze Hauyi Chemical Co., Ltd. ("Heze Huayi") and Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") (collectively, "Consolidated Plaintiffs") hereby submit their reply brief. *See* U.S. Brief (November 6, 2024) ECF 35; *see also* Pet. Brief (November 18, 2024) ECF 36.

I. **The Department's Decision that it Could Consider Romania as a Primary Surrogate Country is Arbitrary and Capricious.**

The Department relied upon Romania as the primary surrogate country in this review. However, Romania was not timely suggested as a potential surrogate country by any party by the surrogate country deadline of December 2, 2022. In response to the Consolidated Plaintiffs' arguments, the United States and Petitioner continue to maintain that there was no requirement for the parties to suggest a surrogate country by the set deadline.

The United States focuses their argument on the lack of a regulatory deadline for the surrogate country. U.S. Br. at 16-19. Petitioner focuses their argument that the Department may select any surrogate country, irrespective of whether an interested party suggested the country. Pet. Br. at 8-9. Both also emphasize that the final surrogate deadline was not until May 31, 2024. These arguments all ignore that the Department sets many deadlines by letter, such as the surrogate country deadline. Indeed all questionnaire deadlines are set by letter by the Department and hold full weight as mandatory deadlines, even though parties may submit information up to 30 days before the preliminary results. *See* 19 C.F.R. 351.301 (c)(5) (a catch-all provision allowing parties to submit information with explanation of why the Department should accept it).

The United States and Petitioner have failed to adequately explain why the surrogate country deadline is different. The Department specifically stated that "comments on surrogate country selection must be submitted to Commerce no later than EST, 5:00 pm, December 2,

1

2022." *See* Dep't SC/SV Memo, PR34. The regulation does allow for parties to continue to submit surrogate value information up to 30 days before the preliminary results. *See* 19 C.F.R. 351.301 (c)(3) ("submissions of factual information to value factors of production under § 351.408(c)" are due no later than 30 days before the preliminary results). But nothing in the regulation would suggest that parties can ignore the Department's letter deadline for comments on the surrogate country, which was several months earlier. Indeed, notably, the United States and Petitioner have cited to no precedent following the fact pattern of this case—i.e. where a party failed to suggest a particular surrogate country by the letter deadline, suggested a surrogate country later in the review, and the Department relied upon that country. In every single review of this Order, the parties have followed the plain meaning of the Department's surrogate country letter and the regulation, and suggested a surrogate country at the surrogate country deadline, submitted initial surrogate values from the suggested countries at the letter deadline, and then submitted final surrogate values from those suggested countries at the final regulatory deadline. Indeed, Counsel is unaware of any instance of the parties and the Department doing otherwise in the context of an investigation or review[1]. Given the lack of citations from the United States and Petitioner it appears that they also are not aware of any such instance and have not met the burden of their baseless arguments.

      This is Department practice and the plain meaning of the Department's surrogate country

---

[1] We note that in a remand of a *Garlic from China* review, the Court ordered the Department to reconsider its surrogate country selection. The Department decided to reopen the record and allow parties to submit new surrogate countries. *Fresh Garlic Producers Ass'n v. United States*, 2017 Ct. Intl. Trade LEXIS 128, *11-12 (upholding Commerce's decision to reopen the record and rely on a newly submitted surrogate country). While the case allowed the submission of surrogate data from a new surrogate country, it was in a remand proceeding and the Department specifically allowed for the submission of new surrogate countries.. Thus this case is factually distinguishable from the present case. This rare case has further been called into doubt in *American Keg. V. US*, where the Court held that the Department abused its discretion in opening the record. *New Am. Keg v. United States*, No. 20 - 00008, 2024 Ct. Intl. Trade LEXIS 131, at *2 (Ct. Int'l Trade Nov. 25, 2024).

2

deadline letter. The United States' and Petitioner' arguments remove all meaning to the surrogate country deadline. Indeed, to the contrary, Consolidated Plaintiffs actually raised two cases where the Department found that a surrogate country was suggested too late in the proceeding. Consol. Plaintiffs R56.2 Brief at 8-10. The United States and Petitioner attempt to distinguish these cases, but the factual differences do not alter the Department's clear statements that the set surrogate country deadline was a deadline. In *Garlic from China*, Petitioner emphasizes that the party was also trying to submit information on economic comparability. Pet. Br. at 11-12. Of course, if the surrogate country deadline has no meaning according to Petitioner, then why should the economic comparability deadline, which is set in the very same letter, matter. Moreover, in *Garlic from China*, the submission of information on economic comparability was not the only focus of the Department's finding. Rather, as quoted in more deadline in Consolidated Plaintiff's opening brief, the Department held that it "intentionally set deadlines for comments on the OP List and relating to **SC selection** to be early in the proceeding." *Fresh Garlic Final Results and Final Rescission of the 20th Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 39,897 (June 20, 2016) and accompanying IDM at Comment 2 (emphasis added). The Department clearly stated that it set a surrogate country selection deadline early in the proceeding and the party in that case did not follow it, same as the Petitioner in this review.

      The United States on the other hand, attempts to argue that in *Garlic from China*, the Department did not expressly extend the surrogate country deadline while it did in this review. U.S. Br. at 18. The United States cites to the preliminary results extension memo and claims that the Department invited further comments on the surrogate country, however the memo in no ways says what the United States implies. The preliminary extension memo states that the

3

Department needed more time "evaluate the selection of the primary surrogate country due to changes in Commerce's surrogate country list since the last administrative review." Dep't Prelim. Extension Memo (February 17, 2023) PD55.  Nothing in the memorandum suggested that the set surrogate country deadline of December 2, 2022 was somehow nullified or extended by this notice.  The Department must provide reasoning for the extension of the preliminary results, and generally cites to needing more time to evaluate surrogate values and questionnaire response.  This is common place and has never meant in any other instance that the letter surrogate country deadline was extended.

The second case cited by Consolidated Plaintiffs was *Pure Magnesium from China*.  Both the United States and Petitioner claim the case is not instructive because the party argued for a new surrogate country in the case brief, while here Petitioner raised it in the final surrogate value deadline.  U.S. Br. at 18; Pet. Br.at 12.  However, this overlooks that the party in the review had submitted a complete Ukraine surrogate country record by the final surrogate value deadline.  The Department found the data itself was timely on the record and would not be rejected, but found that it could not rely upon Ukraine because it was suggested "well after the established deadline for comment on the surrogate country list." *Pure Magnesium Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 94 (January 2, 2024) and accompanying IDM at Comment 1.  Inherent in that discussion is that the surrogate country deadline set by the Department is a set deadline.

Further, in *Hand Trucks from China*, the Department again found that the surrogate country deadline was an established deadline that must be followed. *Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 28,801(May 16, 2013) and accompanying IDM

4

at Comment 2 ("First, on April 18, 2012, the Department set a deadline of June 18, 2012, for the parties to comment on surrogate country selection. Cosco filed an untimely submission three months after the deadline, which was rejected by the Department.  In rejecting Cosco's untimely comments on surrogate country selection, the Department established that any subsequent submissions on the issue were time-barred. Having failed to comment on surrogate country selection in a timely manner, Cosco's argument on the issue is time-barred.").  The deadlines set by the Department by letter, such as the surrogate country deadline, are actual deadlines with which parties must comply.  This has been the Department's practice and all of parties' understandings for the whole extent of this Order and in all other proceedings.  Accordingly, Romania was not timely submitted and should not be relied upon.

Further, the United States and Petitioner downplay the serious procedural unfairness of suggesting a surrogate country on the final surrogate value deadline. Only in Petitioner's surrogate value submission did Petitioner for the first time actually suggest Romania as a surrogate country and submit factors of production for Romania.  Pet. Prelim Cmts & Final SVs (May 31, 2023), PR78.  After this, Respondents were barred under the regulation to submit any alternative Romania surrogate values or value information relevant to the Romanian surrogate values (such as chlorine values in the other surrogate countries as described below to make an aberrancy argument).  Respondents could only submit rebuttal information, but are expressly barred from submitting surrogate values in rebuttal by practice as well.  The United States claims that since Romania was on the surrogate country list, Consolidated Plaintiffs were on notice to submit any information related to Romania.  U.S. Br. at 20.  This suggests that the United States is claiming that a party should submit all potentially relevant information on all surrogate countries on the list just in case it is suggested contrary to deadlines set by the Department on the

5

final surrogate value deadline. This is administratively nonsensical and precisely the type of action that the Department was seeking to avoid in setting a surrogate country deadline early in the proceeding. *Pure Magnesium Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 94 (January 2, 2024) and accompanying IDM at Comment 1 (discussing that submitting a surrogate country late in the proceeding "is exactly the type of scenario considered in and found to create undue administrative difficulties and be potentially unfair to the parties.") (internal quotations omitted). Researching economic data in a foreign country or countries is an incredibly complicated and time-consuming task. Preparing counter data to opposing parties' suggestions is equally complicated and difficult. The United States and Petitioner have conveniently blinded themselves to these obvious facts and Department policy in this rare case.

The Court should find, consistent with its set deadlines, past practice, and principles of fairness, that Romania was not properly submitted as potential surrogate country on this record. The Department's reliance on Romania ignores its own deadlines and practice and is thus arbitrary. *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice."); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."). Malaysia was the only timely submitted surrogate country that is economically comparable to China and the Department must be held to its own well-founded policy and deadline.

**II.     The Department's Decision that Romania Sources the Best Available Information Is Not Supported by Substantial Evidence.**

The Court should find that the Department's reliance on Romania is unlawful because it

was not timely submitted. While this reason alone is fully adequate to reject Romania, Romania also does not source the best available information. Substantial evidence on the record supports that Malaysia sources the best available information. Malaysia sources superior surrogate data for financial ratios and chlorine. Consolidated Plaintiffs also submit that Malaysia sources not only a reliable labor surrogate value, but a superior one in specificity and contemporaneity.

The United States acknowledges that Malaysia sources multiple financial statements, but finds the selection of Romania is still supported because Malaysia has an unreliable labor rate. U.S. Br. at 42, 46. Petitioner similarly dismisses that the Malaysian financials are superior to the sole Romanian financial, and also submits that the Malaysian labor rate cannot be relied upon. Pet. Br. at 16-17. Petitioner also attempts to undermine the superior comparability of the two Malaysian financial statements, pointing out that the record does not establish the quantity of comparable products that the two Malaysia producers produce. Pet. Br. at 15. However, the record also does not establish the quantity that Chimcomplex (Romania) produces. Petitioner cites to Chimcomplex's claim to hold 75-90 percent of the "Chlorosodic" market in Romania, but this is a broader term and not specific to only the comparable products. Thus, the record also does not establish the quantity of comparable production from Chimcomplex. However, the record does establish that Malay-Sino and CCM are <u>only</u> engaged in the production of chlor-alkali products and therefore their whole production is highly comparable. Resp. Final SVs at Exhibit 12&13, PR69-72. Thus, Malaysia offers superior financials both in quality and quantity.

Petitioner and the United States primarily lean on the supposedly unreliable labor value in Malaysia to support reliance on Romania. However, just as in the Final Results, they inappropriately rely on the finding in *New American Keg Final Redetermination* and other similarly situated reviews. In that case, the Department ultimately found that the record

7

established the Malaysian electrical and electronics sector (E&E) industry had significant forced labor. The Department then rejected a Malaysia labor rate for all sectors, because it would have included the E&E sector. But in this case, the Malaysia labor rate on this record is not related to the E&E sector, but is specific only to a separate subsector, i.e., chemical manufacturing. The Department has not provided any support for its rejection of this labor rate from an entirely different sector that the sector at issue in its forced labor findings.

Moreover, the Malaysian labor rate is superior to the Romanian labor rate because it is definitively specific to not only the manufacturing industry, but also to the manufacture of chemicals. The labor rate is reported on a monthly basis and is precisely contemporaneous to the POR. Resp. Final SVs at Exhibit 11, PR69-72. In contrast, the Romanian labor rate is not as contemporaneous and is to not even a manufacturing labor rate at all. The Romanian labor rate is for industry, construction, and services--- this is not a manufacturing-specific labor rate. There is no mention of manufacturing at all. It would include highly dissimilar labor. Pet. Prelim Cmts & Final SVs at Exhibit 10, PR78. A proper review of the record must lead to a conclusion that the Romania labor value is not a suitable surrogate labor value for manufacturing chemicals, while the Malaysia labor value is reliable, specific, and contemporaneous.

Lastly, both the United States and Petitioner also primarily dismiss Consolidated Plaintiffs arguments concerning the chlorine value in Romania. U.S. Br. at 43-44; Pet. Br. at 18-21. Notably, among their arguments is a complaint that Consolidated Plaintiffs did not submit enough comparative information to support the claim that the Romanian chlorine value was aberrant. Consolidated Plaintiffs ability to create a fuller record was directly inhibited by petitioner's failure to timely suggest Romania as a potential surrogate country by the Department's deadline, which is intended to put reasonable limits on the broad array of

economic data that could come into play in the review. The Romanian chlorine value was not placed on the record until the final surrogate value deadline, thus barring Consolidated Plaintiffs from filing any alternative chlorine value in rebuttal to demonstrate aberrancy.

Nonetheless, the information on the record is still adequate to establish the Romanian chlorine import value is not reliable, or at a minimum is not the best available information. *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) ("[S]ubstantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.").

Romania imported only a small amount of chlorine with widely varying AUVs and a significantly higher overall AUV than the other record sources that imported a far larger quantity, Malaysia and Mexico. First, Romania imported only 413 tons with an AUV of $1.88/kg. In contrast, Malaysia and Mexico imported over 12,000 tons and 14,000 tons respectively, with very similar AUVs of $0.31/kg and $0.51/kg. *Peer Bearing Company-Changshan v. United States*, 752 F. Supp. 2d 1353 (January 28, 2011) (finding that substantial evidence did not support relying upon a value 60% higher than other record sources, including countries that were less economically comparable). The import quantities into Malaysia and Mexico are in range with Respondents' purchases and representative of commercial quantities. Heze Huayi Section D at Exhibit D-9, PR32 CR9; *see also* Kangtai Section D at Exhibit D-9, PR33 CR21.

The fact that the Romanian import value is not commercial is all the more evident when looking at the monthly totals. A normal container load is 20 tons in commercial trade. However, the vast majority of the Romanian shipments were less than a container, with a significant amount of imports under 1 ton or even under 0.1 tons (under 100 KG). *See* Respondents' Case

9

Brief at Attachment 1 (analysis of Romanian imports), PR113-114.  These simply are not commercial shipment sizes for industrial production.  Further, the AUVs for the Romanian imports vary widely with no logic for the variance.  While is not uncommon that a small quantity of imports is more expensive than a large quantity of imports, the Romanian import data's widely ranging AUVs,  do not follow this general understanding either.

     Rather than confront the various issues in the data, the United States just declares that 413 MT is commercial. U.S. Br. at 44.  Such a conclusory statement is not supported by substantial evidence.  Although the Department is given discretion in selecting factors of production, that discretion is constrained by the underlying objective to calculate the most accurate dumping margins possible and "[t]his objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents." *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct. Int'l Trade 2003).  Accordingly, relying on imports into Romania that could not be used in commercial production does not fulfil this objective. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (discussing that while Commerce does not have to perfectly duplicate the production experience of the Chinese manufacturer, Commerce should rely on the surrogate value that "most accurately represents the fair market value of [the respective input] in a hypothetical market-economy.").

     In sum, at a minimum, Romania has less quality financial data and lacks a reliable chlorine value.  In contrast, Malaysia sources the best available information, at a minimum, for financials and chlorine.  .As argued above and in more detail in their opening brief, Consolidated Plaintiffs also maintain that Malaysia sources not only a reliable labor rate, but a superior labor rate to Romania.  But even assuming *in arguendo* that the Romania labor rate is superior,

Malaysia still sources the "best available" to value most of Kangtai's and Heze's factors of production and the most important of those surrogate values. *Vinh Hoan Corp. v. United States*, 2015 Ct. Intl. Trade LEXIS 156, *81 (2015) ("The best primary surrogate country in this case is that provides the best available information for most inputs.").

### III. Conclusion and Prayer for Relief

In light of the foregoing, the Department's *Final Results* were not supported by substantial evidence or in accordance with the law. Plaintiffs respectfully request that the Court remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Judith L. Holdsworth
Vivien Jinghui Wang[**]
**deKieffer & Horgan, PLLC**
*Counsel for Consolidated Plaintiffs*

Dated: December 16, 2024

---

[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

11

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **3,378** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth Street., N.W.  20005
Suite 1101
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com

1