Slip Op. 25-39

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **BIO-LAB, INC.; INNOVATIVE WATER CARE LLC; AND OCCIDENTAL CHEMICAL CORPORATION,** | |
| Plaintiffs, | |
| and | |
| **JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD.,** | |
| Consolidated Plaintiffs, | **Before: Timothy M. Reif, Judge** |
| v. | **Consol. Court No. 24-00024** |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD.,** | |
| Defendant-Intervenors. | |

### <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part Commerce's final results in the administrative review of the antidumping order on chlorinated isocyanurates from the People's Republic of China.]

Dated: April 14, 2025

<u>James R. Cannon, Jr.</u> and <u>Chase J. Dunn</u>, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for plaintiffs Bio-Lab, Inc.; Innovative Water Care LLC; and Occidental Chemical Corporation.

<u>Tate N. Walker</u>, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States.  With him on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel were <u>Jesus Saenz</u> and <u>Ashlande Gelin</u>, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Gregory S. Menegaz</u> and <u>Alexandra H. Salzman</u>, The Inter-Global Trade Law Group PLLC, of Washington, D.C., argued for consolidated plaintiffs and defendant-intervenors Juancheng Kangtai Chemical Co., Ltd. and Heze Huayi Chemical Co., Ltd.  With them on the briefs were <u>Judith L. Holdsworth</u> and <u>Vivien Jinghui Wang</u>.

Reif, Judge:  This action concerns the final results of the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping ("AD") order on chlorinated isocyanurates ("chlorinated isos," or the "subject merchandise") from the People's Republic of China ("China") for the period of review ("POR") June 1, 2021, through May 31, 2022.  *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 455 (Jan. 4, 2024) ("*Final Results*"), PR 127, PJA Tab 19; Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China; 2021-2022 (Dec. 28, 2023) ("IDM"), PR 126, PJA Tab 18; *see also Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022* ("*Preliminary Results*"), 88 Fed. Reg. 43,271 (Dep't

of Commerce July 7, 2023) and accompanying Preliminary Decision Memorandum ("PDM") (Dep't of Commerce June 30, 2023).[1]

Bio-Lab, Inc., Innovative Water Care LLC and Occidental Chemical Corporation (collectively, "petitioners," or "plaintiffs") challenge certain aspects of the *Final Results* in a motion for judgment on the agency record with respect to Commerce's decision not to select Mexico as the primary surrogate country for purposes of calculating normal value. Specifically, plaintiffs request that the court remand to Commerce for reconsideration: (1) Commerce's treatment of economic comparability as a threshold criterion for surrogate country selection; and (2) Commerce's determination that calcium hypochlorite ("calcium hypo") and sodium hypochlorite ("sodium hypo") are comparable merchandise to chlorinated isos for purposes of surrogate country selection.  Compl. ¶¶ 15-27, ECF No. 8; Mem. Law and Fact in Supp. Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Pls. Br.") at 3, ECF No. 31.

Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") and Heze Huayi Chemical Co., Ltd. ("Heze Huayi") (collectively, "respondents," or "consolidated plaintiffs")[2] also challenge certain aspects of the *Final Results* in a motion for judgment on the agency record with respect to Commerce's selection of Romania and rejection of Malaysia as

---

[1] Parties include the wrong PDM in the public joint appendix.  In the table of contents, the document is titled "Decision Memorandum for the Preliminary Results of the 2021-2022 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanruates [sic] from the People's Republic of China (June 30, 2023)," but it is instead the PDM for the 2020-2021 administrative review of the AD order on the subject merchandise.  *See* PJA Tab 14.

[2] Kangtai and Heze Huayi are consolidated plaintiffs and defendant-intervenors in the instant action.  For the sake of simplicity, the court will refer to the two as consolidated plaintiffs only.

the primary surrogate country and Commerce's use of Romanian surrogate value ("SV")

data.  Pls.' Mot. for J. on the Agency R., ECF No. 29; Pls.' Rule 56.2 Mem. in Supp. of

Mot. for J. upon the Agency R. ("Consol. Pls. Br."), ECF No. 29-2.  Consolidated

plaintiffs request that the court remand to Commerce for reconsideration: (1)

Commerce's consideration and selection of Romania as the primary surrogate country;

and (2) Commerce's decision that Romania sources the best available information.  *See*

Consol. Pls. Br.

    For the reasons discussed below, the court sustains in part and remands in part

Commerce's *Final Results.*

## BACKGROUND

    On August 9, 2022, Commerce initiated the administrative review at issue here.

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg.

48,459 (Aug. 9, 2022), PR 7, PJA Tab 1.

    On November 15, 2022, Commerce placed the Surrogate Country ("SC") List on

the record.  Mem. to All Interested Parties: "Request for Economic Development,

Surrogate Country and Surrogate Value Comments and Information" (Nov. 15, 2022)

("SC Mem.") at attach. 1, PR 34, PJA Tab 2.  The SC List contained the following

countries: Bulgaria, Costa Rica, Malaysia, Panama, Romania and Turkey.  *Id.*

Commerce solicited comments regarding the selection of the SC and gave interested

parties the opportunity to provide SV data.  *Id.* at 1; PDM at 2.  Commerce stated that

"comments on [SC] selection must be submitted to Commerce no later than *EST, 5:00*

*pm, December 2, 2022*."  SC Mem. at 2.

On November 22, 2022, petitioners submitted comments on the SC List in which they requested that Commerce "consider Mexico as a potential surrogate country." Letter from Pet'rs, "Comments on Surrogate Country List" (Nov. 22, 2022) ("Pet'rs SC List Comments"), PR 36, PJA Tab 3.

On November 28, 2022, respondents provided rebuttal comments in which they requested that Commerce select Malaysia as the primary surrogate country. Letter from Respondents, "Rebuttal Comments on GNI List" (Nov. 28, 2022), PR 37, PJA Tab 4.

On December 2, 2022, respondents and petitioners submitted comments on the selection of a primary surrogate country. Letter from Respondents, "Comments on Surrogate Countries" (Dec. 2, 2022), PR 40, PJA Tab 5; Pet'rs, "Comments on Primary Surrogate Country Selection" (Dec. 2, 2022), PR 41-42, PJA Tab 6.

On December 19, 2022, petitioners submitted initial SV data for Mexico and Romania. Letter from Pet'rs, "Initial Surrogate Value Data" (Dec. 19, 2022) ("Pet'rs Initial SV Data"), PR 45, 47, PJA Tab 7.

On January 23, 2023, petitioners requested that Commerce extend the deadline for the issuance of the preliminary results until June 30, 2023. Letter from Pet'rs, "Request to Extend the Deadline for Preliminary Results" (Jan. 23, 2023), PR 49, PJA Tab 9. Petitioners argued that an extension was "necessary" for Commerce to consider the recent submissions. *Id.* at 1.

On February 17, 2023, Commerce granted petitioners' request and extended the deadline to June 30, 2023. Commerce Mem., "Extension of Deadline for Preliminary

Results of Antidumping Duty Administrative Review" (Feb. 17, 2023) ("Extension

Mem."), PR 55, PJA Tab 10.

On May 31, 2023, petitioners submitted additional surrogate data, including a

request that Commerce select Romania as the primary surrogate country in the event

that it decided not to select Mexico.  Letter from Pet'rs, "Comments Concerning the

Preliminary Determination" (May 31, 2023) ("Pet'rs Preliminary Comments"), PR 78,

PJA Tab 12.

On July 7, 2023, Commerce issued the *Preliminary Results*.  *See Preliminary

Results*, 88 Fed. Reg. at 43,271.  Commerce selected Romania as the primary

surrogate country.  *See* PDM at 32.

On September 29, 2023, respondents submitted a case brief in which they

argued that Romania was not timely suggested as a surrogate country and that

Malaysia provided the best SV data on the record.  *See* Letter from Respondents,

"Case Br." (Sept. 29, 2023) ("Consol. Pls. Case Br."), PR 113-114, PJA Tab 16.

On January 4, 2024, Commerce issued the *Final Results*.  *See Final Results*, 89

Fed. Reg. at 455.  Commerce continued to select Romania as the primary surrogate

country.  *See* IDM at 15.

On February 2, 2024, plaintiffs filed a summons.  Summons, ECF No. 1.  On

March 1, 2024, plaintiffs filed their complaint.  Compl.

On May 17, 2024, plaintiffs and consolidated plaintiffs moved to consolidate their

respective actions.  Pls.' Consent Mot. to Consolidate Cases, ECF No. 23.  On May 20,

2024, the Court granted the motion to consolidate.  Consolidation Order, ECF No. 24.

On July 1, 2024, consolidated plaintiffs filed a consent motion for extension of time to file their opening briefs.  Consent Mot. to Am. Scheduling Order, ECF No. 26.  On July 2, 2024, the Court granted the motion.  Am. Scheduling Order, ECF No. 27.

On July 16, 2024, plaintiffs and consolidated plaintiffs moved for judgment on the agency record pursuant to USCIT Rule 56.2.  Pls. Br.; Consol. Pls. Br.

On October 1, 2024, defendant filed a consent motion for extension of time to file its response brief.  Def.'s Consent Mot. for Extension of Time, ECF No. 33.  On October 2, 2024, the Court granted the motion.  Order, ECF No. 34.

On November 6, 2024, defendant filed its response brief.  Def.'s Resp. to Pls.' and Consol. Pls.' Rule 56.2 Mots. for J. on the Agency R. ("Def. Br."), ECF No. 35.

On November 18, 2024, plaintiffs filed a response brief in opposition to consolidated plaintiffs' motion and consolidated plaintiffs filed a response brief in opposition to plaintiffs' motion.  Bio-Lab, Inc., et al's Resp. Opp'n to Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 36; Def-Intervenors' Resp. Br., ECF No. 37.

On December 16, 2024, plaintiffs and consolidated plaintiffs filed their reply briefs.  Bio-Lab, Inc., et al's Reply Br. ("Pls. Reply Br."), ECF No. 38; Consol. Pls.' Reply Br. ("Consol. Pls. Reply Br."), ECF No. 39.

On March 12, 2025, the Court heard oral argument.  Oral Arg. Tr., ECF No. 50.

## JURISDICTION AND STANDARD OF REVIEW

28 U.S.C. § 1581(c) grants to this Court "exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930."  Section 516A of the Tariff Act of 1930 provides that in an action under 19 U.S.C. § 1516a(a)(2), the court will hold unlawful any determination, finding or conclusion that is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."[3]   19

U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence constitutes "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion," but it requires "more than a mere

scintilla." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol.

Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

For a reviewing court to "fulfill [its] obligation" to determine whether a

determination of Commerce is supported by substantial evidence and in accordance

with law, Commerce is required to "examine the record and articulate a satisfactory

explanation for its action." *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376

(Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716

F.3d 1370, 1378 (Fed. Cir. 2013)).  Even so, the court will "uphold a decision of less

than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle

Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

(quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286

(1974)); *see also NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009)

("Commerce must explain the basis for its decisions; while its explanations do not have

to be perfect, the path of Commerce's decision must be reasonably discernable to a

reviewing court.").

"[T]he Court will not disturb an agency determination if its factual findings are

reasonable and supported by the record as a whole, even if there is some evidence that

detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United*

---

[3] Further citations to the Tariff Act of 1930 are to Title 19 of the U.S. Code, 2018 edition.

*States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001) (citing *Heveafil Sdn. Bhd. v.*

*United States*, 25 CIT 147, 149 (2001)), *aff'd sub nom. Shandong Huarong Gen. Grp.*

*Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).

    In addition, the court will hold unlawful any determination that is "arbitrary and

capricious."  *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d

1367, 1377 (Fed. Cir. 2012); *Ancientree Cabinet Co. v. United States*, 45 CIT __, __,

532 F. Supp. 3d 1241, 1251-52 (2021).  "An agency acted in

an arbitrary and capricious manner if it 'entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise.'"  *Linyi Chengen Imp. and Exp. Co. v. United*

*States*, 43 CIT __, __, 391 F. Supp. 3d 1283, 1292 (2019) (quoting *State Farm*, 463

U.S. at 43).

    Moreover, "it is well-established that 'an agency action is arbitrary when the

agency offer[s] insufficient reasons for treating similar situations differently."  *SKF USA*

*Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration in original)

(quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).

    To demonstrate that Commerce's actions were arbitrary and capricious, a plaintiff

"must show that Commerce consistently followed a contrary practice in similar

circumstances and provided no reasonable explanation for the change in practice."

*Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003).

## DISCUSSION

### I.    Legal framework

19 U.S.C. § 1677b(c)(1) provides that Commerce "shall determine the normal value of the subject merchandise" in an AD investigation that involves a non-market economy ("NME") country "on the basis of the value of the factors of production [("FOPs")] utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *See Juancheng Kangtai Chem. Co. v. United States*, Slip Op. 15-93, 2015 WL 4999476, at *2 (CIT Aug. 21, 2015).

In administrative proceedings that involve an NME country such as China, Commerce calculates the "normal value" of the subject merchandise by selecting surrogate data from one or several market economy countries that Commerce determines constitute the "best available information" in the record.  19 U.S.C. § 1677b(c)(1); *Heze Huayi Chem. Co. v. United States*, 45 CIT __, __, 532 F. Supp. 3d 1301, 1309-10 (2021).  The "best available information" standard involves "a comparison of the competing data sources" in the record.  *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1367 (Fed. Cir. 2019).  Section 1677b(c)(1) does not define "best available information," which means that Commerce has "broad discretion" to evaluate information in the record.  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).

When reviewing a determination by Commerce, the "court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available

information.'" *Id.* (quoting *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)).

Commerce, "in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production" in a surrogate country that is "at a level of economic development comparable" to that of the NME, and a "significant producer[] of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  And "[t]o the extent possible, Commerce's regulatory preference is to 'value all factors in a single surrogate country.'" *Jinko Solar Imp. and Exp. Co. v. United States*, 48 CIT __, __, 701 F. Supp. 3d 1367, 1381 (2024) (quoting 19 C.F.R. § 351.408(c)(2)).

## II. Commerce's consideration of Romania as the primary surrogate country

### A. Additional background

In the *Final Results*, Commerce "continue[d] to select Romania as the primary SC."  IDM at 15.  Commerce determined that "[t]he submission of the Romanian SV data was timely in accordance with 19 CFR 351.301(c)(3)(ii) of Commerce's regulations, which states that factual information to value factors is due 'no later than 30 days before the scheduled date of the preliminary results of review.'" *Id.* at 22 (quoting 19 C.F.R. § 351.301(c)(3)(ii)).

### B. Analysis

The court concludes that Commerce's consideration of Romania as a potential surrogate country was neither arbitrary nor capricious.

Consolidated plaintiffs argue that "Romania cannot be relied upon as a primary surrogate country and [Commerce's] final results are arbitrary and capricious because

[Commerce] ignored [its] deadlines and [Commerce's] normal policy with respect to surrogate country deadlines."  Consol. Pls. Br. at 5.

In the SC Memo, Commerce "provid[ed] all interested parties the opportunity to comment on the [SC List], the selection of a surrogate country and the selection of surrogate values."  SC Mem. at 1.

Commerce informed parties that it "intend[ed] to announce the identification of its surrogate country selection in its preliminary results."  *Id.* at 2.  For that reason, Commerce required that "comments on surrogate country selection . . . be submitted to Commerce no later than *EST, 5:00 pm, December 2, 2022,* so that Commerce [could] have [the] opportunity to consider these comments for the preliminary results."  *Id.* Commerce also required that "[r]ebuttal comments, limited to information submitted by parties on surrogate country selection, are due no later than *EST, 5:00 pm, December 12, 2022.*"  *Id.*

Commerce provided different deadlines for comments on the SC List itself, the selection of a surrogate country and the submission of SV information.  *See id.* Commerce also stated that "[n]otwithstanding the above deadlines, in accordance with 19 CFR 351.301(c)(3), interested parties may submit publicly-available information to value factors of production no later than 30 days before the scheduled date of the preliminary results," which was March 2, 2023, before the extension.  *Id.*

On February 17, 2023, Commerce extended the period for issuing the preliminary results from March 2, 2023, until June 30, 2023.  *See* Extension Mem. at 2. Commerce gave itself "additional time to issue supplemental questionnaires and to

evaluate the selection of the primary surrogate country due to changes in Commerce's surrogate country list since the last administrative review."  *Id.* at 1-2.

On May 31, 2023, petitioners submitted additional surrogate data, which included a request that Commerce select Romania as the primary surrogate country in the event that it decided not to select Mexico.  Pet'rs Preliminary Comments at 25.

On June 30, 2023, in the *Preliminary Results*, Commerce selected Romania as the primary surrogate country for the administrative review.  *See* PDM at 32; *see also* IDM at 15.

Consolidated plaintiffs argue that Commerce "relied upon Romania as the primary surrogate country in this review" even though "Romania was not timely suggested as a potential surrogate country by any party."  Consol. Pls. Br. at 4. Consolidated plaintiffs explain that "[p]etitioner[s] only suggested Romania as a potential primary surrogate country in [their] final surrogate value submission and Preliminary Comments—some 6 months after the surrogate country comment deadline."  *Id.* at 5.

Consolidated plaintiffs assert that "[o]nly in [the] preliminary surrogate value submission did Petitioners make any mention that Romania may be relied upon in any respect" and that this submission came after the December 2, 2022, surrogate country deadline.  *Id.* at 6.

Commerce in the *Final Results* determined that "[t]he submission of the Romanian SV data was timely in accordance with 19 CFR 351.301(c)(3)(ii) of Commerce's regulations, which states that factual information to value factors is due 'no

later than 30 days before the scheduled date of the preliminary results of review.'" IDM at 22 (quoting 19 C.F.R. § 351.301(c)(3)(ii)).

Commerce explained that "petitioners timely submitted Romanian SV data for Commerce's consideration based on the regulatory requirement to provide such data no later than 30 days before the preliminary determination signature date." *Id.* Commerce stated that "there is no basis for disregarding the Romanian SV data submitted by the petitioners" and that Commerce's determination is consistent with its determination in *Steel Racks from China.* *Id.* (citing *Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less than Fair Value* ("*Steel Racks from China*"), 84 Fed. Reg. 35,595 (Dep't of Commerce July 24, 2019) and accompanying IDM (Dep't of Commerce July 17, 2019) at cmt. 1). Commerce explained that in *Steel Racks from China*, "Commerce accepted Romanian SV data submitted 30 days before the preliminary determination signature date." *Id.* (citing *Steel Racks from China* IDM at cmt. 1). Commerce's assertion is correct, albeit incomplete.

Commerce in *Steel Racks from China* determined that "[w]hile the petitioner expressed concerns regarding the timing of Dongsheng's Romania SV data submission, *Dongsheng timely submitted surrogate country selection comments in response to Commerce's request for such comments* and timely submitted Romanian SV data for Commerce to consider based on the regulatory requirement to provide such data no later than 30 days before the preliminary determination signature date." *Steel Racks from China* IDM at cmt. 1 (emphasis supplied). *Steel Racks from China* suggests that

Commerce has indeed distinguished the deadline for submission of surrogate country selection comments from the deadline for the submission of SV data. *See id.*

Consolidated plaintiffs also argue that in *Fresh Garlic from China*, an interested party "attempted to submit an alternative surrogate country due to intervening information on economic comparability that became available only *after* the surrogate country and OP list comment deadline, but it was still rejected as untimely." Consol. Pls. Br. at 9 (citing *Fresh Garlic from the People's Republic of China: Final Results and Final Rescission of the 20th Antidumping Duty Administrative Review; 2013-2014* ("*Fresh Garlic from China*"), 81 Fed. Reg. 39,897 (Dep't of Commerce June 20, 2016) and accompanying IDM (Dep't of Commerce June 10, 2016)).

*Fresh Garlic from China* is not apposite. In that proceeding, the respondent attempted to submit "GNI data"[4] related to SC selection, which is distinct from the "factual information to value factors of production under 19 CFR 351.408(c)." *Fresh Garlic from China* IDM at cmt. 2. Commerce rejected this submission because the deadline for SC comments had passed. *Id.* However, in the instant case, petitioners submitted *SV data* before the regulatory deadline for the submission of "factual information to value factors of production." *Id.* (citing 19 C.F.R. § 351.301(c)(3)(ii)).

Moreover, Commerce in *Fresh Garlic from China* stated that "[w]hile [Commerce] is required to consider the evidence on the record and the parties' arguments to select the country that best matches the established statutory criteria, there is no provision in the statute that requires the Department to defer to the preferences of respondents in

---

[4] "GNI" refers to "Gross National Income," which measures the total income earned by a country's residents, including income earned abroad.

making its choice as long as the Department is following its statutory mandate." *Id.* at cmt. 1.

Finally, consolidated plaintiffs state that in *Hand Trucks from China*, Commerce "again found that the surrogate country deadline was an established deadline that must be followed." Consol. Pls. Reply Br. at 4 (citing *Hand Trucks and Certain Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011* ("*Hand Trucks from China*"), 78 Fed. Reg. 28,801 (Dep't of Commerce May 16, 2013) and accompanying IDM (Dep't of Commerce May 9, 2013)).

In that proceeding, Commerce rejected "untimely comments on surrogate country selection" where the interested party submitted them "three months after the deadline." *Hand Trucks from China* IDM at cmt. 2. Consolidated plaintiffs argue that "[t]he deadlines set by [Commerce] by letter, such as the surrogate country deadline, are actual deadlines with which parties must comply." Consol. Pls. Reply Br. at 5. Consolidated plaintiffs argue that "[o]nly in Petitioner's [May 31, 2023] surrogate value submission did Petitioner for the first time actually suggest Romania as a surrogate country and submit factors of production for Romania." *Id.*

Consolidated plaintiffs' allegation is unfounded. Petitioners' initial SV data submission, dated December 19, 2022, included financial statements of Chimcomplex S.A. Borzesti ("Chimcomplex"), a Romanian producer of chemicals. Pet'rs Initial SV Data, Ex. 11. Petitioners stated therein that "[i]n the event . . . that Commerce departs from the use of Mexico with respect to any of the surrogate values, there is actual production of chlorine, caustic soda, and downstream derivatives in Romania." *Id.* at 4.

Respondents were on notice that petitioners preferred Mexican data as a first choice and Romanian data as a second choice. From December 19, 2022, to May 31, 2023, respondents could have submitted "alternative Romania surrogate values or value information relevant to the Romanian surrogate values," but chose not to. Consol. Pls. Reply Br. at 5. Respondents were not in fact "unfairly prejudiced." Consol. Pls. Br. at 11, 19.

Regardless, Commerce is not required to defer to interested parties in selecting a surrogate country. *See Jiaxing Bro. Fastener Co. v. United States* ("*Jiaxing II*"), 822 F.3d 1289, 1298 (Fed. Cir. 2016) ("We discern nothing in the statute that requires Commerce to consider any particular country as a surrogate country."). Instead, Commerce must "examine the relevant data and articulate a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43. Here, Commerce selected a country that was on the SC List from the beginning of the proceeding and for which Commerce first received SV data in December 2022 – almost five months before the regulatory deadline. *See* Pet'rs Initial SV Data.

The court concludes that Commerce's consideration of Romania as the primary surrogate country was neither arbitrary nor capricious. Consolidated plaintiffs' motion is denied as to this point.

### III.    Commerce's selection of Romania as the primary surrogate country

#### A.    Commerce's interpretation of 19 U.S.C. § 1677b(c)(4)

##### 1.    Legal framework

The Supreme Court has clarified that "courts must exercise independent judgment in determining the meaning of statutory provisions."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024).[5]

To do so, courts will use "traditional tools of statutory construction."  *Id.* at 403. Specifically, "courts examine the 'statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'"  *Ventura Coastal, LLC v. United States*, 48 CIT __, __, 736 F. Supp. 3d 1342, 1356 (2024) (quoting *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000)).

"In exercising such judgment, though, courts may . . . seek aid from the interpretations of those responsible for implementing particular statutes," namely agencies.  *Loper Bright*, 603 U.S. at 394.  The *Loper Bright* Court stated that "[s]uch interpretations 'constitute a body of experience and informed judgment to which courts

---

[5] Even though the *Loper Bright* Court ruled on judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., and this Court reviews determinations of Commerce under 28 U.S.C. § 2640, the logic of *Loper Bright* applies here nevertheless. *See Ventura Coastal, LLC v. United States*, 48 CIT __, __, 736 F. Supp. 3d 1342, 1356 n.15 (2024) (noting that "similar to the APA, 28 U.S.C. § 2640 directs review to 19 U.S.C. § 1516a(a)(2)(B)(iii) providing that the court will set aside a determination found to be 'contrary to law'"); *see also Garg Tube Exp. LLP v. United States*, 48 CIT __, __, 740 F. Supp. 3d 1355, 1365 n.10 (2024).

and litigants may properly resort for guidance' consistent with the APA."  *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

However, "it does not follow that Congress has taken the power to authoritatively interpret the statute from the courts and given it to the agency."  *Id.* at 402.  "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."  *Id.* at 395.

### 2.    Analysis

The court concludes that Commerce's SC selection approach is aligned with the "best reading" of the statute.  *Id.* at 400.

Plaintiffs argue that Commerce failed to implement the twin requirements of 19 U.S.C. § 1677b(c)(4).  Pls. Br. at 10.  Plaintiffs explain that "[t]he statute plainly does not prioritize economic comparability over merchandise comparability."  *Id.*

In response, defendant argues that "Commerce has a rigorous process for determining which countries appear on its surrogate country list" and that a "country's GNI ranking is 'a threshold statutory criterion that must be met before other criteria are considered' in forming the initial surrogacy country list."  Def. Br. at 21-22 (quoting *Clearon Corp. v. United States*, 38 CIT 1122, 1140 (2014)).

The question before the court is whether Commerce's interpretation of the statute is aligned with the "best reading," or "'the reading the court would have reached' if no agency were involved."  *Loper Bright*, 603 U.S. at 400 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.11 (1984)).

Congress delegated to Commerce the duty to value the factors of production.

Even so, the role of the court is to "independently interpret the statute and effectuate the

will of Congress." *Loper Bright*, 603 U.S. at 395.  In determining the "best reading," the

court should defer to Commerce only to the extent contemplated by the statute itself.

*Id.*

Pursuant to 19 U.S.C. § 1677b(c)(1), Commerce "shall determine the normal

value of . . . subject merchandise" exported by an NME "on the basis of the value of the

facts of production utilized in producing the merchandise."  Moreover, "the valuation of

the factors of production shall be based on the best available information regarding the

values of such factors in a market economy country or countries considered to be

appropriate by [Commerce.]"  19 U.S.C. § 1677b(c)(1).  And § 1677b(c)(4) provides

that:

> [Commerce], in valuing factors of production . . . shall utilize, to the extent
> possible, the prices or costs of factors of production in one or more market
> economy countries that are—
>
> (A) at a level of economic development comparable to that of the nonmarket
> economy country, and
>
> (B) significant producers of comparable merchandise.

A plain reading of the statute indicates that, if possible, the surrogate country

must be at a comparable level of economic development to the NME country *and* a

significant producer of comparable merchandise.  Not just one or the other.

Indefinite terms like "appropriate," "comparable" and "significant" in the statute

permit Commerce flexibility in evaluating potential surrogate countries.  *See Ventura*

*Coastal*, 48 CIT at __, 736 F. Supp. 3d at 1356-57 ("Congress may supply an open-

ended term or phrase such as 'reasonable' or 'appropriate' that 'leaves agencies with

flexibility.'" (quoting *Loper Bright*, 603 U.S. at 395)).  For example, "[t]o partially fill the

statutory gap, Commerce promulgated 19 C.F.R. § 351.408(b), which emphasizes per

capita Gross Domestic Product ('GDP') as a measure of economic comparability."

*Jiaxing II*, 822 F.3d at 1293; *see* 19 C.F.R. § 351.408(b).  And with Policy Bulletin 04.1,

Commerce "provide[d] guidance regarding [Commerce's] selection of surrogate market

economy countries in non-market economy . . . cases."  Import Admin., U.S. Dep't of

Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin

04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html (last visited Mar. 25,

2025) ("Policy Bulletin 04.1").  Commerce then set out the following "approach of

sequential consideration of the statutory elements."  *Id.*

> Commerce (1) compiles a list of countries at a comparable level of
> economic development to the subject [NME] based on per capita GNI, (2)
> ascertains which of the listed countries produce comparable merchandise
> to the subject merchandise, (3) determines which of the listed countries are
> significant producers of such merchandise, and (4) evaluates the quality
> (*i.e.*, reliability and availability) of the data from these countries.

*Jiaxing Bro. Fastener Co. v. United States* ("*Jiaxing I*"), 38 CIT 152, 156, 961 F. Supp.

2d 1323, 1328 (2014) (citing Policy Bulletin 04.1).[6]

---

[6] This Court has determined that per capita GNI is proper to use in determining
economic comparability, even though Commerce's regulations express a preference for
per capita GDP.  *See Jiaxing Bro. Fastener Co. v. United States*, 38 CIT 152, 158, 961
F. Supp. 2d 1323, 1329 (2014) (describing GNI as a "consistent, transparent, and
objective metric" and concluding that Commerce's utilization of GNI "to identify and
compare a country's level of economic development is . . . a reasonable interpretation of
the statute"); *Fujian Lianfu Forestry Co. v. United States*, 33 CIT 1056, 1077, 638 F.
Supp. 2d 1325, 1349 (2009); *Fresh Garlic Producers Ass'n v. United States*, 39 CIT __,
__, 121 F. Supp. 3d 1313, 1337 (2015).

Commerce's sequential approach gives the first factor, economic comparability, a gate-keeping function not afforded to the second factor. Commerce will in most cases exclude from consideration a country that is not on the list of potential surrogate countries even if that country is a significant producer of highly comparable, even identical, merchandise pursuant to the second factor. Nevertheless, Commerce's sequential approach is consistent with the "best reading" of the statute. *Loper Bright*, 603 U.S. at 400.

Congress' use of the conjunctive "and" in 19 U.S.C. § 1677b(c)(4)(A) indicates that both factors are required for the proper selection of a surrogate country "to the extent possible" given the facts of the proceeding. However, the statute is silent as to *how* Commerce should determine that a country is at a "comparable" level of economic development and that the country is a "significant producer[] of comparable merchandise." *See* 19 U.S.C. § 1677b(c)(4). This silence and Congress' use of indefinite terms in the statute afford Commerce three possible options.

In designing a methodology for surrogate country selection, Commerce could have chosen to: (1) screen for economic comparability first or significant production of comparable merchandise first based on the facts of each case; (2) screen for economic comparability first by default; or (3) screen for significant production of comparable merchandise first by default. The court concludes for four reasons that Commerce's decision to select the second option is consistent with the "best reading" of the statute. *Loper Bright*, 603 U.S. at 400; *see also* Policy Bulletin 04.1.

First, as discussed, the statute does not specify an approach for Commerce to follow. *See* 19 U.S.C. § 1677b(c)(4). Congress delegated to Commerce the duty to

select the surrogate country in a way that honors both factors and Congress did so with terms that give Commerce a certain degree of flexibility.  Commerce could have selected any of the above three options because, under a plain reading of the statute, none is superior a priori.

Second, the "significant producers of comparable merchandise" prong remains essential under Commerce's chosen approach.  *Id.*  Commerce will still consider the second factor, notwithstanding that it is often not considered until after the potential surrogate country has passed the first "threshold" step.  Regardless, Commerce's inclusion of the second step in the sequential approach ensures that the second factor analysis will occur before Commerce selects a surrogate country.  It would be a different matter altogether if Commerce looked *only* at economic comparability in selecting surrogate countries.  To do so would be to afford the first factor a preeminent and preclusive effect not reflected in a plain reading of the statute.

Further, this Court has affirmed consistently the reasonableness of Commerce's treatment of economic comparability as a threshold criterion.  *See Fresh Garlic Producers Ass'n v. United States*, 39 CIT __, __, 121 F. Supp. 3d 1313, 1341 (2015) (affirming the sequential approach and noting that "[b]y restricting its list of potential surrogate countries to those that are economically comparable to the NME country in a normal case, Commerce can better ensure that its normal value calculation accurately reflects the cost of producing the subject merchandise in a hypothetical ME country"); *Jacobi Carbons AB v. United States*, 41 CIT __, __, 222 F. Supp. 3d 1159, 1172 (2017) (noting that "this court has affirmed Commerce's discretion to exclude countries from consideration on the basis of economic comparability").

Third, Commerce contemplated situations in which "none of the countries identified as being economically comparable are [sic] a significant producer of comparable merchandise."  Policy Bulletin 04.1.  "In such cases, the team should request a *second list of potential surrogate countries* from [the Office of Policy], and then follow the country selection procedure described above."  *Id.* (emphasis supplied).  The generation of an entire new list is unlikely to occur in a scheme in which economic comparability is the sole, or even the preeminent, factor.

Fourth, in certain circumstances, Commerce provides a full exception to its default treatment of the first factor, economic comparability, as a "threshold" criterion.  Specifically, Commerce contemplated and provided expressly for situations in which the second factor should function as the "threshold" when screening potential surrogate countries:

> Occasionally, there are also cases in which it is more appropriate for the team to address economic comparability only *after* the significant producer of comparable merchandise requirement is met.  Cases where particular emphasis on "significant producer of comparable merchandise" is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), *e.g.*, crawfish, which is produced by only a few countries . . . .  Particular emphasis on "significant producer of comparable merchandise" is also generally warranted where major inputs are not widely traded internationally, *e.g.*, electricity, which is used intensively in the production of magnesium.

*Id.*

In sum, the Policy Bulletin 04.1 scheme is consistent with the "best reading" of the statute.  *Loper Bright*, 603 U.S. at 400.  The statute requires that Commerce, "to the extent possible," select a primary surrogate country that is at a comparable level of economic development *and* a significant producer of comparable merchandise.  The

sequential approach meets this core two-part requirement.  *See* 19 U.S.C. § 1677b(c)(4).  Plaintiffs' motion as to this point is denied.

The court will now consider whether Commerce's purported application of the sequential approach in the instant case is supported by substantial evidence and in accordance with the law.

### B.   Commerce's selection of Romania instead of Mexico

### 1.   Additional background

In the *Final Results*, Commerce "continue[d] to select Romania as the primary SC . . . because it is at a comparable level of economic development pursuant to section 773(c)(4) of the Act; is a significant producer of comparable merchandise; and, has publicly available data to value all [factors of production] that constitute the best available information on the record."  IDM at 15.

Commerce opted not to select Mexico because it "is not within the GNI range of the countries on the SC List."  *Id.* at 16.

Plaintiffs argue that Mexico provided the best available SV information because Mexico is economically comparable to China and produces identical merchandise.  Pls. Br. at 13.  Plaintiffs assert that "[b]y presumptively excluding Mexico from consideration, and by failing to weight the relative importance of both statutory criteria, Commerce misapplied the statutory standard for selecting a surrogate country."  *Id.*  Plaintiffs also argue that "Commerce's selection of a surrogate country in the *Final Results* is not in accordance with law."  *Id.*

2.    **Economic comparability**

The court concludes that Commerce's rejection of Mexico as an SC is supported by substantial evidence and in accordance with the law.

Plaintiffs argue that "[d]uring the POR, Mexico was at a level of economic development comparable to China."  Pls. Br. at 14.  Plaintiffs explain that despite Commerce's "consistent treatment of Mexico and China as comparable in economic development . . . Commerce rejected Mexico as a potential surrogate solely because of a thin margin of difference between the per capita GNI of Mexico and the other SC List countries."  *Id.* at 16-17 (citing IDM at cmt. 2).

In the *Final Results*, Commerce stated that its "longstanding practice [is] to identify those countries that are at a level of economic development comparable to the NME country in question based on GNI data reported in the *World Bank Development Report*."  IDM at 15-16.  Commerce explained that "[u]sing 2021 GNI data, Commerce provided interested parties with a list of potential SCs found to be at the same level of economic development as China, including Bulgaria, Costa Rica, Malaysia, Panama, Romania, and Turkey."  *Id.* at 16.

Commerce determined that "Malaysia and Romania are at the same level of economic development comparable to China . . . and that Mexico is not within the GNI range of the countries on the SC List."  *Id.*  Commerce rejected Mexico and noted that it "is not on the SC List because its GNI falls outside of the range of countries on the list, and therefore, is not 'at the same level of economic development,' even if it is, as the petitioner argues, at a comparable level of economic development."  *Id.*  Commerce continued to determine that "because Mexico's GNI is not within the range of GNIs on

the SC List, we will not consider Mexico as a possible SC so long as countries within

the GNI band on the SC List are significant producers of comparable merchandise and

have reliable SV data."  *Id.* at 17-18.

Commerce's misstatement of the standard is unfortunate and avoidable.

Commerce stated at least once that each of the countries on the SC List is deemed to

be at the "same level of economic development" as China.  *See id.* at 16.  And, more

confusingly, Commerce stated that its "practice is to select one of the countries

identified on the SC List that are at the same level of economic development as the

primary SC," rather than the NME.  *Id.* at 15.  But Commerce recognized ultimately that

the actual standard is "comparable level of economic development" with China and

evaluated the potential surrogate countries on the SC List accordingly.  *See id.* ("We

continue to select Romania as the primary SC for these final results because it is at a

*comparable* level of economic development pursuant to section 773(c)(4) of the Act . . .

." (emphasis supplied)).  Further, Commerce did not reject countries that were

*comparable* under its own established metrics pursuant to Policy Bulletin 04.1 in favor of

a country that was at the *same* level of economic development as China.  Even after

Commerce stated erroneously that it rejected Mexico because it was not at the "same

level of economic development," Commerce recognized that its objective under Policy

Bulletin 04.1 is to "identify economically comparable SCs."  *Id.* at 16-17.

As discussed above, Commerce's treatment of the economic comparability factor

as a threshold criterion is aligned with the "best reading" of the statute.  *See supra*

Section III.A.2; *Loper Bright*, 603 U.S. at 400.  In the instant case, China had a per

capita GNI of $11,890, Romania had a per capita GNI of $14,170 and Mexico had a per

capita GNI of $9,380.  SC Mem. at attach. 1; Pet'rs SC List Comments at 7.  The lowest ranked country on the SC List was Turkey with a per capita GNI of $9,830.  SC Mem. at attach. 1.

Plaintiffs argue that "Mexico's per capita GNI . . . is only slightly lower than Turkey's per capita GNI."  Pls. Br. at 14.  Plaintiffs note that "Mexico's proximity to China (*i.e.*, $2,290) is essentially the same as Romania's proximity to China (*i.e.*, $2,280)."  *Id.*

But, as Commerce noted, "petitioner has provided no evidence or justification that indicates that Commerce should have placed Mexico on the SC List or that Commerce has an obligation to consider Mexico as a potential SC ahead of the countries on the SC List."  IDM at 16-17.

Without such evidence, Commerce does not have a reason to depart from the sequential approach set forth in Policy Bulletin 04.1.  Commerce chose six countries that are deemed "equivalent in terms of economic comparability" based on their proximity to China in the GNI rankings.  Policy Bulletin 04.1.

It is foreseeable that there would be countries just above or just below the group of six potential surrogates in a surrogate country list.  However, this Court has upheld the narrowing of "a list of [potential surrogate] countries within a band for purposes of administrative feasibility."  *Juancheng Kangtai*, 2015 WL 4999476, at *8.  The fact of Mexico's proximity to the bottom-ranking country on the SC List alone is not sufficient for Commerce to go beyond its established practice as set forth in Policy Bulletin 04.1.

Moreover, this Court has upheld Commerce's "burdening the party proposing a non-listed country with demonstrating that no country on the surrogate country list provides the scope of 'quality' data that [Commerce] requires in order to make a primary

surrogate country selection." *Clearon Corp. v. United States*, Slip Op. 15-91, 2015 WL

4978995, at *4 (CIT Aug. 20, 2015). Plaintiffs have not met that burden here.

Commerce observed that parties never "challenged Commerce's finding that Romania

and Malaysia are at the comparable level of economic development as China." IDM at

16.

      Plaintiffs argue also that "Commerce consistently found that Mexico was

comparable to China in economic development in six consecutive administrative

reviews." Pls. Br. at 15. Even if plaintiffs are correct, Commerce's selections in past

proceedings are at best probative of the validity of Commerce's selection here. *See*

*Clearon Corp.*, 38 CIT at 1138 ("Commerce is not required by statute or regulation to

select the same surrogate country it did in previous reviews . . . ."); *see also Shandong*

*Huarong Mach. Co. v. United States*, 29 CIT 484, 491 (2005) ("[E]ach administrative

review is a separate segment of proceedings with its own unique facts. Indeed, if the

facts remained the same from period to period, there would be no need for

administrative reviews.").

      Accordingly, Commerce's decision to exclude Mexico from the surrogate country

selection process at the first step of the sequential approach was supported by

substantial evidence.

        **3.    Comparable merchandise**

           **a.    Mexico's production of identical merchandise**

      Plaintiffs argue that "Commerce did not . . . consider whether Mexico produced

comparable merchandise . . . in the course of its surrogate country analysis." Pls. Br. at

17. Plaintiffs assert that "[t]he record showed that Mexico was the only potential

surrogate country with demonstrated production of identical merchandise." *Id.* Plaintiffs state that it was "uncontested" that "Mexico was the only significant producer of identical merchandise among the countries on the SC List." *Id.*

Commerce's decision to not consider Mexico's purported production of identical merchandise is consistent with the sequential approach set forth in Policy Bulletin 04.1 and upheld above. *See supra* Section III.A.2. Plaintiffs do not argue that this is a case involving "unusual" merchandise such that Commerce would alter that approach. *See* Pls. Br.; Policy Bulletin 04.1. Accordingly, Commerce's determination not to consider whether Mexico produced comparable merchandise is in accordance with law.

> ### b.   Commerce's determination that calcium hypo and sodium hypo are comparable to chlorinated isos

Plaintiffs argue that Commerce's determination that calcium hypo and sodium hypo are "comparable" to chlorinated isos is not supported by substantial evidence. Pls. Br. at 20.

In the *Final Results*, Commerce determined that both calcium and sodium hypo are "comparable merchandise." IDM at 6. Commerce explained that both products "share similar physical characteristics and end uses, and a similar production process, as the subject merchandise." *Id.*

The statute requires that Commerce, "to the extent possible," select a surrogate country that is a "significant producer[] of comparable merchandise." 19 U.S.C. § 1677b(c)(4). At the second step of Commerce's sequential approach, "the operations team identifies those countries with producers of comparable merchandise among the potential surrogates on [the surrogate country] list." Policy Bulletin 04.1. Policy Bulletin 04.1 notes that "'comparable merchandise' is not defined in the statute or the

regulations, since it is best determined on a case-by-case basis." *Id.* For that reason, the determination of comparability "depends on the subject merchandise" itself. *Id.*

"To determine if a product produced by a company in the surrogate country is comparable, Commerce's established practice is to apply a three-part test that examines 'physical characteristics, end uses, and production processes.'" *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 490, 318 F. Supp. 2d 1339, 1348 (2004) (quoting *Certain Cased Pencils from the People's Republic of China; Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed. Reg. 48,612 (Dep't of Commerce July 25, 2002) and accompanying IDM (Dep't of Commerce July 16, 2002) at cmt. 5); *US Magnesium LLC v. United States*, 39 CIT __, __, 72 F. Supp. 3d 1341, 1357 n.25 (2015); *List Indus., Inc. v. United States*, 47 CIT __, __, 641 F. Supp. 3d 1400, 1406 (2023).

### i.   Physical characteristics

The court concludes that Commerce did not explain adequately its determination that calcium hypo, sodium hypo and chlorinated isos have comparable physical characteristics for three reasons.

The first reason is that Commerce failed to explain adequately its determination that chlorinated isos are "industrial commodity chemicals," rather than merchandise with a "major input[]." Policy Bulletin 04.1.

Chlorinated isos are composed of cyanuric acid ("CYA"), chlorine and caustic soda. *See* Letter from Pet'rs, "Comments on Primary Surrogate Country Selection" (Dec. 2, 2022) ("Pet'rs Primary SC Selection Comments") at 4-5, CR 32-33, CJA Tab 3. And "[c]hlorine, which is common to chlorinated isos and hypochlorites (calcium or

sodium), provides the disinfectant that purifies the water in residential swimming pools."
Letter from Pet'rs, "Surrogate Value Rebuttal Comments" (Dec. 29, 2022) ("Pet'rs SV
Rebuttal Comments") at 4, CR 36, CJA Tab 5.  CYA is an "intermediate chemical
product . . . which is then reacted with chlorine and caustic soda to produce chlorinated
isos."  Pet'rs Primary SC Selection Comments at 5.  CYA operates as a stabilizer and is
"unique to chlorinated isos."  Pet'rs SV Rebuttal Comments at 4.

In the *Final Results*, Commerce rejected petitioners' argument that "Commerce's
practice under Policy Bulletin 04.1 is to narrowly define comparable merchandise when
subject products incorporate 'specialized or dedicated' major inputs" and that
"chlorinated isos is [sic] such a product because there are only two major inputs,
chlorine and CYA, that impart the essential physical characteristics of [the] subject
merchandise."  IDM at 6.

Commerce explained that "CYA does not meet the definition of a major input as
described in Policy Bulletin 04.1, which generally involves 'processed, agricultural,
aquatic, and mineral products,' that would warrant a narrow definition of comparable
product."  *Id.* at 7.  Commerce contrasted these "major input" products with "'industrial
commodity chemicals' . . . one of the category [sic] of products where 'the large number,
and generic nature, of the inputs makes input matching very complicated.'"  *Id.* (quoting
Policy Bulletin 04.1).

"[I]n the case of industrial commodity chemicals," Commerce has stated that it
"may make more sense for the operations team to consider the physical characteristics
of the merchandise, and the extent of further value-added process in identifying
comparable merchandise."  Policy Bulletin 04.1.  Commerce has explained that this

approach accounts for the fact that "[i]n these cases, the large number, and generic nature, of the inputs makes input matching very complicated."  *Id.*

Commerce has stipulated also that "where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate."  *Id.*; *see also Dupont Teijin Films v. United States*, 38 CIT 1099, 1102, 997 F. Supp. 2d 1338, 1342 (2014) ("In cases where the subject merchandise contains a major input that is specialized or used intensively in the production of the subject merchandise, comparable merchandise should be identified on the basis of a comparison of such major input.").

Commerce failed to explain how chlorinated isos belong to the category of "industrial commodity chemicals."  Chlorinated isos consist of only three intermediate inputs: CYA, chlorine and caustic soda.  Pet'rs Primary SC Selection Comments at 4-5. Policy Bulletin 04.1 does not define what a "large number" of inputs would be, but it seems unlikely given common usage of the term "large number" that three inputs would suffice.  *See* Policy Bulletin 04.1.

For that reason, Commerce was required to explain the reason that, in the absence of a "large number" of inputs, "input matching" would nonetheless be "very complicated" in the case of chlorinated isos such that they fall within the category of "industrial commodity chemicals."  *Id.*

Moreover, Commerce's definition of "major inputs" in Policy Bulletin 04.1 does not limit the category to "agricultural, aquatic and mineral products" exclusively.  Rather,

Commerce's use of "*e.g.*" suggests that the list is illustrative and not exhaustive.[7]  *See id.* ("In other cases, however, where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products . . . ."). Commerce was required to explain the reason that CYA does not constitute a major input even though the record indicates that it is "specialized or dedicated or used intensively[] in the production of" chlorinated isos.  *Id.*

The second reason that Commerce's explanation is inadequate is that Commerce did not consider the physical characteristics of calcium hypo.  *See* IDM at 8. Commerce discussed only the physical characteristics of sodium hypo despite Commerce's conclusion that both calcium and sodium hypo are comparable to chlorinated isos.  *Id.*

The third reason is that Commerce acknowledged that petitioners "provided more detailed information" about calcium and sodium hypo than in prior proceedings; however, Commerce decided to disregard the new information as insufficient without an adequate explanation and without a statement of what the "more detailed information" was.  PDM at 27; *see* IDM at 7.

Instead, Commerce noted that "[n]o parties have previously argued against Commerce's continued use of calcium hypochlorite and sodium hypochlorite as comparable merchandise in every administrative review prior to this one."  PDM at 25.

---

[7] *E.g.*, Merriam-Webster Online Dictionary (last visited Apr. 7, 2025), https://www.merriam-webster.com/dictionary/e.g. (defining "e.g." as "for example"); *e.g.*, Cambridge Online Dictionary (last visited Apr. 7, 2025), https://dictionary.cambridge.org/us/dictionary/english/eg (defining "e.g." as an "abbreviation for exempli gratia: a Latin phrase that means 'for example'").

Reiteration of an approach or conclusion in successive segments of a proceeding is insufficient where there is new information on the record.  *See Shandong Huarong*, 29 CIT at 491 ("[E]ach administrative review is a separate segment of proceedings with its own unique facts.  Indeed, if the facts remained the same from period to period, there would be no need for administrative reviews.").  Commerce's explanation in this, as in any, proceeding must stand on its own merits.

In sum, Commerce did not explain adequately its determination that chlorinated isos, calcium hypo and sodium hypo share similar physical characteristics.  The court remands for further explanation or reconsideration.

On remand, Commerce is instructed to: (1) explain whether CYA is a major input under Policy Bulletin 04.1; (2) explain whether calcium hypo shares similar physical characteristics with chlorinated isos; and (3) explain further or reconsider whether the "more detailed information" that petitioners submitted with respect to physical characteristics is inadequate.

### ii.    End uses

The court concludes that Commerce explained adequately its determination that calcium hypo, sodium hypo and chlorinated isos have comparable end uses.

Plaintiffs argue that the "significant differences in physical characteristics between Chlor isos and calcium or sodium hypo create differences in end use."  Pls. Br. at 23.

In the *Final Results*, Commerce stated that sodium hypo and calcium hypo "share similar uses as subject merchandise in their use as pool sanitizers."  IDM at 8. Commerce argued that "[t]he petitioners claim that the applications for sodium

hypochlorite are limited to non-pool applications that are related to industrial water

treatment or bleaching agents, but the record evidence . . . shows that sodium

hypochlorite also has applications as a 'disinfectant for swimming pools in theme

parks.'"  *Id.* (quoting Letter from Respondents, "Final Surrogate Value Submission (May

31, 2023), Ex. SV2-12, PR 69-72, 76-77, PJA Tab 11).

      And in the *Preliminary Results*, Commerce quoted the following explanation from

the record:

> The most common swimming pool sanitizers used to treat swimming pool
> water release chlorine (hypochlorous acid).  Chlorine is very effective in
> killing or inactivating pathogens and algae in pool water.  It also oxidizes
> other materials that enter the pool from swimmers or the environment.
> Chlorine maintains a residual concentration in the water for hours to even
> days.  There are two basic types of chemicals that release chlorine into
> swimming pools — stabilized and unstabilized chlorines.  The unstabilized
> chlorines are *sodium hypochlorite*, lithium hypochlorite, *calcium
> hypochlorite*, and chlorine gas.  The stabilized chlorines are trichloro-s-
> triazinetrione (trichlor) and dichloro-s-triazinetrione (dichlor).

PDM at 29 (emphases supplied) (citing Pet'rs SV Rebuttal Comments, Ex. 3).

Commerce found that this information "demonstrates how similar subject merchandise

and [calcium hypo and sodium hypo] are in their functionality and use within the chlorine

family."  *Id.*

      Plaintiffs object that "[t]here was no record evidence indicating that either calcium

hypo or sodium hypo are used in residential, as opposed to commercial, swimming

pools."  Pls. Br. at 25.  Plaintiffs argue that there is an "important" distinction "between

sanitizers that are used in large, commercial swimming pools and those used in smaller,

residential swimming pools."  *Id.*  Plaintiffs explain that "[e]ach type of swimming pool

sanitizer 'has unique features and chemical components that work to sanitize the

water.'"  *Id.* (quoting Pet'rs SV Rebuttal Comments, Ex. 3).

Moreover, plaintiffs argue that "record evidence demonstrates that calcium or sodium hypo are not primarily used as a disinfectant in pools." *Id.*  Plaintiffs note that the other, more common end uses for sodium hypo are "as a disinfectant and deodorant in dairies, creameries, water supplies, sewage disposal, and households." *Id.* at 25-26 (quoting Pet'rs Preliminary Comments, Ex. 3).  Plaintiffs insist that the "lack of CYA in calcium or sodium hypo make these product [sic] far more useful in applications other than residential swimming pools, whereas the predominant use of Chlor isos is use in residential swimming pools." *Id.* at 26.

Commerce addressed these arguments and explained adequately its determination that the products have comparable end uses.  "Something that is 'the same' is inherently 'comparable,' but the converse is not necessarily true—something may be 'comparable' yet not be 'the same.'" *Catfish Farmers of Am. v. United States*, Slip Op. 23-97, 2023 WL 4560815, at *6 (CIT July 7, 2023).

In the instant case, Commerce's finding that calcium hypo, sodium hypo and chlorinated isos have comparable end uses — as pool sanitizers, albeit to different degrees — is supported by substantial evidence.  *See Yantai Xinke Steel Structure Co. v. United States*, 38 CIT 478, 501 (2014) ("[T]he conclusion that two products may be comparable for the purposes of surrogate valuation, and yet have different end uses, is not novel.").

### iii.    Production processes

The court concludes that Commerce did not explain adequately its determination that calcium and sodium hypo and chlorinated isos share "a similar production process." IDM at 6.

Plaintiffs argue that the production of chlorinated isos is more expensive and labor-intensive than the production of calcium or sodium hypo.  Pls. Br. at 27.  Plaintiffs argue also that the chlorinated isos production process "requires more equipment and processing stages."  *Id.* at 28.

In the *Preliminary Results*, Commerce stated that here "Commerce is presented with the same production process described for subject merchandise in this review as that described in [the] *Chlorinated Isos from China Investigation*."  PDM at 27-28. There, Commerce determined:  "With respect to production processes, the subject merchandise is produced in three different steps with the first step making intermediate inputs ([CYA], caustic soda, and chlorine gas), the second step combining these intermediate inputs, and the third step shaping the finished products."  *Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates from the People's Republic of China* ("*Chlorinated Isos from China Investigation*"), 70 Fed. Reg. 24,502 (Dep't of Commerce May 10, 2005) and accompanying IDM (Dep't of Commerce May 10, 2005) at cmt. 2.

In the *Final Results*, Commerce determined that the production process for sodium hypo is similar to the production process for chlorinated isos "because it too involves a multi-stage production process requiring the production of two of the three same intermediate inputs, caustic soda and chlorine."  IDM at 8.  Commerce's analysis falls short in two respects.

First, Commerce failed to support its assertion that sodium hypo and chlorinated isos both require "electrolysis, evaporation, and chlorine absorption" in their respective production processes.  *See id.* ("Other information on the record and identified in the

*Preliminary Results* shows that electrolysis, evaporation, and chlorine absorption are other processes used in the production of *sodium hypochlorite*, but these production stages are not accounted for in the petitioners' analysis." (emphasis supplied)).

Second, Commerce failed even to apply to calcium hypo Commerce's insufficient production process analysis of sodium hypo.  *See* IDM; *see also* PDM.  This failure is significant because Commerce's determination states that both sodium *and* calcium hypo "share similar physical characteristics and end uses, *and a similar production process*, as the subject merchandise."  IDM at 6 (emphasis supplied).

In light of the foregoing, the court is not able to conclude that Commerce's determination is supported by substantial evidence.

On remand, Commerce should explain further or reconsider the similarity of the production processes of chlorinated isos, sodium hypo and calcium hypo.  The production processes need not be identical, but Commerce must support its determination of similarity with more than the mere assertion that the processes are both multi-stage and share some inputs.  Commerce need not show that calcium and sodium hypo are comparable to chlorinated isos "along all three fronts," but Commerce must explain further, including based on information in the record, IDM at 8, or reconsider its determination as to physical characteristics and production processes. *See Yantai Xinke*, 38 CIT at 501 ("Though Commerce's practice is to consider a product's end use, physical characteristics, and production process in determining comparability, it is not restricted to using products that are comparable along all three fronts . . . ."); *see also Shanghai Foreign Trade Enters.*, 28 CIT at 491, 318 F. Supp. 2d at 1348 (recognizing that in "some past cases in which Commerce has applied its three-

part 'comparable merchandise' test to two classes of products made using similar materials and production processes, it has found comparability despite differences in shape, size and end use").

### C.    Commerce's selection of Romania instead of Malaysia

In the *Final Results*, Commerce determined that "Romania is the only country on the SC List that is both a significant producer of comparable merchandise and provides reliable SV information for all FOPs, packing materials, and financial ratios, whereas Malaysia does not have a reliable SV for labor due to evidence of forced labor."  IDM at 18.  Commerce explained that it followed its "strong preference to value all FOPs from a single SC in finding Romania's SV data to be better overall than Malaysia's SV data." *Id.*

Consolidated plaintiffs argue that Commerce's selection of Romania should be remanded because "Romania . . . does not source the best available information." Consol. Pls. Br. at 12.  Rather, consolidated plaintiffs assert that "Malaysia sources superior surrogate data for financial ratios, chlorine, and labor."  *Id.*

#### 1.    Labor

The court concludes that Commerce did not explain adequately its decision to select the Romanian labor data.

Consolidated plaintiffs argue that Malaysia "sources the best available information for labor."  Consol. Pls. Br. at 21.

In the *Final Results*, Commerce determined that "Romania is the only country on the SC List that is both a significant producer of comparable merchandise and provides reliable SV information for all FOPs, packing materials, and financial ratios, whereas

Malaysia does not have a reliable SV for labor due to evidence of forced labor." IDM at

18. Commerce noted that the "labor rate issue in this review is more compelling

because it is not simply about selecting the most specific labor rate but about selecting

a usable labor rate where information on the record shows that one of the two labor

rates on record is unreliable due to distortions caused by forced labor." *Id.* at 18-19.

 In reaching its decision, Commerce relied on a line of cases and proceedings

starting with *New American Keg v. United States* ("*New American Keg I*"), Slip Op. 21-

30, 2021 WL 1206153 (CIT Mar. 23, 2021). In *New American Keg I*, the Court

remanded Commerce's determination to use Malaysian labor data because the record

in the underlying proceeding indicated "that forced labor occurs to some degree among

foreign workers in the Malaysia manufacturing workforce, and that Malaysia's heavy

reliance on foreign workers depresses local wages to some extent." *Id.* at *13.

 On remand, Commerce reversed course. Commerce determined that forced

labor was "widespread" throughout the Malaysian electrical and electronics ("E&E")

sector. Final Results of Redetermination Pursuant to Ct. Remand at 5, *New American

Keg v. United States*, No. 1:20-cv-00008 (CIT 2021), ECF No. 40 ("*New American Keg

Remand Results*"). Commerce determined also that because "the Malaysian E&E

subsector employs a substantial proportion of the total workers in the Malaysian

manufacturing sector . . . the Malaysian labor SV [was] not the best available

information on the record." *Id.* at 6-7. Commerce explained that the distortion in wages

due to the prevalence of forced labor outweighed Commerce's "single country and

contemporaneity rationale," *id.* at 7, and rendered Malaysian labor data inadequate

even though the underlying proceeding concerned steel kegs. *See id.*; *see also*

*Refillable Stainless Steel Kegs from the Federal Republic of Germany and the People's Republic of China: Antidumping Duty Orders*, 84 Fed. Reg. 68,405 (Dep't of Commerce Dec. 16, 2019).  The Court did not challenge Commerce's abandonment of Malaysian labor data on remand.  *See New American Keg v. United States* ("*New American Keg II*"), Slip Op. 22-106, 2022 WL 4363320 (CIT Sept. 13, 2022).

In the instant case, Commerce analogized to the *New American Keg Remand Results* and determined that "[a]lthough we have a labor SV from a different sector of manufacturing in Malaysia, we still find that the forced labor in the E&E sector is a large enough share of the overall manufacturing sector to influence the wages in other subsectors of the manufacturing industry, even if we have labor SV information specific to a different sector where widespread unfair labor practices are not present."  IDM at 19.  Commerce concluded: "the Malaysian labor SV on the record of this review is not a reliable market-determined value due to the widespread presence of unfair labor practices in the overall manufacturing sector."  *Id.*

Consolidated plaintiffs object that Commerce "misrepresents [its own] approach to Malaysia labor and . . . misrepresents the findings in the *New American Keg* [*Remand Results*]."  Consol. Pls. Br. at 21.  Consolidated plaintiffs add that Commerce "has absolutely no information that the E&E forced labor impacts other subsectors.  As such, this finding is not supported by substantial evidence but is pure speculation."  *Id.*

Commerce's determination was consistent with Commerce's abandonment of the Malaysian labor data in *New American Keg Remand Results*, which were not challenged by this Court.  *See New American Keg II*.  Moreover, Commerce's decision

aligns with past AD proceedings involving merchandise outside of the E&E subsector in which Commerce nonetheless determined that Malaysian labor data were unusable.[8]

However, Commerce did not address in the *Final Results* comments by consolidated plaintiffs related to the Romanian labor rate: for example, that it is not as contemporaneous and is "not even a manufacturing labor rate at all," or that it includes "construction work and services, and whatever is broadly included in 'industry' labor costs."  Consol. Pls. Br. at 22; Consol. Pls. Case Br. at 14-15.

In the instant case, Commerce used a Romanian rate for *non-manufacturing* sectors and neglected to explain the reason that that rate is nonetheless superior to the "tainted" Malaysian rate that pertains to manufacturing.  *See* IDM at cmt. 2; *cf. Wood Mouldings and Millwork Products from the People's Republic of China: Final Results*

---

[8] *See Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 15,671 (Dep't of Commerce Mar. 14, 2023) and accompanying IDM (Dep't of Commerce Mar. 8, 2023) at cmt. 2 ("In keeping with the *New American Keg Final Redetermination*, we find that a labor SV based on the Malaysian manufacturing sector is not the best available information to value labor in this proceeding."); *Wood Mouldings and Millwork Products from the People's Republic of China: Preliminary Results Intent to Rescind, in Part, and Rescission in Part, of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 16,726 (Dep't of Commerce Mar. 8, 2024) and accompanying PDM (Dep't of Commerce Feb. 28, 2024) at cmt. H.1.b ("[A]fter considering the CIT's decision in *New American Kegs,* [sic] Commerce's *New American Keg Final Redetermination,* and the final results of *LWRPT from China,* Commerce determined that it is inappropriate to use the 'manufacturing' labor data from Malaysia.") (unchanged in final results); *Wood Mouldings and Millwork Products from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 76,452 (Dep't of Commerce Sept. 18, 2024) and accompanying IDM (Dep't of Commerce Sept. 11, 2024); *Wood Mouldings and Millwork Products from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; and Partial Rescission; 2020-2022*, 88 Fed. Reg. 62,539 (Dep't of Commerce Sept. 12, 2023) and accompanying IDM (Dep't of Commerce Sept. 5, 2023) at 5-7.

*and Partial Rescission of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed.

Reg. 76,452 (Dep't of Commerce Sept. 18, 2024) and accompanying IDM (Dep't of

Commerce Sept. 11, 2024) at cmt. 2 (selecting the Turkish labor rate "for manufacturing

in general" as provided by the International Labor Organization and rejecting the

Malaysian labor rate because the latter was "tainted by forced labor").  For that reason,

Commerce's determination to select the Romanian labor data over the Malaysian labor

data was inadequate.

 Accordingly, the Court remands to Commerce to address consolidated plaintiffs'

concerns and explain further or reconsider its selection of the Romanian labor data.

### 2. Chlorine import value

 The court concludes that Commerce explained adequately its determination to

select the Romanian import value for chlorine.

 Consolidated plaintiffs challenge Commerce's determination for three reasons.

Consolidated plaintiffs argue first that "an analysis of the Romanian import value for

chlorine shows abnormalities and renders it an unreliable surrogate value."  Consol. Pls.

Br. at 14.  Consolidated plaintiffs explain that "a number of imports for Romania have no

quantity reported, the monthly AUVs for this commodity base industrial chemical vary

dramatically for no logical reason, the Romanian import quantity is low, and the

Romanian price is many times higher than the other record values for chlorine."  *Id.* at

14-15.

 In the *Final Results*, Commerce "disagree[d] with respondents that the mere

appearance of some zero import quantities in the Romanian import data for chlorine

renders these data abnormal and aberrant."  IDM at 26.  Commerce nevertheless

acknowledged and addressed the point by "remov[ing] the monthly import data for those countries that have reported zero quantities given that their removal from the Romanian import data has some effect on the AUV calculation for chlorine."  *Id.* at 27, 29.

Consolidated plaintiffs questioned also the validity of the data based on shipment sizes.  Consol. Pls. Br. at 17.  Commerce again addressed the issue directly, noting that "Malaysia and Romania both contain small and large monthly import quantities from various countries which suggest [sic] that these two countries have similar transactions that fall along a spectrum of different quantities sold and imported into these countries." IDM at 27.

Commerce noted that the Court in *Jacobi Carbons AB v. United States* ("*Jacobi Carbons 2019*"), 43 CIT __, __, 422 F. Supp. 3d 1318 (2019), addressed a similar issue of import quantity and noted that "[w]hile a surrogate value must be as representative of the situation in the NME country as is feasible, Commerce need not duplicate the exact production experience of the [Chinese] manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value of [the factor] in a [hypothetical] market-economy [China]."  *Id.* at __, 422 F. Supp. 3d at 1327 (second, third, fourth and fifth alterations in original) (internal quotation marks omitted) (quoting *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)).  In that case, the Court upheld Commerce's determination despite the "substantial difference between the Malaysian import quantity and the amount of bituminous coal [respondent] consumes" because "Commerce considered this evidence, acknowledged the quantitative difference, and was not persuaded that the difference rendered the Malaysian value unusable."  *Id.*

Similarly, in the instant case, parties raised issues to which Commerce responded, IDM 26-29; however, consolidated plaintiffs fail to support their contention that the Romanian quantities are "not possible for use in the commercial production of" chlorinated isos.  Consol. Pls. Br. at 16.  As in *Jacobi Carbons 2019*, consolidated plaintiffs "merely disagree with Commerce's conclusion."  *Jacobi Carbons 2019*, 43 CIT at __, 422 F. Supp. 3d at 1327.  Such disagreement is an insufficient basis on which to invalidate Commerce's determination.

Consolidated plaintiffs argue also that "AUVs for the Romanian imports vary widely with no logic for the variance."  Consol. Pls. Br. at 15.  Consolidated plaintiffs insist that this variance suggests "something profoundly unreliable in the dataset, such as imports of something other than commercial chlorine."  *Id.* at 16.

Commerce's longstanding "administrative practice with respect to aberrational data is 'to disregard small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other countries.'"  *Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States*, 23 CIT 479, 485, 59 F. Supp. 2d 1354, 1360 (1999); *Juancheng Kangtai*, 2015 WL 4999476, at *19; *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351, 1358 (Fed. Cir. 2020).  "Commerce considers import data to be aberrationally high if that data is 'many times higher than the import values from other countries.'"  *SolarWorld Ams., Inc. v. United States*, 42 CIT __, __, 320 F. Supp. 3d 1341, 1351 (2018); *Best Mattresses Int'l Co. v. United States*, 47 CIT __, __, 622 F. Supp. 3d 1347, 1379 (2023).

Moreover, "[w]hile there is no bright-line rule for what multiple of other price values would qualify as 'aberrational,' the court has previously affirmed the exclusion of

'aberrational values' that were nearly 30 times higher than other values, . . . and 30 and 79 times higher than the average unit value." *Best Mattresses*, 47 CIT at __, 622 F. Supp. 3d at 1379.

In the instant case, the Romanian AUV ($1.88) is six times higher than the Malaysian AUV ($0.31) and three and a half times higher than the Mexican AUV ($0.51). *See* Consol. Pls. Br. at 18. Considering the relevance of the Court's prior decisions on this issue, the Romanian AUV is not aberrational. Commerce reasonably "continue[d] to rely on that [Romanian] import statistic for use as an SV." IDM at 27 (citing *Shakeproof Assembly*, 23 CIT at 485, 59 F. Supp. 2d at 1360).

In sum, Commerce's reliance on the Romanian import data to value the chlorine input was reasonable and is supported by substantial evidence. Commerce excluded the objectionable zero import quantities, responded to consolidated plaintiffs concerns with respect to the shipment sizes and relied on non-aberrational data under this Court's precedent.

### 3.    Financial Ratios

The court does not consider it necessary at this time to rule on Commerce's selection of the Romanian financial ratios.

Consolidated plaintiffs argue that Commerce "failed to properly consider the importance not only of Malaysia sourcing more financial statements than Romania, but also the relative quality of the statements in each country." Consol. Pls. Br. at 13. Consolidated plaintiffs explain that Malaysia sourced financial statements from two companies with comparable merchandise, whereas Romania sourced financial statements from only one company with comparable merchandise. *Id.*

In the *Final Results*, Commerce conceded respondents' argument that "Commerce has a preference to use multiple financial statements because it reduces the potential for certain cost distortions when relying on one company's financial situation." IDM at 21. However, Commerce noted that such a preference "would be a consideration in selecting one primary SC over another but only in the instance where the overall quality of the remaining SVs of the two competing countries are considered equal." *Id.* Commerce explained that in the instant proceeding, it determined that Malaysia had an "unreliable labor rate and a less preferable water rate," whereas "Romania ha[d] usable SVs for all FOPs as well as usable financial ratios calculated from Chimcomplex's financial statements which have been used in other proceedings." *Id.*

Consolidated plaintiffs do not challenge Commerce's determination with respect to the water rate. *See* Consol. Pls. Br.; *see also* Consol. Pls. Reply Br. And as discussed, Commerce did not explain adequately its decision to reject the Malaysian labor data. *See supra* Section III.C.1.

Accordingly, the court will withhold judgment on Commerce's selection of financial ratios until after Commerce has explained further or reconsidered its selection of the Romanian labor data. It is possible that Commerce's reevaluation of its selection of the Romanian labor data will lead Commerce to reconsider its determination that the Romanian financial ratios constitute the best available information.

## CONCLUSION

In conclusion, the court sustains in part and remands in part Commerce's *Final Results.* For the reasons provided above, it is hereby

**ORDERED** that on remand Commerce shall: (1) explain whether cyanuric acid is a major input under Policy Bulletin 04.1; (2) explain whether calcium hypochlorite shares similar physical characteristics with the subject merchandise; and (3) explain further or reconsider whether the "more detailed information" that petitioners submitted with respect to physical characteristics is inadequate; it is further

**ORDERED** that on remand Commerce shall explain further or reconsider its determination that the production processes of calcium hypochlorite and sodium hypochlorite are similar to the production process of the subject merchandise; it is further

**ORDERED** that on remand Commerce shall explain further or reconsider its selection of the Romanian labor data; it is further

**ORDERED** that Commerce shall file with the court its remand redetermination within 90 days following the date of this Opinion and Order; it is further

**ORDERED** that the moving parties shall have 30 days from the filing of the remand redetermination to submit comments to the court; and it is further

**ORDERED** that should the moving parties submit comments, defendant shall have 15 days from the date of filing of the last comment to submit a response.

**SO ORDERED.**

                                                                    /s/      Timothy M. Reif
                                                                    Timothy M. Reif, Judge

Dated:    April 14, 2025
              New York, New York