A-570-898
Remand
Slip Op. 25-39
POR:  06/01/2021-05/31/2022
**Public Document**
E&C/OVII:  GHC

***Bio-Lab, Inc., et al. v. United States***
**Consol. Court No. 24-00024; Slip Op. 25-39 (CIT April 14, 2025)**
**Chlorinated Isocyanurates from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT) in

*Bio-Lab, Inc., et al. v. United States*, 776 F.Supp.3d 1315  (CIT 2025) (*Remand Order*).  These

final results of redetermination concern the final results of the administrative review of the

antidumping duty (AD) order on chlorinated isocyanurates (chlorinated isos) from the People's

Republic of China (China) covering the period of review (POR) June 1, 2021, through May 31,

2022.[1]  The petitioners in the underlying administrative review are Bio-Lab, Inc., Innovative

Water Care, LLC, and Occidental Chemical Corporation (collectively, the petitioners).  The

respondents selected for individual examination are Heze Huayi Chemical Co., Ltd. (Heze

Huayi) and Juancheng Kangtai Chemical Co., Ltd. (Kangtai).

Pursuant to the Court's *Remand Order*, we have clarified or reconsidered the *Final*

*Results* regarding the issues analyzed below.  Based on this analysis, we have:  (1) explained that

cyanuric acid should not be considered a major input for purposes of determining whether

---

[1] *See Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 FR 455 (January 4, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

calcium hypochlorite (calcium hypo) or sodium hypochlorite (sodium hypo) are comparable to chlorinated isos in Commerce's surrogate country analysis pursuant to Policy Bulletin 04.1; (2) explained further that calcium hypo and chlorinated isos share similar physical characteristics; (3) explained further that the "more detailed information" submitted by the petitioners concerning the physical differences with respect to the physical differences between chlorinated isos, calcium hypo, and sodium hypo is inadequate to support the petitioners' claims against our analysis to determine whether calcium hypo and sodium hypo are comparable to chlorinated isos; (4) explained further our determination that the production processes of calcium hypo, sodium hypo, and chlorinated isos are similar; and (5) reconsidered our selection of the Romanian labor data as the surrogate value for valuing labor after placing new information on the record.  We revised the applicable AD rates accordingly.

## II.    BACKGROUND

On August 9, 2022, Commerce initiated the administrative review of the AD order on chlorinated isos from China covering two respondents, Heze Huayi and Kangtai.[2]  On July 7, 2023, Commerce published the *Preliminary Results* in this administrative review and published the *Final Results* on January 4, 2024.[3]  On April 14, 2025, the Court sustained, in part, and remanded, in part, aspects of the *Final Results*.[4]  As part of the *Final Results*, because China is a non-market economy country, Commerce selected Romania as the primary surrogate country for valuing factors of production (FOPs) because we determined Romania is at a comparable level of economic development pursuant to section 773(c)(4) of the Tariff Act of 1930, as amended (the

---

[2] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 FR 48459 (August 9, 2022).
[3] *See Chlorinated Isocyanurates from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 FR 43271 (July 7, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM); *see also Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 FR 455 (January 4, 2024) (*Final Results*), and accompanying IDM.
[4] *See Remand Order*, 776 F.Supp.3d at 1343-44.

Act); is a significant producer of comparable merchandise; and, has publicly available data to value all FOPs that constitute the best available information on the record.[5]  In the *Final Results*, Commerce found that calcium hypo and sodium hypo are comparable merchandise, finding that these two products share similar physical characteristics, have similar end uses, and have a similar production process to the subject merchandise (*i.e.*, chlorinated isos).[6]  With respect to Commerce's selection of data to value labor, Commerce selected labor rate information from Romania over labor rates from Mexico or from Malaysia, finding that the labor rates from Malaysia are not a reliable market-determined value due to the widespread presence of unfair labor practices in Malaysia's overall manufacturing sector,[7] and that Mexico was not among the countries Commerce found to be at the same level of economic development as China.

On April 14, 2025, the Court remanded to Commerce to explain or reconsider the issues as addressed below.[8]  On May 23, 2025, Commerce reopened the record and requested additional information on:  (1) whether calcium hypo shares similar physical characteristics with chlorinated isos; (2) the similarities in the production processes for calcium hypo, sodium hypo, chlorinated isos; and (3) urea and its applications.[9]  Commerce also placed information regarding urea and its applications on the record, as well as Romanian labor data that is specific to Romania's manufacturing industry and is contemporaneous to the POR.  Interested parties were provided with an opportunity to comment on this information.[10]  The petitioners submitted

---

[5] *See Final Results* IDM at 9-21.
[6] *Id*. at 6-9
[7] *Id*. at 19.
[8] *See Remand Order*, 776 F.Supp.3d at 1343-44.
[9] *See* Memorandum, "Request for Additional Information:  Placing New Factual Information on the Record," dated May 23, 2025 (Commerce's Request for NFI); *see also NTN Bearing Corp. of Am. v. United States*, 132 F.Supp.2d 1102, 1107-08 (CIT 2001) (*NTN Bearing*) ("It was not necessary for the Court to specifically direct Commerce to request information in order for such action to be permissible.  As long as the Court does not forbid Commerce from considering new information, it remains within Commerce's discretion to request and evaluate new data.").
[10] *See* Commerce's Request for NFI.

comments and new factual information on: (1) the physical characteristics between calcium hypo and chlorinated isos; (2) the production processes for calcium hypo, sodium hypo, chlorinated isos and; (3) industrial applications for urea.[11]  No party commented on the Romanian labor data we placed on the record.

On July 3, 2025, Commerce issued its Draft Results of Redetermination and provided interested parties with an opportunity to comment.[12]  On July 14, 2025, Commerce received comments from the petitioners and from the respondents.[13]  On July 21, 2025, Commerce received rebuttal comments from the petitioners and from the respondents.[14]  Our responses to comments received follows the Final Analysis section.

## III.     FINAL ANALYSIS

A.     <u>Explain Whether Cyanuric Acid is a Major Input Under Policy Bulletin No. 04.1</u>

Commerce's Policy Bulletin No. 04.1 states:

. . . where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.[15]

In the *Final Results*, Commerce stated that cyanuric acid does not meet the definition of a "major input" as described in Commerce's Policy Bulletin 4.1, which generally involves

---

[11] *See* Petitioners' Letter, "Comments and New Factual Information," dated May 30, 2025 (Petitioners' NFI Submission).
[12] *See* Draft Results of Redetermination Pursuant to Court Remand, *Bio-Lab, Inc. et al. v. United States*, Consol Court No. 24-00024; Slip Op. 25-39 (CIT April 14, 2025), dated July 3, 2025 (Draft Results of Redetermination).
[13] *See* Petitioners' Letter, "Comments on Draft Results of Redetermination," dated July 14, 2025 (Petitioners' Comments); *see also* the Respondents' Letter, "Comments on Draft Remand," dated July 14, 2025 (Respondents' Comments).
[14] *See* Petitioners' Letter, "Rebuttal Comments on Draft Results of Redetermination," dated July 21, 2025 (Petitioners' Rebuttal Comments); *see also* the Respondents' Letter, "Rebuttal Comments on Draft Remand," dated July 21, 2025 (Respondents' Rebuttal Comments).
[15] *See* Enforcement and Compliance's Policy Bulletin No. 04.1 regarding "Non-Market Economy Surrogate Country Selection Process," (March 1, 2004) (Policy Bulletin 4.1) available on Commerce's website at https://access.trade.gov/Resources/policy/bull04-1.html at the section, "Comparable Merchandise."

"processed agricultural, aquatic, and mineral products," that would warrant a narrow definition of comparable product.[16]  As explained below, we continue to find that cyanuric acid is not a "major input" within the meaning of Policy Bulletin 4.1 for several reasons.

In its *Remand Order*, the Court stated that Commerce did not explain how chlorinated isos belong to the category of "industrial commodity chemicals," and that chlorinated isos consist of only three intermediate inputs:  cyanuric acid, chlorine, and caustic soda.[17]  While the Court focuses on the three inputs referenced above, we do not find that any of the inputs is major (*e.g.*, comprises a predominant portion of the product); further, the actual number of inputs needed to produce chlorinated isos (and for which Commerce requires surrogate values) is more extensive:  caustic soda/sodium hydroxide, chlorine, sulfuric acid, boron oxides, and urea.[18]  Thus, to calculate a surrogate value for chlorinated isos, Commerce requires values for five chemicals, in addition to three types of fuel/energy (*i.e.*, electricity, coal, and steam), and several types of packaging.[19]  As such, Commerce finds that the number of inputs required to produce chlorinated isos is a "large number" and concludes that chlorinated isos more closely resembles the example of "industrial commodity chemicals" referenced in Policy Bulletin 4.1 rather than "major inputs, *i.e.*, that are specialized or dedicated or used intensively, in the production of subject merchandise."[20]  Importantly, this reasoning results in a reasonable choice of a surrogate country in this administrative review as Romania has prices available to value all of the seven chemicals listed above, the energy inputs, and the packing materials.

---

[16] *See* Policy Bulletin 4.1.
[17] *See Remand Order*, 776 F.Supp.3d at 1335-36.
[18] *See* Heze Huayi's November 14, 2022 QR at Exhibit D-2, "FOP Spreadsheet as Per Appendix VI;" *see also* Kangtai's November 14,
 2022 QR at Exhibit D-2, "FOP Spreadsheet as Per Appendix VI."
[19] *Id*.
[20] *See* Policy Bulletin.  For example, raw shrimp would be a major input to the production of frozen warmwater shrimp, a fact pattern which is distinct from the instant one.

Second, the record supports that there are several inputs needed to produce chlorinated isos, and that cyanuric acid is not unique among these inputs. However, even if we were to value cyanuric acid as an input, we continue to find that cyanuric acid is not a "specialized or dedicated" input used as expressed by Policy Bulletin 4.1.[21] Indeed, information on the record from respondent Heze Huayi's product brochure states that cyanuric acid is not only used in the production of chlorinated isos, but it can also be used as an input to produce decolourants (*i.e.*, fabric dyes), resins, paints, and herbicides.[22] Heze Huayi's product brochure also states that cyanuric acid can be used as an inhibitor of nylon, in plastics, polyester, and as an additive in cosmetics.[23] Because of its uses in various products and industries, Commerce does not consider cyanuric acid to be an input that is "specialized or dedicated" with respect to chlorinated isos.

Finally, the record shows that neither respondent purchases any of the cyanuric acid that is used to produce chlorinated isos. Rather, the record demonstrates that both respondents purchase urea which they use to produce the cyanuric acid that is then used to produce chlorinated isos.[24] Because there are several inputs necessary for producing subject merchandise and neither respondent purchases any of the cyanuric acid that is used to produce subject

---

[21] *See* Policy Bulletin 4.1 at section, "Comparable Merchandise."

[22] *See* Heze Huayi's October 24, 2022 QR at Exhibit A-9, "Product Brochure."

[23] *Id*.

[24] *See* Heze Huayi's Letter, "Section A Response," dated October 24, 2022 (Heze Huayi's October 24, 2022 QR) at 16 (showing that Heze Huayi produced cyanuric acid during the POR); *see also* Kangtai's Letter, "Section A Response," dated October 24, 2022 at 17 (showing that Kantai also produced cyanuric acid during the POR); Huayi Heze's Letter, "Section C&D Response," dated November 14, 2022 (Heze Huayi's November 14, 2022 QR) at Exhibit D-1, "Production Flowchart" (showing the production process used by Heze Huayi for the subject merchandise); and Kangtai's Letter, "Section C&D Response," dated November 14, 2022 (Kangtai's November 14, 2022 QR) at Exhibit D-1, "Production Flowchart" (showing the production process used by Kangtai for the subject merchandise). In their publicly-available rebuttal comments on the Draft Results of Redetermination, the Respondents indicated that they self-produce cyanuric acid which is then used to produce chlorinated isos. *See* Respondents' Rebuttal Comments at 2-3, and at 6 (" . . .{t}fact that {cyanuric acid} is commonly self-produced among chlorinated isocyanurates producers, as evidenced by Respondents, is important in this analysis. After all, the entire point of relying on a producer of comparable merchandise is to find reliable surrogate data. If a surrogate value for {cyanuric acid} is not even needed, then this is directly relevant to the comparable merchandise analysis.").

merchandise, cyanuric acid is not an FOP for which we require a surrogate value.  Moreover, Commerce considers it appropriate to focus on the inputs that are *purchased* by the respondents and not intermediate inputs that are produced in the production process, such as cyanuric acid. Commerce concludes that focusing on purchased inputs is appropriate as the purpose of the surrogate country analysis is to determine whether a surrogate country will likely have accurate prices available (*i.e.*, prices representing trade in commercial quantities) for valuing the respondents' inputs and by-products and co-products.  Commerce does not value intermediate inputs produced during the course of production unless those intermediate inputs are sold as by-products or co-products.  Here, neither respondent sells cyanuric acid as a by-product or co-product.[25]  Therefore, Commerce concludes that in this instance, valuing cyanuric acid as an FOP would not affect the respondents' cost of production.  Thus, the fact that Commerce does not need to value cyanuric acid further supports its finding that cyanuric acid is not a major input with respect to Policy Bulletin 4.1.  Because Commerce does not need to value cyanuric acid, regardless of whether we find it to be a major input in accordance with Policy Bulletin 4.1, this should not factor into the analysis of our surrogate country selection.  Therefore, Commerce contends that focusing on cyanuric acid in selecting a surrogate country is not warranted in this instance.

Thus, based on the analysis expressed above, Commerce concludes that cyanuric acid is not a major input as defined by Policy Bulletin 4.1 and that urea is the FOP for which it requires a surrogate value.  As stated above, both respondents use purchased urea to produce the subject merchandise, and Commerce concludes that urea is the only purchased input that could be

---

[25] *See Preliminary Results* PDM at 39, explaining that Heze Huayi and Kangtai each claimed an offset for ammonium sulfate and sodium chloride during the POR, but neither company claimed an offset for cyanuric acid (unchanged in the *Final Results*).

possibly considered as a "major input" according to and as discussed in Policy Bulletin 4.1.[26] However, the record shows that urea can be used in applications such as agriculture, explosives, medical applications, animal feed, dermatology, and in household products such as dish soap.[27] As such, like cyanuric acid, the record demonstrates that urea is not "specialized" or "dedicated" to the production of chlorinated isos as it is used to produce many different products. Consequently, for this remand redetermination, Commerce finds that, as explained above, it is appropriate to value urea as an input and that cyanuric acid is not an input because the record demonstrates that respondents purchase urea as an input.  Because we continue to find that cyanuric acid is not a "major input," we continue to find that cyanuric acid does not impart any special qualities that separate subject merchandise from the comparable products (*i.e.*, calcium hypo and sodium hypo), for which their basic functions are chlorination.[28]  Thus, based on the analysis detailed above, Commerce reasons that neither cyanuric acid nor urea are "major inputs" with respect to Policy Bulletin 4.1.

B.    Explain Whether Calcium Hypo Shares Similar Physical Characteristics with the Subject Merchandise

In the *Final Results*, we selected Romania as the surrogate country in determining that chlorinated isos, sodium hypo, and calcium hypo are comparable products because they share similar physical characteristics and are part of the same chlorine family.[29]  The CIT held in its *Remand Order* that Commerce adequately explained that calcium hypo, sodium hypo, and chlorinated isos all have comparable end uses.[30]  In its *Remand Order*, however, the Court also stated that Commerce did not consider the physical characteristics of calcium hypo in its analysis

---

[26] *See* Policy Bulletin 4.1 at section, "Comparable Merchandise."
[27] *See* Petitioners' NFI at Exhibit 12.C; *see also* Commerce's Request for NFI at Exhibits 1 and 2.
[28] *See Final Results* IDM at 8.
[29] *See Preliminary Results* PDM at 29, unchanged in the *Final Results*.
[30] *See Remand* Order, 776 F.Supp.3d at 1336.

in concluding that calcium hypo is comparable to chlorinated isos.[31]  The Court stated that "Commerce discussed only the physical characteristics of sodium hypo despite Commerce's conclusion that both calcium and sodium hypo are comparable to chlorinated isos."[32]  Based on record information, Commerce continues to find that chlorinated isos and calcium hypo share similar physical characteristics and provides further explanation.  Specifically, we find that record information demonstrates that chlorinated isos and calcium hypo share similar characteristics because they can be both found in a powdery or tablet form, are chlorinated where both products can be used as disinfectants or for water treatment applications, can be purchased in similar packaging, and react in a similar fashion when they come into contact with water.[33]  Thus, on remand, and as explained below, Commerce reevaluated record evidence and determined that the record continues to support its finding that chlorinated isos and calcium hypo share similar physical characteristics.  Commerce also notes that, for purposes of surrogate country selection, it is not required to find more than one product comparable for surrogate valuation purposes.[34]  However, based on the Court's *Remand Order*, we also address our finding that calcium hypo is comparable.

Respondent Heze Huayi placed on the record information from Tianjin Kaifeng Chemical Co., Ltd. (Tianjin Kaifeng)'s Product List.[35]  Tianjin Kaifeng is a Chinese producer of trichloroisocyanuric acid (TCCA), calcium hypo, and sodium hypo.  TCCA is in the family of

---

[31] *Remand Order*, 776 F.Supp.3d at 1336 (referencing *Final Results* IDM at 8).
[32] *Id.*
[33] *See* Heze Huayi's November 28, 2022 Submission at Exhibit 3, "EPA Chemical Emergency Preparedness and Prevention Advisory; Swimming Pool Chemicals:  Chlorine" (EPA Chemical Advisory for Chlorine).
[34] *See* section 773(c) of the Act; *see also* 19 CFR 351.408; and Policy Bulletin 4.1.  There is no indication that Commerce is required to find more than one comparable product.
[35] *See* Heze Huayi's Letter, "Rebuttal Comments on GNI List," dated November 28, 2022 (Heze Huayi's November 28, 2022 Submission) at Attachment 3, "Tianjin Kaifeng Chemical Co., Ltd., Products List, TCCA" (Tianjin Kaifeng's Product List).

chlorinated isos and falls within the description of products under review.[36]  Tianjin Kaifeng's
Product List states that TCCA, which is merchandise under consideration, is a white crystalline
granular powder or tablet with a "strong chlorine odor."[37]  Tianjin Kaifeng's Product List further
states that the effective chlorine percentage of TCCA is approximately 90 percent, and has a
moisture content less than or equal to 0.5 percent.[38]  According to Tianjin Kaifeng's Product List,
some of the applications for TCCA include treating swimming pools, as a germicide, and as a
water treatment for drinking water.[39]

      With respect to calcium hypo, Tianjin Kaifeng's Product List states that calcium hypo is a
white or light gray granular mesh (either 14-50 mesh or 10-30 mesh) or tablet, with an available
chlorine percentage of 65 or 70 percent.[40]  According to Tianjin Kaifeng's Product List,
applications for this product include bleaching, treating swimming pools, and as a disinfectant
for aquaculture and livestock.[41]

      Record information in a chemical emergency preparedness and prevention advisory on
chlorine from the U.S. Environmental Protection Agency also leads us to conclude that
chlorinated isos and calcium hypo share similar characteristics because both products can be
used as disinfectants or for water treatment applications:

> At other pools solid, granular, pellet, or stick compounds (*e.g.*, calcium
> hypochlorite and chlorinated isocyanurates) or liquids (*e.g.*, sodium hypochlorite)
> are added to the water.  In contact with water, these solid and liquid chemicals
> dissolve and form hypochloric acid or chlorine ions to perform the same
> disinfecting function as chlorine.[42]

---

[36] *Id.*
[37] *Id.*; *see also Final Results* IDM at 2, "Scope of the Order."
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *See* EPA Chemical Advisory for Chlorine.

Thus, based on the record information described above, Commerce concludes that chlorinated isos and calcium hypo share similar physical characteristics.  While we acknowledge that the record contains information indicating that chlorinated isos and calcium hypo do have some differences in their physical characteristics (*e.g.*, chlorinated isos contain cyanuric acid while calcium hypo does not, and chlorinated isos and calcium hypo have different chemical structures (chlorinated isos are organic chemicals whereas calcium hypo is an inorganic chemical)),[43] Policy Bulletin 4.1 instructs that for purposes of finding products to be comparable, "'comparable merchandise' is not defined in the statute or the regulations, since it is best determined on a case-by-case basis."[44]  Policy Bulletin 4.1 also informs that products of "roughly similar form" would constitute comparable merchandise.  In this instance, we find that calcium hypo and the subject merchandise to be of "roughly similar form" because they can be both found in a powdery or tablet form, are chlorinated and can used as disinfectants or for water treatment applications, and they each react in a similar fashion when they encounter water.  We note that Commerce has previously found that chlorinated isos and calcium hypo are comparable products in prior segments of this proceeding,[45] and in this case, based on the record information detailed above, we continue to find that chlorinated isos and calcium hypo share similar physical characteristics.

---

[43] *See* Petitioners' NFI Submission at 2-6 and at Exhibits 1-7.
[44] *See* Policy Bulletin 4.1.
[45] *See*, *e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value:  Chlorinated Isocyanurates from the People's Republic of China*, 70 FR 24502, 24505 (May 10, 2005), and accompanying IDM at Comment 2 (finding calcium hypo to be comparable merchandise); *see also Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 4539 (January 28, 2015), and accompanying IDM at Comment 2 (finding both calcium hypo and sodium hypo to be comparable merchandise).

C.      Explain Further or Reconsider Whether the "More Detailed Information" That Petitioners
        Submitted with Respect to Physical Characteristics is Inadequate

In the underlying administrative review, Commerce acknowledged that the petitioners

placed "more detailed information" on the record in this review in comparison to the record

information in prior reviews that concern the differences between the physical characteristics,

end use, and production processes regarding chlorinated isos and the comparable products,

calcium hypo and sodium hypo.[46]  In its *Remand Order*, the Court stated that "Commerce

decided to disregard the new information as insufficient without an adequate explanation and

without a statement of what the 'more detailed information' was."[47]

During the administrative review, the petitioners submitted "more detailed information"

to support their claim that calcium hypo and sodium hypo are not comparable to chlorinated isos.

This information included a finding by the U.S. International Trade Commission (ITC) in *ITC

Calcium Hypochlorite from China* that calcium hypo, sodium hypo, and chloro isos are separate

like products and declarations from engineers for Occidental Chemical Corporation (Occidental

Chemical) and Clearon Corporation that focused on the production processes used to produce

sodium hypo, chlorinated isos, calcium hypo, and cyanuric acid.[48]

In the underlying administrative review, Commerce did consider such information.  First,

Commerce found that the ITC's finding in its *ITC Calcium Hypochlorite from China* report was

not dispositive because the criteria for such products to be part of the same domestic like product

did not involve the same analysis as conducted by Commerce in determining whether a product

---

[46] *See Preliminary Results* PDM at 27; *see also Final Results* IDM at 7.

[47] *See Remand Order*, 776 F.Supp.3d at 1336 (citing *Preliminary Results* PDM at 27, and *Final Results* IDM at 7).

[48] *See* Petitioners' Letter, "Petitioners' Rebuttal Comments on Final Surrogate Value Submission," dated June 26,
2023 (Petitioners' Rebuttal Comments on SV Submission) at Exhibits 4 and 5; *see also Calcium Hypochlorite from
China*, Inv. Nos. 701-TA-510 and 731-TA-1245 (Final), USITC Pub. 4515 (January 2015) and *Calcium
Hypochlorite from China*, Inv. Nos. 701-TA-510 and 731-TA-1245 (Preliminary), USITC Pub. 4452 (February
2014) (*ITC Calcium Hypochlorite from China*).

is "comparable" for purposes of surrogate country selection as defined by the statute.[49]  As

Commerce stated in the *Preliminary Results*:

> However, as the petitioners note themselves, the ITC finding is "instructive," but
> that does not make it dispositive.[50]  The criteria the ITC applies in determining what
> constitutes a domestic like product are not the same criteria that Commerce applies
> in determining whether products are comparable, and many of the facts found by
> the ITC relating to chlorine content level and chemical composition are neither new
> nor revelatory from Commerce's previous determinations regarding the comparable
> products.  The ITC applies different criteria for finding a domestic like product,
> whereas we are guided by Policy Bulletin 04.1 and our practice, which states that
> "to impose a requirement that merchandise must be produced by the same process
> and share the same end uses to be considered comparable would be contrary to the
> intent of the statute."[51]

Commerce also considered the declarations from the engineers from Occidental Chemical

and Clearon Corporation that focused on the production processes used to produce sodium hypo,

chlorinated isos, calcium hypo, and cyanuric acid.[52]  Commerce acknowledged this new

information placed on the record by the petitioners in the *Preliminary Results*:

> In the instant review, the petitioners argue that there is now more detailed
> information on the record which no longer supports finding sodium hypochlorite,
> and to a lesser extent, calcium hypochlorite, to be comparable merchandise.  The
> petitioners' arguments are primarily focused on sodium hypochlorite and not
> calcium hypochlorite, in noting sodium hypochlorite's differences in physical
> characteristics, production processes, and end use compared to subject
> merchandise.[53]

Specifically, the declaration from James Bruce Warner, Principal Process Engineer for

Occidental Chemical, concerned the production processes for cyanuric acid, chlorinated isos, and

sodium hypo.[54]  In his declaration, Mr. Warner details that the multi-stage production process for

---

[49] *See* section 773(c) of the Act.
[50] *See Preliminary Results* PDM at 28.
[51] *Id*. (citing *Sebacic Acid from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 62 FR 65674, 65675-76 (December 15, 1997) (*Sebacic Acid from China*)).
[52] *See Preliminary Results* PDM at 25, referencing Petitioners' Rebuttal Comments on SV Submission at Exhibits 4 and 5.
[53] *Id*.
[54] *See* Petitioners' Rebuttal Comments on SV Submission at Exhibit 4 (Warner Declaration).

cyanuric acid begins with melting urea with steam, which is then pumped into a storage tank. This urea is then pumped into "scrubbers" where "off gas" and impurities are removed.[55]  The urea is then heated to produce cyanuric acid and ammonia gas.  This "crude" cyanuric acid is then moved to storage for further processing or shipping.[56]

For producing chlorinated isos, Mr. Warner explains that the process begins by converting crude cyanuric acid into pure cyanuric acid.[57]  This pure cyanuric acid is then combined with sodium hydroxide (*i.e.*, caustic soda), then chlorinated, dried, and then granulated.[58]

Finally, Mr. Warner states that there are two processes for producing sodium hypo:  a "batch process" and a "continuous process."[59]  In the batch process, caustic soda (also known as sodium hydroxide) is reacted with chlorine to produce sodium hypo, sodium chloride, and water.[60]  This mixture is then filtered to remove impurities that may decrease the shelf life of the finished sodium hypo.  The continuous process consists of adding liquid chlorine to a solution of caustic soda and water.[61]  Similar to the batch process, the mixture produced by the continuous process is also filtered to remove any impurities before shipping.[62]  Mr. Warner also provided information on the chemical structures and physical properties of cyanuric acid, chlorinated isos, and sodium hypo (including a "Sodium Hypochlorite Handbook") which are consistent with his statements on these issues.[63]

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *See* Petitioners' Rebuttal Comments on SV Submission at Exhibit 4 ("Declaration of James Bruce Warner, Principal Process Engineer for Occidental Chemical Corporation") and at Appendix A ("OxyChem Sodium Hypochlorite Handbook" at 7).

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

Concerning the declaration from Hannah Farley, Instruments and Controls Engineer for Clearon Corporation, Ms. Farley also describes the production processes for cyanuric acid, chlorinated isos and sodium hypo, which are similar to the processes described by Mr. Warner.[64]

In analyzing both declarations, both Mr. Warner and Ms. Farley focus more on the production processes of cyanuric acid, chlorinated isos, and sodium hypo than on their physical characteristics. These declarations indicate that although the production of chlorinated isos involves more steps than producing sodium hypo, both chemicals involve combining the key inputs of sodium hydroxide and chlorine in multiple stages and, thus, we continue to find that they are comparable for purposes of selecting a surrogate country.

For this remand redetermination, we continue to find that the process for producing chlorinated isos described in the declarations is comparable to the production process described by respondent Heze Huayi in its questionnaire response,[65] which is discussed in detail below.[66] Because both declarations are silent on the production processes and physical characteristics of the comparable product, calcium hypo, Commerce has no information from these declarations to consider for altering its finding that chlorinated isos, calcium hypo, and sodium hypo are comparable products.

Thus, while Commerce agrees with the Court that it did not specifically identify these declarations as being "new detailed information," Commerce did take these declarations into consideration in finding that calcium hypo and sodium hypo are comparable merchandise.[67]

---

[64] *See* Petitioners' Rebuttal Comments on SV Submission at Exhibit 5 ("Declaration of Hannah Farley").
[65] *See* Heze Huayi's November 14, 2022 QR) at Exhibit D-1.
[66] *See* Issue D below, "Further Explain or Reconsider Whether the Determination that the Production Processes of Calcium Hypochlorite and Sodium Hypo Chlorite are Similar to the Production Process of the Subject Merchandise."
[67] *See Preliminary Results* PDM at 14 and at 25.

As described above, the declarations from Mr. Warner and Ms. Farley focus more on the

production processes for cyanuric acid, chlorinated isos, and sodium hypo, than on their physical

characteristics.  These declarations, including the information Mr. Warner and Ms. Farley

provided to their statements, show that the production of chlorinated isos and sodium hypo are

each produced in a multi-stage process that incorporates sodium hydroxide and chlorine.  With

respect to the physical characteristics of chlorinated isos and sodium hypo that are expressed in

the declarations, Commerce finds no information suggesting it should revise its finding in the

*Final Results* that chlorinated isos, sodium hypo, and calcium hypo are comparable merchandise

under Policy Bulletin 4.1.  Thus, Commerce finds that the "more detailed information" that the

petitioners placed on the record of this review does not detract from its decision with respect to

the physical characteristics regarding calcium hypo and sodium hypo.

Because Commerce has explained and addressed the "new detailed information" that

petitioners submitted with respect to the physical characteristics for calcium hypo and sodium

hypo, Commerce concludes that it has satisfied the Court's *Remand Order* on this issue.

D.     Further Explain or Reconsider Whether the Determination that the Production Processes
       of Calcium Hypo and Sodium Hypo are Similar to the Production Process of the Subject
       Merchandise

In the *Final Results*, Commerce found that chlorinated isos, calcium hypo, and sodium

hypo are comparable merchandise because, in part, Commerce found that these products share

certain similarities in their production processes.[68]  Specifically, with respect to the production

processes for these three products, Commerce stated that "the production of chlorinated isos is a

multi-stage process {and} this is also the case for the comparable products."[69]  In its *Remand*

*Order*, the Court ordered Commerce to explain further or reconsider its determination that the

---

[68] *See Final Results* IDM at 3-9.
[69] *See Preliminary Results* PDM at 27-28.

production processes of calcium hypo and sodium hypo are similar to the production of the subject merchandise.[70]  Specifically, the Court stated that "{t}he production processes need not be identical, but Commerce must support its determination of similarity with more than the mere assertion that the processes are both multi-stage and share some inputs."[71]

Based on our analysis of record information and consistent with the *Final Results*, on remand, Commerce continues to find that the production processes of chlorinated isos, calcium hypo, and sodium hypo are similar for purposes of finding these products to be comparable as instructed by Policy Bulletin 4.1.  Specifically, we continue to determine that these three products require similar key inputs (*i.e.*, sodium hydroxide and chlorine) and each requires multi-stage production processes.  In maintaining this finding for this remand redetermination, we point to and analyze record information provided by respondent Heze Huayi (regarding its process for producing chlorinated isos), the ITC's finding in *ITC Calcium Hypochlorite from China Final* (for the production process for calcium hypo), and information provided by the petitioners (for the two production processes for sodium hypo).

With respect to the production of chlorinated isos, respondent Heze Huayi provided information on the record indicates that the production begins with the production of the intermediate input, cyanuric acid.[72]  The production of cyanuric acid involves condensing urea, and adding sulfuric acid and water to this condensed urea in a hydrolysis reactor.[73]  This mixture then moves to a filler tank where water is added to produce cyanuric acid.[74]  Water and sodium

---

[70] *See Remand Order*, 776 F.Supp.3d at 1343.
[71] *Id.* at 1338.
[72] *See* Heze Huayi's November 14, 2022 QR at Exhibit D-1; *see also* Warner Declaration, which provides a description of the production process for chlorinated isos that is similar to the production process described by Heze Huayi.
[73] *Id*.
[74] *Id*.

hydroxide is added to this cyanuric acid, which is then reacted with chlorine.[75]  Water is then added to this mixture, which is then dried and then either granulated or formed into tablets, which is then packed for shipping as chlorinated isos.[76]

Regarding the production of calcium hypo, information submitted by the petitioners in Petitioners' NFI Submission states that calcium hypo can be produced by either a sodium process or a calcium process, which is consistent with the ITC's finding in *ITC Calcium Hypochlorite from China Final*.[77]  With respect to the sodium process, in the *ITC Calcium Hypochlorite from China Final*, the ITC found that caustic soda and chlorine are combined in a reactor, which yields sodium hypo, sodium chloride, and water.[78]  The sodium hypo is then combined with hydrated lime and chlorine to form calcium hypo paste.  This calcium hypo paste is then filtered to produce a cake that is then dried to a granular or powdered form.  This mixture is then cooled, compacted, crushed, and then screened for size and then packaged for sale as calcium hypo.[79]  For the calcium process used to produce calcium hypo, the *ITC Calcium Hypochlorite from China Final* states that lime and chlorine are blended to produce calcium hypochlorite crystals.[80]  Calcium chloride is then removed from these crystals either by filtering or centrifuging, and these crystals are dried to make the final product, calcium hypo.[81]

As stated above, record information regarding the production of the comparable product sodium hypo indicates that it can be produced either by a "batch process" or by a "continuous

---

[75] *Id*.
[76] *Id*.
[77] *See* Petitioners' NFI Submission at 8 (citing the petition regarding Calcium Hypochlorite from China, December 18, 2013, and *ITC Calcium Hypochlorite from China Final* at I-8 – I-9, "Manufacturing Process").
[78] *Id*.
[79] *Id*.
[80] *Id*.
[81] *Id*.

process."[82]  In the batch process, caustic soda is reacted with chlorine to produce sodium hypo, sodium chloride, and water.[83]  This mixture is then filtered to remove impurities that may decrease the shelf life of the finished sodium hypo.  The continuous process consists of adding liquid chlorine to a solution of caustic soda and water.[84]  Similar to the batch process, the mixture produced by the continuous process is also filtered to remove any impurities before shipping.  In its *Remand Order*, the Court stated that Commerce failed to support its assertion that sodium hypo and chlorinated hypo both require "electrolysis, evaporation, and chlorine absorption" in their respective production processes.[85]  We have further reviewed the record with respect to whether sodium hypo requires electrolysis, evaporation, and chlorine absorption and, as a result, we have reconsidered that finding and now conclude that sodium hypo does not require evaporation as part of its production process.[86]  We continue to conclude, however, that the production of sodium hypo still requires a multi-stage process (*i.e.*, electrolysis and chlorine absorption) consistent with our finding in the *Final Results*.[87]  In reviewing Policy Bulletin 4.1, with respect to the production process for sodium hypo, Policy Bulletin 4.1 does not require Commerce to find more than one comparable product (*i.e.*, Commerce concludes that either calcium hypo *or* sodium hypo can be found to be comparable to chlorinated isos).[88]

The petitioners argue that "chlorinated isos contain a major input, cyanuric acid, that imparts unique and distinct physical characteristics" that are lacking in both calcium hypo and

---

[82] *See* Petitioners' Rebuttal Comments on SV Submission at Exhibit 4 ("Declaration of James Bruce Warner, Principal Process Engineer for Occidental Chemical Corporation") and at Appendix A ("OxyChem Sodium Hypochlorite Handbook" at 7).
[83] *Id*.
[84] *Id*.
[85] *See Remand Order*, 776 F.Supp.3d at 1338-39 (citing *Final Results* IDM at 8).
[86] *See* Respondents' Letter, "Final Surrogate Value Submission," dated May 31, 2023 at Exhibit SV2-13, "Malay-Sino Chemical Financial Statement & Information" at "Process & Products-Overview" (Malay-Sino Product Overview) (showing that sodium hypo requires electrolysis and chlorine absorption, but not evaporation).
[87] *See Final Results* IDM at 8.
[88] *See* Policy Bulletin 4.1 at "Comparable Merchandise."

sodium hypo.[89]  However, as we explained above, we find that in this instance, cyanuric acid is not an input for which we require a surrogate value, nor do we find that it is a major input under Policy Bulletin 4.1.  The petitioners claim that cyanuric acid "imparts unique and distinct physical characteristics" in chlorinated isos that distinguishes the subject merchandise from the comparable products calcium hypo and sodium hypo (*i.e.*, cyanuric acts as a stabilizing agent in chlorinated isos and aids in reducing the loss of chlorine).[90]  Although the production of cyanuric acid requires another stage in the production process for producing chlorinated isos, consistent with the *Final Results*, we continue to find that this fact alone does not warrant excluding calcium hypo and sodium hypo as comparable products because the key inputs that they share in the production of chlorinated isos are chlorine and caustic soda, which are essential for chlorination.[91]  Finally, and also as explained above, because neither respondent purchases cyanuric acid that is used to produce subject merchandise, cyanuric acid is not an FOP for which we require a surrogate value.  As such, Romania is a reasonable choice for a surrogate country in the underlying administrative review because it has the prices available to value the FOPs relevant to the respondent companies.[92]

Therefore, Commerce continues to determine that the production processes of chlorinated isos, calcium hypo, and sodium hypo are similar for purposes of finding these products to be comparable as instructed by Policy Bulletin 4.1.  Specifically, we continue to determine that these three products require similar inputs and a multi-stage production process.

E.      Explain Further or Reconsider the Selection of the Romanian Labor Data

---

[89] *See* Petitioners' NFI Submission at 2.
[90] *Id*. at 3 and at Exhibits 2 and 3.
[91] *See Preliminary Results* PDM a 25-26 (citing *Sebacic Acid from China*, "{T}o impose a requirement that merchandise must be produced by the same process and share the same end uses to be considered comparable would be contrary to the intent of the statute.") (unchanged in the *Final Results*).
[92] *See Final Results* IDM at Comment 2 (" . . . Romania has usable {surrogate values} for all FOPs as well as usable financial ratios . . .")

In non-market economy AD proceedings, Commerce prefers to value labor solely based on data from the primary surrogate country.[93]  In this administrative review, Commerce was presented with three sources from which to value labor:  (1) International Labour Organization (ILOSTAT) labor rates from Mexico from 2008 covering the manufacture of chemical products;[94] (2) Malaysian labor rates from June 2021 through December 2021 covering "overall manufacturing;"[95] and (3) Romanian Eurostat labor rates from 2020 through 2021 covering "construction and services." [96]  Regarding the labor rates from Mexico, Commerce did not consider using this data to value labor because Mexico was not on the list of countries that Commerce considered to be at the same level of economic as China.[97]  Additionally, the labor rates from Mexico are from 13 years prior to the POR and, therefore, are not contemporaneous with the POR.  In contrast, the labor rates from Romania and Malaysia are contemporaneous with the POR.[98]  Commerce explained that a labor surrogate value based on the Malaysian manufacturing sector was not the best available information to value labor because of evidence of widespread forced labor practices, such as in the Malaysian electrical and electronics sector, which is a subsector of the manufacturing sector.[99]  We explained that in keeping with *New American Keg Final Redetermination*, we found the Malaysian labor surrogate values are not the best information on the record to value labor in this proceeding and, as a result, we relied on the

---

[93] *See Preliminary Results* PDM at 41 (citing *Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production:  Labor*, 76 FR 36092 (June 21, 2011) (*Antidumping Methodologies*)).

[94] *See* Petitioners' Letter, "Initial Surrogate Value Data," December 19, 2022 (Petitioners' Initial SV Data) at Exhibit 4.

[95] *See* Respondents' Letter, "Preliminary Surrogate Value Submission," December 19, 2022 (refiled on June 22, 2023) (Respondents' Preliminary SV Data) at Exhibit SV-4.

[96] *See* Petitioners' Letter, "Petitioners' Comments Concerning the Preliminary Determination," dated May 31, 2023 (Petitioners' Comments for the Preliminary Results) at Exhibit 10.

[97] *See Preliminary Results* PDM at 21, unchanged in *Final Results* ("Commerce normally values all FOPs in a single{surrogate country}); *see also* 19 CFR 351.408(c)(2).

[98] *See* Petitioners' Initial SV Data at Exhibit SV-4 (for Malaysia labor rates); *see also* Petitioners' Comments for the Preliminary Results at Exhibit 10 (for Romanian labor rates).

[99] *See Final Results* IDM at 19.

labor data from Romania.[100]  In its *Remand Order*, the Court ordered Commerce to explain further or reconsider the selection of the Romanian labor data.[101]  To comply with the Court's order, Commerce has reconsidered the selection of the Romanian labor data.  Specifically, we reopened the record and placed Romanian labor data from ILOSTAT covering 2021-2022 for "manufacturing" on the record and provided parties with an opportunity to comment.[102]  No interested parties commented on these Romanian labor rates.  As such, Commerce finds that these Romanian labor rates to be specific to the production of subject merchandise (*i.e.*, specific to the manufacturing sector), contemporaneous with the POR, and satisfy Commerce's preference to value labor solely from the primary surrogate country as detailed in *Antidumping Methodologies*.  Thus, Commerce will rely on the average of the 2021-2022 Romanian labor rates for manufacturing for this remand redetermination.  In reconsidering its selection of the Romanian labor data as ordered by the Court, Commerce has satisfied the Court's *Remand Order* on this issue.

## IV.    COMMENTS ON DRAFT RESULTS OF REDETERMINATION

On July 14 and July 21, 2025, Commerce received comments and rebuttal comments on the Draft Results of Redetermination, respectively, from the petitioners and from the respondent companies.[103]  These comments are addressed below.  After considering these comments, we made no changes to our conclusions in the Draft Results of Redetermination for these final results of redetermination.

**Comment 1:   Whether Commerce Explained that Cyanuric Acid is a Major Input Under Policy Bulletin No. 04.1**

---

[100] *See Preliminary Results* PDM at 30 (citing *Final Results of Redetermination Pursuant to Court Remand, New American Keg v. United States*, Slip Op. 22-106, Court No. 20-00008, dated November 10, 2022 (*New American Keg Final Redetermination*), available at https://access.trade.gov/Resources/remands/22-106.pdf.
[101] *See Remand Order*, 776 F.Supp.3d at 1341.
[102] *See* Commerce's Request for NFI.
[103] *See* Petitioners' Comments; *see also* Respondents' Comments; Petitioners' Rebuttal Comments; and Respondents' Rebuttal Comments.

The following is a verbatim executive summary of argument submitted by the petitioners.

For further details, *see* Petitioners' Comments at 4-13 (internal citations omitted).

> Commerce's determination that CYA is not a "major input" within the meaning of Policy Bulletin 04.1 is without merit. The record establishes that CYA is the "major" material of chlorinated isos and imparts the key physical characteristics that distinguish chlorinated isos from other water treatment chemicals, such as calcium and sodium hypochlorite. There {sic} mere fact that CYA can be used in other applications, or is produced rather than purchased by respondents, is not relevant to whether CYA is a major input. Furthermore, Commerce's assertion that five material inputs is a "large" number for purposes of Policy Bulletin 04.1 is not logical given past precedent covering merchandise that requires dozens, hundreds, or even thousands of inputs. Put simply, none of the arguments put forward by Commerce undermines the substantial evidence on the record demonstrating that CYA {is} the major input of chlorinated isos.

The following is a verbatim summary of argument submitted by the respondents. For

further details, *see* Respondents' Rebuttal Comments at 4-6.

> {Commerce} has fully explained why CYA is not a major input as contemplated in {P}olicy {B}ulletin 04.1. {Commerce} has properly explained that CYA is not a "specialized or dedicated" input such that comparable merchandise needs to be narrowly defined as contemplated in the {P}olicy {B}ulletin. Petitioner's arguments to the contrary are divorced from the {P}olicy {B}ulletin's discussion and purpose. CYA is not specialized or dedicated to chlorinated isocyanurates, CYA is used in many industries. CYA is not so critical to chlorinated isocyanurates or difficult to find a surrogate value, such that {Commerce} needed to specially consider this input in deciding comparable merchandise. Indeed, {Commerce}and all of the parties for the entire course of the Order have found reliable surrogate values in multiple countries that produced comparable merchandise – comparable merchandise that was not made with CYA. Further, the fact that CYA is commonly self-produced among chlorinated isocyanurate producers, as evidenced by Respondents, is important in this analysis. Afterall, the entire point of relying on a producer of comparable merchandise is to find reliable surrogate data and CYA surrogate value is not even needed.

**Commerce's Position:** As we explained above, for purposes of valuing FOPs, we are using a

surrogate value for urea as the input. The respondents purchase urea and convert urea internally

to cyanuric acid. Accordingly, our focus for purposes of calculating a margin is on urea.

Notwithstanding, we disagree with the petitioners and continue to find that cyanuric acid is not a

major input in the production of chlorinated isos as contemplated by Policy Bulletin 4.1.  In making this finding, we stress the fact that cyanuric acid is an intermediate product produced internally by both respondents from the input urea, which is an FOP that was reported by each respondent.[104]  Accordingly, neither respondent reported cyanuric acid as an FOP for which we require a surrogate value.  Consequently, because cyanuric acid is not even an input under Policy Bulletin 4.1, Commerce concludes that it cannot be a "major input" as contemplated in Policy Bulletin 4.1.

Regarding the petitioners' argument that five material inputs is not a "large number" with respect to Policy Bulletin 4.1 and that Commerce has evaluated merchandise that have incorporated hundreds raw materials,[105] Policy Bulletin 4.1 does not place a minimum number or floor limit on what a "large number" is.[106]  We stated above that to value chlorinated isos as produced by the respondents, we require surrogate values for five chemicals, in addition to three types of fuel/energy (*i.e.*, electricity, coal, and steam), and several types of packaging.  The fact that Commerce has evaluated products that have required more than five inputs in the past does not lead us to conclude that the number of inputs needed to value chlorinated isos as produced by the respondents is not a "large number" with respect to Policy Bulletin 4.1.

**Comment 2:   Whether Commerce Explained Further that Calcium Hypochlorite and Chlorinated Isocyanurates Share Similar Physical Characteristics**

The following is a verbatim executive summary of argument submitted by the petitioners. For further details, *see* Petitioners' Comments at 13-15 (internal citations omitted).

---

[104] *See* Draft Remand Redetermination at 7 ("Thus, based on the analysis expressed above, Commerce concludes that cyanuric acid is not a major input as defined by the Policy Bulletin and that urea is the FOP for which it requires a surrogate value.").
[105] *See* Petitioners' Comments at 8-11 (citing *e.g.*, *Final Determination of Sales at Less Than Fair Value:  Wooden Furniture from the People's Republic of China*, 69 FR 67313 (November 7, 2004), and accompanying IDM at Comment 15).
[106] *See* Policy Bulletin 4.1 at section, "Comparable Merchandise."

Commerce's determination that calcium hypo and chlorinated isos have similar physical characteristics is similarly without merit, and myopically focuses on form and end use without discussing our accounting for the importance of CYA to chlorinated isos and instructions in Policy Bulletin 04.1 to define comparable merchandise "narrowly" on the basis of defining "specialized or dedicated" inputs. Innumerable chemicals are available in powder or tablet form. Likewise, numerous chemicals are used for water treatment in all sorts of applications. Accordingly, neither form nor end use demonstrate that calcium hypo and sodium hypo are comparable to chlorinated isos.

The following is a verbatim summary of argument submitted by the respondents. For further details, *see* Respondents' Rebuttal Comments at 6.

{Commerce}, drawing on record evidence, explained in more detail that calcium and sodium hypochlorite shares {sic}very similar physical characteristics with chlorinated isocyanurates. The products both are very similar in physical appearance – a white mesh or tablet with a very similar characteristic – to bleach or treat water. Petitioner again narrowly hashes differences, explaining that chlorinated isocyanurates are generally used to treat residential swimming pools, while calcium hypochlorite is only sometimes listed as an application. These are not major differences in physical characteristics. Indeed, the policy bulletin specifically discusses that steel pipe and tube would be comparable merchandise to all sorts of other steel products like hot-rolled steel plate, steel wire rod, and structural steel. If petitioner's narrow view of physical characteristics was applied to steel pipe and tube, then none of those products would be comparable because they are used in different products.

**Commerce's Position:** We disagree with the petitioners and maintain that calcium hypo and chlorinated isos share similar physical characteristics for the purpose of finding calcium hypo is comparable merchandise. Specifically, we disagree with the petitioners on the correct weight to place on whether these two products are similar enough for our purposes of selecting a comparable product. We explained in our analysis above that the record of the underlying administrative review leads us to conclude that both chlorinated isos and calcium hypo are chlorinated products that are powdery in substance, can be used as disinfectants or as water treatment applications, and react in a similar fashion when they come into contact with water. While chlorinated isos may have a higher effective chlorine percentage when compared to

calcium hypo,[107] we find that the characteristics differences between these two products are not enough to say that they are not comparable.

The petitioner's arguments are akin to arguing that calcium hypo is not an identical product and miss the basis for determining that calcium hypo is comparable. Specifically, petitioners continue to rely on the inclusion of cyanurate acid in chlorinated isos as the reason to find chlorinated isos and calcium hypo are not comparable.[108] However, because cyanurate acid is not an input for which we need an FOP, the petitioners' reliance on cyanurate acid as an input is misplaced in this instance. The petitioners have placed on the record information indicating that cyanurate acid is a stabilizer that binds to free chlorine in pool water and causes the chlorine to release in the water more slowly.[109] According to the petitioners, because of the use of cyanurate acid in chlorinated isos, "stabilized" pools are fundamentally different than pools that are treated with calcium hypo or sodium hypo. The petitioners conclude that because neither calcium hypo nor sodium hypo have the physical characteristics that can act as a stabilizer (*i.e.*, because neither product contains cyanurate acid), their applications are not comparable to chlorinated isos.[110] Although the petitioners continue to contend that calcium hypo does not contain cyanurate acid and, thus, is not comparable to chlorinated isos, the evidence submitted by the petitioners is not persuasive and, thus, does not rebut our finding that these two products are comparable.

---

[107] *See* Tianjin Kaifeng's Product List, indicating that the effective chlorine percentage for merchandise under consideration can be up to 90 percent, and that the effective chlorine percentage for calcium hypo can range from 65 to 70 percent.

[108] *See* Petitioners' Comments at 13-15.

[109] *Id.* at 14, referencing Petitioners' Letter, "Rebuttal Comments on Surrogate Values," (December 29, 2022) at Exhibit 2, "What is Pool Stabilizer: The Truth About Pool Stabilizers;" *see also* Petitioners' Letter, "Petitioners' Rebuttal Comments on Final Surrogate Value Submission," June 26, 2023 at Exhibit 2, "Impact of Sunlight on Chlorie Residual."

[110] *Id.* at 14-15.

The purpose of Policy Bulletin 4.1's section on "comparable merchandise" is to provide guidance on how to select comparable merchandise from potential surrogate countries.

> . . . Second, the operations team identifies those countries with producers of comparable merchandise among the potential surrogates on OP's list. As noted above, "comparable merchandise" is not defined in the statute or the regulations, since it is best determined on a case-by-case basis. Even so, there are some basic rules that every team should follow. In all cases, if identical merchandise is produced,[FN(6)] the country qualifies as a producer of comparable merchandise. In cases where identical merchandise is not produced, the team must determine if other merchandise that is comparable is produced. How the team does this depends on the subject merchandise. For example, in some cases, *e.g.*, steel and textiles, physical form and the extent of processing/finishing essentially distinguish different products. In such cases, consideration of major inputs often is not required, as it is normally sufficient for the team to identify comparable merchandise on the basis of physical differences in the merchandise and whether the product is one of low or high value-added. Thus, if circular steel pipe and tube were the subject merchandise, rectangular steel pipe and tube, hot-rolled steel sheet and plate, steel wire rod, steel wire rope, steel bar, and structurals, all of which are low value-added products of roughly similar form (made by combining iron, energy, and further processing), would constitute comparable merchandise.

It is important to note that the footnote referenced in this section of Policy Bulletin 4.1 states that, "{i}f considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that *produce a broader category of reasonably comparable merchandise* {emphasize added}."[111] In the underlying administrative review, Commerce found that there we no countries on its list of appropriate surrogate countries that produced identical merchandise in significant quantities. Because there were no available producers of identical merchandise, it is reasonable to conclude that Commerce was confronted with "data difficulties," which led the team to consider countries that produce a category of merchandise it found to be reasonably comparable to chlorinated isocyanurates, *i.e.*, calcium hypo and sodium hypo. Commerce has found calcium hypo and sodium hypo to be comparable

---

[111] *See* Policy Bulletin 4.1 at section, "Comparable Merchandise."

to chlorinated isos in a prior segment of this proceeding.[112]   As such, in the underlying

administrative review, Commerce selected Romania as the surrogate country because it

concluded that Romania was at a comparable level of economic development pursuant to section

773(c)(4) of the Act; was a significant producer of calcium hypo and sodium hypo (*i.e.*, the

comparable merchandise); and had publicly available data to value all FOPs that constitute the

best information on the record.[113]   In determining that calcium hypo and sodium hypo are

comparable to chlorinated isos, we explained, above, that these products share similar physical

characteristics (both are part of the same chlorine family, and have similar production processes,

as well as end uses).   The petitioners seem to conclude that Commerce needs to limit

merchandise comparable to chlorinated isocyanurates only to products that contain cyanuric acid.

Again, this is  an argument about whether the products are identical.  However, Policy Bulletin

4.1 does not require Commerce to determine comparable products to be identical to the subject

merchandise; Commerce only needs to find that the products are comparable.[114]   In this instance,

Commerce finds that calcium hypo and sodium hypo satisfy Policy Bulletin 4.1's guidance

regarding a "broader category of comparable merchandise" with respect to chlorinated

isocyanurates absent identical merchandise.  As such, Commerce continues to determine that

calcium hypo and sodium hypo are comparable to chlorinated isos because, in part, these

products share similar physical characteristics.

---

[112] *See* Respondents' Letter, "Final Surrogate Value Submission," dated May 31, 2023, at Exhibit SV-2, "DOC Information on Comparable Products."  This Exhibit references the underlying less than fair value investigation, *Notice of Final Determination of Sales at Less Than Fair Value:  Chlorinated Isocyanurates from the People's Republic of China*, 70 FR 24502 (May 10, 2005) (*Chlorinated Isocyanurates from China Inv. Final*), and accompanying IDM at Comment 2 (where Commerce found calcium hypo to be comparable to chlorinated isos); *see also Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013) (*Chlorinated Isocyanurates from China 2010-2011 AR*), and accompanying IDM at Comment 1 (where Commerce found sodium hypo to be comparable to chlorinated isos).
[113] *See Final Results* IDM at Comment 2.
[114] *See* Policy Bulletin 4.1 at section, "Comparable Merchandise."

**Comment 3:   Whether Commerce Explained Further its Determination that the Production Processes of Calcium Hypochlorite, Sodium Hypochlorite, and Chlorinated Isocyanurates are Similar**

The following is a verbatim executive summary of argument submitted by the petitioners.

For further details, *see* Petitioners' Comments at 15-22 (internal citations omitted).

Commerce failed to address the significant differences between the production processes of chlorinated isos and calcium/sodium hypo. Commerce asserts that the production of chlorinated isos is comparable to the production of calcium and sodium hypo because they all have common inputs and are all manufactured using a multi-stage process. However, record evidence demonstrates that the production of chlorinated isos is significantly more expensive, has a much higher labor intensity, requires more and specialized equipment, and requires many more production stages. Commerce failed to address this evidence in the Draft Remand Results and failed to conduct any comparative analysis between the three products.

The following is a verbatim summary of argument submitted by the respondents. For further details, *see* Respondents' Rebuttal Comments at 7-8.

{Commerce} followed the Court's instruction and explained in more detail how the production processes are similar for the comparable products. {Commerce} analyzed information provided by Respondents and the ITC, and found the processes have similar key inputs (sodium hydroxide and chlorine) and have similar multi-staged production processes, such as electrolysis and chlorine absorption. Petitioner emphasizes that the production of chlorinated isocyanurates is more expensive and requires more labor and specialized equipment. However, these are not critical differences in consideration of the use of this comparison – to find a pool of potential primary surrogate countries. Petitioner engages in the type of analysis {Commerce} would do when choosing between actual surrogate financial statements, where {Commerce} will rely upon the most comparable. But at this early stage in determining the pool of potential surrogate countries, the goal is to have several options of countries where available, reliable surrogate values could be found.

Very critically, in the country that petitioner is arguing for, Mexico – there is not a surrogate financial statement for a producer of chlorinated isocyanurates. Rather, petitioner has proffered a financial statement from a large Mexican chemical conglomerate that among its many products, produces sodium hypochlorite – the very product that now petitioner argues is not comparable enough. Thus, if {Commerce} was to narrow the pool of potential surrogate countries to only those that produce identical merchandise, {Commerce} would have to select Mexico. Then, in Mexico, {Commerce} would have to rely upon a producer of the very product that petitioner says is not comparable enough, sodium hypochlorite. This

is wholly illogical and turns the whole surrogate country methodology on its side. Petitioner's narrow view of comparable products runs contrary to the direction from the statute and undermines the surrogate country process.

**Commerce's Position:**  We disagree with the petitioners and continue to find that the production processes for calcium hypo, sodium hypo, and chlorinated isos are similar.  In our analysis as detailed above, we explained that the production processes for these three products require similar inputs and a multi-stage production process, which leads us to conclude the production processes are similar  for the purposes of our comparability analysis.  Our analysis is not whether the production processes are identical, only that they are similar.

To produce chlorinated isos, we explained that the record indicates that the production process starts with the production of cyanuric acid by condensing urea and adding sulfuric acid and water to the condensed urea in a hydrolysis reactor.[115]  Water is added to this mixture to produce cyanuric acid.  The next step is to add water and sodium hydroxide to the cyanuric acid, which is then reacted with chlorine.  The final steps include adding water to this mixture, drying it, and either granulating it or forming it into tablets to produce the finished product.[116]

To produce calcium hypo, we detailed that there are two production processes: a sodium process or a calcium process.  The sodium process consists of combining caustic soda and chlorine in a reactor, which produces sodium hypo, sodium chloride, and water.  Hydrated lime and chlorine are mixed with the sodium hypo to form a calcium hypo paste.  This paste is then filtered and dried, cooled, compacted, crushed, and then screened for packaging as calcium hypo. The calcium production process involves blending lime and chlorine to produce calcium hypo

---

[115] *See* Heze Huayi's November 14, 2022 QR at Exhibit D-1; *see also* Warner Declaration.
[116] *Id*.

crystals. Calcium chloride is removed from these crystals, which are then dried to produce calcium hypo.[117]

Finally, in our analysis on the production of sodium hypo, we described that the "batch process" involves reacting caustic soda with chlorine to produce sodium hypo, sodium chloride, and water.[118] This mixture is then filtered and results in sodium hypo. We explained that the "continuous process" involves adding liquid chlorine to a mixture of caustic soda and water. This mixture is then filtered to remove any impurities before it is packaged and shipped as sodium hypo.[119] Thus, based on the above descriptions regarding the production processes for chlorinated isos, calcium hypo, and sodium hypo, we continue to find that the production processes for each product require a multi-stage process using similar inputs.

In their comments, the petitioners argue that Commerce did not address record evidence demonstrating that the production of chlorinated isos is more expensive, is more labor intensive, requires more specialized equipment, and has more stages of production. Specifically, the petitioners state that the cost of building a new chlorinated isos production facility is more than the cost to set up a new sodium hypo facility.[120] The petitioners go on to state that Commerce did not address the record information indicating that it takes more workers to produce chlorinated isos than it takes to produce sodium hypo.[121] The petitioners also point to record

---

[117] *See ITC Calcium Hypochlorite from China Final* at I-8 – I-9, "Manufacturing Process."
[118] This method is consistent with information placed on the record by the petitioners. *See* Petitioner's Comments at 18, referencing Petitioners' Comments for the Preliminary Results at Exhibit 3, "Chemical and Process Design Handbook," James G. Speight (2002).
[119] *See* Petitioners' Rebuttal Comments on SV Submission at Exhibit 4 ("Declaration of James Bruce Warner, Principal Process Engineer for Occidental Chemical Corporation") and at Appendix A ("OxyChem Sodium Hypochlorite Handbook" at 7).
[120] *See* Petitioners' Comments at 16-17, referencing Petitioners' Comments for the Preliminary Results at Exhibit 4, "Declaration of Chris Dixon, Chief Manufacturing Officer of KIK Consumer Products, Inc."
[121] *Id.*

evidence indicating that it takes more steps to produce chlorinated isos compared to the steps required to produce both calcium hypo and sodium hypo.[122]

The petitioners' arguments are essentially that Commerce must find that the production processes for chlorinated isos, calcium hypo, and sodium hypo are identical. However, Commerce is not required to show that the production processes are identical; Commerce's analysis in this respect focuses on whether the production processes for these three products are comparable.[123] The fact that one product requires more processing steps and different production facilities than the other does not take away from our conclusion that production processes are comparable. We note that although the petitioners placed information on the record comparing the production facilities and workers needed to produce chlorinated isos are more extensive when comparing the production processes of chlorinated isos and sodium hypo, the petitioners' Comments do not point to record information on this issue for comparing the production presses for chlorinated isos to the other product we found to be comparable, calcium hypo.[124]

And while the petitioners contend that we ignored the differences in the nature of the production steps cited to *Tetrafluroethane from China* and to *Xanthan Gum from China* as examples where Commerce found the production processes of the subject merchandise and respective comparable products were not comparable,[125] we stated above that Policy Bulletin 4.1 expresses that comparable merchandise is best determined on a case-by-case basis, and how Commerce makes this determination depends on the subject merchandise as well what is on the

---

[122] *Id*. at 19-20.
[123] *See* Policy Bulletin 4.1 at section, "Comparable Merchandise."
[124] *See* Petitioners' Comments.
[125] *Id.* at 20, (citing *1,1,1,2-Tetrafluroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 FR 62597 (October 20, 2014) (*Tetrafluroethane from China*), accompanying IDM at Comment 16, and *Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013) (*Xanthan Gum from China*), and accompanying IDM at Comment 1.

record.[126]  The petitioners argue that the production of the subject merchandise is not identical to the merchandise we find to be comparable, but the goal of Commerce's analysis is to determine whether merchandise is comparable, not whether the production processes are identical. Whether one product requires more labor or undergoes a more laborious production process is not the focus of Commerce's analysis.  Commerce's analysis examines this issue on a case-by-case basis.[127]

### Comment 4:   Whether Commerce Explained Further or Reconsidered the Selection of the Romanian Labor Data

The following is a verbatim summary of argument submitted by the respondents.  For further details, *see* Respondents' Comments at 3-5.

> The Court remanded {Commerce} to explain how the Romanian labor rate was superior to the Malaysian labor rate, given the Romanian labor rate is not a manufacturing labor rate.  However, instead of addressing this, {Commerce} placed a new ILO Romanian labor rate on the record and relied upon this.  {Commerce's} remand results are not in accordance with the Court's Order or {Commerce's} established practice that it is the parties' burden to create the record.  The Malaysian labor rate is usable and thus {Commerce} had no reason to need to reopen the record. Further, the Malaysian labor rate is more specific and superior to both the original Romanian labor rate on the record and the new ILO Romanian labor rate that {Commerce} newly placed on the record.  Further, the reconsideration of the best available information to value labor also requires reconsideration of the primary surrogate country.  {Commerce} relies upon the surrogate country that sources the best available information.   As Romania does not source the best available information for labor, {Commerce} must reconsider the overall data and country selection, including the arguments raised by Respondents regarding financials and chlorine that favor selection of Malaysia as the primary (or sole) surrogate country. {Commerce} should find that Malaysia sources the best available information and rely upon Malaysia as the primary
> surrogate country for this segment.

The following is a verbatim executive summary of argument submitted by the petitioners.

For further details, *see* Petitioners' Rebuttal Comments at 3-8 (internal citations omitted).

---

[126] *See* Policy Bulletin 4.1 at section, "Comparable Products."
[127] *Id*.

Commerce's determination that the Romanian labor rates on the record constituted the best available information to value Respondents' labor factor of production ("FOP") is in accord with the Court's Remand Order and supported by substantial evidence. Pursuant to the Court's Remand Order, Commerce reevaluated the labor data on the record and found that (1) the Mexican labor rates were not contemporaneous and were from a country not on the surrogate country list, (2) the Malaysian labor rates were distorted by widespread forced labor in the Malaysian manufacturing sector, and (3) the Romanian labor rates were not specific to manufacturing. Commerce held that none of these labor rates were usable and, therefore, reasonably exercised its discretion to place additional labor data on the record from the primary surrogate country that was contemporaneous with the POR and specific to manufacturing.

Commerce's determination that the Malaysian labor rates were unusable and its decision to place additional labor data on the record was reasonable and consistent with the Court's instructions. Accordingly, Commerce should continue to reject the Malaysian labor data and should continue to rely on the 2021-2022 Romanian labor rates in the final remand results.

**Commerce's Position:** We disagree with the respondents' arguments on this issue. In its *Remand Order*, the Court concluded that Commerce did not adequately explain its decision to rely on the Romanian labor rates for "construction work and services," and ordered Commerce to "explain further or reconsider" the selection of these data for valuing labor.[128] To comply with the Court's *Remand Order*, in reconsidering the selection of the data, Commerce re-opened the record and placed Romanian labor data from ILOSTAT for manufacturing from 2021-2022 on the record.[129] No interested party submitted comments on this issue for us to consider for the Draft Results of Redetermination; the respondents and the petitioners have submitted comments for us to consider for the final results of redetermination.[130]

We explained above that we find the Romanian ILOSTAT labor rates are specific to the manufacturing sector, contemporaneous with this POR, and satisfy Commerce's preference to value labor solely from the primary surrogate country.

---

[128] *See Remand Order*, 776 F.Supp.3d at 1341.
[129] *See* Commerce's Request for NFI.
[130] *See* Respondents' Comments at 3; *see also* Petitioners' Rebuttal Comments at 3.

In their comments, the respondents concede that the Court "specifically remanded for 'Commerce to address the consolidated plaintiffs' concerns and explain further *or reconsider* its selection of the Romanian labor data{emphasis added}.'"[131]  However, the respondents argue that, instead of addressing the issues regarding the Romanian labor rates for construction work and services that were already on the record, Commerce did not follow the Court's instructions and "side-stepped" this issue by adding the Romanian ILOSTAT labor rates on the record.[132] The respondents also contend that the re-opening of the record was an abuse of Commerce's discretion.  We find the respondents' arguments are without merit.

In reconsidering the labor rates on the record as directed by the Court, we explained above that the labor rates from Mexico from 2008 covering chemical products are not usable because Mexico was not on the list of countries Commerce considered to be at the same economic level as China for the underlying administrative review, and because these labor rates are from 13 years prior to the POR.  With respect to the Malaysian labor rates, we stated above that although these rates were contemporaneous to the POR and specific to the manufacturing sector, these labor rates are tainted because of evidence of forced labor practices in the Malaysian electrical and electronics sector (a subsector of the manufacturing sector).  Above, we detailed that in keeping with *New American Keg Final Redetermination*, we found that these Malaysian labor surrogate values are not the best information on the record to value labor in this proceeding because of the widespread presence of unfair labor practices in Malaysia's overall manufacturing sector.  In reconsidering the Romanian labor rates for construction and services as ordered by the Court, Commerce exercised its discretion to re-open the record and placed Romanian labor rates

---

[131] *See* Respondents' Comments at 3.
[132] *Id.*

that are specific to the manufacturing section and contemporaneous to the POR to be considered for the final results of remand redetermination.

In its comments, the respondents argue that Commerce's action of re-opening the record and placing the Romanian ILOSTAT labor rates on the record is contrary to its normal practice and administrative polity that the "burden of creating an adequate record lies with interested parties and now with Commerce."[133]  However, the respondents omitted that this ruling begins by stating that "Commerce has the authority to place documents in the administrative record that it deems relevant."[134]  In the instant remand redetermination, Commerce concluded that the Romanian ILOSTAT labor rates it placed on the record are relevant because it found the labor rates already on record were flawed.

Regarding the respondents' arguments that Commerce abused its discretion by re-opening the record and adding the Romanian ILOSTAT labor rates, in ordering Commerce to further explain or reconsider the use of the Romanian rates for construction work and services, the Court did not forbid Commerce from doing so.[135]  Thus, Commerce concludes that re-opening the record in this instance was well within its discretion.

Finally, we disagree with the respondents that the Malaysian labor rates are best information on the record and should be relied upon for valuing labor.[136]  For the final results of remand redetermination, we continue to find that the Malaysian rates are not the best available information on the record because these labor rates are tainted because of evidence of forced

---

[133] *See* Respondents' Comments at 3 (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).
[134] *Id.*
[135] *See NTN Bearing*.
[136] *See* Respondents' Comments at 3-6.

labor practices in a subset of Malaysia's manufacturing sector.  We note that the Court did not

remand our determination not to rely on the Malaysian labor rates.[137]

**Comment 5:   Selection of the Surrogate Country**

The following is a verbatim summary of argument submitted by the respondents.

For further details, *see* Respondents' Comments at 5-6.

> { . . .} {T}he reconsideration of the best available information to value labor also
> requires reconsideration of the primary surrogate country. {Commerce} relies upon
> the surrogate country that sources the best available information.  As Romania does
> not source the best available information for labor, {Commerce} must reconsider
> the overall data and country selection, including the arguments raised by
> Respondents regarding financials and chlorine that favor selection of Malaysia as
> the primary (or sole) surrogate country.  {Commerce} should find that Malaysia
> sources the best available information and rely upon Malaysia as the primary
> surrogate country for this segment.

The petitioners did not submit a summary of argument to permit a verbatim summary for

this issue, and its views can be summarized as follows:[138]

> {T}he record also demonstrates that Mexico is significant producer of chlorinated
> isos. Given its production of identical merchandise, Mexico provides market values
> for all of the essential raw materials needed to produce the subject merchandise,
> including urea needed to produce CYA. Mexico also provides a dependable source
> for surrogate financial ratios. Accordingly, Mexico provides surrogate values that
> are specific to the production of chlorinated isos and "representative of the foreign
> producers under investigation."

**Commerce's Position:**  The Court did not remand us on this issue or rule against our selection

of Romania as the surrogate country.  Accordingly, for the final results of redetermination, we

find that it is not necessary to reconsider the selection of Romania as the surrogate country.

**V.      FINAL RESULTS OF REDETERMINATION**

On remand, Commerce has:  (1) explained that cyanuric acid is not a major input under

Policy Bulletin 4.1; (2) explained that calcium hypochlorite shares similar physical

---

[137] *See Remand Order* at 43.
[138] *See* Petitioners' Comments on page 13.

characteristics with the subject merchandise; (3) explained whether the "more detailed

information" that petitioners submitted with respect to physical characteristics is inadequate; (4)

explained further its determination that calcium hypochlorite and sodium chlorite are similar to

the production process of the subject merchandise; and (5) reconsidered its selection of the

Romanian labor data.  If these remand results are affirmed by the Court, we intend to issue

amended *Final Results* providing the updated estimated weighted-average dumping margins

below and issue appropriate customs instructions to U.S. Customs and Border Protection.

| Respondent | Weighted-Average Dumping Margins (percent) from *Final Results* | Weighted-Average Dumping Margins (percent) for Final Remand[139] |
|---|---|---|
| Heze Huayi Chemical Co., Ltd. | 50.27 | 48.87 |
| Kangtai Chemical Co., Ltd. | 73.84 | 72.26 |

8/4/2025

X *Chris J. Abbott*

Signed by: CHRISTOPHER ABBOTT
Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance

---

[139] Commerce made no changes to the calculations from the Draft Results of Redetermination.