**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| BIO-LAB, INC., ET AL. | ) |
| *Plaintiffs and Consolidated Defendant-Intervenors*, | ) ) ) ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| *Defendant,* | ) |
| AND | ) |
| | ) |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD., | ) ) |
| *Defendant-Intervenors and Consolidated Plaintiffs.* | ) ) ) |

Consol. Ct. No.  24-00024

**NONCONFIDENTIAL VERSION**
Business Proprietary Information
Removed from Brackets on Pages 5-6 and 16.

**COMMENTS ON REMAND REDETERMINATION**

James R. Cannon Jr.
Chase J. Dunn
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W., Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Plaintiffs and Consolidated Defendant-Intervenors Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

Date:   September 3, 2025

**Table of Contents**

**Page**

I.    Commerce's Determination that CYA is Not a Major Input Under Policy
Bulletin 04.1 is Unsupported by Substantial Evidence and Not in Accordance
with Law ................................................................................................................ 3

     A. CYA is a "Major" Input in the Production of Chlorinated Isos ................................. 4

     B. A "Major Input" Can Be Used in the Production of Other Merchandise .................. 7

     C. Chlorinated Isos Do Not Require a "Large" Number of Inputs Within
the Meaning of Policy Bulletin 04.1 ........................................................... 8

     D. CYA is a Major Input Even If Respondents Do Not Purchase CYA but
Produce it Internally ..................................................................................... 10

II.   Calcium Hypo and Chlorinated Isos Do Not Have Comparable Physical
Characteristics ...................................................................................................... 12

III. Commerce's Assertion that the Production of Chlorinated Isos is Comparable to
the Production of Sodium and Calcium Hypo Is Not Supported by Substantial
Evidence ................................................................................................................ 15

     A. Commerce Failed to Address Record Evidence Demonstrating that the
Production of Chlorinated Isos is More Expensive, More Labor
Intensive, Requires More Specialized Equipment, and Has More
Stages of Production ..................................................................................... 16

     B. Shared Inputs and "Multi-Stage" Production Processes Do Not Render
The Production of Chlorinated Isos Comparable to the Production of
Calcium or Sodium Hypo ............................................................................. 19

IV. Conclusion ............................................................................................................ 21

i

<u>**Table of Authorities**</u>

**Page(s)**

<u>**Statutes**</u>

19 U.S.C. § 1677b(c)(4)...........................................................................................3, 7, 10

<u>**Court Decisions**</u>

*Allegheny Ludlum Corp. v. United States*, 112 F. Supp.2d 1141 (Ct. Int'l
Trade 2000).........................................................................................................................18

*Linyi Chengen Import and Export Co., Ltd. v. United States*, 487 F.
Supp. 3d 1349 (Ct. Int'l Trade 2020)...............................................................................9

*Nation Ford Chemical Co. v. United States*, 166 F.3d 1373 (Fed. Cir.
1999) ...........................................................................................................................7, 9, 11

<u>**Administrative Determinations**</u>

*1,1,1,2-Tetrafluoroethane from the People's Republic of China: Final
Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62597
(Oct. 20, 2014) ..................................................................................................................19

*Certain Corrosion-Resistant Carbon Steel Flat Products from the
Republic of Korea: Notice of Final Results of the Fourteenth
Administrative Review and Partial Rescission*, 74 Fed. Reg. 11082 (Mar.
16, 2009) ...............................................................................................................................8

*Final Determination of Sales at Less Than Fair Value: Sodium
Hexametaphosphate From the People's Republic of China*, 73 Fed. Reg.
6479 (Feb. 4, 2008)..........................................................................................................13

*Millwork Products from the People's Republic of China: Final Results
and Partial Rescission of Antidumping Duty Administrative Review;
2022-2023*, 89 Fed. Reg. 76452 (Sept. 18, 2024).......................................................13

*Notice of Final Determination of Sales at Less Than Fair Value: Certain
Hot-Rolled Carbon Steel Flat Products from Indonesia*, 66 Fed. Reg.
49628 (Sept. 28, 2001)......................................................................................................8

*Sodium Hexametaphosphate from China*, Inv. No. 731-TA-1110,
USITC Pub. 5549 (Sept. 2024).......................................................................................13

*Steel Wire Garment Hangers from the People's Republic of China:
Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg.
47587 (Aug. 14, 2008)......................................................................................................20

*Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33351 (June 4, 2013)......................................................................................................... 19-20

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| BIO-LAB, INC., ET AL. ) | |
| *Plaintiffs and Consolidated* ) | |
| *Defendant-Intervenors*, ) | |
| ) | |
| v. ) | Consol. Ct. No.  24-00024 |
| UNITED STATES, ) | |
| *Defendant,* ) | **NONCONFIDENTIAL VERSION** |
| AND ) | Business Proprietary Information |
| ) | Removed from Brackets on Pages 5- |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. AND ) | 6 and 16. |
| HEZE HUAYI CHEMICAL CO., LTD., ) | |
| *Defendant-Intervenors and* ) | |
| *Consolidated Plaintiffs.* ) | |
| ) | |

## COMMENTS ON REMAND REDETERMINATION

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade,

Consolidated Plaintiffs Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical

Corporation ("Bio-Lab, IWC, and OxyChem" or "Plaintiffs") respectfully submit this response

to the U.S. Department of Commerce's ("Commerce") *Final Results of Redetermination*

*Pursuant to Court Remand*, filed with the Court on August 4, 2025. *See* ECF No. 54 ("*Remand*

*Redetermination*"); *see also See Bio-Lab, Inc. et al. v. United States*, No. 24-00024, Slip Op. 25-

39 (CIT Apr. 14, 2025) ("*Remand Order*"); *Chlorinated Isocyanurates from the People's*

*Republic of China: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89

Fed. Reg. 455 (Jan. 4, 2024) ("*Final Results*") (P.R. 127) and accompanying Issues and

Decision Memorandum ("IDM") (P.R. 126).[1]

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__".

In its *Remand Order*, this Court held that Commerce failed to support with substantial evidence its assertion that chlorinated isocyanurates ("chlorinated isos"), calcium hypochlorite ("calcium hypo"), and sodium hypochlorite ("sodium hypo") have comparable physical characteristics or comparable production processes. *See Remand Order* at 30-40. With respect to physical characteristics, this Court instructed Commerce to (1) explain whether cyanuric acid ("CYA") was a major input under Policy Bulletin 04.1, (2) to explain whether calcium hypo shares similar physical characteristics with chlorinated isos, and (3) to evaluate all record evidence concerning the physical characteristics of chlorinated isos and calcium/sodium hypo. *See id.* at 35. With respect to the production process, this Court instructed Commerce to "support its determination of similarity with more than the mere assertion that the processes are both multi-stage and share some inputs." *Id.* at 39.

Commerce's *Remand Redetermination* fails to address the deficiencies in its original analysis identified above. As demonstrated below, Commerce's assertion that CYA—the most important input used in the production of chlorinated isos—is not a major input under Policy Bulletin 04.1 is not supported by substantial evidence and is contrary to longstanding practice. Likewise, Commerce's conclusion that chlorinated isos and calcium hypo have similar physical characteristics is not supported by substantial evidence because Commerce failed to address the significant differences in physical characteristics between chlorinated isos and calcium hypo that are imparted CYA (*i.e.,* stability). Finally, Commerce's conclusion that the production process of chlorinated isos, calcium hypo, and sodium hypo were comparable solely because they used common inputs and are all manufactured using a multi-stage process fails to address the Court's concerns and ignores substantial record evidence demonstrating that the production of chlorinated isos requires significantly more investment, has a much higher labor-intensity, and

requires more sophisticated equipment and a greater number of production steps. Accordingly, the Court should continue to find that Commerce's determination that chlorinated isos, calcium hypo, and sodium hypo are "comparable" within the meaning of 19 U.S.C. § 1677b(c)(4) is not supported by substantial evidence.

I.    **Commerce's Determination that CYA is Not a Major Input Under Policy Bulletin 04.1 is Unsupported by Substantial Evidence and Not in Accordance with Law**

Policy Bulletin 04.1 distinguishes between "industrial commodity chemicals" that have a "large number" of "generic" inputs which make input matching difficult and products that have "major inputs" that are "specialized or dedicated or used intensively" in the production of subject merchandise. *Policy Bulletin 04.1*. Chlorinated isos are not industrial commodity chemicals, but are specialty chemicals produced using only three primary inputs: caustic soda, chlorine, and CYA. *See* Letter from Petitioners, "Petitioners' Comments on Primary Surrogate Country Selection" (Dec. 2, 2022) ("*SC Selection Cmts*") (P.R. 41-43: C.R. 32-34) at 5 and Exhibit 1 (USITC Pub 4452) at 7 ("Chlorinated isos are a cyanuric acid derivative, produced from a reaction of cyanuric acid (derived from urea), chlorine, and caustic soda."). CYA, which imparts the unique physical characteristics and uses of chlorinated isos (*i.e.,* stability), is an input that is "specialized or dedicated or used intensively" within the meaning of Policy Bulletin 04.1. *See*, *e.g.,* Letter from Petitioners, "Case Brief" (Sept. 29, 2023) ("*Case Brief*") (P.R. 115; C.R.100) at 9-11, 21-23; Letter from Petitioners, "Petitioners' Comments Concerning the Preliminary Determination" (May 31, 2023) ("*Pre-Preliminary Cmts*") (P.R. 78; C.R. 64) at 19-20. Consequently, it qualifies as a "major input" under Policy Bulletin 04.1 and, therefore, Commerce should have defined comparable merchandise in this case "narrowly, on the basis of a

comparison of the major input." *Policy Bulletin 04.1.* Based on such a comparison, record

evidence demonstrates that calcium and sodium hypo are not "comparable" to chlorinated isos.

In its *Remand Order*, the Court acknowledged that record evidence "indicate{d} that

{CYA} is 'specialized or dedicated or used intensively{} in the production of' chlorinated isos,"

and that Commerce had failed to explain why CYA "does not constitute a major input" under

Policy Bulletin 04.1. *Remand Order* at 34. The Court therefore remanded this issue for further

consideration.

In its *Remand Redetermination*, Commerce found that CYA "is not a 'major input' within

the meaning of Policy Bulletin 4.1" because:

> (1) CYA did not "comprise{} a predominant portion of the product;"
>
> (2) CYA is one of five chemical inputs used to produce chlorinated isos, which is a "large" number of inputs;
>
> (3) CYA can be used in a variety of products and industries and is not a "specialized or dedicated" input; and
>
> (4) CYA is not an input requiring a surrogate value because respondents purchase urea and produce CYA, which is then used to produce chlorinated isos.

*Remand Redetermination* at 4-8, 22-24. As discussed below, Commerce's analysis is inconsistent

with Policy Bulletin 04.1 and is not supported by substantial evidence.

## A. CYA is a "Major" Input in the Production of Chlorinated Isos

Commerce's assertion that CYA is not a "major input" because it does not "comprise{} a

predominant portion of the product" is not consistent with the record. *Remand Redetermination*

at 5. Indeed, Commerce cites no record evidence or any prior practice for the proposition that an

input must be "predominant" in order to be a major input. *Id.* Commerce's assertion is

inconsistent with Heze Huayi's admission that CYA is "the major material of the subject goods"

(*i.e.,* chlorinated isos). Letter from Heze Huayi Chemical Co., Ltd., " Section C&D Response"

4

(Nov. 14, 2022) ("Heze DQR") (P.R. 32; C.R. 9-20) at 3, 5. It is also inconsistent with the U.S.

International Trade Commission's ("USITC") recognition that chlorinated isos are "a cyanuric

acid derivative," which reflects the importance of CYA to the finished product. *SC Selection*

*Cmts* at Exhibit I (USITC Pub. 4452) at 7.

    The Chinese producers only produced trichloro isocyanuric acid ("TCCA") during the

period of review. *See* Heze DQR at 5 (P.R. 32; C.R. 9); Letter from Kangtai, "Section C&D

Responses" (Nov. 14, 2022) ("Kangtai DQR") at D-5 (P.R. 33; C.R. 21-31). Among all raw

material inputs the Chinese producers used to produce TCCA, urea and sulfuric acid are the raw

materials used to produce CYA and accounted for [          ] percent by volume of the raw

material inputs singled out in Commerce's final analysis memo and used to produce chlorinated

isos:

|  | Urea (a) | Sulfuric Acid (b) | CYA (a+b) | Chlorine | Sodium Hydroxide | Sodium Chloride | Total Raw Material Inputs |
|---|---|---|---|---|---|---|---|
|  | Input Kg/MT TCCA |||||||
| Heze Huayi | [ |  |  |  |  |  | ] |
| Kangtai | [ |  |  |  |  |  | ] |
|  | % of Inputs |||||||
| Heze Huayi | [ |  |  |  |  | ] | 100.0% |
| Kangtai | [ |  |  |  |  | ] | 100.0% |

*Source*: Commerce, Final SAS Output, Heze Huayi, "Sample Print of Factors of Production" (C.R. 109);
Commerce, Final SAS Output, Kangtai, "Sample Print of Factors of Production" (C.R. 102); Heze DQR
at Exhibits D-3 and D-4 (C.R. 12-13); Kangtai DQR at Exhibit D-3 (C.R. 24).[2]

    As shown above, to produce one metric ton of finished TCCA, Heze Huayi consumed [

] Kg of urea and sulfuric acid, which it reacted to make the amount of CYA needed for

one ton of TCCA. *See, e.g.,* Heze DQR at Exhibits D-3 and D-4 (C.R. 12-13). Expressed as a

---

[2] It may be noted that Commerce's "Sample Print of Factors of Production" [               ]
Urea, Sulfuric Acid, Chlorine, and Sodium Hydroxide, reflecting the importance of these values.
The value for Sodium Chloride was taken from the questionnaire responses cited above.

percentage of all of the FOP material inputs used in the final normal value calculation, Heze Huayi's usage of urea and sulfuric acid accounted for [      ] percent of the total volume of material inputs – representing the [         ] input in its production processes. Similarly, Kangtai's usage of urea and sulfuric acid accounted for [      ] percent of the total, accounting for [              ] input by volume. *See* Kangtai DQR at Exhibit D-3 (C.R. 24) (showing the inputs used to produce CYA).

Although [              ] of the raw material inputs by volume, the record shows that CYA accounts for a [              ] portion of the total volume of material inputs.

More importantly, CYA imparts the key physical characteristics that distinguish chlorinated isos from other water treatment chemicals (*i.e.*, stability), such as calcium and sodium hypochlorite. *See, e.g.,* Letter from Petitioners, "Petitioners' Rebuttal Comments on Surrogate Values" (Dec. 29, 2022) ("*Petitioners' SV Rebuttal Cmts*") (P.R. 48; C.R. 36) at Exhibit 2 (Peter Rossi, "What is Pool Stabilizer: The Truth About Pool Stabilizers") ("A pool stabilizer is needed for regulating the chlorine level and ensuring the effectiveness of cleaning that reduces the chance of pathogenic organisms in the water that are harmful to human health"); *see also* Letter from Petitioners, "Petitioners' Comments and New Factual information" (May 30, 2025) (Remand P.R. 2-6) ("*Petitioners' NFI Submission*") at Exhibit 3 (Orenda Technologies, "Understanding Cyanuric Acid (CYA)") (noting that due to the use of CYA, "{s}tabilized pools are fundamentally different than non-stabilized pools").

Chlorinated isosyanurates, Trichloro isocyanuric acid and Dichloro isocyanurates, take their chemical name from chlorine and cyanuric acid. Taken together, CYA and chlorine account for [      ] of the raw materials.

6

It follows that, because CYA provides the essential characteristics of chlorinated isos, it is necessary to find a surrogate country in which CYA is commercially available and utilized. *See, e.g.*, *Nation Ford Chemical Co. v. United States*, 166 F.3d 1373, 1377-78 (Fed. Cir. 1999) (noting the purpose of selecting a surrogate country is to identify a comparable market economy that will allow Commerce to construct "a hypothetical 'market value'" of the subject merchandise that is "representative of the foreign producers under investigation"). This is the purpose for the statutory instruction to identify a surrogate that is both economically comparable and has "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). That is, if there are significant producers of comparable merchandise located in the surrogate country, it follows that there is likely to be a market for the inputs used in the production process.

### B.  A "Major Input" Can Be Used in the Production of Other Merchandise

Commerce's assertion that CYA is not a major input because it can be used "in various {other} products and industries," and thus it is not "'specialized or dedicated' with respect to chlorinated isos," misses the point. *Remand Redetermination* at 6. CYA is a major input because chlorinated isos require this input in substantial quantity in order to produce a finished product that has the physical characteristics and uses comparable to the subject merchandise.

It follows that an input is "major" for this purpose if it is an important input for the production of the subject merchandise and likewise for the production of comparable merchandise. Policy Bulletin 04.1 observes that "major inputs" are inputs that are "specialized or dedicated or used intensively, in the production of the subject merchandise." In other words, CYA is a "major input" because it is essential to the production of chlorinated isos. It follows that CYA is not any less a "major input" simply because it is used in other products. Thus, the Policy Bulletin also observes that "comparable merchandise should be identified narrowly, <u>on</u>

the basis of a comparison of the major inputs," and that "{p}articular emphasis on 'significant producer of comparable merchandise' is also generally warranted where major inputs are not widely traded internationally."

For this reason, Commerce has found inputs to be "major inputs" even when used in many other applications. For example, Commerce has found natural gas to be a "major input" even though it can be used in the production of nearly any industrial product. *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products from Indonesia*, 66 Fed. Reg. 49628 (Sept. 28, 2001), IDM at Comment 6 ("we have determined that natural gas is a major input"). Commerce has also found steel substrate to be a "major input" even though it is used in the production of nearly all steel products. *See Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Fourteenth Administrative Review and Partial Rescission*, 74 Fed. Reg. 11082 (Mar. 16, 2009), IDM at Comment 7 ("The Department determines that Union's purchases of steel substrate from a certain supplier constitute a major input…"). There is no reason to define the term "major input" differently under Policy Bulletin 04.1.

### C. Chlorinated Isos Do Not Require a "Large" Number of Inputs Within the Meaning of Policy Bulletin 04.1

In its *Remand Order*, the Court observed that chlorinated isos are produced using "only three intermediate inputs," which is not a "large number" of inputs for purposes of identifying a major input under Policy Bulletin 04.1. *Remand Order* at 33. The *Remand Redetermination* asserts that CYA is not a major input because there are "five" material inputs, as well as energy and packing. *Remand Redetermination* at 5, 24. Whether five or three, the number of inputs does not detract from the evidence that CYA is a major input, both in terms of the volume of CYA

used in production of chlorinated isos and in terms of the critical role played by CYA to produce the physical characteristics of isos.

As an initial matter, Commerce simply asserts "Policy Bulletin 4.1 does not place a minimum number or floor limit on what a 'large number' is" and that five material inputs is a "large number." *Remand Redetermination* at 24. Mere assertion, without context, does not provide any evidentiary or logical support for Commerce's conclusion. *See, e.g., Linyi Chengen Import and Export Co., Ltd. v. United States*, 487 F. Supp. 3d 1349, 1359 (Ct. Int'l Trade 2020) ("Commerce's mere assertions without substantial evidence do not serve the purpose of calculating dumping margins as accurately as possible.").

Whether there are three or five major inputs, it is simply arbitrary to insist that CYA is not a major input because five material inputs is a "large number." *Remand Redetermination* at 5, 24. In any case, CYA is essential to the physical characteristics of chlorinated isos, which in turn drive the uses of chlorinated isos in the market and the specific demand for (and price of) CYA in a surrogate market economy. *See Petitioners' SV Rebuttal Cmts* at Exhibit 1 ("Conditions for water disinfection"), Exhibit 2 ("What is Pool Stabilizer: The Truth About Pool Stabilizers"), Exhibit 3 ("Learning the difference Between Swimming Pool Sanitizers"); *see also Petitioners' NFI Submission* at Exhibit 3 ("Understanding Cyanuric Acid (CYA)").

In short, analyzing chlorinated isos based on the sheer number of inputs for which Commerce requires surrogate values, whether three or five, is not reasonably linked to the statutory task: finding a surrogate that is a significant producer of comparable merchandise. *See* 19 U.S.C. § 1673b(c)(4); *see also Nation Ford Chemical*, 166 F.3d at 1377-78 (the purpose for selecting a surrogate country is to identify a comparable market economy that will allow

Commerce to construct "a hypothetical 'market value'" of the subject merchandise that is "representative of the foreign producers under investigation").

### D. CYA is a Major Input Even If Respondents Do Not Purchase CYA but Produce it Internally

Commerce asserts that CYA is not a major input relevant to its selection of a surrogate country because respondents do not purchase CYA, but instead "purchase urea which they use to produce the cyanuric acid that is then used to produce chlorinated isos." *Remand Redetermination* at 6. According to Commerce, it "does not need to value cyanuric acid" so CYA "should not factor into the analysis of our surrogate country selection" and should not be considered an input under Policy Bulletin 04.1. *Id.* at 7, 24. Commerce's argument puts the cart before the horse.

The first step in the selection of a surrogate country is to identify a surrogate market with "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Policy Bulletin 04.1 explains that when merchandise contains "major inputs, *i.e.,* inputs that are specialized or dedicated or used intensively" in the production process then "comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs." *Policy Bulletin 04.1*. It does not matter for this purpose whether the major input is itself manufactured from another material (*e.g.*, urea) or whether the producer of the comparable merchandise itself manufactures the major input.

Because CYA is a "major input" as defined by Policy Bulletin 04.1, *see supra*, Commerce should first identify comparable merchandise "narrowly" to reflect the major inputs and the resulting physical characteristics and uses of the subject merchandise, chlorinated isos. Assuming that calcium or sodium hypochlorite are comparable <u>because there are sales of urea in</u>

Romania is backwards. Neither calcium nor sodium hypo are made using CYA or urea. *See SC Selection Cmts* at 5 and Exhibit 1 (USITC Pub 4452) at 7. The existence of "comparable merchandise" cannot logically be based on the mere presence of a raw material in a surrogate country when that material is not used in the potentially comparable merchandise.

Only after identifying potential surrogates with significant production of comparable merchandise does Commerce then evaluate whether the factor values needed for that production (*e.g.*, the price of urea) are commercial, free-market values. At this stage, Commerce "determine{s} whether a surrogate country will likely have accurate prices available (*i.e.*, prices representing trade in commercial quantities) for valuing respondents' inputs." *Remand Redetermination* at 7.

Here, uncontested record evidence demonstrates that none of the countries on the surrogate country list produce chlorinated isos except Mexico. *See SC Selection Cmts* at 5-9 and Exhibit 2. Uncontested record evidence also demonstrates that none of the countries on the surrogate country list are producers of merchandise manufactured with the essential raw materials, such as CYA or urea, required to make chlorinated isos. *See id.* Again, neither calcium nor sodium hypo utilize urea or CYA. *See SC Selection Cmts* at 5 and Exhibit 1 (USITC Pub 4452) at 7. Accordingly, Romania does not provide surrogate values that are specific to the production of chlorinated isos and does not result in a normal value that is "representative of the foreign producers under investigation." *Nation Ford*, 166 F.3d at 1377-78.

In contrast, the record demonstrates that Mexico is significant producer of chlorinated isos. *See SC Selection Cmts* at 5-9, Exhibits 2, 3, 5, and 6. Given its production of identical merchandise, Mexico provides market values for all of the essential raw materials needed to

produce the subject merchandise, including urea needed to produce CYA. *See id.*[3] Mexico also

provides the best available source for surrogate financial ratios. *See* Letter from Petitioners,

"Petitioners' Initial Surrogate Value Data" (Dec. 19, 2022) ("*SV Cmts*") (P.R. 45-47) at Exhibit

10. Accordingly, Mexico provides surrogate values that are specific to the production of

chlorinated isos and "representative of the foreign producers under investigation." *Nation Ford*,

166 F.3d at 1377-78.

## II.    Calcium Hypo and Chlorinated Isos Do Not Have Comparable Physical Characteristics

In its *Remand Order*, the Court held that "Commerce did not adequately explain its

determination that calcium hypo, sodium hypo and chlorinated isos have comparable physical

characteristics" because, *inter alia*, Commerce "did not consider the physical characteristics of

calcium hypo." *Remand Order* at 31, 34. In its *Remand Redetermination*, Commerce found that

chlorinated isos and calcium hypo share similar characteristics "because they can be both found

in a powdery or tablet form, are chlorinated where both products can be used as disinfectants or

for water treatment applications, can be purchased in similar packaging, and react in a similar

fashion when they come into contact with water." *Remand Redetermination* at 9. This focus on

form and end-use, however, ignores the importance of CYA to chlorinated isos and instructions

in Policy Bulletin 04.1 to define comparable merchandise "narrowly" on the basis of defining

"specialized or dedicated" inputs.

---

[3] We note that urea is produced to different purity levels depending on application. For example, there is a distinction between "technical grade" and "fertilizer grade urea" and each "type is used in different fields." *See* Petitioners' NFI Submission at Exhibit 12.C. Moreover, 90% of urea production goes into agriculture, and thus the mere fact that Romania has imports of urea does not demonstrate that such urea is of the appropriate grade to be used in the production of complex chemicals, like chlorinated isos. *See id.* at Exhibit 10.

As to form, innumerable chemicals and other products are available in powder or tablet form. *See, e.g., Final Determination of Sales at Less Than Fair Value: Sodium Hexametaphosphate From the People's Republic of China*, 73 Fed. Reg. 6479 (Feb. 4, 2008), IDM at Comment 1 (noting that SHMP can be in "powder form"); *Wood Mouldings and Millwork Products from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 76452 (Sept. 18, 2024), IDM at Comment 8 (noting respondents used "wood powder" in the production process). Salt, which like sodium hypochlorite contains sodium and chlorine, is commonly available as a powder or tablet. Yet, this observation does nothing to narrow the field of potentially comparable merchandise.

Likewise, numerous chemicals are used for water treatment in all sorts of applications. *See Sodium Hexametaphosphate from China*, Inv. No. 731-TA-1110, USITC Pub. 5549 (Sept. 2024) at I-6 (noting that Sodium Hexametaphosphate includes sodium and chlorine and is commonly used in municipal water treatment of drinking water).

But, viewed narrowly from the perspective of the major inputs (*i.e.*, through the lens of Policy Bulletin 04.1), the key factor here is that the vast majority of chlorinated isos are used for water treatment in residential swimming pools. *See Pre-Preliminary Cmts* at Exhibit 5 (USITC Pub. 4494) at 21 ("Approximately 85-90 percent of chlorinated isos in the U.S. market are used as residential pool sanitizers"). In contrast, this application is rarely identified as a use for sodium hypochlorite and is only sometimes listed as an application for calcium hypochlorite, which is only sometimes interchangeable with chlorinated isos. *See e.g., Pre-Preliminary Cmts* at Exhibit 3 (noting that sodium hypo is "employed as a disinfectant and deodorant in dairies, creameries, water supplies, sewage disposal, and households."); *SC Selection Cmts* at Exhibit 1

13

(USITC Pub. 4452) at 8 (noting that "while calhypo is used as a sanitizer for drinking water systems, {Chlorinated isos} is not used in such applications because it produces cyanuric acid unsuitable for drinking water.").

CYA is a major input in chlorinated isos because it provides an important function in residential swimming pools. It is a stabilizer. CYA binds to free chlorine in the pool water and releases the chlorine slowly, extending the time needed to deplete each dose of sanitizer. *See Petitioners' SV Rebuttal Cmts* at Exhibit 2 (Rossi, "What is Pool Stabilizer:  The Truth About Pool Stabilizers"); *see also* Letter from Petitioners, "Petitioners' Rebuttal Comments on Final Surrogate Value Submission" (June 26, 2023) ("*Pre-Preliminary Rebuttal Cmts*") (P.R. 90-91; C.R. 88-89) at Exhibit 2 (G.D. Nelson, "Impact of Sunlight on Chlorine Residual," Special Report #6862, Monsanto Industrial Chemical Co. (Rev. May 1975), p. VI-8, Fig. 41). Because chlorinated isos incorporate CYA, the chlorine is released more slowly, particularly when trichlor tablets are used. *See id.* at Exhibit 3 (Robert W. Lowry, Pool Chlorination Facts, Lowry Consulting Group, Jasper, GA (Dec. 2003)). Due to the use of CYA, "{s}tabilized pools are fundamentally different than non-stabilized pools." *Petitioners' NFI Submission* at Exhibit 3 ("Understanding Cyanuric Acid (CYA)").

Calcium and sodium hypochlorite do not share this physical characteristic and are therefore less frequently used in residential swimming pools, as compared to chlorinated isos. *See, e.g., Pre-Preliminary Cmts* at Exhibit 3 (Speight) (noting that sodium hypo is "employed as a disinfectant and deodorant in dairies, creameries, water supplies, sewage disposal, and households. It is also used as bleach in laundries. As a bleaching agent, it is very useful for cotton, linen, jute rayon, paper pulp, and oranges"); *see also id.* at Exhibit 5 (USITC Pub. 4494) at 21 ("Approximately 85-90 percent of chlorinated isos in the U.S. market are used as

residential pool sanitizers").Viewed narrowly in terms of their actual applications, the record

shows that chlorinated isos and calcium and sodium hypochlorite do not have comparable

physical characteristics and, therefore, are not comparable merchandise. As such, Commerce's

*Remand Redetermination* does not rationally apply Policy Bulletin 04.1 to the record facts in this

case.

### III.    Commerce's Assertion that the Production of Chlorinated Isos is Comparable to the Production of Sodium and Calcium Hypo Is Not Supported by Substantial Evidence

In its *Remand Order*, the Court held that Commerce "did not explain adequately its

determination that calcium and sodium hypo and chlorinated isos share 'a similar production

process.'" *Remand Order* at 37. The Court recognized that record evidence demonstrated the

"production of chlorinated isos is more expensive and labor-intensive than the production of

calcium or sodium hypo." *Id.* at 38. The Court further recognized that "the chlorinated isos

production process 'requires more equipment and processing stages.'" *Id.* Yet, Commerce

"decided to disregard the new information as insufficient without an adequate explanation." *Id.*

at 34. The Court therefore instructed that Commerce "must support its determination of

similarity with more than the mere assertion that the processes are both multi-stage and share

some inputs." *Id.* at 39.

Commerce's *Remand Redetermination* continues to find that the production process of

calcium hypo, sodium hypo, and chlorinated isos are similar because they use common inputs

and are all manufactured using a multi-stage process. *See Remand Redetermination* at 30 ("In

our analysis…we explained that the production process for these three products require similar

inputs and a multi-stage production process, which leads us to conclude the production processes

are similar for the purposes of our comparability analysis."). Although Commerce outlined the

production process for chlorinated isos, calcium hypo, and sodium hypo in the *Remand Redetermination*, it failed to conduct any comparative analysis regarding how these production processes are "similar" or "comparable" given the significant differences in cost, labor intensity, equipment, and production stages involved. *See id.* at 16-20. For that reason, Commerce's assertion in the *Remand Redetermination* that the production process of chlorinated isos is comparable to the production processes for calcium and sodium hypo does not address the Court's concerns outlined in the *Remand Order* and is not supported by substantial evidence.

### A. Commerce Failed to Address Record Evidence Demonstrating that the Production of Chlorinated Isos is More Expensive, More Labor Intensive, Requires More Specialized Equipment, and Has More Stages of Production

Record evidence demonstrates that the production of chlorinated isos involves a workforce, a plant, and an investment that is an order of magnitude greater than the number of workers and amount of investment involved in the production of calcium or sodium hypo. Specifically, the construction of a new Chlor isos production facility costs [          ] million dollars and requires [      ] engineers and [                    ], whereas the construction of a new sodium hypo facility costs approximately [          ] and requires only [          ] for construction. *See Pre-Preliminary Cmts* at Exhibit 4 (Dixon Declaration). Similarly, the operation of a Chlor isos plant requires at least [      ] skilled technicians to monitor thermal and chemical reactions. *See id.* Indeed, Heze Huayi states that [      ] workers are involved in its production of Chlor isos. S*ee* Heze DQR at Exhibit D-1. In contrast, record evidence indicates that the operation of a sodium hypo manufacturing facility required only [                ]. *See Pre-Preliminary Cmts* at Exhibit 4 (Dixon Declaration)*.* Commerce failed to address these significant differences in plant costs and number of employees in the *Remand Redetermination*. *See, e.g., Remand Redetermination* at 16-20, 30-33.

Additionally, the production of chlorinated isos also requires more equipment and more production stages than calcium or sodium hypo, further demonstrating the lack of comparability between these products. The production of chlorinated isos begins with the production of CYA from urea. *SC Selection Cmts* at 5. Specifically, respondent Heze Huayi explained that the production of CYA involves the following separate processes, each manned by numerous employees and involving hours' worth of energy consumption and use of extensive equipment:

1. Condensation Reaction
2. Hydrolysis Reaction
3. Suction Filter Tanks
4. Ammonium Sulfate Reactor
5. Centrifugal Machine

*See* Heze DQR at Exhibit D-1 (production flowchart); *see also* Letter from Heze Huayi, "Supplemental Questionnaire Response" (May 26, 2023) ("Heze SQR") (P.R. 68; C.R. 46-63) at Exhibit SQ1-13 (revised production flowchart). CYA production also results in several additional by-product recovery and processing operations. *See, e.g.,* Heze DQR at 5, 8, 16. Thereafter, the production of chlorinated isos involves numerous additional processes at a different site:

1. Make-up Tank
2. Chlorination Reactor
3. Suction Filtering Tank
4. Tower Drier
5. Granulating Machine
6. Tableting Machine
7. Sewage Treatment Equipment

*See id.* at Exhibit D-1; *see also* Heze SQR at Exhibit SQ1-13.

In contrast, sodium hypochlorite is produced from chlorine and sodium hydroxide (caustic soda) which are the two chemicals simultaneously produced by any chlor-alkali producer. This one-step reaction is as follows:

17

$$Cl_2 \text{ (g)} + 2 \text{ NaOH (aq)} \;\rightarrow\; \text{NaCl (aq)} + \text{NaClO (aq)} + H_2O \text{ (aq)}$$

*See Pre-Preliminary Cmts* at Exhibit 3 (Speight). As shown above, the Chlorine gas is reacted

with liquid caustic soda (sodium hydroxide) to yield salt water (NaCl), sodium hypo liquid

(NaClO), and water ($H_2O$). Put differently, the entire production process to make sodium hypo

utilizes liquid caustic soda from a holding tank, chlorine recovered from the trichlor chlorinator,

and a single vessel ("NaOCl GEN") where the sodium hypo (NaOCl) is produced. As illustrated

in Appendix B of Petitioners' administrative case brief, the production of sodium hypo amounts

to a partial process involved in one stage of a 12-stage process to manufacture chlorinated isos.

*See Case Brief* at Appendix B. Commerce failed to address these significant differences in

equipment and number and sophistication of stages of production in the *Remand*

*Redetermination*. *See Remand Redetermination* at 16-20, 30-33.

The significant differences in cost, labor-intensity, number of stages, and sophistication

of equipment and processing discussed above reflect the fact that the production of chlorinated

isos is complex process involving the production of several intermediate chemicals, which are

then further processed to yield chlorinated isos. In contrast, production of calcium or sodium

hypo is a simpler process with no intermediate chemicals, which requires much less investment,

significantly less labor, and only a few stages of production that utilize less equipment.

Commerce's failure to address any of the evidence above renders its *Remand Redetermination*

unsupported by substantial evidence. *See Allegheny Ludlum Corp. v. United States*, 112 F.

Supp.2d 1141, 1165 (Ct. Int'l Trade 2000) (noting that it "is also well-established that

Commerce's total failure to consider or discuss record evidence which, on its face, provides

significant support for an alternative conclusion renders the Department's determination

unsupported by substantial evidence").

18

**B. Shared Inputs and "Multi-Stage" Production Processes Do Not Render The Production of Chlorinated Isos Comparable to the Production of Calcium or Sodium Hypo**

As an initial matter, every product that requires more than one stage of production is "multi-stage." However, this alone does not demonstrate that the production of chlorinated isos and calcium/sodium hypo are comparable in number or complexity. The production of sodium hypo involves two production steps (*i.e.,* electrolysis and chlorine absorption), and the process for calcium hypo requires three (calcium process) or four (sodium process) steps. *See Remand Redetermination* at 18-19. As noted above, however, the production process for CYA alone requires *five complex stages* of production. *See* Heze DQR at Exhibit D-1. On this record, the *twelve-stage production process* required for the production of chlorinated isos is not reasonably comparable to the production processes for calcium and sodium hypochlorite. *See id.*

Apart from the number of process steps, however, Commerce in past cases has analyzed the nature of the production steps. For example, in R-*134a from China* Commerce found that although "both the hydrocarbon and tetrafluoroethane production use high temperatures and a refining process to derive the end product," they nevertheless did not have comparable production processes because "hydrocarbon production involves distilling crude oil at many different temperatures to create various hydrocarbon products, whereas tetrafluoroethane production requires a catalyst to create a reaction between two inputs to create the product." *See 1,1,1,2-Tetrafluoroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62597 (Oct. 20, 2014), IDM at Comment 16 ("We disagree that hydrocarbon products are comparable merchandise"). Similarly, in *Xanthan Gum from China*, Commerce held that although the production of carrageenan and xanthan gum both involved drying and milling, they did not have comparable production processes because the

production of carrageenan did not involve certain "vital stages" of the production of xanthan gum (*e.g.,* fermentation of specialized bacteria) or require "similar amounts of energy or similar types of specialized equipment as does the production of xanthan gum." *Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33351 (June 4, 2013), IDM at Comment 1 ("We continue to find that these essential requirements for the production of xanthan gum differ significantly from the production process of carrageenan and, thus, that carrageenan and xanthan gum are not comparable in terms of production processes.").

Additionally, common inputs used in the production of different products does not demonstrate that the production *processes* are similar or comparable. For example, in *Steel Wire Garment Hangers from China* Commerce found that producers of steel wire do not have a comparable production process to those of steel wire hangers even though both utilize steel "because wire hangers are a downstream product of wire requiring additional manufacturing processes." *Steel Wire Garment Hangers from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 47587 (Aug. 14, 2008), IDM at Comment 3. Indeed, under Commerce's theory all types of steel (*e.g.,* hot-rolled, cold-rolled, corrosion-resistant, stainless) would have "comparable" production processes because they are all made of iron and carbon. Taken to its logical conclusion, Commerce's theory suggests that all products that include steel (*e.g.,* cars, skyscrapers, cargo ships, kitchen knives, and railway tracks) would have comparable production processes because they all use steel. Commerce cites no evidence and no prior practice to support such a conclusion.

In summary, Commerce's *Remand Redetermination* fails to address the Court's instructions to "support its determination of similarity with more than the mere assertion that the

processes are both multi-stage and share some inputs." *Remand Order* at 39. As noted above,

Commerce has repeatedly found production processes to not be comparable even where they

utilized common inputs and were multi-stage, and even when the production processes in

question had common stages of production. Accordingly, Commerce's *Remand Redetermination*

is not supported by substantial evidence.

## IV.    Conclusion

For the reasons discussed above, this Court should find Commerce failed to support with

substantial evidence its determinations that: (1) CYA is not a major input under Policy Bulletin

04.1, (2) that calcium hypo and chlorinated isos have comparable physical characteristics, and

(3) that the production of chlorinated isos is comparable to the production of calcium or sodium

hypo. Consequently, its assertion that calcium and sodium hypochlorite are comparable to

chlorinated isos, and thus its selection of Romania, rather than Mexico, as the primary surrogate

for China in its *Remand Redetermination*, is unsupported by substantial evidence. Therefore, this

Court should remand this matter to Commerce with instruction to reconsider its selection of

Romania as the primary surrogate.

Respectfully submitted,

/s/ James R. Cannon, Jr.
James R. Cannon, Jr.
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W.
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

Date:    September 3, 2025

Consol. Court. No. 24-00024

## <u>Certificate of Compliance</u>

The undersigned hereby certifies that the forgoing submission, "Comments on Remand Redetermination," filed by Bio-Lab, IWC, and OxyChem on September 3, 2025, contains 6,028 words, including footnotes, and excluding the table of contents, table of authorities, and signature block, and therefore, complies with the maximum 10,000-word limitation set forth in the Standard Chambers Procedures.

BY: <u>/s/  James R. Cannon Jr.</u>