## THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |  |
|---|---|---|
| BIO-LAB, INC., INNOVATIVE WATER CARE, LLC, AND OCCIDENTAL CHEMICAL CORPORATION, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD., and HEZE HUAYI CHEMICAL CO., LTD., | ) ) ) ) | |
| Consolidated Plaintiffs, | ) ) ) | |
| v. | ) ) | Consol. Court No. 24-00024 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) ) | |
| and | ) ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD., AND HEZE HUAYI CHEMICAL CO., LTD., | ) ) ) ) | |
| Defendant-Intervenors., | ) ) ) | |
| BIO-LAB, INC., INNOVATIVE WATER CARE, LLC, and OCCIDENTAL CHEMICAL CORPORATION, | ) ) ) ) | |
| Defendant-Intervenors. | ) ) ) ) | |

## <u>ORDER</u>

Upon consideration of the parties' comments and responses regarding redetermination, and upon all other papers and proceedings herein, the Court

**ORDERS** that the remand redetermination is sustained; and further

**ORDERS** that final judgment be entered in favor of the United States.

**SO ORDERED**

Dated:_____, 2025
New York, New York                          _____
                                            Timothy M. Reif, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., INNOVATIVE WATER CARE, LLC, AND OCCIDENTAL CHEMICAL CORPORATION, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| JUANCHENG KANGTAI CHEMICAL CO., LTD., and HEZE HUAYI CHEMICAL CO., LTD., | ) ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| v. | ) ) Consol. Court No. 24-00024 |
| UNITED STATES, | ) ) |
| Defendant, | ) ) ) |
| and | ) ) |
| JUANCHENG KANGTAI CHEMICAL CO., LTD., AND HEZE HUAYI CHEMICAL CO., LTD., | ) ) ) ) |
| Defendant-Intervenors., | ) ) |
| BIO-LAB, INC., INNOVATIVE WATER CARE, LLC, and OCCIDENTAL CHEMICAL CORPORATION, | ) ) ) ) |
| Defendant-Intervenors. | ) ) ) ) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL
Jesus Saenz
Attorney
Office of Chief Counsel
For Trade Enforcement & Compliance
Department of Commerce

TATE NATHAN WALKER
Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 307-0163
Fax: (202) 305-7643

September 23, 2025                    *Attorneys for Defendant*

# TABLE OF CONTENTS

BACKGROUND ................................................................................................2

PROCEEDINGS BEFORE THE COURT.................................................................4

REMAND REDETERMINATION PROCEEDINGS ...............................................4

ARGUMENT .................................................................................................10

I.     Standard Of Review ...............................................................10

II.    Commerce's Complied With The Court's Remand Order In Placing New Romanian Labor Data On The Record ...............................................................10

       A.  Commerce Complied With The Court's Remand Order ...................................10

       B.  Accepting Kangtai' s Arguments Regarding Placement of New Romanian Labor Data On The Record Improperly Constrains Commerce..................................11

III.   Commerce's Determination Of Comparable Products Complies With The Court's Remand Order And Is Supported By Substantial Evidence..................................15

       A.  Legal Framework for Merchandise Comparability...........................................15

       B.  Commerce's Decision That CYA Is Not A Major Input Is Supported By Substantial Evidence In Accordance With The *Policy Bulletin* .......................16

       C.  Commerce Reasonably Determined That Record Evidence Supports Finding Calcium Hypo And Sodium Hypo Comparable To Subject Merchandise........22

           1.  Record Evidence Demonstrates That The Physical Characteristics Of Calcium Hypo And Subject Merchandise Are Comparable .....................................23

           2.  Record Evidence Demonstrates That The Production Processes Of Sodium Hypo, Calcium Hypo, And Chlorinated Isos Are Comparable ..................27

CONCLUSION................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Silicon Techs. v. United States,*
  261 F.3d 1371 (Fed. Cir. 2001)..............................................................33

*Dorbest Ltd. v. United States,*
  462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ....................................24, 25

*Downhole Pipe & Equip. LP v. United States,*
  887 F. Supp.2d 1311 (Ct. Intl. Trade 2012)..........................................19

*Downhole Pipe & Equip., L.P. v. United States,*
  776 F.3d 1369 (Fed. Cir. 2015)..............................................................32

*Fresh Garlic Producers Ass'n v. United States,*
  190 F. Supp. 3d 1302 (Ct. Int'l Trade 2016) ........................................13

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996)................................................................33

*Haixing Jingmei Chem. Prods. Sales Co., Ltd. v. United States,*
  335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) ........................................32

*Heze Huayi Chemical v. United States,*
  No. 17-0032, 2018 WL 2328183 (Ct. Int'l Trade May 22, 2018) ..........15

*Hindalco Industries Ltd. v. United States,*
  No. 23-00260, 2025 WL 2049062 (Ct. Intl. Trade July 22, 2025) ..........26

*Kumho Tire (Vietnam) Co., Ltd. v. United States,*
  741 F. Supp. 3d 1277 (Ct. Intl. Tr. 2024) .............................................12

*MacLean-Fogg Co. v. United States,*
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................10

*New Am. Keg. v. United States,*
  No. 20-08, 2024 WL 379968 (Ct. Int'l Tr. Jan 31, 2024)..................13, 14

*New American Keg v. United States,*
  No. 22-106, 2022 WL 4363320 (Ct. Int'l Trade Sept. 13, 2022) ..........14

*NTN Bearing Corp. of Am. v. United States,*
  132 F. Supp. 2d 1102 (Ct. Int'l Trade 2016) ..............................8, 9, 13

*QVD Food Co. v. United States,*
  658 F.3d 1318 (Fed. Cir. 2011) ............................................................... 13

*Risen Energy Co., Ltd. v. United States,*
  569 F. Supp. 3d 1315 (Ct. Intl. Tr. 2022) ............................................... 12

*Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States,*
  203 F. Supp. 3d 1327 (Ct. Intl. Trade 2017) ........................................... 13

*Trade Enters. Co. v. United States,*
  318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ........................................... 15

*U.S. Steel Corp. v. United States,*
  759 F. Supp. 2d 1349 (Ct. Intl. Trade Feb. 15, 2011) .............................. 20

**Statutes**

19 U.S.C. § 1677(c)(4)(B) ............................................................................ 15

19 U.S.C. § 1677b(3) ........................................................................... 20, 23

19 U.S.C. § 1677b(c)(1) ................................................................... 2, 21, 24

19 U.S.C. § 1677b(c)(2)(A) ......................................................................... 15

**Regulations**

19 C.F.R. § 301(c)(4) .................................................................................. 10

19 C.F.R. § 351.301(c)(4) ...................................................................... 12, 13

C.F.R. § 351.301(c)(4) .................................................................................. 5

**Administrative Cases**

*1,1,1,2-Tetrafluoroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62,597 (Oct. 20, 2014) *1,1,1,2-Tetrafluoroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62,597 (Oct. 20, 2014) ......................................................30

*Certain Hot-Rolled Carbon Steel Flat Products from Indonesia*, 66 Fed. Reg. 49,628 (Dep't of Commerce Sept. 28, 2001) ................................................................... 19

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 74 Fed. Reg. 11,082 (Dep't of Commerce Mar. 16, 2009)................................................. 20

*Certain Woven Electric Blankets from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 75 Fed. Reg. 38,459 (Dep't of Commerce Jul. 2, 2010) ........ 16

*Final Determination of Sales at Less Than Fair Value: Sodium Hexametaphosphate From the People's Republic of China,* 73 Fed. Reg. 6,479 (Dep't of Commerce Feb. 4, 2008) ............ 25

Final Results of Redetermination Pursuant to Court Remand, *New American Keg v. United States*, No. 20-08, Slip Op. 21-30 (Ct. Int'l Trade 2022) available at https://access.trade.gov/Resources/remands/22-106.pdf ......................................................... 14

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 15,671 (March 14, 2023) (*LWRPT from China*) ............................................................................................................. 14

*Pure Magnesium from the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 80,791 (Dep't of Commerce Dec. 23, 2010) ........................................................................... 15

*Steel Wire Garment Hangers from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 47,587 (Aug. 14, 2008) ............................................... 30

*Wood Mouldings and Millwork Products from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 76,452 (Dep't of Commerce Sept. 18, 2024) ........................................................................... 25

*Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,351 (June 4, 2013) ...................................................................... 30

**Other Authorities**

U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, *Policy Bulletin* 04.1 (2004), *http://enforcement.trade.gov/policy/bull04-1.html* (last September 23, 2025) ................................................................................................................... *passim*

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., INNOVATIVE WATER CARE, LLC, AND OCCIDENTAL CHEMICAL CORPORATION, )<br><br>Plaintiffs, )<br><br>JUANCHENG KANGTAI CHEMICAL CO., LTD., and HEZE HUAYI CHEMICAL CO., LTD., )<br><br>Consolidated Plaintiffs, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>JUANCHENG KANGTAI CHEMICAL CO., LTD., AND HEZE HUAYI CHEMICAL CO., LTD., )<br><br>Defendant-Intervenors., )<br><br>BIO-LAB, INC., INNOVATIVE WATER CARE, LLC, and OCCIDENTAL CHEMICAL CORPORATION, )<br><br>Defendant-Intervenors. ) | Consol. Court No. 24-00024 |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the comments filed by

plaintiffs Bio-Lab Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation

(collectively, petitioners or Bio-Lab) and consolidated plaintiffs Heze Huayi Chemical Co., Ltd. (Heze Huayi) and Juancheng Kangtai Chemical Co., Ltd. (Juancheng Kangtai) (collectively, respondents or Kangtai), regarding the final results of redetermination filed by the Department of Commerce in this case. *See* Petitioners' Comments, ECF No. 56 (Pet. Br.), Respondents' Comments, ECF No. 57 (Resp. Br.).

On remand, Commerce continued to find that calcium hypochlorite (calcium hypo) and sodium hypochlorite (sodium hypo) are comparable to the subject merchandise—chlorinated isocyanurates (chlorinated isos)—for purposes of the surrogate country analysis. *See* Final Results of Remand Pursuant to Court Remand, ECF No. 54, August 4, 2025 (Remand Results). Commerce also continued to find that the Romanian surrogate value labor data were the best on the record and rejected the Malaysian labor surrogate value data because they were tainted by allegations of forced labor. Commerce's remand results comply with the Court's remand order and are otherwise lawful and supported by substantial evidence. Thus, we respectfully request that the Court sustain the remand results.

## <u>BACKGROUND</u>

On August 9, 2022, Commerce initiated an administrative review of the antidumping duty order covering chlorinated isos from the People's Republic of China (China), for the period June 1, 2021, through May 31, 2022. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 48,459, 48,462 (Dep't of Commerce Aug. 9, 2022) (P.R. 7). The administrative review covered two producers/exporters. Because China is a non-market economy country, Commerce calculated the normal value of chlorinated isos based on surrogate values offered in a comparable market economy. *See* 19 U.S.C. § 1677b(c)(1).

On January 4, 2024, Commerce published its *Final Results*: *Chlorinated Isocyanurates From the People's Republic of China: Final Results Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 455 (Dep't of Commerce Jan. 4, 2024) (Final Results), [1] (P.R. 127), and accompanying Issues and Decision Memorandum (IDM) (P.R. 126). In the final results, Commerce determined that record evidence supported finding Romania, a county on Commerce's surrogate country list, as a significant producer of comparable merchandise and Romanian import data to be the best available information for the calculation of surrogate values for respondents' factors of production (FOPs). *See* IDM at Cmts. 1-2.

Pertinent to the current issues to be addressed, Commerce, in accordance with its *Policy Bulletin*, found that calcium hypos and sodium hypos are comparable to chlorinated isos because the products share similar physical characteristics, have similar end uses, and have a similar production process. *Id*. (citing Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, *Policy Bulletin* 04.1 (2004), *http://enforcement.trade.gov/policy/bull04-1.html* (*Policy Bulletin*); Letter from Petitioners re: Surrogate Country Comments, dated November 22, 2022 (P.R. 36) at Exhibit 1). Commerce also selected labor rate information from Romania rather than labor rates from Mexico or from Malaysia because record evidence demonstrates that the labor rates from Malaysia were unreliable due to the widespread presence of unfair labor practices in Malaysia's overall manufacturing sector and that Mexico was not among the countries that Commerce found to be at the same level of economic development as China. *Id*. Accordingly, Commerce relied on Romania as the primary surrogate country. *Id*. at Cmt. 2.

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the underlying administrative review. Citations to the public record (P.R.R.) and confidential record (C.R.R.) refer to the record underlying the remand redetermination.

## PROCEEDINGS BEFORE THE COURT

Before the Court, petitioners and respondents challenged various aspects of Commerce's final results, including its decision on product comparability.  On April 14, 2024, the Court sustained in part and remanded in part the final results.  Order, ECF No. 51.  The Court remanded with instructions for Commerce to explain or further consider its "selection of Romania labor data," its "determination that the production processes of calcium hypochlorite and sodium hypochlorite are similar to the production process of the subject merchandise," and that "Commerce shall: (1) explain whether cyanuric acid is a major input under *Policy Bulletin* 04.1; (2) explain whether calcium hypochlorite shares similar characteristics with the subject merchandise; and (3) explain further or reconsider whether the 'more detailed information' that petitioners submitted with respect to physical characteristics is inadequate."  Order at 49.  The Court did not restrict Commerce's ability to request or to consider new information placed on the record.  Order.

## REMAND REDETERMINATION PROCEEDINGS

Upon remand, Commerce solicited comments and reopened the record.  *See* Memorandum, Request for Additional Information: Placing New Factual Information on the Record, (May 23, 2025) (Request for NFI) (P.R.R. 1).  Commerce explained that it was "reopening the record and providing interested parties with an opportunity to submit new factual information on whether calcium hypochlorite shares similar physical characteristics with the subject merchandise."  *Id.* at 1.  Commerce also provided "interested parties with an opportunity to submit new factual information on the similarities between the production processes for calcium hypochlorite, sodium hypochlorite, and the subject merchandise."  *Id.* at 2.

Pursuant to 19 C.F.R. § 351.301(c)(4) and in light of this Court's remand order, Commerce chose to place information on the record regarding urea and additional Romanian labor data specific to the Romanian manufacturing sector. *Id.* at 2. This data included studies pertaining to Commerce's comparable product determination and a report from the Romanian Labor Statistics, Manufacturing 2021-2022 from the International Labour Organization (ILO). *Id.* at 2; *see* Request for NFI, Attachments 1-3. Commerce also invited "interested parties . . . to comment and submit factual information to rebut, clarify, or correct this information." *Id.* This included the option to place new factual information on the record. *Id.* ("Comments and new factual information must be filed by . . . May 30, 2025.").

In response, , Bio-Lab argued that chlorinated isos and calcium hypo are not comparable products because calcium and sodium hypos lack the presence of cyanuric acid (CYA). Petitioners' Comments and New Factual Information, dated May 30, 2025 (P.R.R. 2) (Pet. NFI), at 2-3. Bio-Lab argued further that both calcium hypo and chlorinated isos contain "chlorine which. . . is a sanitizer that functions as a disinfectant and purifies the water in the *swimming pool*." *Id*. at 3. (emphasis added). Bio-Lab argued that stabilized pools, using chlorinated isos that contained CYA, are "fundamentally different than non stabilized" pools sanitized by calcium hypo without CYA. *Id.* Bio-Lab distinguished the stability that CYA imparts from the unstabilized sodium and calcium hypos, making them dissimilar to the subject merchandise. *Id.* at 3-4.

As for calcium hypo specifically, Bio-Lab also argued that this chemical, classed as an inorganic chemical, is not comparable to an organic compound like chlorinated isos and that calcium hypos additionally have a much higher content of chlorine compared to chlorinated isos. *Id*. at 4-6. In addition, Bio-Lab argued that the production process for chlorinated isos is

dissimilar to calcium hypo because the production process for calcium hypo "depends on a single reaction of lime (calcium hydroxide) with chlorine whereas the production process used by respondents to produce the subject merchandise requires the separate manufacture of CYA, which takes place in several workshops and stages." *Id.* at 10. Bio-Lab also argued the same for sodium hypos in that they require only "three factors of production" and not the five step process to produce CYA alone that chlorinated isos must undergo. *Id.* at 9. No party "commented on the Romanian labor data that {Commerce} placed on the record." Remand Results at 4.

On July 3, 2025, Commerce issued its Draft Results of Redetermination and invited comments. Draft Results of Redetermination, (P.R.R. 8). In response, the parties submitted comments and rebuttal comments. Petitioners' Comments on Draft Result of Redetermination, July 14, 2025 (P.R.R. 16) (Pet. Cmts on Draft Red.); Respondents' Comments on Draft Results of Redetermination, July 14, 2025 (P.R.R. 15) (Resp. Cmts. on Draft Red.); Petitioners' Rebuttal Comments on Draft Remand, July 21, 2025 (P.R.R. 20) (Pet. Reb. Cmts); Respondents Rebuttal Comments on Draft Remand, July 21, 2025 (P.R.R. 21) (Resp. Reb. Cmts).

Kangtai argued that Commerce's "determination on the Romanian labor rate is not supported by the record or in accordance with the Court's remand." Resp. Cmts. on Draft Red. at 2. Kangtai faulted Commerce over its decision to place "a new ILO Romania labor rate on the record" instead of explaining how the existing record Romanian labor data "was superior to the Malaysian labor rate." Resp. at 2. In Kangtai's view, the existing "Malaysian labor rate is usable and thus the Department had no reason to need to reopen the record." *Id.*

Kangtai also contended that the existing Malaysian labor data was in fact "more specific and superior to both the original Romanian labor rate on the record and the new ILO Romanian labor rate." *Id.* Kangtai also alleged that Commerce did not follow the Court's instructions to

"'explain further or reconsider its selection of the Romanian labor data'" by placing this new ILO labor data in the record. *Id.* at 3 (quoting Order at 49). Kangtai alleged that this placement contravened "normal practice and administrative policy" of having the parties create Commerce's record. *Id.* (citation omitted). Kangtai argued that, because Commerce placed this new labor data onto the record, this was a tacit admission that the Romanian labor data were not the best on the record, thus Commerce must "reconsider its surrogate country decision in light of its apparent determination that the original Romanian labor rate on the record is unreliable." *Id.* at 6.

Bio-Lab responded that Commerce's decision "to place additional Romanian labor data on the record was consistent with the Court's *Remand Order* and a reasonable exercise of its discretion insofar as the existing labor data on the record was not usable." Pet. Reb. Cmts at 3 (emphasis in original). Bio-Lab argued that, because Malaysian labor data was found to be tainted by the "widespread forced labor in the Malaysian manufacturing sector," rejection of this data was "consistent with the Court's Remand Order and recent practice." *Id.* Bio-Lab explained that "the Court agreed with Commerce{'s}" refusal to use the tainted Malaysian data and "held that its 'determination was consistent with {its} abandonment of the Malaysian labor data in the *New American Keg Remand Results*.'" *Id.* at 5 (quoting Order at 42). Bio-Lab observed that the remand order was limited to having Commerce explain why the less specific Romanian labor rate was "'superior to the 'tainted' Malaysian rate that pertains to manufacturing.'" *Id.* (quoting Order at 43).

On remand, Bio-Lab asserted that all three sources of labor on the record were not sufficient because "(1) the Mexican labor data was not contemporaneous and was from a country not on the surrogacy country list, (2) Malaysian data was tainted by forced labor, and (3)

Romania labor data was not specific to manufacturing." *Id.*  Thus, Bio-Lab explained,

Commerce had grounds to "'to request and evaluate new data' on remand." *Id.* at 6 (quoting

*NTN Bearing Corp. of Am. v. United States*, 132 F. Supp. 2d 1102, 1107 (Ct. Int'l Trade 2016)).

Bio-Lab observed that the Court did not prohibit Commerce from placing new data in the record

nor was Commerce otherwise constrained.  *Id.*  Bio-Lab added that Kangtai's argument that

Malaysia should be reconsidered as a primary surrogate country should be rejected because "the

Court upheld the use of the Romanian chlorinate value in this proceeding." *Id.* at 9.

Bio-Lab largely reiterated its previous comments regarding Commerce's failure to class

CYA as a major input according to the *Policy Bulletin*, Commerce's failure to find that calcium

hypo and chlorinated isos do not have similar physical characteristics to chlorinated isos, and

Commerce's failure to find that calcium and sodium hypos and the chlorinated isos have

dissimilar production processes.  Pet. Cmts on Draft Red. at 2-3.

In response, Kangtai argued that Commerce "ha{d} fully explained why . . CYA is not a

major input" because "CYA is not specialized or dedicated to chlorinated isos{}, CYA is used in

many industries.  CYA is not so critical to chlorinated isos{} or difficult to find a surrogate value,

such that the Department need to specially consider this input in deciding comparable

merchandise." Pet. Reb. Cmts at 2.  Kangtai argued that the fact that "CYA is commonly self-

produced among chlorinated iso{} producers, . . ., is important in this analysis," *Id.* at 3, because

the "point of relying on a producer of comparable merchandise is to find reliable surrogate data.

If a surrogate value for CYA is not even needed, then it is directly relevant to the comparable

merchandise analysis." *Id.* at 6.

Kangtai urged Commerce not to select Mexico because it was found not be economically

comparable to China and that Commerce should not sacrifice data quality and availability by

focusing on only the product comparability prong at the expense of economic comparability. *Id.* at 7. Kangtai urged Commerce to reject Bio-Lab's "narrow" view of comparable products and instead focus on the ability for Commerce to find reliable surrogate values, which would not be possible in the context of a truly specialized or dedicated input like Commerce's garlic or crawfish cases that feature only one main input—garlic and crawfish. *Id.* at 5-6.

Kangtai argued further that calcium and sodium hypos share similar physical characteristics with chlorinated isos because all are a "white mesh or tablet with a very similar characteristic—to bleach or treat water." *Id.* at 3. Kangtai also agreed with Commerce that calcium and sodium hypos shared a similar production process with the subject merchandise because of the "similar key inputs (sodium hydroxide and chlorinate) and have similar multi-staged production processes, such as electrolysis and chlorine absorption." *Id.* Kangtai noted that Bio-Lab's argument that chlorinated isos' production requires "more labor and specialized equipment," in addition to being more expensive, were "not crucial differences." *Id.* at 3-4.

On August 4, 2025, Commerce issued its Remand Results. Therein, Commerce addressed the comments submitted by Bio-Lab and Kangtai. *See* Remand Results. In its Remand Results, Commerce continued to find that calcium and sodium hypos are comparable to Chlorinated isos, and that the Malaysian surrogate value data are not the best available information on the record for valuing labor. *Id.* Accordingly, Commerce concluded that the Romanian surrogate value data are the best available information on the record, having fully complied with this Court's admonition to further explain this determination. *See* Remand Results at 37. \

# ARGUMENT

## I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

## II.   Commerce Complied With The Court's Remand Order In Placing New Romanian Labor Data On The Record

This Court remanded this case to Commerce for it to "adequately explain its decision to rely on the Romanian labor rates for 'construction work and services,' and ordered Commerce to 'explain further or reconsider' the selection of this data for valuing labor." Remand Results at 34 (quoting Remand Order at 43-44).

### A.    Commerce Complied With The Court's Remand Order

On remand, Commerce added specific Romanian labor data on the record to address the Court's concerns as to the lack of manufacturing specific labor data in the pre-remand record under 19 C.F.R. § 301(c)(4). Remand Results at 35-36. No party offered alternative Romanian data, or labor data from any other country, or even an initial comment on the placement of this data in the record. *Id*. at 22.

In placing the data on the record, Commerce "exercised its discretion to re-open the records and place Romanian labor rates that are specific to the manufacturing sect{or} and contemporaneous to the POR" "and satisfy Commerce's preference to value labor solely from the primary surrogate country." Remand Results at 22; 35-36. Commerce rejected Kangtai's argument that Commerce must reconsider its decision to select Romania as the primary surrogate

country, and that, failing to do so, Commerce acted beyond the Court's instructions in placing outside evidence on the record. Remand Results at 36-37.

Commerce explained that it could not consider Mexican labor data because Mexico had been determined not to be economically comparable to China and the data were not contemporary to the period of review. Remand Results at 21. Commerce likewise rejected Malaysian labor rates because of "evidence of widespread forced labor practices, such as in the Malaysian electrical and electronics sector, which is a subsector of the manufacturing sector." Remand Results at 21; *see also* Order at 26 ("{t}he court concludes that Commerce's rejection of Mexico as a{} {surrogate country} is supported by substantial evidence and in accordance with the law."); Order at 42 ("Commerce's determination was consistent with Commerce's abandonment of the Malaysian labor data in *New American Keg Remand Results*"). The Court having sustained Commerce's practice of rejecting tainted Malaysian data and Commerce's finding that Mexico was not economically comparable to China, Commerce did not err in simply placing updated, specific manufacturing labor data on the record. The Court remanded for Commerce to address respondents' various concerns regarding the nonspecific Romanian labor rate. Order at 43-44. That is exactly what Commerce did in its remand results.

**B.    Accepting Kangtai's Arguments Regarding Placement Of New Romanian Labor Data On The Record Improperly Constrains Commerce**

Kangtai renews the argument that Malaysia provides the best available surrogate value information with respect to labor, financial ratios, and chlorine. *See* Resp. Br. at 7. Kangtai asserts that the Commerce must "consider the quality of the Romanian labor data on the record as compared to the Malaysian labor rate of record." Resp. Br. at 1. Kangtai argues that Commerce improperly placed new Romanian labor data on the record and instead should have relied solely on party submitted data, even though the parties failed to provide any alternative

data during the remand proceeding despite Commerce explicitly providing them with an opportunity to place new data or to comment on any data Commerce placed on the record. *Id*. at 1-2; Request for NFI.

Commerce reasonably addressed the fatal flaws of the Malaysian surrogate value data, adding significant analysis in the final decision upon redetermination. *Compare* IDM at Cmt. 2 *with* Remand Results at 21-22, 33-37. The Court did not remand Commerce's decision to reject Malaysian labor data, in fact, the Court affirmed Commerce's longstanding practice in observing that "Commerce's determination was consistent with Commerce's abandonment of the Malaysian labor data in *New American Keg Remand Results*, which were not challenged by this Court." *Order* at 42; *see also* Order at 42-43 ("Moreover, Commerce's decision aligns with past AD proceedings involving merchandise outside of the E&E subsector in which Commerce nonetheless determined that Malaysian labor data were unusable" (citation omitted)).

As to Commerce's re-opening of the record and placing additional data on the record, Kangtai is wrong to suggest that it was error. Resp. Br. at 1-2. Commerce's regulations, 19 C.F.R. § 351.301(c)(4), provide,

> The Department may place factual information on the record of the proceeding at any time. An interested party is permitted one opportunity to submit factual information to rebut, clarify, or correct factual information placed on the record of the proceeding by the Department by a date specified by the Secretary.

Commerce's placement of data onto the record has been affirmed routinely by this Court. *See Kumho Tire (Vietnam) Co., Ltd. v. United States,* 741 F. Supp. 3d 1277, 1343, 1349 (Ct. Intl. Tr. 2024) (affirming Commerce's practice of placing agency reports onto the record); *see also Risen Energy Co., Ltd. v. United States*, 569 F. Supp. 3d 1315, 1328-29 (Ct. Intl. Tr. 2022) (acknowledging that Commerce may place data on the record but that it must provide an

opportunity to rebut, correct, or clarify that data).  This includes a remand proceeding assuming the Court did not order Commerce not to reopen the record.  *See Fresh Garlic Producers Ass'n v. United States,* 190 F. Supp. 3d 1302, 1306 (Ct. Int'l Trade 2016)("Commerce generally may reopen the administrative record on remand."); *Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Intl. Trade 2017) ("the court remanded to Commerce for further explanation or reconsideration as may be appropriate.  Prior cases support the proposition that specific language directing Commerce to decide whether to reopen the record on remand is unnecessary." (citations and quotation marks omitted)); *NTN Bearing,* 132 F. Supp. 2d at 1107 ("As long as the Court does not forbid Commerce from considering new information, it remains within Commerce's discretion to request and evaluate new data.").

Kangtai could have addressed this new Romanian data in its comments.  Request for NFI. Kangtai could have disputed Commerce's finding that Malaysian data are tainted.  *Id*.  However, Kangtai chose not to do so.  Having skipped the opportunity to do so, Kangtai should not complain that Commerce allowed itself its fully regulatory authority as it was unrestrained by the Court.  Order.

Kangtai argues that Commerce's placement of "new Romanian labor rate to the record{} . . . {was} contrary to the Department's normal practice and administrative policy that the 'burden of creating an adequate record lies with interested parties and not with Commerce.'" Respondents' Br. at 1 (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).  Although generally true, this principle does not, as explained above, restrict Commerce from placing any "factual information on the record at any time."  19 C.F.R. § 351.301(c)(4).

As to Kangtai's discussion of *New Am. Keg. v. United States*, No. 20-08, 2024 WL 379968, *1-2 (Ct. Int'l Tr. Jan 31, 2024), that case does not stand for the proposition that

Commerce may not act within its discretion to place data on the record, only that any placed on the record should serve a purpose in correcting or adjusting the existing data that the Court rejected in its remand decision. Resp. Br. at 3-4. None of the data in *New American Keg* involved Malaysian data, and instead the Court's decision rests on whether Commerce appropriately placed Mexican labor data on the record despite finding that the record Brazilian data was otherwise reliable. 2024 WL 379968, *1-2.

In contrast, the Court in this case held that reliance on the non-specific Romanian labor data was insufficient, and thus Commerce placed on the record data more specific to the manufacturing sector after finding that no data on the record was viable, in keeping with this Court's observation of Commerce's affirmed past practice of rejecting Malaysian tainted data. Order at 42-43 (citing *New American Keg v. United States*, No. 22-106, 2022 WL 4363320 at *3-5 (Ct. Int'l Trade Sept. 13, 2022)); *see also* Final Results of Redetermination Pursuant to Court Remand, *New American Keg v. United States*, No. 20-08, Slip Op. 21-30 (Ct. Int'l Trade 2022) available at https://access.trade.gov/Resources/remands/22-106.pdf (*New American Keg Remand*); and *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 15,671 (March 14, 2023) (*LWRPT from China*), and accompanying IDM at 6 ("{t}hus, because 28 percent of employees in the Malaysian E&E subsector, at minimum, were employed in conditions of forced labor in the most recent period for which we have data available on the record . . . we conclude that over 22 percent of employees in the Malaysian manufacturing sector exhibited such characteristics.").

Kangtai's contention that the Court ordered a far more drastic remedy and that the mere presence of new data on the record indicates that the "Romanian labor rate that was on the record

was not the best available information to value labor" is incorrect and ignores Commerce's practice to "prefer to value labor solely based on data from the primary surrogate country." Resp. Br. at 2; Remand Results at 22. The Court took issue with only the lack of specific Romanian data. *See* Order at 43-44. Upon the placement and consideration of manufacturing specific labor data, Commerce fully complied with the Court's remand order, and Commerce's decision not to look to Malaysia is supported by substantial evidence.

### III.   Commerce's Determination Of Comparable Products Complies With <u>The Court's Remand Order And Is Supported By Substantial Evidence</u>

#### A.    <u>Legal Framework For Merchandise Comparability</u>

Congress requires that Commerce "shall determine the normal value of the subject merchandise on the basis of the price at which merchandise that is comparable to the subject merchandise" is sold. 19 U.S.C. § 1677b(c)(2)(A). As the Court has explained, "{t}he statute does not speak directly to the meaning of 'comparable.'" *Heze Huayi Chemical v. United States*, No. 17-0032, 2018 WL 2328183, at *4 (Ct. Int'l Trade May 22, 2018); *see also* 19 U.S.C. § 1677(c)(4)(B). In its *Policy Bulletin*, Commerce addresses this statutory requirement through a reasonable methodology for assessing comparability.

Commerce's *Policy Bulletin* explains that "{c}omparable merchandise is not defined in the statute or the regulations, since it is best determined on a case by case basis." The *Policy Bulletin* continues, "{e}ven so, there are some basic rules that every team should follow."

To determine whether a producer produces "identical or comparable merchandise," Commerce often applies a three-part test, on a case-by-case basis, examining "physical characteristics, end uses, and production processes." *Shanghai For. Trade Enters. Co. v. United States,* 318 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2004) (citation omitted); *see, e.g., Pure Magnesium from the People's Republic of China: Final Results of the 2008-2009 Antidumping*

*Duty Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 80,791 (Dep't of Commerce Dec. 23, 2010), and accompanying IDM at Cmt. 2; and *Certain Woven Electric Blankets from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 75 Fed. Reg. 38,459 (Dep't of Commerce Jul. 2, 2010), and accompanying IDM at Cmt. 2.

### B.    Commerce's Decision That CYA Is Not A Major Input Is Supported By Substantial Evidence In Accordance With The *Policy Bulletin*

In the Remand Order, the Court held that Commerce "was required to explain the reason CYA does not constitute a major input even though the record indicates that it is 'specialized or dedicated or used intensively{} in the production of' chlorinated isos." Order at 34.  On remand, Commerce provided additional explanation to support its finding that CYA is not a major input, as defined under the *Policy Bulletin*, based on the information in the record.  Remand Results at 4-8; 22-24.

Commerce reasonably found that CYA did not meet the definition of a "major input" as defined in Commerce's *Policy Bulletin*.  The *Policy Bulletin* provides guidance for Commerce's analysis of a "major input."  A major input is "specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate."  *Policy Bulletin*.  This contrasts with "industrial commodity chemicals," which have a "large number, and generic nature of the inputs makes input matching very complicated."  As a result, Commerce should "consider the physical characteristics of the merchandise, and the extent of the further value-added process in identifying comparable merchandise."  *Policy Bulletin*.  The *Policy Bulletin* also provides a non-exhaustive list of examples of products that contain a major input:  agricultural, aquatic, and

mineral products.  The *Policy Bulletin*, at a footnote in "Comparable Merchandise," provides that "{i}f considering a producer of identical merchandise leads to data difficulties, the operations team may consider that produce *a broader category* of reasonably comparable merchandise." Remand Results at 27 (emphasis added).

On remand, Commerce relied on record evidence to continue finding that CYA is not a major input.  Remand Results at 4-8, 22-24.  Consistent with its *Policy Bulletin,* Commerce determined that CYA does not represent a predominant portion of the subject merchandise and found that CYA is not specialized or dedicated or used intensively in the production of chlorinated isos.  *Id.*  Instead, Commerce determined that chlorinated isos are comprised of a large number of inputs (eight in total), that CYA has several applications outside of chlorinated isos; and that CYA is not an input that need be purchased by Kangtai in their production of subject merchandise because CYA is produced in-house and thus need not be valued at all as a factor of production to determine the dumping margin.  *Id.* at 5-7.

Despite Commerce's additional findings on remand, Bio-Lab continues to contend that, under the *Policy Bulletin* CYA, is a major input.  Pet. Br. at 4-5.  Bio-Lab claims that CYA is a major input because it accounts for a significant portion of the total volume of material inputs and imparts key physical characteristics that distinguish chlorinated isos from other water treatment chemicals.  *Id.* at 5.  Lastly, Bio-Lab simply disagrees with Commerce's finding that chlorinated isos require a large number of inputs and that CYA must be purchased by respondents in order for it to be considered as a major input for the purpose of surrogate country selection.  *Id.* at 8-10.  Bio-Lab's arguments, however, fail to detract from Commerce's findings.

First, Commerce reasonably determined that CYA does not make up a predominant portion nor functions as the primary input of chlorinated isos to be a major input according to the

*Policy Bulletin*.  Remand Results at 5.  Although Bio-Lab focuses on "three primary inputs: caustic soda, chlorine, and CYA" required to produce chlorinated isos, Pet. Br. 3 (citation omitted), several additional chemical inputs are required to produce the actual subject merchandise, including sulfuric acid, boron oxides, and urea.  Remand Result at 5 (citing Heze Huayi's Section C-D Questionnaire Response (Nov. 14, 2022) at Ex. D-2, "FOP Spreadsheet as Per Appendix VI;" (C.R. 9) (Heze Huayi's Section C-D Questionnaire Response); *see also* Kangtai's Section C-D Questionnaire Response (Nov. 14, 2022) at Ex. D-2, "FOP Spreadsheet as Per Appendix VI." (C.R. 21) (Kangtai Section C-D Questionnaire Response)).  Commerce also identified additional inputs required for calculating a surrogate value for chlorinated isos, including "three types of fuel/energy (*i.e.*, electricity, coal, and steam) and several types of packaging."  *Id.*; *see also* Kangtai Questionnaire Response at Section D-9 (listing the various inputs).  And Bio-Lab agrees with Commerce that CYA does not represent a "majority of raw materials inputs by volume."  Pet. Br. at 6; Remand Results at 5 ("we do not find that any of the inputs is major (*e.g.*, comprises a predominant portion of the product.").  Thus, as contemplated by the *Policy Bulletin*, these large number of inputs and diverse generic material supports Commerce's determination that CYA is not a major input and instead that subject merchandise is made of a large number of inputs, some of which are generic in nature.  *See Policy Bulletin.*

Although Bio-Lab may argue that five material inputs are not a large enough number, as Commerce explained, the *Policy Bulletin* "does not place a minimum number or floor limit on what a large number is."  Remand Results at 24 (citation and quotations marks omitted).  Bio-Lab's mere disagreement with Commerce as to what is "significant" enough to make a major input is insufficient to counter Commerce's reasoned analysis.  Pet. Br. at 6.

Second, Commerce determined that CYA is not a specialized or dedicated input as contemplated by the *Policy Bulletin*.  Remand Results at 6.  Commerce found that CYA is used as an input in a variety of distinct products including "decolourants (*i.e.*, fabric dyes), resins, paints, and herbicides", or "as an inhibitor of nylon, in plastics, polyester, and as an additive in cosmetics."  *Id*. (citing Kangtai Section C-D Questionnaire Response at D-1, and Heze Huayi Section C-D Questionnaire Response at D-1); *see also* Remand Results at 8 ("the record shows that urea can be used in applications such as agriculture, explosives, medical applications, animal feed, dermatology, and in household products like dish soap."  The *Policy Bulletin* defines major inputs as "inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise."  An intermediate input, such as CYA, can hardly be considered specialized when it is also used in a wide variety of products and industries.  *See Downhole Pipe & Equip. LP v. United States,* 887 F. Supp.2d 1311, 1327 (Ct. Intl. Trade 2012) (Explaining that tool joints were considered specialized by looking at the uniqueness of the product and infrequency of its production around the world).

Bio-Lab downplays the meaning of major inputs by arguing that major inputs mean only any input that is necessary or "essential" in the production of the subject merchandise.  Resp. Br. at 7, 11.  However, Commerce's analysis is not what is essential or necessary to the production.  Commerce considers whether the input is specialized or dedicated.  *Policy Bulletin*.  By Bio-Lab's logic, almost any input needed to produce a product may qualify as a major input.

Bio-Lab relies on *Certain Hot-Rolled Carbon Steel Flat Products from Indonesia* to assert that natural gas was considered a major input despite its commonality across almost all industries.  Resp. Br. at 8 (citing *Certain Hot-Rolled Carbon Steel Flat Products from Indonesia*, 66 Fed. Reg. 49,628 (Dep't of Commerce Sept. 28, 2001), and accompanying IDM at Cmt. 6).

However, Bio-Lab overlooks that in that decision Commerce was not making a major input decision in line with its *Policy Bulletin*; instead, Commerce explained that for the purposes of its *affiliated parties test*, Commerce tests transactions to determine "whether the reported values of the major inputs are above the affiliated supplier's COP {costs of production}." *Id.* Commerce then considered the "percentage level natural gas represents as an input of the product under consideration." *Id.* Commerce did not supply what percentage was necessary under this test nor dictate any broad sweeping test for that determination that was not done under its *Policy Bulletin*'s surrogate country analysis.

The same fatal flaws follow Bio-Lab's reliance on *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 74 Fed. Reg. 11,082 (Dep't of Commerce Mar. 16, 2009). That administrative decision explicitly explained that the major input finding was made under the "major input rule," found in 19 U.S.C. § 1677b(3), which deals with affiliate parties, and that affiliated party major input rule is discretionary. *U.S. Steel Corp. v. United States*, 759 F. Supp. 2d 1349, 1355 (Ct. Intl. Trade Feb. 15, 2011) ("Nucor acknowledges that application of the major input rule is discretionary"). Bio-Lab's comparison is inapt, relying on the application of a different statute with a very different purpose. Thus, Commerce reasonably determined that CYA is not a specialized or dedicated input of Chlorinated isos.

Third, Commerce determined that neither respondent purchased any CYA in its production of subject merchandise. Remand Results at 6-7 (citing Heze Huayi's Section A Questionnaire Response (Oct. 24, 2022) at 16 (C.R. 7); and Kangtai's Section A Questionnaire Response (Oct. 24, 2022) at 17 (C.R. 5). Instead, respondents purchased the input urea, which was then further processed into CYA. *Id.* Commerce observed that it does not assign a surrogate value to intermediate inputs produced during the production of subject merchandise

unless those intermediate inputs are sold as by-products or co-products.  Remand Results at 7.

Thus, CYA is not assigned a value as a factor of production.  Pet. Br. at 3 (chlorinated isos . . .

are specialty chemicals produced using only three primary inputs: caustic soda, chlorine, and

CYA.").

Bio-Lab does not appear to dispute that CYA is not purchased by either respondent and is

not assigned a surrogate value.  Pet. Br. at 10.  Bio-Lab further concedes that CYA is an

intermediate input produced from other inputs purchased by respondents, which are already

accounted for in the factors of production analysis.  *Id*. at 18; *see also* Remand Results at 23

("{W}e are using a surrogate value for urea as the input.  The respondents purchase urea and

convert urea internally to cyanuric acid.  Accordingly, our focus for purposes of calculating a

margin is on urea.").

In antidumping proceedings involving a non-market economy, Commerce is required to

"determine the normal value of the subject merchandise" "on the basis of the value of the factors

of production utilized in producing the merchandise and to which shall be added an amount for

general expenses and profit plus the cost of containers, coverings, and other expenses."  *See* 19

U.S.C. § 1677b(c)(1).  Thus, to base Commerce's surrogate country and value selection on an

intermediate input that is produced internally by respondents from other inputs that respondents

purchase (which are already accounted in the factors of production analysis) and, thus, will not

be assigned a surrogate value nor used to calculate a factor of production, would undermine the

purpose of Commerce's surrogate value analysis.  *See* Remand Results at 26 ("{B}ecause

cyanurate acid is not an input for which we need an FOP, the petitioners' reliance on cyanurate

acid as input is misplaced in this instance.").

Further, Bio-Lab's attempt to resurrect its argument as to Mexico being the sole primary surrogate country because it produces identical merchandise should be rejected because this Court has explained that "Commerce's treatment of the economic comparability factor as a threshold criterion is aligned with the 'best reading' of the statute."  Pet. Br. at 10-12; Order at 27 (citations omitted).  Bio-Lab's attempt to flip this analysis on its head, to make product comparability the first consideration, Pet. Br. 10-12, should be rejected as it was before.

### C.    Commerce Reasonably Determined That Record Evidence Supports Finding Calcium Hypo And Sodium Hypo Comparable To Subject Merchandise

The Court sustained Commerce's finding that calcium hypo and sodium hypo have end uses comparable to that of chlorinated isos.  Order at 35.  The Court explains that "Commerce need not show that calcium and sodium hypo are comparable to chlorinated isos 'along all three fronts,' but Commerce must explain further, including based on information in the record . . . or reconsider its determination as to physical characteristics and production processes."  Order at 39.

In its remand results, after considering the new factual information placed on the record of the remand redetermination and the evidence already on the record of the administrative review, Commerce continued to find that calcium and sodium hypos are comparable to chlorinated isos.  *See* Remand Results.  Commerce found that record evidence supports finding that calcium hypo and sodium hypo share similar physical characteristics as chlorinated isos, the "more detailed information" not explicitly considered by Commerce in the pre-remand decision further supports finding that calcium hypo shares similar physical characteristics with chlorinated isos, and calcium hypo and sodium hypo share a similar production process as chlorinated isos.  *See id* at 37-38.; Order at 34-35.  Thus, Commerce continued to find that Romania is a producer of comparable merchandise.  Remand Results at 37.

22

Bio-Lab first challenges three aspects of Commerce's remand redetermination finding that calcium hypo and sodium hypo are comparable to subject merchandise. *See* Pet. Br. First, Bio-Lab claims that, because chlorinated isos contain CYA, a purported major input, and calcium hypo and sodium hypo do not contain CYA as an input, the three products cannot be considered comparable. *Id*. at 12. Bio-Lab further contends that calcium hypo and sodium hypo do not have comparable physical characteristics. *Id*. at 12-15. Lastly, Bio-Lab argues that the production processes of calcium hypo and sodium hypo are not comparable to subject merchandise. *Id*. at 15-21.

As discussed below, on remand Commerce relied on record evidence to reasonably determine that as to both physical characteristics and production processes calcium hypo and sodium hypo are comparable to chlorinated isos for the purpose of selecting a surrogate country . *See* Remand Results at 8-11.

1. **Record Evidence Demonstrates That The Physical Characteristics Of Calcium Hypo And Subject Merchandise Are Comparable**

On remand, Commerce determined that record evidence reasonably demonstrates that calcium hypo shares comparable physical characteristics with chlorinated isos. Remand Results at 8-11. Commerce determined that calcium hypo and chlorinated isos share a comparable chlorine percentage, have the same physical form, physical use, and have the same chemical reaction when placed in water. *Id*.

Bio-Lab claims, however, that Commerce's findings ignore the importance of CYA to chlorinated isos as a chlorine stabilizer. Petitioners Br. at 14. Bio-Lab also argues that "innumerable chemicals and other products are available in powder or tablet form," and that such a finding demonstrates that sodium and calcium hypo are not comparable. *Id*. at 13. Finally,

Bio-Lab contends that, when "viewed narrowly" in their application, chlorinated isos and calcium hypo are not comparable.  *Id.*

As an initial matter, Bio-Lab improperly contend that Commerce should identify merchandise with *identical*, rather than *comparable,* physical characteristics to compare with subject merchandise.  Yet, as explained above, that is not the standard.  *See* 19 U.S.C. § 1677b(c)(1); *see also Policy Bulletin*.  Instead, if the product is comparable to the subject merchandise and the country economically comparable to the non-market economy, then Commerce has fulfilled its statutory duty.  *See Dorbest Ltd. v. United States,* 462 F. Supp. 2d 1262, 1274-75 (Ct. Int'l Trade 2006) ("The statute does not require Commerce to find a producer of identical merchandise, but rather a producer of comparable merchandise").

In this case Commerce made four distinct factual findings based on the available record evidence to conclude that calcium hypo shares comparable physical characteristics with chlorinated isos and also adhered to the Court's Order to discuss the "more detailed information" placed on the record by the petitioners.  Remand Results at 12-15.

First, Commerce determined that the products contain similar chlorine percentages. Commerce analyzed the physical characteristics of trichloroisocyanuric acid (TCCA), a product listed as subject merchandise under the scope of the order and within the family of chlorinated isos.  Remand Results at 9-10.  Commerce found that TCCA has an effective chlorine percentage of approximately 90 percent and that calcium hypo has a chlorine percentage of 65 to 70 percent. *Id*. at 10 (citing Respondents' Surrogate Country Rebuttal Cmts. (Nov. 28, 2022) at Att. 3. (P.R. 37).  Commerce acknowledged that chlorinated isos has a higher effective chlorine percentage, up to 90 percent, compared to calcium hypos, between 65 and 70 percent chlorine; however, Commerce did not find this difference in percentage, a maximum of 25 percent and a potential

minimum of zero percent, was significant in finding a product comparable with both products being members of the "chlorine family."  Remand Results at 25-26, 28.

Second, Commerce found that the products both share the same physical form: they both are a powdery substance and may be formed into a tablet.  Remand Results at 9-10 (citing Respondents' Surrogate Country Rebuttal Cmts. (Nov. 28, 2022) at Att. 3, ( "Tianjin Kaifeng Chemical Co., Ltd, Products List, TCCA").  Commerce determined that TCCA is produced into a white crystalline granular powder or tablet and calcium hypo is a white or light gray granular mesh or a tablet.  *Id.*  Bio-Lab does not dispute this finding though they belittle its primacy in this determination.  *See* Petitioners Br.  at 12-13.

To negate this finding, Bio-Lab contends that unnumerable chemicals and other products are available in powder or tablet form.  *Id.* at 13 (comparing a chemical in powder form to wood in powder form and citing *Final Determination of Sales at Less Than Fair Value: Sodium Hexametaphosphate From the People's Republic of China*, 73 Fed. Reg. 6,479 (Dep't of Commerce Feb. 4, 2008), IDM at Cmt. 1, and *Wood Mouldings and Millwork Products from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 76,452 (Dep't of Commerce Sept. 18, 2024) IDM at Cmt. 8).

Yet, Bio-Lab makes its argument in isolation from Commerce's other findings. Commerce did not simply rely on the fact that calcium hypo and chlorinated isos have a similar physical form to support finding that they have comparable physical characteristics.  Rather Commerce explained, "both chlorinated isos and calcium hypo are chlorinated products that are powdery in substance, can be used as disinfectants or as water treatment applications, and react in a similar fashion when they come into contact with water."  Remand Results at 25.  Thus,

Commerce made four distinct findings with respect to physical characteristics, and when taken together, Commerce's analysis supports Commerce's finding. *See Hindalco Industries Ltd. v. United States*, No. 23-00260, 2025 WL 2049062, at *12 (Ct. Intl. Trade July 22, 2025) ("{t}he court reiterates that its role is not to decide whether a more accurate or precise benchmark could have been constructed, but whether Commerce's choice is grounded in a reasoned analysis and supported by record evidence.").

Third, Commerce found that both TCCA and calcium hypo are chlorinated for the purpose of being used as a disinfectant to treat water. *Id.* at 10-11. Commerce determined that calcium hypo is used for bleaching, treating swimming pools, and as a disinfectant for aquaculture and livestock. *Id.* at 10 (citing Respondents' Surrogate Country Rebuttal Cmts. (Nov. 28, 2022) at Att. 3, "Tianjin Kaifeng Chemical Co., Ltd, Products List, TCCA"). Bio-Lab concedes that calcium hypo is used as a water treatment in swimming pools, but claims that the application is used "less frequently" than chlorinated isos. Pet. Br. at 13-14. Bio-Lab contends that, unlike calcium hypo, the CYA in chlorinated isos permits chlorine to be released slowly, extending the time needed to deplete the product. *Id.* at 14. The Court has already held, however, that the end-use of chlorinated isos is comparable to the end use of calcium hypo and sodium hypo. Order at 37 (holding "{i}n the instant case, Commerce's finding that calcium hypo, sodium hypo and chlorinated isos have comparable end use — as pool sanitizers, albeit to different degrees — is supported by substantial evidence.") (citation omitted). Accordingly, by raising arguments regarding the end-use of the products, Bio-Lab improperly attempts to relitigate an issue settled by the Court.

Commerce also determined that calcium hypo and chlorinated isos have similar physical properties because they have a similar chemical reaction to water, which makes them useful in

swimming pools.  Remand Results at 10-11.  Commerce cited an advisory opinion on chlorine

from the U.S. Environmental Protection Agency that found calcium hypochlorite and chlorinated

isocyanurates have the same chemical reaction to water:

> At other pools solid, granular, pellet, or stick compounds (*e.g.*, calcium hypochlorite and chlorinated isocyanurates) or liquids (*e.g.*, sodium hypochlorite) are added to the water. In contact with water, these solid and liquid chemicals dissolve and form hypochloric acid or chlorine ions to perform the same disinfecting function as chlorine.

*Id*. at 10 (citing Respondents' Surrogate Country Rebuttal Cmts. (Nov. 28, 2022) at Att. 3, "EPA

Chemical Emergency Preparedness and Prevention Advisory; Swimming Pool Chemicals:

Chlorine").  Bio-Lab does not rebut this finding.  *See* Pet. Br.

Finally, Commerce's remand decision also acknowledges respondents' arguments about

the differences among calcium hypo and subject merchandise.  *Id*.  For example, Commerce

found that calcium hypo is an inorganic chemical whereas chlorinated isos are an organic

chemical.  Remand Results at 10-11 (citing Pet. NFI 2-6).  Nevertheless, Commerce concluded

that, when taken together, the finding that calcium hypo shares comparable chlorine percentage,

form, physical use, and chemical reaction to water, as subject merchandise reasonably

demonstrates that calcium hypo satisfies the physical characteristics prong for determining

whether calcium hypo is comparable to chlorinated isos.  *Id*. at 11.

Bio-Lab's arguments to the contrary fail to demonstrate that Commerce's decision

regarding physical characteristics is unreasonable or unsupported by record evidence.

### 2. Record Evidence Demonstrates That The Production Processes Of Sodium Hypo, Calcium Hypo, And Chlorinated Isos Are Comparable.

On remand, Commerce addressed the Court's concerns, providing the requisite

explanation, and continued to find that chlorinated isos, sodium hypo, and calcium hypo have a

"similar" production process by first looking to their "similar key inputs (i.e., sodium hydroxide

and chlorine)."  Remand Results at 16-20, 30 (citing Heze Huayi's Section C-D Questionnaire Response (Nov. 14, 2022) at Ex. D-2, Petitioners' NFI Submission at 8, Petitioners' Rebuttal Cmts. on SV Submission (Jun. 26, 2023 at Ex. 4 ("Declaration of James Bruce Warner")). Second, Commerce found that the chlorinated isos, sodium hypo, and calcium hypo each share a similar "multi-stage production processes."  Remand Results at 17.

As to common inputs, although chlorinated isos contain a CYA production step, Commerce explained on remand that chlorine and caustic soda are the common inputs essential for the chlorination production process–the key shared characteristic.  *Id.* at 20.  All three products involve reacting with chlorine in the production process.  Remand Results at 17-19.

Commerce also explained the various steps in the multi-stage production processes using these inputs for sodium hypo and calcium hypo, and their similarity to chlorinated isos.  *Id*. at 16-20.  For example, Commerce demonstrated the steps involved in the two types of productions processes, calcium and sodium, by which calcium hypo is produced.  Remand Results at 30. Likewise, Commerce found that sodium hypo has two types of production processes, batch and continuous, and listed the steps of each process.  *Id*. at 17-19 (citing Petitioners' NFI Submission at 8 and Petitioners' SV Cmts. at Ex 1).

Though there were some differences, such as the lack of evaporation in sodium hypo, Commerce explained that sodium hypo, calcium hypo, and chlorinated isos all combine the aforementioned key inputs to undergo a similar multi-stage production process, and are then produced into a similar form.  *Id*. at 17-20.  Commerce found that the production processes of chlorinated isos, sodium hypo and calcium hypo all similarly share the combining of sodium hydroxide (also known as caustic soda) and chlorine, which are mixed with water.  *Id*. at 17-19. Chlorine is then introduced into the mixture to induce a chemical reaction.  *Id*.  This reaction

creates a paste or similar mixture. *Id*. Depending on the type of production process, the mixture is then processed into either a tablet, powder, or granular form. *Id*.

Bio-Lab argues that the production process of chlorinated isos involves several more production steps than that of calcium hypo or sodium hypo and that Commerce did not contend with these differences in complexity and cost. Pet. Br. at 17. Bio-Lab also includes in its analysis the production steps required for CYA. *Id*. In sum, Bio-Lab contends that subject merchandise requires twelve separate production steps, whereas calcium hypo and sodium hypo requires singular steps. Br. at 17-18.

Nevertheless, Commerce found similarities between the multi-stage production process of the chlorinated isos and the production processes of sodium hypo and calcium hypo. Commerce identified several stages shared in the production of chlorinated isos and calcium hypo and sodium hypo. Remand Results at 17-19. For instance, similar to chlorinated isos, sodium hypo and calcium hypo undergo a chemical reaction with chlorine, are dried, and undertake a granulating or tableting process. *Id*. Omitting the production process for CYA, which is not a valued input, sodium hypo and calcium hypo have more production stages in common with chlorinated isos than are different. *Id*.

More broadly, Commerce continued to find that the production process of chlorinated isos and calcium hypo require electrolysis, evaporation, and chlorine absorption. *Id*. at 19 (citing Respondents' Final Surrogate Value Submission (May 31, 2023) at Exhibit SV2-13 (P.R. 69-70)). Commerce also revaluated its decision from the Final Results and determined that chlorinated isos and sodium hypo also require electrolysis and chlorine absorption, but acknowledged that sodium hypo does not require evaporation. *Id*.

Bio-Lab also argues that the shared inputs and similar multi-stage production processes do not support Commerce's finding that chlorinated isos have a comparable production process as sodium hypo and calcium hypo.  Pet. Br. at 19-21.  Bio-Lab claims that chlorinated isos involve a more complex production process and that common inputs alone do not demonstrate that the production processes are similar.  *Id*.  Bio-Lab cites to *Tetrafluoroethane from China* and *Xanthum Gum from China*, that are purportedly analogous to the facts here.  *Id*. at 19-20 (citing *1,1,1,2-Tetrafluoroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62,597 (Oct. 20, 2014), and accompanying Issues and Decision Memo, and *Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,351 (June 4, 2013), and accompanying Issues and Decision Memorandum).  Similarly, Bio-Lab cites *Steel Wire Garment Hangers from China* as evidence that sharing common inputs is insufficient to demonstrate that the production processes are similar or comparable.  *Id*. at 20 (citing *Steel Wire Garment Hangers from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 47,587 (Aug. 14, 2008), and accompanying Issues and Decision Memorandum).

Bio-Lab, however, conflates Commerce's factual findings in the cited cases with the facts in this case.  In *Tetrafluoroethane from China* and *Xanthum Gum from China*, Commerce determined that, although the subject merchandise and product at issue had similar production steps, the products also included production steps that were vastly different.  *See Tetrafluoroethane from China* and *Xanthum Gum from China*; *see also* Remand Results at 32.  For example, in *Tetrafluoroethane from China*, Commerce found that both products utilized high temperatures and a refining process but also found the "hydrocarbon production involves distilling crude oil at many different temperatures to create various hydrocarbon products,

whereas tetrafluoroethane production requires a catalyst to create a reaction between two inputs to create the product"—two distinctly different production processes. *Tetrafluoroethane from China* IDM at 45. In *Xanthum Gum from China*, Commerce found "no evidence on the record suggests that carrageenan production involves the mutation, maintenance, and growth of a specialized strain of bacteria or the fermentation of specialized bacteria with a carbohydrate source, each of which are vital stages in the production of xanthan gum." *Xanthum Gum from China* IDM at 11. And in *Steel Wire Garment Hangers from China*, Commerce concluded that a company that manufactured a product that underwent further processing, akin to hangers, would better reflect the production experience of the respondent at issue. *Steel Wire Garment Hangers from China* IDM at Cmt. 3. Thus, unlike the cases cited by Bio-Lab, in this case Commerce has made two distinct findings with respect to the comparable merchandise and subject merchandise: first, that the products share comparable inputs, and second, that they share comparable production processes. Bio-Lab's arguments to the contrary only demonstrate that the products are not identical and fail to resolve the pertinent issue of whether the products, while not identical, are comparable. Remand Results at 26.

Lastly, Bio-Lab argues that Commerce failed to address record evidence demonstrating that the production of chlorinated isos is more expensive, more labor intensive, requires more specialized equipment, and has more stages of production. Pet. Br. at 16. Bio-Lab cites to the cost, number of employees, and time needed to construct a new chlorinated isos facility compared to that of a sodium hypo facility. Pet. Br. at 16.

Contrary to Bio-Lab's assertion, Commerce acknowledges this distinction, but it did not find it dispositive. Commerce still determined that the focus of its analysis is not to determine whether the products share identical production processes or require the same level of investment

in facilities or number of employees.  Remand Results at 16-20, 29-33.  "The fact that one product requires more processing steps and different production facilities than the other does not take away from our conclusion that production processes are comparable."  Remand Results at 32.  As the Court held, "the production processes need not be identical."  Order at 39.  Instead, the Court held that "Commerce must support its determination of similarity with more than the mere assertion that the processes are both multi-stage and share some inputs."  Order at 39.  Commerce provides that support on remand.

Commerce's holistic analysis compares the different production steps of the three products side-by-side and reasonably determined that the production processes are comparable.  Remand Results at 30-32.  In conducting the analysis regarding the production process, Commerce also considered the "the more detailed information" related to these production processes and found that the declarations contained in the record indicate that "although the production of chlorinated isos involves more steps than producing sodium hypo, both chemicals involve combining the key inputs of sodium hydroxide and chlorine in multiple stages and, thus, we continue to find that they are comparable."  Remand Results at 15.  Commerce's job was not to narrowly find some identical product or a product that is nearly identical; Commerce's job, considering the "data difficulties" it faced, was to find "reasonably comparable" merchandise.  Remand Results at 27; Policy Bulletin.  Bio-Lab's arguments to the contrary amount to "mere disagreement" with Commerce's weighing of record evidence.  *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015); *Haixing Jingmei Chem. Prods. Sales Co., Ltd. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018).

In sum, Commerce reasonably determined that calcium hypo, sodium hypo, and chlorinated isos all share comparable physical characteristics and production processes.

Commerce did so by reasonably relying on record evidence and properly using its "case-by-case" approach. Remand Results at 32-33. Even if Bio-Lab could show that a contrary conclusion could be drawn from the evidence of record, "such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed. Cir. 1996)). Accordingly, Commerce's remand redetermination is lawful, supported by substantial evidence, and complies with the Court's remand order.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR
Assistant Director

/s/ Tate N. Walker
OF COUNSEL:                          TATE N. WALKER
JESUS N. SAENZ                       Trial Attorney
Assistant Chief Counsel              U.S. Dept. of Justice
Office of the Chief Counsel          Civil Division
for Trade Enforcement and Compliance Commercial Litigation Branch
U.S. Department of Commerce          P.O. Box 480
Washington, D.C.                     Ben Franklin Station
                                     Washington, D.C. 20044
                                     Telephone: (202) 307-0163
                                     E-mail: Tate.Walker@usdoj.gov

September 23, 2025                    *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that defendant's response in this matter complies with the Court's type-volume limitation rules. According to the word count calculated by the word processing system with which the response was prepared, this brief contains a total of 9,545 words.

/s/ Tate N. Walker

September 23, 2025