Slip Op. 26-43

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BIO-LAB, INC.; INNOVATIVE WATER CARE LLC; AND OCCIDENTAL CHEMICAL CORPORATION,** | |
| Plaintiffs, | |
| and | |
| **JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD.,** | |
| Consolidated Plaintiffs, | **Before: Timothy M. Reif, Judge** |
| v. | **Consol. Court No. 24-00024** |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD.,** | |
| Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part Commerce's remand redetermination in the administrative review of the antidumping order on chlorinated isocyanurates from the People's Republic of China.]

Dated: April 27, 2026

<u>Chase J. Dunn</u>, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for plaintiffs Bio-Lab, Inc., Innovative Water Care LLC and Occidental Chemical Corporation.  Also on the brief was <u>James R. Cannon, Jr.</u>

<u>Tate N. Walker</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. Also on the brief were <u>Brett A. Shumate</u>, Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of counsel was <u>Jesus Saenz</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Vivien Jinghui Wang</u>, The Inter-Global Trade Law Group PLLC, of Washington, D.C., argued for consolidated plaintiffs and defendant-intervenors Juancheng Kangtai Chemical Co., Ltd. and Heze Huayi Chemical Co., Ltd. Also on the brief were <u>Gregory S. Menegaz</u>, <u>Alexandra H. Salzman</u> and <u>Judith L. Holdsworth</u>.

*     *     *

Reif, Judge: Before the court are the remand results of the U.S. Department of Commerce ("Commerce") concerning the administrative review of the antidumping ("AD") order on chlorinated isocyanurates ("chlorinated isos," or "subject merchandise") from the People's Republic of China ("China") for the period of review ("POR") June 1, 2021, through May 31, 2022. Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 54-1; *see also Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021-2022* ("*Final Results*"), 89 Fed. Reg. 455 (Dep't of Commerce Jan. 4, 2024) and accompanying Issues and Decision Memorandum ("IDM") (Dep't of Commerce Dec. 28, 2023).

Bio-Lab, Inc., Innovative Water Care LLC and Occidental Chemical Corporation (collectively, "petitioners" or "plaintiffs") challenge certain aspects of the Remand Results and request that the court remand to Commerce "with instruction to reconsider its selection of Romania as the primary surrogate." Comments on Remand Redetermination ("Pls. Br.") at 21, ECF No. 58. Plaintiffs object specifically to the

continued determination of Commerce that Romania is a significant producer of comparable merchandise to chlorinated isos.  *See id.*

Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") and Heze Huayi Chemical Co., Ltd. ("Heze Huayi") (collectively, "respondents" or "consolidated plaintiffs")[1] also challenge certain aspects of the Remand Results and request that the court remand to Commerce to "reconsider its surrogate country decision."  Consolidated Pls.' Remand Comments ("Consol. Pls. Br.") at 4, ECF No. 57.  Consolidated plaintiffs object specifically to the decision of Commerce to reopen the administrative record and rely on a new Romanian labor rate.  *See id.*

For the reasons discussed below, the court sustains in part and remands in part the Remand Results.

## BACKGROUND

The court presumes familiarity with the facts as set out in *Bio-Lab, Inc. v. United States* ("*Bio-Lab I*"), 49 CIT __, 776 F. Supp. 3d 1315 (2025), and recounts only those facts relevant to the issues before the court on remand.

On April 14, 2025, the Court concluded that Commerce did not explain adequately: (1) Commerce's determination that cyanuric acid ("CYA") is not a "major input" under Policy Bulletin 04.1; (2) Commerce's determination that calcium hypochlorite ("calcium hypo") and chlorinated isos share similar physical characteristics; (3) Commerce's treatment of "more detailed information" submitted by petitioners with respect to the physical differences between calcium hypo, sodium hypochlorite ("sodium

---

[1] Kangtai and Heze Huayi are consolidated plaintiffs and defendant-intervenors in the instant action.  For the sake of simplicity, the court will refer to the two as consolidated plaintiffs only.

hypo") and chlorinated isos; (4) Commerce's determination that the production processes for calcium hypo, sodium hypo and chlorinated isos are similar; and (5) Commerce's selection of the Romanian labor data on the record as the surrogate value for labor.  *See id.* at __, 776 F. Supp. 3d at 1343.

On May 23, 2025, Commerce reopened the record and requested additional information with respect to: (1) "whether calcium hypo shares physical characteristics with chlorinated isos"; (2) "the similarities in the production processes for calcium hypo, sodium hypo, [and] chlorinated isos"; and (3) "urea and its applications."  Remand Results at 3.  Further, "Commerce . . . placed information regarding urea and its applications on the record, as well as Romanian labor data that is specific to Romania's manufacturing industry and is contemporaneous to the POR."  *Id.*  Commerce provided interested parties with an opportunity to comment on the new information.  *Id.*

On July 3, 2025, Commerce issued its draft remand redetermination and provided interested parties with an opportunity to comment.  *Id.* at 4.  On August 4, 2025, Commerce issued its final remand results.  *See id.*

On September 3, 2025, plaintiffs and consolidated plaintiffs filed their comments on the final remand results.  Pls. Br.; Consol. Pls. Br.  On September 23, 2025, defendant United States filed its response to plaintiffs' and consolidated plaintiffs' comments.  Def.'s Resp. to Pls.' and Consol. Pls.' Comments on Commerce's Remand Redetermination ("Def. Br."), ECF No. 62.

On March 19, 2026, the Court heard oral argument.  Oral Arg. Manifest, ECF No. 73.

**JURISDICTION AND STANDARD OF REVIEW**

28 U.S.C. § 1581(c) grants to this Court "exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930."  Section 516A of the Tariff Act of 1930 provides that in an action under 19 U.S.C. § 1516a(a)(2), the court will hold unlawful any determination, finding or conclusion that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."[2]  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," but it requires "more than a mere scintilla."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  For a reviewing court to "fulfill [its] obligation" to determine whether a determination of Commerce is supported by substantial evidence and in accordance with law, Commerce is required to "examine the record and articulate a satisfactory explanation for its action."  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

Even so, the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *see also NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2018 edition.

decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.").

"[T]he Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).

On remand, the Court will sustain Commerce's determinations "if they are in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 39 CIT __, __, 100 F. Supp. 3d 1349, 1355 (2015).

## DISCUSSION

### I.     Comparable merchandise

#### A.     Legal framework

19 U.S.C. § 1677b(c)(1) provides that Commerce "shall determine the normal value of the subject merchandise" in an AD investigation that involves a non-market economy ("NME") country "on the basis of the value of the factors of production [("FOPs")] utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *See Juancheng Kangtai Chem. Co. v. United States*, Slip Op. 15-93, 2015 WL 4999476, at *2 (CIT Aug. 21, 2015).

Commerce, "in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production" in a surrogate country that is "at a

level of economic development comparable" to that of the NME, and a "significant

producer[] of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  And, "[t]o the extent

possible, Commerce's regulatory preference is to 'value all factors in a single surrogate

country.'"  *Jinko Solar Imp. and Exp. Co. v. United States*, 48 CIT __, __, 701 F. Supp.

3d 1367, 1381 (2024) (quoting 19 C.F.R. § 351.408(c)(2)).

The statute does not define terms such as "significant producer" and

"comparable merchandise."  *Id.*  However, "[s]ome clarification is . . . provided in the

Conference Report to the 1988 Omnibus Trade and Competitiveness Act, which added

to the statute the current NME provisions and states that 'significant producer' includes

any country that is a 'significant net exporter.'"  Import Admin., U.S. Dep't of Commerce,

Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004),

https://enforcement.trade.gov/policy/bull04-1.html (last visited Apr. 20, 2026) ("Policy

Bulletin 04.1") (quoting Conference Report to the 1988 Omnibus Trade &

Competitiveness Act, H.R. Rep. No. 100-576 (1988), at 590).  And "[t]o determine if a

product produced by a company in the surrogate country is comparable, Commerce's

established practice is to apply a three-part test that examines 'physical characteristics,

end uses, and production processes.'"  *Shanghai Foreign Trade Enters. Co. v. United*

*States*, 28 CIT 480, 490, 318 F. Supp. 2d 1339, 1348 (2004) (citation omitted); *US*

*Magnesium LLC v. United States*, 39 CIT __, __, 72 F. Supp. 3d 1341, 1357 n.25

(2015); *List Indus., Inc. v. United States*, 47 CIT __, __, 641 F. Supp. 3d 1400, 1406

(2023).

### B.      Major input

In *Bio-Lab I,* the Court remanded for further explanation or reconsideration Commerce's determination that CYA "does not meet the definition of a major input as described in Policy Bulletin 04.1."  49 CIT at __, 776 F. Supp. 3d at 1335-36 (quoting IDM at 7).

Policy Bulletin 04.1 states that in cases "where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate."  Policy Bulletin 04.1.  Accordingly, the narrow definition of "comparable merchandise" based on a major input finding could have a significant impact on the selection of a surrogate country.

On remand, Commerce continued to determine that CYA is not a major input in the production of chlorinated isos for three reasons: (1) CYA does not "comprise[] a predominant portion of" subject merchandise; (2) CYA is one of a "large number" of inputs required to produce subject merchandise such that "chlorinated isos more closely resemble[] . . . 'industrial commodity chemicals'"; and (3) CYA is not a "specialized or dedicated" input.  *See* Remand Results at 4-8, 22-24.  And, in the alternative, Commerce concluded that urea should be the focus of the major input inquiry because CYA was not purchased by the respondents and, therefore, was not an input for which a surrogate value was required.  *Id.*

Plaintiffs continue to argue that Commerce's determination that CYA is not a major input is unsupported by substantial evidence and not in accordance with law. Pls. Br. at 3-12.

The court concludes that Commerce's determination as to CYA is not in accordance with law or supported by substantial evidence and further concludes that Commerce's alternative analysis of urea is not in accordance with law or supported by substantial evidence.

### 1.    "Predominant portion"

The court concludes that Commerce failed to demonstrate that CYA does not constitute a predominant portion of subject merchandise.

Plaintiffs argue that "Commerce's assertion that CYA is not a 'major input' because it does not 'comprise[] a predominant portion of the product' is not consistent with the record." Pls. Br. at 4 (alteration in original) (quoting Remand Results at 5).

Commerce on remand did not proffer support for its determination that none of the three intermediate inputs for chlorinated isos (CYA, chlorine and caustic soda) comprises a predominant portion of the product. *See* Remand Results at 5. Commerce merely cited respondent-submitted FOP spreadsheets that list the inputs for chlorinated isos and their respective volumes in the finished product. *See id.* at 5 n.18. A mere citation to the record without an accompanying analysis and explanation of the relative proportions of the inputs is insufficient support for Commerce's finding. *See Tianjin Magnesium Int'l Co. v. United States*, 34 CIT 980, 982, 722 F. Supp. 2d 1322, 1328 (2010) (explaining that the substantial evidence standard "requires that Commerce thoroughly examine the record and 'articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made.'" (citation omitted)).  This conclusion is especially true given that Commerce does not offer a definition of "predominant portion" in its sparse, half-sentence discussion of predominance.  *See id.*

Merriam-Webster defines "predominant" as "having superior strength, influence, or authority."  *Predominant*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/predominant (last visited Apr. 20, 2026).  Similarly, Cambridge Dictionary defines the term as "more noticeable or important, or larger in number, than others."  *Predominant*, Cambridge Online Dictionary, https://dictionary.cambridge.org/us/dictionary/english/predominant (last visited Apr. 20, 2026).

Plaintiffs concede that CYA does not comprise the majority of material inputs by volume but note that the record demonstrates that the raw material inputs used to produce CYA, urea and sulfuric acid comprise the plurality.  Pls. Br. at 5-6 (citing Commerce, Final SAS Output, Kangtai, "Sample Print of Factors of Production," CR 102; Commerce, Final SAS Output, Heze Huayi, "Sample Print of Factors of Production," CR 109).

As the intermediate input that accounts for the plurality of raw material inputs by volume, CYA appears to "comprise[] a predominant portion of" subject merchandise.  Commerce failed to offer a reason to the contrary in its explanation.  *See* Remand Results at 5.  For that reason, Commerce's "predominant portion" basis for concluding that CYA is not a major input is not supported by substantial evidence.

The court remands to Commerce to address plaintiffs' arguments and to explain further in light of the court's discussion of the points above or reconsider its determination that CYA does not comprise a predominant portion of chlorinated isos.

### 2.    Large number of inputs

The court concludes that Commerce failed to demonstrate that chlorinated isos require a "large number" of inputs for their production.

In *Bio-Lab I*, the Court concluded that "Commerce failed to explain how chlorinated isos belong to the category of 'industrial commodity chemicals'" such that CYA is not a "major input."[3]  49 CIT at __, 776 F. Supp. 3d at 1335.  The Court reasoned that:

> Commerce failed to explain how chlorinated isos belong to the category of "industrial commodity chemicals."  Chlorinated isos consist of only three intermediate inputs: CYA, chlorine and caustic soda. . . .  Policy Bulletin 04.1 does not define what a "large number" of inputs would be, but it seems unlikely given common usage of the term "large number" that three inputs would suffice.  *See* Policy Bulletin 04.1.  For that reason, Commerce was required to explain the reason that, in the absence of a "large number" of inputs, "input matching" would nonetheless be "very complicated" in the case of chlorinated isos such that they fall within the category of "industrial commodity chemicals."  *Id.*

*Id.* at __, 776 F. Supp. 3d at 1335-36.

On remand, Commerce explained that "the actual number of inputs needed to produce chlorinated isos . . . is more extensive" than three and consists of "caustic soda/sodium hydroxide, chlorine, sulfuric acid, boron oxides, and urea."  Remand

---

[3] Policy Bulletin 04.1 contrasts "major inputs" with inputs for "industrial commodity chemicals," a class of goods for which "the large number, and generic nature, of the inputs makes input matching very complicated."

Results at 5 (citing Letter from Heze Huayi Chemical Co., Ltd., "Section C&D Response" (Nov. 14, 2022), Ex. D-2, CR 9-20; Letter from Juancheng Kangtai Chemical Co., Ltd., "Section C&D Response" (Nov. 14, 2022), Ex. D-2, CR 21-31).  Commerce noted also that in addition to the five chemical inputs, "Commerce requires values for . . . three types of fuel/energy (*i.e.*, electricity, coal, and steam), and several types of packaging."  *Id.*  Commerce concluded that for these reasons, "chlorinated isos more closely resembles [sic] the example of 'industrial commodity chemicals' referenced in Policy Bulletin 04.1 rather than 'major inputs.'"  *Id.* (citing Policy Bulletin 04.1).

Plaintiffs object that "[w]hether there are three or five [material] inputs, it is simply arbitrary to insist that CYA is not a major input because five material inputs is a 'large number.'"  Pls. Br. at 9.

The court agrees.  Commerce on remand merely restated, without further explanation, that the number of inputs needed to produce chlorinated isos is a "large number."  Remand Results at 5.  The only difference on remand is that Commerce adjusted the number from "three intermediate inputs" to five chemical inputs, three energy sources and "several types of packaging."[4]  *Id.*

While it is true that Policy Bulletin 04.1 does not set a floor or ceiling on what may constitute a "large number" of inputs, *see* Policy Bulletin 04.1, Commerce is required to explain the reason that its decision to bypass the colloquial understanding of that phrase is nonetheless supported by substantial evidence.  Mere assertions are insufficient.  *See Linyi Chengen Imp. and Exp. Co. v. United States*, 487 F. Supp. 3d

---

[4] The court notes that packaging and energy sources are inputs to some extent in many if not most products.  For that reason, the court is not persuaded that such "inputs" should be counted for the purposes of the "large number" inquiry.

1349, 1359 (2020) ("Commerce's mere assertions without substantial evidence do not serve the purpose of calculating dumping margins as accurately as possible."). Accordingly, Commerce's "large number" of inputs argument is not supported by substantial evidence.

On remand, Commerce is directed to explain further by offering support from other Commerce determinations or court decisions and if none offers specific and apposite support for Commerce's conclusion, to offer support from other legal sources, or reconsider its determination that five to eight inputs constitute a "large number" of inputs under Policy Bulletin 04.1.

### 3.    Specialized or dedicated input

The court concludes that Commerce did not explain adequately its determination that CYA is not a "specialized or dedicated" input in the production of chlorinated isos.

Commerce on remand concluded that CYA is not a major input because it is "not a 'specialized or dedicated' input . . . as expressed by Policy Bulletin 4.1."  Remand Results at 6.  Commerce found that "information on the record . . . states that [CYA] is not only used in the production of chlorinated isos, but it can also be used as an input to produce decolourants . . ., resins, paints, and herbicides," as well as "an inhibitor of nylon, in plastics, polyester, and as an additive in cosmetics."  Remand Results at 6. Commerce determined that "[b]ecause of its uses in various products and industries, Commerce does not consider [CYA] to be an input that is 'specialized or dedicated' with respect to chlorinated isos."  *Id.*

Plaintiffs argue that CYA is "specialized or dedicated or used intensively" because it "imparts the unique physical characteristics and uses of chlorinated isos,"

namely "stability."  Pls. Br. at 3.  Plaintiffs explain that "CYA is a 'major input' because it is essential to the production of chlorinated isos" and "is not any less a 'major input' simply because it is used in other products."  *Id.* at 7.

Commerce on remand stated merely that the use of CYA in other contexts demonstrated that CYA was not "specialized or dedicated" with respect to chlorinated isos.  *See* Remand Results at 6, 23-24.  Commerce's failure to address petitioners' arguments prevents the court from concluding that the determination was reasonable and supported by substantial evidence.  What is more, Commerce's own language in the scope of the order itself describes chlorinated isos as "derivatives of cyanuric acid." IDM at 2; *see also Calcium Hypochlorite from China*, Inv. Nos. 701-TA-510 and 731-TA-1245, USITC Pub. 4452 at 6 (Feb. 2014) ("Chlorinated isos are a cyanuric acid derivative, produced from a reaction of cyanuric acid (derived from urea), chlorine, and caustic soda.").  So, the scope itself requires that Commerce explain the reason that CYA is not "specialized or dedicated" notwithstanding that the subject merchandise is a cyanuric acid derivative.[5]

Moreover, Commerce's explanation on remand failed to address the complete definition of major inputs set forth in the Policy Bulletin.  Major inputs are defined as "inputs that are specialized or dedicated *or used intensively*, in the production of the subject merchandise."  Policy Bulletin 04.1 (emphasis supplied).  If Commerce wishes to take the position that CYA is not a major input, Commerce needs to demonstrate that CYA is not "used intensively" in the production of subject merchandise.  *Id.*  That (1)

---

[5] In view of this language and other language discussed throughout this opinion, the court takes the opportunity to underscore its expectation that Commerce will adhere closely to the specific remand instructions.

CYA accounts for the plurality of raw material inputs by volume and appears to comprise a "predominant portion" of subject merchandise, and (2) Commerce did not explain adequately its determination that chlorinated isos include a "large number" of inputs require that Commerce address this point directly. *See supra* Section I.B.1-2. In omitting any discussion of this third criterion, Commerce failed to explain adequately the reason that CYA could not be considered a "major input" under its own regulations. Nor did Commerce cite authority that would explain its silence on this point. *See* Remand Results at 5-6. Accordingly, Commerce's "specialized or dedicated" basis for concluding that CYA is not a major input is both insufficient and incomplete.

On remand, Commerce is directed to: (1) provide definitions for "specialized," "dedicated" and "used intensively"; (2) explain further or reconsider its determination that CYA is not a "specialized or dedicated" input with respect to chlorinated isos given that chlorinated isos are derived from CYA; and (3) explain whether CYA is "used intensively" in the production of chlorinated isos.

### 4. Urea

The court concludes that Commerce did not explain adequately its determination in the alternative on remand, that it is inappropriate to focus on CYA for the "major input" analysis and that Commerce should focus instead on urea. *Id.* at 6-7; 23-24.

Commerce contended that "neither respondent purchases any of the [CYA] that is used to produce chlorinated isos" but "both respondents purchase urea which they use to produce the [CYA] that is then used to produce chlorinated isos." *Id.* at 6.

Plaintiffs object that, under Policy Bulletin 04.1, "[i]t does not matter . . . whether the major input itself is manufactured from another material (*e.g.*, urea) or whether the

producer of the comparable merchandise itself manufactures the major input." Pls. Br. at 10. Plaintiffs explain that "[u]ncontested record evidence . . . demonstrates that none of the countries on the surrogate country list are [sic] producers of merchandise manufactured with the essential raw materials, such as CYA or urea, required to make chlorinated isos." *Id.* at 11.

Commerce on remand maintained that "focusing on purchased inputs is appropriate as the purpose of the surrogate country analysis is to determine whether a surrogate country will likely have accurate prices available . . . for valuing the respondents' inputs and by-products and co-products." Remand Results at 7.

This comment is not supported by the language of the statute or Commerce's regulations. Commerce, in short, is confusing or conflating the statute's surrogate country selection process under § 1677b(c)(4) with the factors of production analysis under § 1677b(c)(1), which provides that Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise" in the surrogate country.

By contrast, the determination of normal value is downstream from the surrogate country selection process set forth in § 1677b(c)(4). Before looking at FOPs, Commerce must select the surrogate country that will be the source of those FOPs. Once a surrogate country is selected that, "to the extent possible," is "at a level of economic development comparable to that of the nonmarket economy country" and a "significant producer of comparable merchandise," *then* shall Commerce "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise" in the surrogate country. *See* 19

U.S.C. § 1677b(c)(1)-(4).  The statute does not provide that Commerce shall make certain assumptions regarding the availability of price data when considering whether a potential surrogate country meets the two statutory criteria.[6]  *See id.*  And there is nothing in the statute or in Policy Bulletin 04.1 that requires that Commerce must consider inputs purchased in the surrogate country for the "comparable merchandise" inquiry.  *See id.*; *see also* Policy Bulletin 04.1.  For the court to conclude otherwise would be to conflate the "significant producer" and "comparable merchandise" elements of the inquiry.

As discussed, the determination of whether different types of merchandise are comparable involves "a three-part test that examines 'physical characteristics, end uses, and production processes.'"  *Shanghai Foreign Trade Enters.*, 28 CIT at 490, 318 F. Supp. 2d at 1348.  That an input, such as CYA, is produced rather than purchased in the surrogate country is irrelevant to the basic question of whether two products are comparable.  For that reason and those enumerated above, the court remains unpersuaded that a "major input" analysis as to CYA is improper.

But even if urea *is* the proper input to be analyzed in the "major input" inquiry here, Commerce's determination in that respect is not supported by substantial

---

[6] Moreover, Policy Bulletin 04.1 states expressly that "if more than one country has survived the selection process" after the economic comparability and significant producer of comparable merchandise inquiries, then "the country with the best factors data is selected as the primary surrogate country."  The Policy Bulletin provides that poor data quality could be a legitimate reason for rejecting a country that meets the two statutory criteria or departing from the surrogate country list entirely to select one or more surrogate countries not on the original list.  *See id.*  However, the structure of the regulation suggests that this decision should occur only *after* the potential surrogate countries are analyzed under the two statutory criteria.  *See id.*

evidence.  Commerce stated that urea is not a "major input" because it is used in a wide range of applications and is therefore not "specialized" or "dedicated."  Remand Results at 8.  As with CYA, Commerce needs to explain the reasons that urea should be the focus of the major input inquiry given that the scope of the order describes chlorinated isos as "derivatives of cyanuric acid," not "derivatives of urea."  IDM at 2.

Further, as with CYA, Commerce failed to address a critical part of the Policy Bulletin's definition of "major input," namely that a major input may also be an input that is "used intensively" in the production of subject merchandise.  Policy Bulletin 04.1 ("[W]here there are major inputs, i.e., inputs that are specialized or dedicated *or used intensively* . . . ." (emphasis supplied)); *see supra* Section I.B.3.  Commerce restated also its conclusion that the number of inputs needed to produce chlorinated isos is a "large number" without further explanation.  *See* Remand Results at 24; *see supra* Section I.B.2.

For these reasons, the court remands to Commerce to explain further as specified above or reconsider its determination that neither CYA nor urea is a "major input" such that "comparable merchandise should [not] be identified narrowly, on the basis of a comparison of the major inputs."  *See* Policy Bulletin 04.1.  In addition to the remand instructions set forth above, Commerce is directed specifically to consider the volume of urea in subject merchandise and whether urea does or does not comprise a "predominant portion" of subject merchandise.  *See supra* Section I.B.1-3.  The court notes the significant impact that a reconsideration by Commerce of its major input determination could have on the broader comparable merchandise inquiry, which could in turn have ramifications for the selection of a surrogate country.

### C.      Physical characteristics

#### 1.      Whether calcium hypo and chlorinated isos share similar physical characteristics

The court concludes that Commerce's determination that calcium hypo and chlorinated isos share physical characteristics was reasonable and supported by substantial evidence.

In *Bio-Lab I*, the Court held that Commerce did not explain adequately its determination that calcium hypo and chlorinated isos shared similar physical characteristics.  49 CIT at __, 776 F. Supp. 3d at 1336.  Commerce in the *Final Results* "discussed only the physical characteristics of sodium hypo despite Commerce's conclusion that both calcium and sodium hypo are comparable to chlorinated isos."  *Id.* (citing IDM at 8).  Accordingly, the Court remanded for Commerce to "explain whether calcium hypo shares similar physical characteristics with chlorinated isos."  *Id.*

Commerce on remand found that "record information demonstrates that chlorinated isos and calcium hypo share similar characteristics because they can be both found in a powdery or tablet form, are chlorinated[,] . . . both products can be used as disinfectants or for water treatment applications, can be purchased in similar packaging, and react in a similar fashion when they come into contact with water." Remand Results at 9.

Plaintiffs argue that Commerce's determination is not supported by substantial evidence.  Pls. Br. at 12-15.  Plaintiffs assert that Commerce's conclusions with respect

to the "powdery or tablet form" of the products ignores the fact that "innumerable chemicals and other products are available in powder or tablet form."[7]  *Id.* at 13.

Even if plaintiffs note correctly the preponderance of "chemicals and other products . . . available in powder or tablet form," plaintiffs do not address Commerce's other factual findings.  *See id.*  For example, Commerce discussed the similarly high chlorine percentages of trichloroisocyanuric acid ("TCCA") — one of the three primary chemical compositions of chlorinated isos that is within the scope of the AD order, *see* IDM at 2 — and calcium hypo.  Remand Results at 9-10.

Moreover, Commerce cited the following excerpt from advisory material from the U.S. Environmental Protection Agency on swimming pool chemicals:

> At many pools, gaseous chlorine . . . is fed directly into pool water to kill bacteria and Other microorganisms.  Almost all pools using gaseous chlorine use cylinders containing 100 to 150 pounds of chlorine.

> At other pools[,] solid, granular, pellet, or stick compounds *(e.g., calcium hypochlorite and chlorinated isocyanurates)* or liquids (e.g., sodium hypochlorite) are added to the water.  In contact with water, these solid and liquid chemicals dissolve and form hypochloric acid or chlorine ions to perform the same disinfecting function as chlorine.

Letter from Respondents, "Rebuttal Comments on GNI List" (Nov. 28, 2022), attach. 3, PR 37 (emphasis supplied).

---

[7] To support this notion, plaintiffs cite only two proceedings in which Commerce noted that certain products were available in powder form; however, in neither of these determinations did Commerce link its conclusion as to the availability of the product in powder form with the "comparable merchandise" inquiry.  *See* Pls. Br. at 13 (citing *Final Determination of Sales at Less than Fair Value: Sodium Hexametaphosphate from the People's Republic of China*, 73 Fed Reg. 6,479 (Dep't of Commerce Feb. 4, 2008) and accompanying IDM at cmt. 1 (Dep't of Commerce Jan. 28, 2008); *Wood Mouldings and Millwork Products from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 76,452 (Dep't of Commerce Sep. 18, 2024) and accompanying IDM at cmt. 8 (Dep't of Commerce Sep. 11, 2024)).

It was reasonable for Commerce to read the proximity of calcium hypo and chlorinated isos in the above excerpt as an indication that they share physical characteristics.  Moreover, both products may appear as "solid, granular, pellet, or stick compounds" and both "dissolve and form hypochloric acid or chlorine ions" when brought into contact with water.  *Id.*

In light of the totality of the record information, it was reasonable for Commerce to conclude that chlorinated isos and calcium hypo share physical characteristics.  The court notes further that Commerce on remand provided more information regarding the physical similarity between chlorinated isos and calcium hypo than Commerce did regarding the physical similarity between chlorinated isos and sodium hypo in the *Final Results*.  *Compare* Remand Results at 9-11, *with* IDM at 6-9.  The Court concluded in *Bio-Lab I* that the explanation of the latter comparison was adequate and the court concludes the same of the former here.  *See Bio-Lab I*, 49 CIT at __, 776 F. Supp. 3d at 1336.

Plaintiffs in effect ask the court to isolate each item of record information and determine whether each proves conclusively that calcium hypo and chlorinated isos share physical characteristics.  Such an approach is not provided for let alone required by the statute, Policy Bulletin 04.1 or case law.  19 U.S.C. § 1677b(c); Policy Bulletin 04.1.  Nor have plaintiffs proffered legal authority in support of this approach.  *See* Pls. Br.

Accordingly, the court sustains the Remand Results on this point.

> **2.      Whether Commerce explained adequately its treatment of the "more detailed information" submitted by petitioners**

The court concludes that Commerce's explanation of its treatment of the "more detailed information" submitted by petitioners is adequate.

Commerce in the *Preliminary Results* noted that the information that petitioners provided regarding the "differences in physical characteristics, end use, and production processes to produce sodium hypochlorite versus chlorinated isos" was "more detailed" compared to the information submitted in prior reviews. Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022 ("Preliminary Results"), 88 Fed. Reg. 43,271 (Dep't of Commerce July 7, 2023) and accompanying Preliminary Decision Memorandum ("PDM") at 19 (Dep't of Commerce June 30, 2023); IDM at 7.

In *Bio-Lab I*, the Court concluded that Commerce in the *Final Results* disregarded petitioners' submission "without an adequate explanation and without a statement of what the 'more detailed information' was." 49 CIT at __, 776 F. Supp. 3d at 1336 (citing PDM at 27; IDM at 7). On this basis, the Court held that Commerce failed to explain adequately its treatment of information submitted by petitioners with respect to physical characteristics. *Id.* The Court remanded to Commerce to "explain further or reconsider whether the 'more detailed information' that petitioners submitted with respect to physical characteristics is inadequate." *Id.*

On remand, Commerce identified the "more detailed information" as including:

[A] finding by the U.S. International Trade Commission (ITC) . . . that calcium hypo, sodium hypo, and chloro isos are separate like products and declarations from engineers for Occidental Chemical Corporation (Occidental Chemical) and Clearon Corporation that focused on the

production processes used to produce sodium hypo, chlorinated isos, calcium hypo, and cyanuric acid.

Remand Results at 12 (citing *Calcium Hypochlorite from China*, Inv. Nos. 701-TA-510 and 731-TA-1245 (Final), USITC Pub. 4515 (Jan. 2015); *Calcium Hypochlorite from China*, Inv. Nos. 701-TA-510 and 731-TA-1245 (Preliminary), USITC Pub. 4452 (Feb. 2014); Letter from Petitioners, "Petitioners' Rebuttal Comments on Final Surrogate Value Submission" (June 26, 2023), Ex. 4, CR 88-89).

Commerce asserted that "while . . . it did not specifically identify these declarations as being 'new detailed information'" in the underlying administrative review, "Commerce did take these declarations into consideration in finding that calcium hypo and sodium hypo are comparable merchandise." *Id.* at 15. Commerce explained that it determined in the *Final Results* that the ITC's findings were not dispositive "because the criteria for such products to be part of the same domestic like product did not involve the same analysis as conducted by Commerce in determining whether a product is 'comparable' for purposes of surrogate country selection as defined by the statute." *Id.* at 12-13.

The court agrees that Commerce provided adequate analysis on this point in both the *Final Results* and *Preliminary Results* but notes that Commerce failed to identify the ITC finding as constituting part of the "more detailed information" from

petitioners.  *See* IDM at 8-9; PDM at 28.  Commerce remedied that discrepancy on remand.[8]

In light of the foregoing and seeing that plaintiffs do not comment on this point, *see* Pls. Br., the court sustains.

### D.      Production processes

The court concludes that Commerce on remand did not explain adequately its determination that calcium hypo, sodium hypo and chlorinated isos share similar production processes.

In *Bio-Lab I*, the Court concluded that "Commerce did not explain adequately its determination that calcium and sodium hypo and chlorinated isos share 'a similar production process.'"  49 CIT at __, 776 F. Supp. 3d at 1338 (quoting IDM at 6).  The Court instructed that:

> On remand, Commerce should explain further or reconsider the similarity of the production processes of chlorinated isos, sodium hypo and calcium hypo.  The production processes need not be identical, but Commerce must support its determination of similarity with more than the mere assertion that the processes are both multi-stage and share some inputs.

*Id.*

Commerce on remand "continue[d] to find that the production processes of chlorinated isos, calcium hypo, and sodium hypo are similar for purposes of finding

---

[8] The court notes separately that the second category of "more detailed information" described in the Remand Results, "products and declarations from engineers for Occidental Chemical Corporation . . . and Clearon Corporation," concerns primarily production processes and does not pertain to the Court's instructions in the remand order, which concerned physical characteristics.  Remand Results at 12-16; *Bio-Lab, Inc. v. United States*, 49 CIT __, __, 776 F. Supp. 3d 1315, 1336 (2025).

these products to be comparable as instructed by Policy Bulletin 04.1." Remand Results at 17. Commerce explained specifically that "these three products require similar key inputs (*i.e.*, sodium hydroxide and chlorine) and each requires multi-stage production processes." *Id.* In making this determination, Commerce relied upon: (1) "record information provided by respondent Heze Huayi (regarding its process for producing chlorinated isos)"; (2) an ITC proceeding regarding calcium hypo from China in which the ITC made findings with respect to the production process; and (3) petitioner-submitted information regarding the "two production processes for sodium hypo." *Id.*

Plaintiffs object on two fronts. First, plaintiffs argue that Commerce failed to address record evidence demonstrating that the production of chlorinated isos is more expensive, more labor intensive, requires more specialized equipment and has more stages of production. Pls. Br. at 16-19. Second, plaintiffs argue that shared inputs and multi-stage production processes do not automatically render the production of chlorinated isos comparable to the production of calcium or sodium hypo. *Id.* at 19-21.

On remand, Commerce noted these concerns but responded that "petitioners' arguments are essentially that Commerce must find that the production processes for chlorinated isos, calcium hypo, and sodium hypo are identical." Remand Results at 32. Commerce explained that "[t]he fact that one product requires more processing steps and different production facilities than the other does not take away from our conclusion that production processes are comparable." *Id.*

Commerce's attempt to avoid petitioners' objections is not persuasive. Commerce does not cite authority of any kind for the assertion that two products with

different production steps and facilities are nonetheless comparable.  *See id.*; *cf. M S Int'l, Inc. v. United States*, 45 CIT __, __, 547 F. Supp. 3d 1254, 1270 (2021) (affirming Commerce's comparison of two production processes that shared "five of the seven production steps" for one product and "use[d] similar machinery").  Commerce instead reiterated, as it did in the *Final Results*, that the products share similar inputs (sodium hydroxide and chlorine) and all involve multi-stage production processes.  Remand Results at 17.

The court recognizes that Commerce on remand described the production processes of chlorinated isos, calcium hypo and sodium hypo in greater detail than in the *Final Results*.  *Compare* Remand Results at 16-20, 30-33, *with* IDM at 8.  However, Commerce did not actually compare these processes to each other.[9]  *See* Remand Results at 18-19.  Commerce even reconsidered its earlier determination with respect to the comparability of the production processes of sodium hypo and chlorinated isos after finding that, unlike chlorinated isos, "sodium hypo does not require evaporation as part of its production process."  *Id.* at 19.

In sum, Commerce on remand did not explain adequately its determination that chlorinated isos, calcium hypo and sodium hypo involve similar production processes.

That said, the court declines to remand on this point given that Commerce has explained adequately the similarity of physical characteristics and end uses among the

---

[9] The attempted comparison of the three production processes in defendant's brief is a post-hoc rationalization and cannot constitute an adequate explanation under the law. Def. Br. at 28-29; *see Ad Hoc Shrimp Trade Enf't Comm. v. United States*, 46 CIT __, __, 578 F. Supp. 3d 1310, 1320 (2022) ("A court will uphold an agency action when the explanation is of less-than-ideal clarity; however, the explanation must come from the agency, not counsel's post hoc rationalization of agency action.").

three products and therefore established their comparability.  *See supra* Section I.C;

*Bio-Lab I*, 49 CIT at __, 776 F. Supp. 3d at 1336-38.  "Though Commerce's practice is

to consider a product's end use, physical characteristics, and production process in

determining comparability, it is not restricted to using products that are comparable

along all three fronts . . . ."  *Yantai Xinke Steel Structure Co. v. United States*, Slip Op.

No. 14-38, 2014 WL 1387529, at *19 (CIT Apr. 9, 2014); *see also Shanghai Foreign

Trade Enters.*, 28 CIT at 491, 318 F. Supp. 2d at 1348 (recognizing that in "some past

cases in which Commerce has applied its three-part 'comparable merchandise' test to

two classes of products made using similar materials and production processes, it has

found comparability despite differences in shape, size and end use.").

In conclusion as to Commerce's findings on comparable merchandise, the court

is unable to sustain Commerce's determination that calcium hypo and sodium hypo are

comparable merchandise until Commerce explains further or reconsiders its "major

input" determination on remand.  *See supra* Section I.B.  Doing so will in turn determine

whether "comparable merchandise" must be defined "narrowly," which could alter

Commerce's determinations with respect to the comparability of calcium and sodium

hypo.  *See* Policy Bulletin 04.1.

## II.    Reconsideration of the Romanian labor data

The court concludes that Commerce did not abuse its discretion in reopening the

administrative record and relying on new Romanian labor data.

In *Bio-Lab I*, the Court concluded that Commerce "did not explain adequately its

decision to select the Romanian labor data" on the record.  49 CIT at __, 776 F. Supp.

3d at 1339.  The Court explained that Commerce in the *Final Results* did not address

comments by consolidated plaintiffs related to the Romanian labor rate, namely consolidated plaintiffs' objection that the labor rate is not contemporaneous with the POR and "is 'not even a manufacturing labor rate at all.'" *Id.* at __, 776 F. Supp. 3d at 1341 (citation omitted).  For that reason, the Court remanded to Commerce "to address consolidated plaintiffs' concerns and explain further or reconsider its selection of the Romanian labor data." *Id.*

On remand, Commerce "reopened the record and placed Romanian labor data from ILOSTAT covering 2021-2022 for 'manufacturing' on the record and provided parties with an opportunity to comment."  Remand Results at 22.  Commerce determined to rely on the new Romanian labor data because Commerce concluded that the data were "specific to the production of subject merchandise (*i.e.*, specific to the manufacturing sector), contemporaneous with the POR, and satisfy Commerce's preference to value labor solely from the primary surrogate country." *Id.*

Consolidated plaintiffs argue that in reopening the record, placing an alternative Romanian labor rate on the record and relying on that rate, Commerce "did not follow the Court's instructions" and violated its "normal practice."  Consol. Pls. Br. at 1. Consolidated plaintiffs' argument runs contrary to this Court's precedent.

It is well-established that "Commerce generally may reopen the administrative record on remand." *Fresh Garlic Producers Ass'n v. United States*, 40 CIT __, __, 190 F. Supp. 3d 1302, 1306 (2016); *Calcutta Seafoods Pvt. Ltd. v. United States*, 45 CIT __, __, 495 F. Supp. 3d 1318, 1335 (2021); *cf. Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1382 (Fed. Cir. 2003) ("Whether on remand the Commission reopens the evidentiary record, while clearly within its authority, is of course solely for the

Commission itself to determine.").  This Court has stated that "[a]s long as the Court does not forbid Commerce from considering new information, it remains within Commerce's discretion to request and evaluate new data" on remand.  *NTN Bearing Corp. of Am. v. United States*, 25 CIT 118, 124, 132 F. Supp. 2d 1102, 1107 (2001); *see also Laclede Steel Co. v. United States*, 19 CIT 1076, 1078 (1995) ("Any decision to expand the administrative record upon remand is well within [Commerce's] discretion, absent express language from the court barring such action.").  There was no such prohibition in the instant case, so Commerce was permitted to reopen the administrative record on remand.  *See generally Bio-Lab I*, 49 CIT __, 776 F. Supp. 3d 1315.

Consolidated plaintiffs argue that Commerce's reopening of the record "is contrary to [Commerce's] normal practice and administrative policy that 'the burden of creating an adequate record lies with interested parties and not with Commerce.'" Consol. Pls. Br. at 1 (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).  But consolidated plaintiffs offer the court only a partial quotation of the Federal Circuit's language in the case that they quote.  *See QVD Food Co.*, 658 F.3d at 1324.  The Federal Circuit's full sentence reads: "*Although Commerce has authority to place documents in the administrative record that it deems relevant*, 'the burden of creating an adequate record lies with [interested parties] and not with Commerce.'" *Id.* (emphasis supplied) (alteration in original) (citation omitted).[10] Consolidated plaintiffs' selective quotation of the Federal Circuit is misleading.

---

[10] The court takes the opportunity to remind all parties that all attorneys practicing before this Court are considered Officers of the Court.  As such, they have an obligation to present the law fully and accurately.  Selective quotation fails to meet this obligation.

Further, Commerce complied with 19 C.F.R. § 351.301(c)(4), which states that interested parties are permitted one opportunity to submit factual information to "rebut, clarify, or correct factual information placed on the record of the proceeding" by Commerce. *See Risen Energy Co., v. United States*, 46 CIT __, __, 569 F. Supp. 3d 1315, 1328-29 (2022). On remand, Commerce provided interested parties an opportunity to rebut, clarify or correct factual information placed on the record, including the ILO Romania 2021-2022 labor data. *See* Mem., "Request for Additional Information: Placing New Factual Information on the Record" (May 23, 2025), PRR 1. Respondents did not comment at that time. *See* Remand Results at 4.

Consolidated plaintiffs argue also that "even in comparing this new Romanian ILO labor rate that [Commerce] itself placed on the record, the Malaysian labor rate is still more specific." Consol. Pls. Br.at 2.

In *Bio-Lab I*, the Court sustained Commerce's rejection of the Malaysian labor data on the record on the grounds that the data were distorted by the prevalence of forced labor in the Malaysian electrical and electronics sector. *See* 49 CIT at __, 776 F. Supp. 3d at 1339-41. The Court sustained also Commerce's rejection of the Mexican labor data because Commerce determined that Mexico was not at a comparable level of economic development to China during the POR. *See id.* at __, 776 F. Supp. 3d at 1332-33. And on remand, Commerce explained that the Mexican labor data are not reliable either because they "are from 13 years prior to the POR and, therefore, are not contemporaneous with the POR." Remand Results at 21.

Because Commerce determined that all three original labor rates on the record were unreliable, it was reasonable for Commerce to rely on a new labor rate that is

more "specific to the production of subject merchandise . . . contemporaneous with the POR, and satisf[ies] Commerce's preference to value labor solely from the primary surrogate country." *Id.* at 22.

Accordingly, the court concludes that Commerce's reopening of the record and selection of the new Romanian ILOSTAT labor data was supported by substantial evidence. The court sustains the Remand Results on this point.

## III.    Commerce's selection of the Romanian financial ratios

### A.    Legal framework

In administrative proceedings that involve an NME country such as China, Commerce calculates the "normal value" of the subject merchandise by selecting surrogate data from one or several market economy countries that Commerce determines constitute the "best available information" in the record. 19 U.S.C. § 1677b(c)(1); *Heze Huayi Chem. Co. v. United States*, 45 CIT __, __, 532 F. Supp. 3d 1301, 1309-10 (2021).

The "best available information" standard involves "a comparison of the competing data sources" in the record. *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1367 (Fed. Cir. 2019). Section 1677b(c)(1) does not define "best available information," which means that Commerce has "broad discretion" to evaluate information in the record. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).

When reviewing a determination by Commerce, the "court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available

information.'"  *Id.* (quoting *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619, 431 F.

Supp. 2d 1323, 1327 (2006)).

### B.    Analysis

The court concludes that Commerce's selection of Romanian financial ratios in

the *Final Results* was reasonable and is supported by substantial evidence.

In *Bio-Lab I*, the Court withheld "judgment on Commerce's selection of financial

ratios until after Commerce has explained further or reconsidered its selection of the

Romanian labor data."  49 CIT at __, 776 F. Supp. 3d at 1343.  The Court noted the

possibility that "Commerce's reevaluation of its selection of the Romanian labor data will

lead Commerce to reconsider its determination that the Romanian financial ratios

constitute the best available information."  *Id.*

As discussed, Commerce reconsidered its selection of the original Romanian

labor data and determined to rely on new Romanian labor data.  *See supra* Section II.

And Commerce's reconsideration on remand did not disturb its determination in the

*Final Results* that the Romanian financial ratios constituted the best available

information.  *See* Remand Results; *see also* IDM.  Accordingly, the court will now

address consolidated plaintiffs' objections to Commerce's selection of Romanian

financial ratios in the *Final Results*.

Consolidated plaintiffs argue that Commerce "failed to properly consider the

importance not only of Malaysia sourcing more financial statements than Romania, but

also the relative quality of the statements in each country."  Pls.' Rule 56.2 Mem. in

Supp. of Mot. for J. Upon the Agency R. at 13, ECF No. 29.  Specifically, consolidated

plaintiffs object to the fact that Romania sourced financial statements from only one

company with comparable merchandise whereas Malaysia sourced financial statements from two companies with comparable merchandise.  *Id.*

In the *Final Results*, Commerce conceded that "Commerce has a preference to use multiple financial statements because it reduces the potential for certain cost distortions when relying on one company's financial situation."  IDM at 21.  However, Commerce noted that such a preference "would be a consideration in selecting one primary SC over another but only in the instance where the overall quality of the remaining SVs of the two competing countries [is] considered equal."  *Id.*  Commerce contrasted such a circumstance with the instant proceeding in which Commerce determined that Malaysia had an "unreliable labor rate and a less preferable water rate," whereas "Romania has usable SVs for all FOPs as well as usable financial ratios calculated from Chimcomplex's financial statements which have been used in other proceedings."  *Id.*

The court concludes that Commerce explained adequately its determination. Given that Commerce concluded reasonably that the other Romanian surrogate values were reliable, *see Bio-Lab I*, 49 CIT at __, 776 F. Supp. 3d at 1339-43; *see also supra* Section II, it was reasonable for Commerce to rely on Romanian financial ratios notwithstanding its stated preference for multiple financial statements.  This determination follows Commerce's longstanding practice of "valu[ing] all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2).

The court sustains the *Final Results* on this point.

## CONCLUSION

In conclusion, the court sustains in part and remands in part Commerce's Remand Results. For the reasons provided above, it is hereby

**ORDERED** that on remand Commerce shall address plaintiffs' arguments and explain further or reconsider its determination that CYA does not comprise a predominant portion of chlorinated isos; it is further

**ORDERED** that on remand Commerce shall explain further by offering support from other Commerce determinations or court decisions and if none offers specific and apposite support for Commerce's conclusion, to offer support from other legal sources, or reconsider its determination that five to eight inputs constitute a "large number" of inputs under Policy Bulletin 04.1; it is further

**ORDERED** that on remand Commerce shall: (1) provide definitions for "specialized," "dedicated" and "used intensively"; (2) explain further or reconsider its determination that CYA is not a "specialized or dedicated" input with respect to chlorinated isos given that chlorinated isos are derived from CYA; and (3) explain whether CYA is "used intensively" in the production of chlorinated isos; it is further

**ORDERED** that on remand Commerce shall explain further or reconsider its determination that neither CYA nor urea is a "major input" such that "comparable merchandise should [not] be identified narrowly, on the basis of a comparison of the major inputs." *See* Policy Bulletin 04.1. It is further

**ORDERED** that Commerce shall file with the court its second remand redetermination within 90 days following the date of this Opinion and Order; it is further

**ORDERED** that the moving parties shall have 30 days from the filing of the remand redetermination to submit comments to the court; and it is further

**ORDERED** that should the moving parties submit comments, defendant shall have 21 days from the date of filing of the last comment to submit a response.

**SO ORDERED.**

/s/    Timothy M. Reif
Timothy M. Reif, Judge

Dated: April 27, 2026
       New York, New York