UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., ET AL.<br>Plaintiffs,<br><br>and<br><br>JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD.,<br>Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br>Defendant,<br><br>and<br><br>BIO-LAB, INC., ET AL; JUANCHENG KANGTAI CHEMICAL CO., LTD. ET AL.<br>Defendant-Intervenors and<br>Consolidated Defendant-Intervenors.. | Consol. Ct No. 24-00024 |

**CONSOLIDATED PLAINTIFFS' COMMENTS IN OPPOSITION TO REMAND RESULTS**

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinhui Wang
**The Inter-Global Trade Law Group, PLLC**
Suite 1101
1156 Fifteenth Street, N.W. 20005
Tel: (202) 868-0300
email: gmenegaz@igtlaw.com
*Counsel to Consolidated Plaintiffs*

Dated: November 23, 2026

# TABLE OF CONTENTS

I. Calcium and Hypochlorite are Comparable Products within the Meaning of the Statute and Policy Bulletin 04.1 ..... 1

A. CYA Should not Determine Comparable Products ..... 1

B. The Statute and Policy Bulletin Require Commerce to Rely Upon the Best Available Information, and on Significant Producers of Comparable Merchandise to the Extent Possible ..... 5

II. Mexico Should Not be Selected as the Primary Surrogate Country ..... 8

III. Conclusion and Prayer for Relief ..... 13

# TABLE OF AUTHORITIES

## Cases


*Bartenwerfer v. Buckley*, 598 U.S. 69c(2023) .......... 8

*Citic Trading Co. v. United States*, 27 C.I.T. 356c(2003) .......... 5-6

*CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277 (2011) .......... 6

*Fresh Garlic Producers Ass'n v. United States*, 2015 Ct. Intl. Trade LEXIS 133 (Ct. Int'l Trade Nov. 30, 2015) .......... 7

*Lasko Metal Prods. v. United States*, 810 F. Supp. 314 (Ct. Int'l Trade 1992) .......... 6

*Michigan v. Bay Mills Indian Community*, Ed. 2d 1071 (U.S. 2014) .......... 6

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990) .......... 6

*Shanghai Foreign Trade Enters. Co. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) .......... 2

*Shenzhen Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333(Ct. Int'l Trade 2014) .......... 12

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) .......... 8-9


## Statute


19 U.S.C. § 1677b(c)(1) .......... 5-7

19 U.S.C. § 1677b(c)(4) .......... 5-8


## Administrative Decisions


*Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Comm. Nov. 9, 2012) .. 10

*Activated Carbon from China* Remand Results, CIT 16-185 (June 17, 2019) .......... 12

*Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value* (July 17, 2019) .......... 12

USITC Publication 5677, Chlorinated Isocyanurates from China, Investigation No. 701-TA-501 (Second Review) (November 2025), available at https://www.usitc.gov/publications/701_731/pub5677.pdf .......... 2

Pursuant to Rule 56.2 (c)(1), Consolidated Plaintiffs Heze Hauyi Chemical Co., Ltd. ("Heze Huayi") and Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") (collectively, "Consolidated Plaintiffs") hereby submit their comments comment in opposition to the remand results. *See* Dep't Remand Results (October 9, 2026), ECF80.

The Court remanded four related issues in Commerce's remand results with respect to comparable merchandise. The Court remanded for the further explanation or reconsideration of whether 1) cyanuric acid comprises a predominant portion of subject merchandise, 2) five to eight inputs is a large number as contemplated by Policy Bulletin 04.1, 3) whether cyanuric acid is specialized, dedicated, and used intensively in the production of subject merchandise, and 4) whether cyanuric acid or urea is a major input for identifying comparable merchandise. Commerce for the first time reversed its position on all of these issues. Now on remand, Commerce finds that cyanuric acid is a major input for chlorinated isos and as such, calcium and sodium hypochlorite are not comparable products. Given none of the listed countries produce comparable merchandise, Commerce then selected Mexico as the primary surrogate country. Respondents object to Commerce's findings in each respect.

## I. Calcium and Hypochlorite are Comparable Products within the Meaning of the Statute and Policy Bulletin 04.1.

### A. CYA Should not Determine Comparable Products.

Commerce found that urea is not a major input in the production of chlorinated isos, which is supported by information submitted by Respondents and appears to be conceded by petitioner. Remand Results at 13; *see also* Resp. NFI (July 22, 2026) at Exhibit 2 (information on urea). Accordingly, Commerce based its new analysis on comparable products entirely on CYA. However, Respondents submit this is not appropriate because not only do Respondents' self-produce CYA, but the industry generally self-produces CYA. Accordingly, CYA is not a

major input in the industry.

Commerce disagreed with Respondents' argument that CYA is not a major input because Respondents do not purchase CYA. Remand Results at 19. Commerce says the Court "expressly rejected" this reasoning that the Respondents' purchasing experience matters for this analysis. *Id*. citing to Slip Op. 26-43 at 15-16. However, this does not capture the full argument, as it not only that Respondents do not purchase CYA—but it is industry standard for chlorinated isos producers to self-produce CYA and not purchase CYA.

Respondents self-produce CYA from urea. Based on Respondents' position in the market, it also stands that it is most common that chlorinated isos producers generally self-produce CYA. Respondents have been the top exporters of chlorinated isos to the United States for over a decade. China is the largest world exporter of chlorinated isos. Respondents are not affiliated in any manner either. Thus, the evidence of these two independent significant chlorinated isos on the global market is indicative of the industry—i.e. chlorinated isos manufacturers generally self-produce CYA. Further, even the U.S. chlorinated isos manufacturers self-produce CYA. USITC Publication 5677, Chlorinated Isocyanurates from China, Investigation No. 701-TA-501 (Second Review) (November 2025) at pg 1.8, pdf pg 38 ("U.S. chlorinated isos producers use urea to make cyanuric acid…"), available https://www.usitc.gov/publications/701_731/pub5677.pdf. CYA cannot reasonably be the deciding factor in what is a comparable product for a chlorinated isos producer, when such producers are not purchasing and consuming CYA—they are producing it from further upstream materials.

This Court said whether merchandise are comparable "involves 'a three-part test that examines 'physical characteristics, end uses, and production processes.'" Slip Op. 26-43 at 17

quoting *Shanghai Foreign Trade Enters*., 28 CIT at 490, 318 F. Supp. 2d at 1348. This Court then found that " an input, such as CYA, is produced rather than purchased in the surrogate country is irrelevant to the basic question of whether two products are comparable." *Id*. However, the consideration of the production processes is precisely why CYA should not be considered a primary input. The chlorinated isos industry is not consuming CYA—the industry is consuming the upstream materials to produce CYA, namely urea[1]. To put this in the context of another industry, hardwood plywood, it is as if Commerce was basing comparable products on products that used plywood platforms (multiple wood veneers glued together), rather than basing comparable products on products that used wood veneers. While some plywood producers buy plywood platforms to produce hardwood plywood, it is most common in the industry to buy wood veneers to make plywood platforms and then further manufacturer into finished plywood. CYA is essentially like an intermediate product in the normal production of chlorinated isos. It is contrary to the policy bulletin's consideration of raw materials and production process to place primary emphasis on an intermediate product, CYA, that chlorinated isos producers generally self-produce rather than consider the base raw materials and production process overall.

Ultimately, there is no predominant, major, specialized, dedicated, or intensively used input for chlorinated isocyanates such that it should define comparable merchandise as contemplated in Policy Bulletin 04.1. Policy Bulletin 04.1 explained that major input analysis or "specialized, dedicated, or intensively" used analysis is not the normal analysis; rather, it depends on the particular product. The examples provided of when such input specific analysis

[1] The further upstream materials for CYA are not "specialized," "dedicated" and "used intensively" with respect to chlorinated isos or CYA. The primary material used to produce CYA is urea. As Commerce already found, urea is not dedicated to the chlorinated isos market and is also not dedicated to CYA. Remand Results at 13. Indeed, Urea is a widely used input, especially in the fertilizer industry—an entirely different market than chlorinated isos. Resp. NFI at Exhibit 2.

would make sense, is "processed agricultural, aquatic and mineral products." Indeed, when Commerce has relied on this part of Policy Bulletin 04.1, it has been for such products like fresh garlic, shrimp, or fish fillets. Commerce understandably applied a narrow input focused comparable-merchandise analysis in those cases because that input essentially drives the entire value of the final product. If a country has no production of garlic, shrimp, or fish fillets then it would not reasonably have a surrogate value for said input. But this is not the case with chlorinated isos.

The subject merchandise in this case is made with industrial chemical inputs that are widely available and widely used in the economically comparable countries. A particular input that is unusual on the world market is not driving the cost of chlorinated isos. This is evidenced by multiple suggested surrogate country having a full surrogate value record, in this review and all prior reviews.

Further, this Court relied upon "physical characteristics, end uses, and production processes" as defining comparable merchandise. However, the primary emphasis on the use of CYA does not consider physical characteristics or end uses at all. The Policy Bulletin's contemplation that physical characteristics and end-uses would be the appropriate consideration for comparable merchandise supports that sodium and calcium hypochlorite are comparable products.

Chlorinated isos is within the broader chlor-alkali product family which are industrial commodity chemicals used as sanitizing, disinfecting and bleaching agents. The Policy Bulletin explains that physical characteristics would make more sense for industrial commodity chemicals or products where inputs are widely available, such as here. The physical characteristics of chlorinated isos and calcium/sodium hypochlorite are very similar. These are

all used in the disinfecting/bleaching agents for water. They can be found in a powdery or tablet form, are chlorinated and can used as disinfectants or for water treatment applications, and they each react in a similar fashion when they encounter water. Chlorine is a major material/function as seen in the plain name of all three.

Commerce's original comparable product analysis considering physical characteristics and end-uses as contemplated by Policy Bulletin 04.1 was appropriate for chlorinated isos (particularly given the lack of a major or unusual input) and in accordance with the statute, Policy Bulletin, and past practice. The Court should remand to Commerce to reconsider that chlorinated isos lacks a major input and to consider physical characteristics and end-uses in its comparable product analysis.

**B. The Statute and Policy Bulletin Require Commerce to Rely Upon the Best Available Information, and on Significant Producers of Comparable Merchandise to the Extent Possible.**

Further, Respondents respectively disagree with this Court that consideration of the Respondent's surrogate values (namely that CYA would never be a surrogate value) in determining comparable products conflates "the statute's surrogate country selection process under § 1677b(c)(4) with the factors of production analysis under § 1677b(c)(1). Slip Op. 26-43 at 17. 1677b(c)(4) and 1677b(c)(1) work together. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (Moreover, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). The entire goal of 1677b(c) is to calculate the most accurate margin. Commerce relies upon the best available information (1677b(c)(1)) to calculate the most accurate margin. Commerce relies to the extent possible on economically comparable and significant producers of comparable merchandise (1677b(c)(4)) to find the best available information and calculate the

most accurate margins. The entire purpose of this provision is in pursuit of relying upon the best available information and calculating the most accurate margin. *Citic Trading Co. v. United States*, 27 C.I.T. 356, 365, n.12 (2003) (Commerce's discretion "is constrained by the underlying objective of [19 U.S.C. § 1677b(c)]; to obtain the most accurate dumping margins possible."); *Lasko Metal Prods. v. United States*, 810 F. Supp. 314, 316 (Ct. Int'l Trade 1992) quoting *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ("The purpose of the antidumping statute, according to the Federal Circuit, is 'determining current margins as accurately as possible.'").

Indeed, the statute directs, to the extent possible, Commerce to rely on countries that are significant producers of *comparable* merchandise. 19 U.S.C. 1677b(c)(4). Congress chose to use comparable merchandise, and petitioner's argument now adopted by Commerce is impermissible because it removes any meaning from the term "comparable" in the statute by equating it with identical. *Michigan v. Bay Mills Indian Community*, Ed. 2d 1071, 1086 (U.S. 2014) (Congress wrote the statute it wrote--meaning, a statute goes so far and no further; "This Court has no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view that … Congress 'must have intended'" something different.) *citing CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 295 (2011).

The statute specifically called for comparable merchandise, not identical or nearly identical. By defining comparable merchandise so narrowly in this review, Commerce has not actually defined any comparable product—only identical. Commerce claims it has not narrowly defined comparable merchandise to only identical, but rather only determined that Romania and Malaysia are not producers of comparable merchandise. Slip Op. 26-43 at 23. However, the only identified product that fulfils this narrowing of comparable merchandise is chlorinated isos

itself. This is contrary to the best reading of the statue.

It is also not established on this record that Mexico is a *significant* producer, as contemplated by the statute. The only country with a known quantity of exports of chlorinated isocyanurates on the record is Mexico. Significance is a term of comparison, therefore there is no comparison to establish that the figure exported from Mexico is significant and renders Mexico a significant producer. *See Fresh Garlic Producers Ass'n v. United States*, 2015 Ct. Intl. Trade LEXIS 133 (Ct. Int'l Trade Nov. 30, 2015) (discussing that the term significant holds meaning and suggesting that a significant producer is a country "whose domestic production could influence or affect world trade…" "This follows from the plain meaning of the word "significant" as something "having or likely to have influence or effect."). Commerce's explanation that Mexico is a significant exporter is that Mexico has a single company that produces chlorinated isos and exported a certain amount of chlorinated isos to the United States—yet, this involves no comparison. Remand Results at 25.

Further, by narrowing the definition so, Commerce is left with one surrogate country—and one that is not even economically comparable, the second criterion of Congress's instruction. 19 U.S.C. 1677b(c)(4). Thus, Commerce is now essentially viewing the comparable merchandise crtierion of the statute as more important than economic comparability, contrary to the best reading of the statute and past practice.

Moreover, Commerce's decision to narrowly define comparable merchandise fails to consider that the entire point of the surrogate country process is to arrive at the best available surrogate values—quality, comparable, and available surrogate values.

First, Commerce never had any problem identifying quality, comparable, and available surrogate values in countries that produced calcium/sodium hypochlorite. This record has a full

record for Romania and Malaysia. In past reviews, others producers of sodium/calcium hypochlorite, Thailand, Philippines, and India, provided the best available information for many years, according to Commerce. The entire premise that narrowing the potential pool of surrogate countries to only one identical producer will further the statutory aim to rely upon the best available information is incorrect.

Second, Mexico does not source the best available information. There was no data quality improvement by narrowing the potential surrogate countries to Mexico. As argued further below, we submit that the supposed data quality gained is in fact lost due to this narrowing.

While Mexico may have identical production, the only Mexican financial statement on the record is from CYDSA, which does not produce identical merchandise. There is only evidence of one producer of identical merchandise in Mexico, Aquachlor, but that financial statement is not on the record. As elaborated below, CYDSA is actually highly dissimilar to Respondents and not the best financial data on the record and the Mexican import data used to value most inputs is likewise seriously flawed. Commerce's narrowing of comparable merchandise contravenes the statutory directive to rely upon the "best available information". 19 U.S.C. § 1677b(c)(1).

## II. Mexico Should Not be Selected as the Primary Surrogate Country.

The statute states to the *extent possible* to rely upon data in countries that are a) economically comparable and b) significant producers of comparable merchandise. 19 U.S.C. § 1677b(c)(4). But Commerce's remand results narrowly defines comparable merchandise to only include Mexico, and then broadly finds that "Commerce requires economic comparability only to the extent possible." Remand Results at 27. The statutory language to "the extent possible"

applies equally to both economic comparability and significant production; it is contrary to statutory interpretation to apply it unequally. *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023) (Statutory interpretation "always" begins with "the text of the statute."); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) (An agency interpretation that is "inconsisten{t} with the design and structure of the statute as a whole" is impermissible.).

Commerce claims that because Mexico is the only country that fulfills the comparable merchandise criterion and that "Commerce considered Mexico's economic comparability 'only to the extent possible' as the only country with comparable merchandise and sufficient data on the record to be considered as a surrogate country." Remand Results at 28. This is nonsensical and arbitrary under statutory interpretation. Indeed, the very opposite is also true, since Malaysia (and Romania) fulfill the economic comparability criterion, then Commerce can consider Malaysia's significant production of comparable merchandise to the 'extent possible" as a country that is economically comparable and has sufficient data on the record to be considered as a surrogate country.

Commerce in its remand results has elevated significant production of comparable merchandise above economic comparability. This is contrary to Commerce's policy bulletin sequential approach that it argued for in this very case and that was upheld. U.S. Response Br. (November 6, 2024) at 24-29; Slip Op. 25-39 at 22-25. Following Commerce's position in this very litigation, Mexico would be disfavored over Malaysia because Mexico fails on the first criteria, economic comparability. Or at the very minimum, these two criterion must be considered equally—in which case, under Commerce's current definition of comparable merchandise, Malaysia and Mexico would equally fulfil only one of the first two surrogate country criteria.

Commerce has not changed its position that Mexico is not economically comparable to China, nor was this within the scope of the remand, which upheld Commerce's decision in that regard in the last remand. Therefore, Mexico is not economically comparable. Malaysia is economically comparable. Based on Commerce's current[2] decision on comparable products, Malaysia is not a significant producer of comparable products and Mexico is. Therefore, Mexico only fulfils one of the two first criteria of Commerce's surrogate country analysis—but so does Malaysia. They are equal in this regard based even on this remand. Thus, the third criterion, the data quality, should determine which surrogate country to select. Respondents submit that Malaysia sources has the highest data quality as it sources the best available information, at a minimum, for financials and all import values.

First, the relative comparison of the financials in the competing surrogate countries is different now that Commerce has determined that calcium/sodium hypochlorite are not comparable products. With that determination, then none of the potential surrogate financials produce a comparable product—in Mexico or Malaysia. Other aspects of financial comparison must be considered then.

Mexico is less preferable to Malaysia because of the quality and quantity of financial statements. The three Malaysian financials are more comparable than the sole Mexican financial because the Malaysian financials are solely engaged in the chemical industry and in the chlor-alkali field specifically. CCM is only engaged in the same industry, i.e., chlor-alkali manufacturing. Resp. Final SVs at Exhibit 12, **PR69-72**. Malay-Sino is also only engaged in

[2] Commerce claims that Respondents concede that Malaysia does not fulfill the significant producer requirements. Remand Results at 27. However Respondents clearly stated only that Malaysia does not fulfill Commerce's current definition of comparable products. Respondent absolutely do not concede that Malaysia is not a significant producer of comparable merchandise and argued that calcium and sodium hypochlorite are comparable merchandise.

the production of chlor-alkali products and is therefore highly comparable. *Id*. at Exhibit 13. The third Malaysian financial statement is from Mey Chern Chemicals which is a manufacturer and trader of chlor-alkali chemicals. *Id*. at Exhibit 14. These companies are all only chemical companies. These companies are similarly integrated to Respondents and do not engage in dissimilar production of electricity or hydrocarbons, unlike CYDSA in Mexico discussed below. Commerce also has a well-established preference for relying on a country with multiple financials. *Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Comm. Nov. 9, 2012), and accompanying *IDM* at Cmt. 1F (after preliminarily finding Thailand to be the most suitable surrogate country, Commerce changed its position in the final results, selecting the Philippines because multiple Philippines financial statements provided a broader market average than the sole Thai statement, satisfying Commerce's "preference for using multiple financial statements.").

In contrast, CYDSA has five business segments: 1) salt, 2) chlorine, caustic soda, and related specialties, 3) electricity and steam cogeneration, 4) hydrocarbon processing, and 5) underground storage. Only one of these divisions is at all comparable to the production of subject merchandise. Pet. Prelim. SVs (December 19, 2022) at Exhibit 10, **PR45**. Further, CYDSA's electricity and steam cogeneration division supplies all electricity needs for the company. These costs are dissimilar to the costs incurred by Respondents and means that CYDSA is at a different level of integration than the Respondents, who purchase electricity. CYDSA is also a massive conglomerate with 20 subsidiaries in 8 different cities in Mexico. Its annual report attests to the numerous brand names the company owns and its extensive plans and initiatives to enhance brand image and invest in development. The advertising and promotion of

numerous global brand names is also radically dissimilar from the respondents' situations. In fact, Heze and Kangtai sell the subject merchandise in containers provided by the customer with the customer's own brand name on it so they do not incur any branding expenses; and neither of the respondents have advertising costs. *Compare Shenzhen Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333, 1383 (Ct. Int'l Trade 2014) (finding the marketing and branding expenses of a large company were critically different for respondent Xinboda.).

Next, the Mexico surrogate value record has another major flaw. The Mexican import values are reported on an FOB basis. Commerce relies on a CIF value and therefore when Commerce relied upon Mexico, it had to add facts available for international freight, marine insurance, and brokerage & handling expenses to each import value to arrive at an approximate CIF value for each of the respondents' material and packing inputs, decreasing the accuracy of each value. While Commerce did make adjustments to the FOB data—it is only a very rough approximation of the actual CIF costs. Therefore, every single import value into Mexico is less preferable than Malaysia, which reports its import values on a CIF basis. Indeed, Commerce has found this to be a tiebreaker between competing surrogate countries, preferring to rely upon the CIF country. *Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value* (July 17, 2019) ("Conversely, the Romanian SV data are already reported on a CIF basis and require no adjustment because they include specific actual costs for inputs used in the production of subject merchandise. While this difference alone may not necessarily be sufficient to determine that Romania is preferable to Brazil as a surrogate country, the totality of the evidence, as discussed above, leads us to find that Romania is the appropriate primary surrogate country in this case."); *Activated Carbon from China* Remand Results, CIT 16-185 (June 17, 2019) at 11 (Selecting Malaysia and finding

"While the underlying record of this administrative review contains international freight SVs to put the Philippine GTA import data on a cost-insurance-and-freight (CIF) basis, the Malaysian GTA import data available on the record are already on a CIF basis.").

Even continuing to find that sodium/calcium hypochlorite are not comparable products does not entail that Commerce must select Mexico. Mexico is not economically comparable to China, thus Mexico and Malaysia would be equally flawed with the first two criteria of Commerce's surrogate country analysis—falling short on one. Using the third criterion, best available information, Malaysia should be selected as the primary surrogate country.

## III. Conclusion and Prayer for Relief

In light of the foregoing, the Department's Remand Results were not supported by substantial evidence or in accordance with the law. Consolidated Plaintiffs respectfully request that the Court remand this case for redetermination of the issues presented in this comment.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Judith L. Holdsworth
Vivien Jinghui Wang
**The Inter-Global Trade Law Group, PLLC**
*Counsel for Consolidated Plaintiffs*

Dated: November 23, 2026

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **3,777** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**The Inter-Global Trade Law Group, PLLC**